# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                          No. CIV 10-0433 JB/SCY

NBA MEDIA VENTURES, LLC,
MLB ADVANCED MEDIA, L.P.,
MERCURY RADIO ARTS, INC.,
GBTV, LLC, MAJOR LEAGUE
BASEBALL PROPERTIES, INC ., &
PREMIERE RADIO NETWORKS, INC.,

      Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                          No. CIV 12-1309 JB/SCY

MLB ADVANCED MEDIA, L.P.,
MERCURY RADIO ARTS, INC.,
d/b/a 'THE GLEN BECK PROGRAM,
INC.', & GBTV, LLC,

      Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                          No. CIV 13-1153 JB/SCY

NBA MEDIA VENTURES,
TURNER SPORTS INTERACTIVE, INC.
& TURNER DIGITAL BASKETBALL
SERVICES, INC.,

Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

     Plaintiff,

vs.                            No. CIV 13-0636 JB/SCY

TURNER SPORTS INTERACTIVE, INC., AND
TURNER DIGITAL BASKETBALL SERVICES,
INC.,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendants [Turner Sports Interactive, Inc. and Turner Digital Basketball Services, Inc.]' Motion for Leave to File Defendants' First Amended Answer, Defenses, and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement, filed October 30, 2013 (Doc. 39 in <u>Front Row Techs., LLC v. Time Warner Inc.</u>, No. CIV 13-0636 JB/SCY (D.N.M.)("Front Row v. Time Warner"))("Motion for Leave"); (ii) Plaintiff Front Row Technologies, LLC's Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 187)[1]; (iii) Plaintiff Front Row Technologies, LLC's Motion to Dismiss NBA Media Ventures, LLC's Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 188); (iv) Plaintiff Front Row Technologies, LLC's Motion to Dismiss GBTV, LLC's & Mercury Radio Arts, Inc.'s Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 189); (v) Plaintiff Front Row Technologies, LLC's Motion to Dismiss Premiere Radio Networks, Inc.'s Inequitable

---

[1]If a document number does not refer to a specific case, the document number is within <u>Front Row Techs., LLC v. MLB Advanced Media, L.P.</u>, No. CIV 10-0433 JB/SCY (D.N.M.)("Front Row v. MLB"), the lead case in this matter.

Conduct Counterclaim, filed November 26, 2013 (Doc. 190); (vi) Plaintiff's 12(b)(6) Motion to

Dismiss Defendants' Inequitable Conduct Counterclaims, filed February 14, 2014 (Doc. 21 in

Front Row Techs., LLC v. NBA Media Ventures, No. CIV 13-1153 JB/SCY (D.N.M.)("Front

Row v. NBA Media"))("Turner Motion to Dismiss"); and (vii) Plaintiff Front Row

Technologies, LLC's Motion to Transfer, filed July 13, 2015 (Doc. 221)("Motion to Transfer").[2]

The Court held a hearing on October 27, 2015 on the Motions to Dismiss (ii)-(v) and the Motion

to Transfer.  The Court did not hold a hearing on the Motion for Leave and the Turner Motion to

Dismiss, but the parties have indicated that the Court heard the substance of these motions at the

October 27, 2015 hearing.  The primary issues are: (i) whether the allegations that attorneys Luis

Ortiz and Kermit Lopez improperly filed patent applications on inventions properly attributed to

Ericsson, Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") in MLB Advanced

Media, L.P.'s Answers and Counterclaims to Plaintiff Front Row Technologies, LLC's Fourth

Amended Complaint, filed October 22, 2013 (Doc. 173)("Counterclaim"),[3] sufficiently allege

---

[2]The text of the Motions to Dismiss described above in (ii)-(vi) is almost identical.  The Court will thus cite only to Front Row Technologies, LLC's Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim as the "Motions to Dismiss" for ease of citation.  It will refer to Defendants MLB Advanced Media, L.P., NBA Media Ventures, LLC, GBTV, LLC, Mercury Radio Arts, Inc., Premiere Radio Networks, Inc., and Turner Sports Interactive, Inc., and Turner Digital Basketball Services, Inc. as the "Counterclaimants."

[3]The other Counterclaimants have either sought leave to file or filed their own Answers and Counterclaims.  See Motion for Leave (attaching "Turner Sports Interactive, Inc. and Turner Digital Basketball Services, Inc.'s First Amended Answer, Defenses, and Counterclaims to Front Row Technologies, LLC's First Amended Complaint for Patent Infringement," a proposed Answer); NBA Media Ventures, LLC's Answer, Defenses, and Counterclaims to Plaintiff's Fourth Amended Complaint for Patent Infringement, filed October 22, 2013 (Doc. 175); Defendants Mercury Radio Arts, Inc.'s and GBTV, LLC's Answer and Counterclaims to Fourth Amended Complaint, filed October 22, 2013 (Doc. 176); Defendant Premiere Radio Networks, Inc.'s Answer to Fourth Amended Complaint and Counterclaim, filed October 22, 2013 (Doc. 177).  Because the Court grants in part the Motion for Leave and the counterclaim-related content of all of these pleadings is almost identical, the Court will cite only to MLB Advanced Media, L.P.'s Counterclaims as the "Counterclaim."

inequitable conduct; (ii) whether the Counterclaim's allegations that Messrs. Ortiz and Lopez affirmatively misled the United States Patent and Trademark Office ("USPTO") by submitting avowedly "independent" declarations from one of their law firm's associates, Dr. Richard Krukar, and their business partner, Tony Verna, sufficiently allege inequitable conduct; (iii) whether the Counterclaim's allegations that Messrs. Ortiz and Lopez concealed adverse Appeals Board decisions from patent examiners sufficiently allege inequitable conduct; (iv) whether the Counterclaim's allegations that Messrs. Ortiz and Lopez withheld material information from examiners handling related, co-pending patent applications sufficiently allege inequitable conduct; (v) whether the Court should transfer this case to the United States District Court for the Eastern District of Texas, because the case could have been brought there and practical factors allegedly favor a transfer; and (vi) whether the Court should permit Turner Sports Interactive, Inc. ("Turner Sports") and Turner Digital Basketball Services, Inc. ("Turner Basketball") to amend their pleadings to assert similar counterclaims against Front Row. The Court concludes that the Counterclaim's allegations related to: (i) Ericsson, Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson"); (ii) Tony Verna's declaration to the USPTO; and (iii) Front Row's failure to disclose material information to examiners handling related, co-pending patent applications do not satisfy rule 9(b)'s particularity requirement. The Court will allow the Counterclaim's allegations related to: (i) Dr. Krukar's declaration to the USPTO; and (ii) Front Row's concealment of adverse Appeals Board decisions to proceed. The Court will thus grant Front Row's Motions to Dismiss in part and deny them in part. In light of the Court's decision, the parties' briefing on the Motion to Transfer is largely moot. The Court will deny the Motion to Transfer without prejudice to Front Row re-filing the motion if it continues to desire transfer down the road. Finally, the Court will grant in part and deny in part the Motion for Leave to

allow Turner Sports and Turner Basketball to assert the remaining inequitable conduct counterclaims against Front Row.

## FACTUAL BACKGROUND

The Court takes its facts from the Counterclaim.  It also draws on the Plaintiff's Fourth Amended Complaint for Patent Infringement and Jury Demand, filed April 23, 2013 (Doc. 149)("Complaint") and Plaintiff Front Row Technologies, LLC's Original Complaint for Patent Infringement, filed July 10, 2013 (Doc. 1 in Front Row v. Time Warner)("Turner Complaint"), for important details where necessary.

### 1.      The Parties.

Plaintiff and Counterdefendant Front Row Technologies, LLC ("Front Row") is a New Mexico limited liability company that holds patents related to streaming video on mobile devices.  See Complaint ¶¶ 1-20, at 1-5.  Attorneys Ortiz and Kermit Lopez founded Front Row in 2000 and are still its owners.  See Counterclaim ¶¶ 18-19, at 37.  They have filed "over twenty [patent] applications that relate to the same general subject matter."  Counterclaim ¶ 19, at 37. Front Row states that it owns "all rights, title, and interest in and under" ten such patents:

1. United States Patent No. 8,090,321 ("321 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on January 3, 2012;

2. United States Patent No. 8,086,184 ("184 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on December 27, 2011;

3. United States Patent No. 8,270,895 ("895 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on September 18, 2012;

4. United States Patent No. 7,812,856 ("856 patent"), titled "Providing Multiple Perspectives of a Venue Activity to Electronic Wireless Hand Held Devices," which duly and legally issued on October 12, 2010;

5.  United States Patent No. 7,796,162 ("162 patent"), titled "Providing Multiple Synchronized Camera Views for Broadcast from a Live Venue Activity to Remote Viewers," which duly and legally issued on September 14, 2010;

6.  United States Patent No. 7,884,855 ("855 patent"), titled "Displaying Broadcasts of Multiple Camera Perspective Recordings from Live Activities at Entertainment Venues on Remote Video Monitors," which duly and legally issued on February 8, 2011;

7.  United States Patent No. 7,782,363 ("363 patent"), titled "Providing Multiple Video Perspectives of Activities through a Data Network to a Remote Multimedia Server for Selective Display by Remote Viewing Audiences," which duly and legally issued on August 24, 2010;

8.  United States Patent No. 8,184,169 ("169 patent"), titled "Providing Multiple Video Perspectives of Activities through a Data Network to a Remote Multimedia Server for Selective Display by Remote Viewing Audiences," which duly and legally issued on May 22, 2012;

9.  United States Patent No. 8,401,460 ("460 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on March 19, 2013; and

10. United States Patent No. 7,376,388 ("388 patent"), titled "Broadcasting Venue Data to a Wireless Hand Held Device," which duly and legally issued on May 20, 2008.

Complaint ¶¶ 11-20, at 3-5.  Front Row alleges that all of these patents are valid and enforceable.

See Complaint ¶¶ 21-31, at 5-6.

Defendant and Counterclaimant MLB Advanced Media, L.P. ("MLB Media") is in the business of broadcasting sporting events through electronic and wireless means, and selling software to support that broadcasting.  See Complaint ¶ 2, at 1-2.  Its primary product relevant to this litigation is "At Bat 13," Major League Baseball's official smartphone application. Complaint ¶ 33, at 6.

Defendants and Counterclaimants Mercury Radio Arts, Inc. and GBTV, LLC create and distribute multimedia content over the internet.  See Complaint ¶¶ 3-4, at 2.  They are both associated with talk show host and radio personality Glenn Beck.  See Complaint ¶¶ 4-5, at 2.

Defendant and Counterclaimant Premiere Radio Networks, Inc. is a "national radio network that produces radio programming and services for radio stations, and distributes its own and various third-party radio programs to radio station affiliates throughout the world." Complaint ¶ 5, at 2.

Defendant and Counterclaimant NBA Media Ventures, LLC ("NBA Media"), like MLB Advanced Media, L.P., is in the business of broadcasting sporting events through electronic and wireless means, and of selling software to support that broadcasting. See Complaint ¶¶ 6, 37, at 2, 8. Its primary products relevant to this litigation are "NBA League Pass Mobile" and "NBA League Pass Broadband," which provide video of National Basketball Association games to consumers over the internet. Complaint ¶¶ 37, at 8.

Turner Sports and Turner Basketball are in the business of broadcasting sporting events through electronic and wireless means. See Turner Complaint ¶ 3, at 2.

The Counterclaimants allege that Messrs. Ortiz and Lopez "engaged in a comprehensive and deliberate scheme to deceive the USPTO and "mislead the patent examiners responsible for reviewing Front Row's numerous patent applications" to obtain the patents relevant to this lawsuit. Counterclaim ¶ 21, at 37. Specifically, they state that Messrs. Ortiz and Lopez are liable for inequitable conduct, because they stole ideas from Ericsson, a former employer/client, and made numerous misrepresentations to the USPTO. See Counterclaim ¶¶ 23, 106, at 38, 60.

2.      **Stolen Ideas.**

Between August 1998 and August 2000, Mr. Lopez was an in-house patent and intellectual property counsel at Ericsson's North American headquarters in Dallas, Texas.  See Counterclaim ¶¶ 23-25, at 38.  Mr. Lopez was responsible for advising Ericsson on patent issues and prosecuting new patents for the firm.  See Counterclaim ¶ 27, at 38 (citing Method and Sys. for Dynamically and Periodically Updating Mobile Station Location Data in a Telecommc'ns Network, U.S. Patent No. 6,119,012 (issued September 12, 2000)).  Mr. Lopez had access to Ericsson's internal information through: (i) its files; (ii) news and status updates; and (iii) Contact, Ericsson's proprietary magazine, which was "distributed to all Ericsson employees worldwide[.]"  Counterclaim ¶ 28, at 38-39.  "In August 2000, approximately two months prior to filing the provisional[4] patent application that led to all Patents-in-Suit, Lopez left Ericsson as in-house patent and intellectual property counsel and joined the law firm of Bickel & Brewer."  Counterclaim ¶ 29, at 39.  Mr. Lopez "continued to represent Ericsson in intellectual property matters as an associate at Bickel & Brewer until he left the law firm in March 2001."  Counterclaim ¶ 29, at 39.

Mr. Ortiz represented Ericsson as outside counsel in intellectual property matters between at least May, 1999, and March, 2001.  See Counterclaim ¶¶ 32-33, at 39 (citing Mr. Ortiz' involvement in U.S. Patent No. 6,505,051).  Although Mr. Ortiz was not Ericsson's employee, he had access to similar information.  See Counterclaim ¶¶ 33-35, at 39-40.

---

[4]"A provisional application provides the means to establish an early effective filing date in a later filed nonprovisional patent application filed under 35 U.S.C. §111(a). It also allows the term 'Patent Pending' to be applied in connection with the description of the invention." Provisional Application for Patent, (Mar. 2008), http://searchunifiedcommunications.techtarget.com/definition/Internet-Protocol.

Messrs. Ortiz and Lopez worked together between August, 2000, and March, 2001, as attorneys at Bickel & Brewer (now Brewer, Attorneys & Counselors), Ericsson's outside counsel.  See Counterclaim ¶ 35, at 40.  "During this time, Ortiz and Lopez filed a provisional patent application and a non-provisional patent application naming themselves as inventors.  On information and belief, neither Ortiz nor Lopez ever disclosed these applications to Ericsson."  Counterclaim ¶ 35, at 40.

<strong>a.     Ericsson's "Arena Project".</strong>

Beginning in 1998, Ericsson began a project known as "The Arena Project," which involved a system designed to provide multimedia services over a wireless network.  Counterclaim ¶¶ 38-39, at 41.  The system used a central server located at a venue to receive, process, and transmit data, including real-time video, over a wireless network.  See Counterclaim ¶ 41, at 41.  It allowed spectators, both inside and outside the arena, to view a sports event from multiple angles, use instant reply, and receive statistics about the ongoing event.   See Counterclaim ¶¶ 41-21, at 41.

Ericsson published issue 8 of its internal magazine, Contact Magazine, on May 18, 2000.  See Counterclaim ¶ 43, at 41.  Mr. Lopez "received a copy of this issue on or around" the same day.  Counterclaim ¶ 44, at 42.  The issue included a prominent article describing the Arena Project and its demonstration at a hockey game in Sweden.  See Counterclaim ¶¶ 45-47, at 42-43.  The article explained that the system allowed journalists to "view the game via a wireless connection to the Internet," adding that it was "the first live transmission over the internet of a professional hockey match."  Counterclaim ¶ 49, at 43.  It also noted that the system relied on

"IP[5] multicast, a technology that makes it possible to save bandwidth[6] when many people are connected" to a live transmission feed.  Counterclaim ¶ 52, at 45.  The system's creators next planned to place sensors and small cameras on the players themselves.  See Counterclaim ¶ 54, at 46.

The same magazine issue featured a second article on the Arena Project.  See Counterclaim ¶ 56, at 46 (citing an article titled "Sports arena a new test lab for Ericsson Research").  The second article explained that Ericsson was "working on radio access networks, algorithms[7] for radio networks, speech coding[8] and radio network performance.  IP can be involved in all these areas."  Counterclaim ¶ 56, at 46-47.  The Counterclaimants say that these articles "described many key aspects of the patent applications that attorneys Ortiz and Lopez later filed," including:

- wireless, real-time transmission of video of a sporting event at a venue

- simultaneously transmitting multiple perspectives of a venue-based activity to a display

---

[5]The Internet Protocol ("IP") "is the method or protocol by which data is sent from one computer to another on the Internet.  Each computer (known as a host) on the Internet has at least one IP address that uniquely identifies it from all other computers on the Internet."  Internet Protocol Definition, TECHTARGET NETWORK (Mar. 2008), available at http://searchunifiedcommunications.techtarget.com/definition/Internet-Protocol.

[6]Bandwith is "a synonym for data transfer rate, the amount of data that can be carried from one point to another in a given time period (usually a second)."  Bandwith Definition, TECHTARGET NETWORK (Aug. 2014), http://searchenterprisewan.techtarget.com/definition/bandwidth.

[7]An algorithm is a procedure or formula that can be used to solve a problem.  A computer program is a sort of elaborate algorithm.  See Algorithm Definiton, TECHTARGET NETWORK (Jul. 2014), http://whatis.techtarget.com/definition/algorithm.

[8]"Speech coding is the process of obtaining a compact representation of voice signals for efficient transmission over band-limited wired and wireless channels and/or storage."  Mark Hasegawa-Johnson and Abeer Alwan, Speech Coding: Fundamentals and Applications, WILEY ENCYCLOPEDIA OF TELECOMMUNICATIONS (2003 ed.) at EOT156.

- receiving venue-based data, including video, on a Smart phone

- transmitting statistics and instant replay as venue-based data

- transmitting "in-play" camera angles from players' helmets as venue-based data

Counterclaim ¶ 58, at 47.  They conclude that Messrs. Ortiz and Lopez were aware of the Arena Project and its intellectual property implications.  See Counterclaim ¶¶ 59-60, at 47-48.

### b.   Ericsson's "America's Cup Project".

In late 1999, Ericsson began a collaboration with a New Zealand company to cover the America's Cup, a famous yacht race, with wireless internet technology.  See Counterclaim ¶¶ 61-62 at 48.  The project, known as the America's Cup Project, would transmit real-time GPS information and statistics to spectators, in particular those using Ericsson's "smart phones with WAP (Wireless Application Protocol)[9] capability."  Counterclaim ¶ 61, at 48.

Ericsson published issue 14 of its Contact Magazine on September 16, 1999.  See Counterclaim ¶ 64, at 49.  The issue included a special "Contact IT/IP" supplement, which featured the America's Cup Project on its front page.  Counterclaim ¶ 67, at 49.  The article described how the America's Cup Project provided viewers with a choice of camera angles, speed and direction indicators for boats and the wind.  See Counterclaim ¶¶ 68-70, at 49-50.

Ericsson also described the America's Cup Project in issue 3 of its Contact Magazine, which it published in March 2000.  See Counterclaim ¶ 66, at 49.  This article also detailed how

---

[9]WAP "is a specification for a set of communication protocols to standardize the way that wireless devices, such as cellular telephones and radio transceivers, can be used for Internet access."  See WAP (Wireless Application Protocol) Definition, TECHTARGET NETWORK (Nov. 2010), http://searchmobilecomputing.techtarget.com/definition/WAP.

spectators could use Ericsson's system to view various camera angles and receive information on racing conditions.  See Counterclaim ¶ 75, at 52.

The Counterclaimants say that these articles "described many key aspects of the patent applications that attorneys Ortiz and Lopez later filed," including:

- wireless transmission of statistics and GPS data regarding a live sporting event

- wireless transmission of statistics and GPS data over a cellular network

- simultaneous display of images from multiple camera angles generated from data received over a wireless network

- a system adaptable to other sports, including auto-racing

- a system adaptable to support more resource-intensive features as technology progressed

Counterclaim ¶ 58, at 47.  They conclude that Messrs. Ortiz and Lopez were aware of the America's Cup Project and its intellectual property implications.  See Counterclaim ¶¶ 78-79, at 53.

### c.        Front Row's Patent Applications.

As discussed above, Messrs. Ortiz and Lopez both worked at Bickel & Brewer, Ericsson's outside counsel, in August 2000.  See Counterclaim ¶ 80, at 53.  They state that they conceived of their invention on August 25, 2000 -- only days after Mr. Lopez departed from his in-house counsel position at Ericsson.  See Counterclaim ¶ 81, at 53.  They filed their first patent applications while they were still working for Ericsson, but failed to disclose their work for Ericsson to the USPTO.  See Counterclaim ¶ 85, at 54.

Before December 13, 2001, Ericsson was planning a public announcement of its "Event System," the commercialized version of its earlier Arena Project.  Counterclaim ¶ 87, at 54.  The Event System involves the use of in-play cameras, such as those placed on athletes' or referees'

- 12 -

helmets.  See Counterclaim, ¶ 87, at 54-55.  Messrs. Ortiz and Lopez were aware of the Event System before December 13, 2001, through their connections to Ericsson.  See Counterclaim ¶¶ 93-94, at 56.  On December 13, 2001 -- one day before Ericsson publicly announced this event system -- Messrs. Ortiz and Lopez filed a patent application asserting, for the first time, "the use of 'in-play' cameras as part of a wireless video system."  Counterclaim ¶ 88, at 55.  Ericsson's announcement led to several news articles that mentioned features similar to the features listed in Messrs. Ortiz and Lopez' patent application, such as helmet-mounted cameras.  See Counterclaim ¶¶ 89-92, at 55-56.

Messrs. Ortiz and Lopez did not disclose Ericsson's Arena, Event, or America's Cup Projects to the USPTO.  See Counterclaim ¶ 95, at 57.  They instead "took essential parts of the projects and filed patent applications on them as if they had invented it instead of the scientists and engineers of their client."  Counterclaim ¶ 95, at 57.  "Ortiz and Lopez deliberately chose a conception date after Lopez left Ericsson in order to avoid Lopez's contractual obligation to assign, or at least disclose, his applications to Ericsson."  Counterclaim ¶ 96, at 57.  Messrs. Ortiz and Lopez have filed over twenty patent applications, "nearly all of which claim priority back to the provisional application filed October 26, 2000," and all of which "generally related to wireless transmission of venue-based data during live events."  Counterclaim ¶ 100, at 58. Neither attorney disclosed any information related to Ericsson's projects in their patent applications.  See Counterclaim ¶ 100, at 58.

> Federal regulations require that every applicant submit an oath or declaration along with the patent application.  In particular, 37 C.F.R. § 1.63 requires that the person(s) signing the oath or declaration declare that he or she "believes the named inventor or inventors to be the original and first inventor or inventors of the subject matter which is claimed and for which a patent is sought."

Counterclaim ¶ 101, at 58.  Messrs. Ortiz and Lopez allegedly submitted at least eighteen false declarations in connection with their patent applications; although they knew that they had stolen the ideas, they nonetheless certified that they were the inventions' true and individual inventors. See Counterclaim ¶¶ 102-104, at 58-60.  Their misconduct "was but-for material to each and every one of the patents-in-suit, as the PTO would certainly not have issued patents . . . had they not falsely sword that they were the original inventors."  Counterclaim ¶ 103, at 59.  The Counterclaimants thus argue that none of the patents are enforceable.  See Counterclaim ¶ 105, at 60.

### 2.     Material Misrepresentations to the USPTO.

The USPTO requires any individual "associated with the filing and prosecution of a patent application" to "disclose to the [USPTO] all information known to that individual to be material to patentability . . . ."  Counterclaim ¶ 107, at 60 (citing 37 C.F.R. § 1.56).  These individuals have a "duty of candor and good faith in dealing with the [USPTO]."  Counterclaim ¶ 107, at 60 (citing 37 C.F.R. § 1.56).

Messrs. Ortiz and Lopez affirmatively misled the USPTO by submitting declarations that they falsely represented were "independent" analyses in favor of their patents.  Counterclaim ¶ 110, at 61.  These declarations came from the pair's business partners and employees.  See Counterclaim ¶ 106, at 60.  First, Messrs. Ortiz and Lopez submitted a declaration from Dr. Krukar (the "Dr. Krukar Declaration"), a computer engineer, which they describe as "independent analysis."  Counterclaim ¶ 111, at 61.  The Dr. Krukar Declaration did not disclose that he was an associate at Messrs. Ortiz and Lopez' law firm.  See Counterclaim ¶ 111, at 61.

Second, Messrs. Ortiz and Lopez submitted a declaration from Tony Verna (the "Verna Declaration"), the inventor of instant replay, to overcome the USPTO's objections to Verna's

patent.  See Counterclaim ¶ 167, at 74.  The Verna Declaration stated that Verna was "retained by Front Row Technologies" for purposes of reexamination.  Counterclaim ¶ 112, at 61-62.  Messrs. Ortiz and Lopez repeatedly, however, suggested that Verna was an independent expert, despite that he "was their business partner and a co-inventor with them on other patent applications."  Counterclaim ¶ 112, at 61-62.  They even filed their first provisional patent application with Verna the day after Verna signed his supposedly independent Declaration.  See Counterclaim ¶ 181, at 77.

For each of these incidents, the Counterclaimants attempt to demonstrate that the misrepresentation was material to patentability.  For the Dr. Krukar Declaration, they contend that the misstatements were "affirmative egregious misconduct that is inherently material."  Counterclaim ¶ 143, at 68.  Furthermore, they allege that the original misconduct made further patents unenforceable, both directly and "under the doctrine of infectious unenforceability."[10]  Counterclaim ¶ 147, at 69.  The Counterclaimants make similar contentions regarding the Verna Declaration.  See Counterclaim ¶¶ 193-195, at 80.

### 3.    Concealed Adverse Decisions.

The Board of Patent Appeals and Interferences ("Appeals Board") is the appellate body for the USPTO.  See Counterclaim ¶ 201, at 82.  It reviews patent examiners' final application rejections, reviews appeals of reexaminations, and gives guidance to patent prosecution attorneys and patent adjudicators.  See Counterclaim ¶ 201, at 82.  Its decisions govern further examinations in the USPTO.  See Counterclaim ¶ 201, at 82.

---

[10]Infectious unenforceability is one name for a general doctrine under which a fraud in obtaining any claim renders an entire patent invalid.  Even claims not obtained through inequitable conduct are unenforceable.  See Baxter Int'l Inc. v. McGaw, Inc., 958 F. Supp. 1313, 1315 (N.D. Ill. 1997) reversed on other grounds by 149 F.3d 1321 (Fed. Cir. 1998).

Patent attorneys "have a duty to bring to the attention of the examiner . . . information within their knowledge as to other co-pending United States applications which are 'material to patentability' of the application in question."  Counterclaim ¶ 203, at 82 (quoting The Manual of Patent Examining Procedure (MPEP) § 2001.06(b)).  Patent attorneys' duty of candor and good faith requires that inventors disclose adverse USPTO Appeals Board decisions, which are material to their arguments in related applications.  See Counterclaim ¶ 203, at 82.

The USPTO's Appeals Board issued a decision that rejected "several of Ortiz and Lopez's arguments about the teachings of, and motivations to combine, the prior art." Counterclaim ¶ 202, at 82 (referring to the decision as the "Board's Decision").  The Board's Decision denied several of Messrs. Ortiz and Lopez' claims on the grounds that they would be obvious to a person of skill in the art.  See Counterclaim ¶ 216, at 85.  It rejected their argument that their proposed use of a server distinguished their invention from prior art, noting that the prior art's analog[11] interface was "equivalent to the server of the claimed invention since it performs the same functions of processing the video data and distributing it back to the user." Counterclaim ¶ 217, at 85.

Messrs. Ortiz and Lopez failed to disclose the Board's Decision as they prosecuted related patents, "and even asserted arguments that they knew were directly contrary to the Board's Decision."  Counterclaim ¶ 204, at 83.  For example, they continued to argue that their use of a server instead of an analog system distinguished their system from prior art.  See Counterclaim ¶ 224, at 87.

---

[11]An analog device or system represents changing values as continuously variable physical quantities.  A clock with continuously-moving hands, for example, can indicate every possible time of day.  A digital clock, in contrast, can only indicate a finite number of different times.    See  Webopedia:  Analog,  IT  BUSINESS  EDGE  (2015), http://www.webopedia.com/TERM/A/analog.html.

The Counterclaimants assert that the Board's Decision "was material to the prosecution of these related patents, and Messrs. Ortiz and Lopez's deceitful misconduct violated their duties of candor and good faith."  Counterclaim ¶ 204, at 83.  They explain that certain patents are unenforceable because, but for Messrs. Ortiz and Lopez' deceit, the examiners would never have allowed their claims.  See Counterclaim ¶ 205, at 83.

### 4.     Withheld Material Information from Related Co-Pending Applications.

The MPEP "specifically states that applicants 'have a duty to bring to the attention of the examiner . . . information within their knowledge as to other copending United States applications which are 'material to patentability' of the application in question.'" MPEP § 2001.06(b).  The MPEP  also "declares that the individuals covered by 37 CFR 1.56 cannot assume that the examiner of a particular application is necessarily aware of other applications which are 'material to patentability' of the application in question, but must instead bring such other applications to the attention of the examiner."  Counterclaim ¶ 282, at 100 (citing MPEP § 2001.06(b)).  These duties to disclose material information also include an obligation to disclose "prior art references and office actions[12] of record in the co-pending applications if those references and office actions are 'material to patentability' of the application."  Counterclaim ¶ 283, at 100 (citing MPEP § 2001.06(b)).  Finally, patent attorneys have separate duties of candor and good faith, which require them to "disclose co-pending applications they have filed regarding similar subject matter."  Counterclaim ¶ 282, at 100.  These various duties are meant, in part, to prevent prosecuting attorneys from engaging in "examiner shopping."  Counterclaim ¶ 284, at 100.

---

[12]An "office action" is a written letter from a patent examiner that requires a signed written response from a patent applicant in order for the applications processing to continue. Responding to Office Actions, UNITED STATES PATENT AND TRADEMARK OFFICE (2015), http://www.uspto.gov/patents-maintaining-patent/responding-office-actions.

Messrs. Ortiz and Lopez allegedly violated these duties of disclosure by concealing material information, selectively disclosing information, and misrepresenting their disclosure with intent to deceive the USPTO.  See Counterclaim ¶ 285, at 101.  Front Row filed three "nearly identical" patent applications covering "a hand held device for display of venue-based data, including video data, transmitted from at least one venue-based source."  Counterclaim ¶ 296, at 103.  All three applications sometimes used the same language, including a representation that "[t]he key aspect of [our] invention is simultaneous viewing of more than one video image captured by cameras at an entertainment venue on a single display associated with hand held devices."  Counterclaim ¶ 299, at 104.  Messrs. Ortiz and Lopez filed all three submissions within one week.  See Counterclaim ¶ 299, at 104.

Despite these similarities, Messrs. Ortiz and Lopez withheld the following information from patent Examiner Tilahun Gesesse: (i) co-pending applications with substantially similar claims; (ii) office actions in the co-pending applications; and (iii) prior art references cited in the office actions in the co-pending applications.  See Counterclaim ¶ 286, at 101.  For example, Messrs. Ortiz and Lopez submitted Information Disclosure Statements ("IDS")[13] to Gesessee that did not disclose the other two similar applications pending before other examiners.  See Counterclaim ¶ 301, at 104.  They also concealed other examiners' decisions to reject "nearly identical" claims.  Counterclaim ¶¶ 306-07, at 105.

The Counterclaimants argue that this inequitable conduct made numerous patents unenforceable, either directly or under the doctrine of "infectious unenforceability."

---

[13]An Information Disclosure Statement ("IDS") is a form patent applicants must send to the USPTO detailing all prior art references that would be material to the patent examiner in determining patentability.  See Todd L. Juneau, Jill K. MacAlpine, Protecting Patents from the Beginning: The Importance of Information Disclosure Statements During Patent Prosecution, 82 J. PAT. & TRADEMARK OFF. SOC'Y 577, 578 (2000).

Counterclaim ¶¶ 289-90, at 101-02.  Directly, the additional information would have led Gesesse to issue a double-patenting rejection.[14]  See Counterclaim ¶ 353, at 115.  Indirectly, the same information would have made other related patents unenforceable.  See Counterclaim ¶ 376, at 122.

     5.     **"Pattern of Misconduct".**

The MPEP requires that, "[w]here the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office."  Counterclaim ¶ 379, at 123 (citing MPEP § 2001.06(c)).  On September 29, 2008, Messrs. Ortiz and Lopez, as Front Row's principals, filed suit against several defendants on patent infringement grounds.  See Counterclaim ¶¶ 379-380, at 123.  Neither attorney disclosed this litigation's existence to "any of the examiners of the related, pending applications." Counterclaim ¶ 381, at 123.  The Counterclaimants then sum up their account of Messrs. Ortiz and Lopez' misconduct:

- Claiming the work of Ericsson and its engineers as their own invention

- Using their position of trust as legal counsel for Ericsson for their own personal gain

- Submitting declarations from interested parties without disclosing their interest

---

[14]"There are generally two types of double patenting rejections. One is the 'same invention' type double patenting rejection based on 35 U.S.C. § 101 which states in the singular that an inventor 'may obtain a patent.'  The second is the 'nonstatutory-type' double patenting rejection based on a judicially created doctrine grounded in public policy and which is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent."  The Manual of Patent Examining Procedure (MPEP) § 804.

- Selectively disclosing information about a declarant to bolster his credibility as an expert while concealing information that would show his bias or interest

- Repeatedly and affirmatively misrepresenting that a declarant is independent when, in fact, the declarant has a clear business relationship with Ortiz and Lopez

- Concealing unfavorable authority of the Appeals Board from examiners of related patents

- Affirmatively presenting claims or arguments of patentability that they knew had been previously rejected by the Appeals Board

- Engaging in "examiner shopping" by filing multiple applications drawn to the same subject matter without disclosing the existence of those co-pending applications

- Withholding prior art references and office actions of record in co-pending applications from examiners of related applications drawn to the same subject matter

- Intentionally waiting for years to disclose prior art, which they had long known was material, until after they had secured patents from a particular examiner

- Affirmatively misrepresenting the completeness and timeliness of their belated disclosure of material information

- Selectively disclosing one co-pending application while withholding other, more material co-pending applications in order to create the misleading impression that they had fully disclosed all related applications

Counterclaim ¶ 383, at 123-124.

## **PROCEDURAL BACKGROUND**

The current case consists of four consolidated cases.  Front Row filed its first lawsuit in the District of New Mexico on May 5, 2010.  <u>See</u> Plaintiff's Original Complaint for Patent Infringement and Jury Demand, filed May 5, 2010 (Doc. 1)(filed in Front Row v. MLB).  Front Row filed its second lawsuit on May 25, 2012 in the United States District Court for the Northern District of Texas.  <u>See</u> Complaint, filed May 25, 2012 (Doc. 1)(filed in <u>Front Row</u>

Techs., LLC v. MLB Advanced Media, L.P., No. 3:12-cv-01639-K (N.D. Tex.)("Texas Action")).  On December 17, 2012, the Honorable Ed Kinkeade, United States District Judge for the Northern District of Texas, transferred the Texas Action to the District of New Mexico.  See Order, filed December 17, 2012 (Doc. 44 in the Texas Action).  The Texas Action then received a new case number, No. CIV 12-1309 JB/SCY (D.N.M.).  On February 12, 2013, the Honorable District Judge William P. Johnson consolidated the Texas Action with Front Row v. MLB.  See Order Consolidating Civil Cases, filed February 12, 2013 (Doc. 65 in the Texas Action).

Front Row filed its third lawsuit on July 10, 2013.  See Plaintiff Front Row Technologies, LLC's Original Complaint for Patent Infringement, filed July 10, 2013 (Doc. 1 in Front Row v. Time Warner).  The Court granted the parties' joint consolidation motion on December 3, 2013.  See Proposed Order, filed December 3, 2013 (Doc. 43 in Front Row v. Time Warner).

Front Row filed its fourth lawsuit on December 5, 2013.  See Plaintiff Front Row Technologies, LLC's Original Complaint for Patent Infringement, filed December 5, 2013 (Doc. 1 in Front Row v. NBA Media).  The Honorable District Judge Judith C. Herrera consolidated the case with Front Row v. MLB on April 22, 2014.  See Order of Consolidation, filed April 22, 2014 (Doc. 65 in Front Row v. NBA Media).

1.      **The Complaint.**

Front Row filed its Fourth Amended Complaint on April 23, 2013.  See Complaint at 1.  The Complaint alleges that the Defendants infringed its patents by: (i) selling applications that capture live video of entertainment events and transmit it over a cellular communications network to hand-held mobile devices; and (ii) knowingly inducing their customers to infringe on the patent by providing applications that those customers would use to access live video of entertainment events.  See Complaint ¶¶ 33-37, at 6-8.  They target in particular Major League

Baseball's MLB.TV, At Bat 13, Postseason.TV, MiLB.TV, and MiLB applications; the National Basketball Association's NBA League Pass Mobile and NBA League Pass Broadband applications; and Mercury Radio Arts, Inc., GBTV, LLC, and Premiere Radio Networks, Inc.'s TheBlaze TV and TheBlaze TV Plus applications.  See Complaint ¶¶ 33, 35, 37, at 6-8.

Front Row seeks extensive relief against all Defendants, including: (i) a declaration that Front Row "exclusively owns" all of the patents; (ii) a declaration that all of the patents are valid and enforceable; (iii) a declaration that all of the Defendants are liable for past and present infringement, "both literally and under the doctrine of equivalents," on certain patents; (iv) all damages to which Front Row is entitled; and (vi) permanent injunctions against the Defendants for infringing certain patents.  Complaint ¶¶ (a)-(f), at 32-33.

### 2.   The Answers and Counterclaims.

The Counterclaimants responded to the Complaint with four similar pleadings on October 22, 2013.  See MLB Advanced Media, L.P.'s Answers and Counterclaims to Plaintiff Front Row Technologies, LLC's Fourth Amended Complaint, filed October 22, 2013 (Doc. 173)("Counterclaim");[15] NBA Media Ventures, LLC's Answer, Defenses, and Counterclaims to Plaintiff's Fourth Amended Complaint for Patent Infringement, filed October 22, 2013 (Doc. 75); Defendants Mercury Radio Arts, Inc.'s and GBTV, LLC's Answer and Counterclaims to Fourth Amended Complaint, filed October 22, 2013 (Doc. 76); Defendant Premiere Radio Networks, Inc.'s Answer to Fourth Amended Complaint and Counterclaim, filed October 22, 2013 (Doc. 177).

---

[15]The Court will cite only to MLB Advanced Media, L.P.'s Answers and Counterclaims as the "Counterclaim" because the counterclaim-related content of all of these pleadings is almost identical.

The 400-paragraph Counterclaim first alleges that all of Front Row's patents "are invalid and unenforceable for failure to comply with Title 35 of the U.S. Code." Counterclaim ¶ 14, at 36. It then alleges that, in any case, the Counterclaimants did not infringe, directly or indirectly, any of the relevant patents' claims. See Counterclaim ¶16, at 36. Third, relying on the allegations described above, the Counterclaimants allege that all of Front Row's patents are unenforceable, because Messrs. Ortiz and Lopez engaged in inequitable conduct. See Counterclaim ¶¶ 17-402, at 37-126.

The Counterclaimants seek relief against Front Row, including: (i) a declaration that they have not infringed any of Front Row's patents; (ii) a declaration that Front Row's patents are invalid and unenforceable; (iii) a declaration that Front Row is not entitled to damages or any injunctive relief against them; (iv) a preliminary and permanent injunction against Front Row preventing it from asserting patent infringement with respect to any of the relevant patents; (v) attorney's fees and costs under 35 U.S.C. § 285; and (vi) "such further and additional relief as the Court deems just and proper." Counterclaim ¶¶ (a)-(f), at 126-127.

### 3. The Motion for Leave.

On October 30, 2013, Turner Sports and Turner Basketball[16] filed the Motion for Leave to assert the same counterclaim allegations against Front Row. See Motion for Leave at 1-6. The Motion for Leave first emphasizes the liberal nature of leave to amend under rule 15(a) of the Federal Rules of Civil Procedure. See Motion to Amend at 2. It contends that the proposed amendment does not involve delay, bad faith, or any dilatory motive, see Motion for Leave at 3; that Front Row will not be prejudiced, because it "filed an amended complaint less than two

---

[16]As discussed above, the Court will include Turner Sports Interactive, Inc. and Turner Digital Basketball Services, Inc. within the term "Counterclaimants" for the sake of simplicity.

months ago" and faces overlapping counterclaims from other defendants, Motion for Leave at 3-4; and that granting leave to amend will not be futile, see Motion for Leave at 4-6.

Front Row responded on November 26, 2013.  See Plaintiff Front Row Technologies, LLC's Opposition to Defendants' Motion for Leave to Amend, filed November 26, 2013 (Doc. 42 in Front Row v. Time Warner)("Leave Response").  Front Row argues that Turner Sports and Turner Basketball filed the Motion for Leave in bad faith, see Leave Response at 5-6; and that leave to amend would be futile because the proposed allegations fail to satisfy rule 9(b)'s particularity requirement, see Leave Response at 6-10.  Front Row also attached a series of affidavits denying the counterclaim allegations.  See Leave Response at 14-61.

 Turner Sports and Turner Basketball replied on December 20, 2013.  See Defendants' Reply in Support of their Motion for Leave to File Defendants' First Amended Answer, Defenses, and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement, filed December 20, 2013 (Doc. 46 in Front Row v. Time Warner)("Leave Reply").  The Leave Reply contends that the accusations of bad faith are "baseless," noting that Front Row cannot "prevent the assertion of a claim simply by producing a declaration from an interested party." Leave Reply at 2.  It argues that Front Row attacks only the weight of the evidence and not the sufficiency of its proposed pleadings.  See Leave Reply at 8.

### 4.    The Motions to Dismiss.

Front Row moved to dismiss the Counterclaimants' inequitable conduct counterclaims on November 26, 2013.  See Motions to Dismiss at 1.  It advances two principal arguments: (i) that the Counterclaim fails to satisfy rule 9(b)'s particularity requirement; and (ii) that the Counterclaimants acted in bad faith, and solely to slander and intimidate Messrs. Ortiz and Lopez.  See Motions to Dismiss at 1.

Front Row places most of its reliance on the Counterclaim's inconsistency with rule 9(b). It contends that "[i]nequitable conduct is a species of fraud that must be pled with particularity under Federal Rule of Civil Procedure 9(b)."  Motions to Dismiss at 6 (citing Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009)("Exergen")("Inequitable conduct, while a broader concept than fraud, must be pled with particularity under Rule 9(b).")(internal quotation omitted)).  It argues that rule 9(b) permits pleading "on information and belief" only when "essential information lies *uniquely within another party's control*, but only if the pleading sets forth the facts on which the belief is reasonably based."  Motions to Dismiss at 6 (emphasis in Motions)(quoting Exergen, 575 F.3d at 1330).   It then notes that: (i) the Counterclaimants base most of their allegations on information that they could have obtained from third parties, such as Bickel & Brewer, LLP and Ericsson; and (ii) no "specific facts upon which the belief is reasonably based" support the allegations.  Motions to Dismiss at 6 (quoting Exergen, 575 F.3d at 1330).  They add that the Counterclaimants have not "issued a single subpoena, ha[ve] not deposed a single witness, and ha[ve] not produced a single document evidencing that its allegations against Kermit [Lopez] and Luis [Ortiz] can be corroborated, much less proven."  Motions to Dismiss at 6-7.

Front Row begins its argument on this point by questioning whether Mr. Lopez had access to Ericsson's proprietary information.  See Motions to Dismiss at 7.  It notes that Ericsson employed 105,100 people worldwide during the events in question.  See Motions to Dismiss at 7. It states that Mr. Lopez was a "low-level intellectual property attorney employed in Richardson, Texas" assigned "to prosecute patents based on the inventions created by fellow employees" in the Texas office.  Motions to Dismiss at 7.  It notes that Mr. Lopez had no access to any other research and development information, and that the Projects mentioned in the Counterclaim took

place in Luleå, Sweden.   See Motions to Dismiss at 7.   It thus concludes that the Counterclaimants' assertions of Mr. Lopez' knowledge are "not reasonably based on any specific facts that have been alleged, and . . . in fact demonstrably false."  Motions to Dismiss at 7.

Front Row then turns to the Counterclaimants' Contact Magazine theory.  It notes that "[i]t is not reasonable to infer that Ericsson AB printed and distributed copies of Contact to each and every one of its 105,100 worldwide employees or that it was required reading."  Motions to Dismiss at 9.  Mr. Lopez, it explains, has no memory of ever having read or seen the magazine before reading the Counterclaim.   See Motions to Dismiss at 9.   It concludes that the Counterclaimants cannot reasonably infer that Mr. Lopez either read Contact or was aware of Ericsson's various Projects from the specific facts presented.  See Motions to Dismiss at 9.

Front Row is even more dismissive of Mr. Ortiz' possible knowledge of Ericsson's Projects.  See Motions to Dismiss at 10.  It points out that there is no explanation why or how Mr. Ortiz would have received Contact Magazine.  See Motions to Dismiss at 10.  It contrasts the Counterclaimants' statement that Mr. Ortiz had access to "[o]ther sources of information available to Ericsson's outside counsel or the public in general," with Mr. Ortiz' denial that he "had 'no knowledge of the Arena project, the Virtual Spectator project, the America's Cup Project or the Event System project."  Motions to Dismiss at 10.

Front Row concludes by emphasizing that the Counterclaimants' allegations are "highly inflammatory and potentially career-threatening," and that their willingness to "slander the reputations of two upstanding New Mexico attorneys is reprehensible" and contrary to their professional obligations as lawyers.  Motions to Dismiss at 11.  It notes that it provided their attorneys with "with sworn testimony and other documentary evidence demonstrating the falsity of [their] allegations," without any effect on the case.  Motions to Dismiss at 2.  Front Row

concludes that the Court should dismiss "paragraphs 17-105" of the Counterclaim.  Motions to Dismiss at 11.

### 5. Counterclaimants' Responses.

Three sets of Counterclaimants filed their responses on December 20, 2013.  See Defendant Major League Baseball Advanced Media's Opposition to Plaintiff Front Row's Motion to Dismiss, filed December 20, 2013 (Doc. 194)("MLB Response"); GBTV, LLC, Mercury Radio Arts, Inc. and Premiere Radio Networks Inc.'s Opposition to Plaintiff's Motion to Dismiss, filed December 20, 2013 (Doc. 195)("Beck Response"); NBA Media Ventures, LLC's Opposition to Plaintiff Front Row Technologies, LLC's Motion to Dismiss Inequitable Conduct Counterclaim, filed December 20, 2013 (Doc. 196)("NBA Response").  The remaining Counterclaimants filed their response on March 3, 2014.  See Defendants' Opposition to Plaintiff's 12(b)(6) Motion to Dismiss Inequitable Counterclaims, filed March 3, 2014 (Doc. 38 in Front Row v. NBA Media)("Turner Response").  The Counterclaimants' response briefs are not quite identical, so the Court will discuss them separately.  They raise similar, but slightly distinct, arguments to rebut Front Row's arguments.

### a. MLB Media's Response.

MLB Media begins by highlighting the limited nature of the Motions to Dismiss, noting that Front Row's Motions to Dismiss focused narrowly on the relationship among Messrs. Ortiz and Lopez, and Ericsson.  See MLB Response at 1.  First, it notes that "Front Row makes no attempt to deny or dismiss the other serious allegations of misconduct described in paragraphs 106 to 384."  MLB Response at 1.  Second, it contends that Front Row "only challenges the factual veracity of MLBAM's allegations rather than their legal sufficiency."  MLB Response at 1.  It says that it pled "facts that are more than sufficient to create a reasonable inference that

Ortiz and Lopez knew of Ericsson's projects, took ideas from them, and failed to disclose them to the PTO."  MLB Response at 1.

MLB Media then moves to shore up its Counterclaim's sufficiency.  See MLB Response at 10-17.  It explains that Exergen requires the party alleging inequitable conduct to "identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  MLB Response at 10 (quoting Exergen, 575 F.3d at 1326).  It provides a chart listing each element, relying on Contact Magazine for the "where."  MLB Response at 11.  It adds that the proper legal standard requires the Court to focus solely on its allegations and exhibits, ignoring any of Front Row's extrinsic evidence.  See MLB Response at 11.

MLB Media then focuses on subsections of Front Row's Motions to Dismiss.  See MLB Response at 15.  First, it argues that it has sufficiently pled Messrs. Ortiz and Lopez' knowledge of the Arena Project and of the America's Cup Project.  See MLB Response at 15.  It contends that the Court may infer Messrs. Ortiz and Lopez' access to internal information, because: (i) "they filed patents in this area on Ericsson's behalf,"  MLB Response at 16; (ii) "Ericsson freely distributed information about its Arena Project and America's Cup Project," MLB Response at 16; and (iii) Mr. Lopez received copies of Contact Magazine, because he worked as an IP counsel for Ericsson, see MLB Response at 16.  It cites cases involving "publications that were widely known in the art," Johnson Outdoors Inc. v. Navico Inc., 774 F. Supp. 2d 1191, 1200 (M.D. Ala. 2011)(Watkins, J.); documents referenced at a meeting that at least one inventor attended, see HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d 146, 151 (D.D.C. 2009)(Collyer, J.); and a reference presented or discussed at a conference "where reference was presented or discussed, see Aerocrine AB v. Apieron Inc., 2010 WL 1225090, at *10 (D. Del.

March 30, 2010)(Stark, J.).  It also contends that the Court cannot require it to show that Contact Magazine was "required reading" for all Ericsson employees, "particularly at the pleading stage."  MLB Response at 14.  In any case, it says, the magazine was available online, regardless whether Ericsson distributed it to all employees in print.  See MLB Response at 14.  It dismisses Front Row's declarations that Messrs. Ortiz and Lopez were not aware of Ericsson's Projects on the grounds that they are "irrelevant and improper on a motion to dismiss."  MLB Response at 15 (citing Auxilium Pharms., Inc. v. Watson Labs., Inc., No. 12-3084, 2013 WL 5503209, at *5, 7 (D.N.J. Oct. 2, 2013)(Hammer, J.)).  It contends that Front Row's arguments are analogous to those of a defendant who simply declares, at the pleading stage, that it lacked the requisite state of mind.  See MLB Response at 15.

Second, MLB Media makes the same argument for Messrs. Ortiz and Lopez' intent.  It points to several allegations of knowledge and materiality in the Counterclaim, including, among others: (i) the suspicious timing of Messrs. Ortiz and Lopez' supposedly new idea; (ii) the suspicious timing of their patent application -- one day before Ericsson's public announcement for the Event System; (iii) Messrs. Ortiz and Lopez' failure to disclose any Ericsson Projects as prior art; and (iv) Messrs. Ortiz and Lopez' financial interests in deception.  See MLB Response at 16.  It states that these "multiple instances of misconduct" are sufficient to support a reasonable inference that Messrs. Ortiz and Lopez acted with deceptive intent.  MLB Response at 16.

Third, MLB Media defends its use of "on information and belief" allegations in the Counterclaim.  It argues that "[w]hether the individuals prosecuting the [patent-in-suit] had knowledge or intent to deceive the PTO falls within the category of information that lies uniquely within another party's control," thus allowing the use of these allegations.  MLB

Response at 17 (citing <u>Johnson Outdoors Inc. v. Navico Inc.</u>, 774 F. Supp. 2d at 1200).  It notes that it relies both on these allegations and on specific facts.  <u>See</u> MLB Response at 17.

MLB Media reiterates that Front Row's extrinsic evidence is irrelevant.  <u>See</u> MLB Response at 18.  It contends that the Court cannot consider this evidence because: (i) Front Row did not incorporate it into the Complaint by reference; and (ii) it is not subject to judicial notice. <u>See</u> MLB Response at 18.  To review this evidence, MLB Media argues, the Court would have to convert Front Row's rule 12(b)(6) motion to dismiss into a rule 56 motion for summary judgment.  <u>See</u> MLB Response at 18.  Summary judgment, it says, would be premature, given that it has had neither a scheduling conference nor an opportunity to conduct full discovery.  <u>See</u> MLB Response at 18.

As a fallback, MLB Media contends that Front Row's extrinsic evidence supports its allegations.  It notes that Front Row's documents confirm its allegations about Mr. Lopez' employment, that Mr. Lopez had access to confidential information, and that Messrs. Ortiz and Lopez both knew that there was clear overlap between their inventions and Ericsson's Event System as early as April 2002.  <u>See</u> MLB Response at 19.  MLB Media dismisses declarations from Messrs. Ortiz and Lopez as "uncorroborated" and "self-serving."  MLB Response at 20. MLB Media asserts that the Court cannot properly grant summary judgment to Front Row without assessing the pair's credibility.  <u>See</u> MLB Response at 20.

      **b.**     **GBTV, LLC, Mercury Radio Arts, Inc., and Premiere Radio <u>Networks, Inc.'s Response.</u>**

Counterclaimants GBTV, LLC, Mercury Radio Arts, Inc., and Premiere Radio Networks, Inc. (collectively "Beck Counterclaimants") jointly submitted a single response.  <u>See</u> Beck Response at 1.  Like MLB Media, the Beck Counterclaimants begin by noting that Front Row attacks only "a narrow segment of the many factual allegations that give Defendants'

counterclaim ample fodder."  Beck Response at 1.  The Beck Counterclaimants argue that Front

Row's motion to dismiss is "really a motion to strike in disguise, even though it falls short of the

heightened requirement to strike a portion of a pleading."  Beck Response at 1.

        The Beck Counterclaimants first contend that Front Row's motion is a motion to strike,

which carries a much higher burden.  See Beck Response at 6.  They explain that Front Row's

"crocodile tears" cannot overcome their specific allegations, which set out "one of at least four

independent reasons why Front Row's patents-in-suit are unenforceable."  Beck Response at 6-7.

        The Beck Counterclaimants next argue that the Counterclaim complies with rule 9(b).

See Beck Response at 13.  They explain that inequitable conduct merely requires "a higher

degree of notice" so that the defendant can respond specifically and at an early stage "to

potentially damaging allegations of immoral and criminal conduct."   Beck Response at 13

(quoting Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001)).  They say

that they have provided that notice, because they identify "the specific who, what, when, where,

and how of the material misrepresentation or omission committed before the PTO."   Beck

Response at 8 (quoting Exergen, 575 F.3d at 1326).  See Beck Response at 11-12 (listing

different factors).

        They also state that there are two necessary elements for a claim for inequitable conduct:

intent and materiality.  See Beck Response at 8.  To plead intent, "the proponent of the

inequitable conduct theory need only plead facts supporting a reasonable inference that a specific

individual knew of the misrepresentation and had the specific intent to deceive the PTO."  Beck

Response at 8 (quoting Sanders v. The Mosaic Co., 418 F. App'x 914, 919 (Fed. Cir. 2011)).

The Beck Counterclaimants argue that, to plead materiality, "the proponent need only allege that

the patentee's 'misrepresentation to the USPTO' qualifies as a 'but-for cause of the patent's

issuance.'"  Beck Response at 8 (quoting Spectrum Pharm., Inc. v. Sandoz, Inc., 2:12-cv-00111-GMN-NJK, 2013 WL 5492667, at *2-3 (D. Nev. Sept. 30, 2013)(Navarro, J.)).  They contend that materiality is presumed if "affirmative egregious misconduct" occurs.  Beck Response at 8 (citing Spectrum Pharm., Inc. v. Sandoz, Inc., 2013 WL 5492667, at *2-3).

The Beck Counterclaimants assert that they can plead based on "information and belief" even if evidence is available from third parties.  See Beck Response at 9.  They contend that a requirement to the contrary would "turn Rule 8(a), *Twombly* and the purpose of discovery, generally, on their heads, creating an insurmountable hurdle for claimants at the pleading stage." Beck Response at 9.

Like MLB Media, the Beck Counterclaimants dismiss Front Row's proffered affidavits as outside "the proper [sufficiency] inquiry under *Exergen*."  Beck Response at 9.  According to the Beck Counterclaimants, the Court's consideration of Front Row's evidence "would prematurely foreclose Defendants' opportunity to challenge the veracity of their statements, including on cross-examination at deposition, and conduct full discovery in support of their claims."  Beck Response at 10.

Finally, the Beck Counterclaimants argue that Front Row has failed to refute that Ericsson's technology is but-for material to the patents-in-suit.  See Beck Response at 14.  They contend that Messrs. Ortiz and Lopez' theft of ideas from Ericsson constitutes "affirmative egregious conduct" that is per se material.  Beck Response at 14 (quoting Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1292 (Fed. Cir. 2011)(en banc)("Therasense")).

### c.    NBA Media's Response.

NBA Media makes three primary arguments in its response.  See NBA Response at 1-14. First, NBA Media argues that the Court should ignore Front Row's submissions until it has a

chance to conduct discovery.  See NBA Response at 1.  It cites Tal v. Hogan, 453 F.3d 1244 (10th Cir. 2006), for the proposition that "motions to dismiss are not designed to weigh evidence or consider the truth or falsity of an adequately pled complaint."  453 F.3d at 1265-66.  It notes that summary judgment is inappropriate, given the lack of depositions or document productions. See NBA Response at 9.

Second, NBA Media argues that its "information and belief" pleadings are reasonably based on its specific pleaded facts.  NBA Response at 1.  NBA Media conceives of this inquiry differently from Front Row -- it asks whether the relevant information is "in 'another party's control,' i.e., not NBA[]'s control."  NBA Response at 12.  NBA Media contends that the fact that information might be discoverable from Ericsson, for example, is irrelevant, because the information is not within NBA Media's control.  See NBA Response at 12.  It argues in favor of a reasonable inference that "Mr. Lopez conveyed information about the Arena Project and America's Cup Project to Mr. Ortiz while they were employed at Bickel & Brewer and working together to prepare and file Front Row's first patent applications on the subject matter claimed in the patents-in-suit."  NBA Response at 14.

Third, NBA Media argues that Front Row's Motions to Dismiss left its primary allegations intact.  It argues that numerous points went uncontested:

> (1) Mr. Kermit Lopez and Mr. Luis Ortiz, the principals of Front Row, both worked as patent counsel for Ericsson (as in-house and outside counsel, respectively), (2) at a time when Ericsson was developing technology remarkably similar to that eventually claimed by Messrs. Lopez and Ortiz in their subsequent patent applications (which ripened into the patents-in-suit), (3) Ericsson published documents reflecting its technological developments, which on their face reflect distribution to all Ericsson employees, and (4) Messrs. Lopez and Ortiz never disclosed this information to the U.S. Patent and Trademark Office ("PTO").

NBA Response at 2.

### d.    Turner Sports and Turner Basketball's Response.

Turner Sports and Turner Basketball advance two primary arguments in their Response. See Turner Response at 16-33.  First, they state that they adequately pled the "what," "where," and "how" of the alleged inequitable conduct.  Turner Response at 17.  They note that Front Row overlooked the distinction between their two types of arguments: "Throughout its motion, Front Row addresses Defendants' inequitable conduct claims as if they, like certain claims in *Exergen*, all involve allegations concerning withheld prior art.  Defendants' inequitable conduct claim, however, includes two types of allegations: (1) 'misrepresentation' claims that constitute affirmative egregious misconduct and (2) information 'withholding' claims."  Turner Response at 17 (citations omitted).  They assert that specific paragraphs within the Counterclaim met each of the primary requirements within each of these two categories.  See Turner Response at 13-18. Second, they argue that Front Row has failed to rebut their intent pleadings with respect to the Ericsson allegations.  See Turner Response at 23-24.

### 6.    Front Row's Replies.

Front Row replied to three of the Counterclaimants' responses on January 16, 2014.[17] See Plaintiff Front Row Technologies, LLC's Reply in Support of its Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim, filed January 16, 2014 (Doc. 198); Plaintiff Front Row Technologies, LLC's Reply in Support of its Motion to Dismiss NBA Media Ventures, LLC's Inequitable Conduct Counterclaim, filed January 16, 2014 (Doc. 199); Plaintiff Front Row Technologies, LLC's Reply in Support of its Motion to Dismiss GBTV LLC's,

---

[17]Front Row replied to the Turner Response on March 20, 2014.  See Plaintiff's Reply in Support of its 12(b)(6) Motion to Dismiss Defendants' Inequitable Conduct Counterclaims, filed March 20, 2014 (Doc. 42 in CIV 13-1153 JB/SCY).

Mercury Radio Arts, Inc.'s, and Premiere Radio Networks Inc.'s Inequitable Conduct Counterclaim, filed January 16, 2014 (Doc. 200).[18]

Front Row makes two primary arguments in its Reply.  First, it argues that the Counterclaimants have failed to meet Exergen's "who, what, when, where, and how" requirements.  See Reply at 1.  Second, it contends that the Counterclaimants' "other inequitable conduct counterclaims are so voluminous that they are virtually incomprehensible."  Reply at 1. Front Row thus argues that the Court should dismiss the Counterclaimants' targeted inequitable conduct allegations and require them to condense their other allegations into an "Exergen Pleading Chart."  Reply at 1.

Front Row begins by laying out its conception of the Exergen pleading standards.  See Reply at 1-3.  It contends that there are two primary requirements: (i) the defendant must identify the "specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO"; and (ii) the defendant must identify "the relevant conditions of the mind, which are '(1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO.'"  Reply at 1.

Front Row lays out an elaborate set of legal arguments on the first prong:

**Who:** the name of the specific individual associated with the filing or prosecution of the application at issue, who both knew of the material information and deliberately withheld or misrepresented it.

**What:** the identification of (i) the particular patent claims at issue in the inequitable conduct allegation and (ii) the particular limitations of those claims that are implicated by the inequitable conduct.

**When:** when the "who" became aware of the prior art references.

---

[18]The text of Front Row's Replies is almost identical.  The Court will thus cite only to Plaintiff Front Row Technologies, LLC's Reply in Support of its Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim as the "Reply" for ease of citation.

> **Where:** the specific location within the withheld prior art the material information is found.
>
> **How:** how an examiner would have used the information the applicant failed to disclose in assessing the patentability of the claims. There are two competing interpretations of the "how" requirement. Most district courts have applied this requirement in the context of whether the examiner would have issued a claim rejection had he been aware of the withheld prior art. Some district courts have applied a less stringent standard, allowing pleadings which only explained how the omitted prior art included features which were not in prior art before the examiner.

Reply at 2-3 (references omitted)(bold in original).  Front Row then attacks the Counterclaimants on each of these points.

Front Row first argues that the Counterclaimants fail to meet Exergen's "what" requirement.  See Reply at 4.  It notes that the Counterclaim identifies its paragraphs 39 to 79 as meeting this requirement.  See Reply at 4 (citing Counterclaim at 11).  These paragraphs, it says, describe only Ericsson's various Projects.  See Reply at 4.  It explains that nowhere in the entire Counterclaim do the Counterclaimants "identify a single specific Front Row patent claim or limitation that would be affected by [their] inequitable conduct allegations."  Reply at 4.  Front Row adds that the Counterclaimants consequently fail to meet the "where" requirement, noting that "without first identifying specific claims and claim limitations [the Counterclaimants] cannot identify information that would be material to those claims and claim limitations."  Reply at 4.

Front Row then moves on to the "how" requirement.  See Reply at 5.  It explains that the majority of courts require a pleading "to describe how the withheld prior art meets each and every claim limitation of the claims at issue," while the minority require only "an identification of claim limitations disclosed in the withheld prior art that were not in prior art considered by the examiner."  Reply at 5.  Front Row argues that the Counterclaimants fail under either approach,

because they have "not identified any specific claims that are at issue and, thus, cannot identify specific claim limitations that were not disclosed by the prior art considered by the examiner during prosecution."  Reply at 5.

Front Row places most its arguments' weight on the knowledge requirement.  It notes that the Counterclaimants must plead facts allowing the Court to reasonably infer that Messrs. Ortiz and Lopez were aware of the relevant prior art.  See Reply at 6.  It states that the Counterclaimants have only put three material prior-art references at issue -- the three issues of Contact Magazine which the Counterclaim describes.  See Reply at 6.  It repeats that the Court cannot reasonably infer Mr. Ortiz' or Mr. Lopez' knowledge based on these articles, citing the huge number of Ericsson employees.  See Reply at 6.  Front Row also works to distinguish the Counterclaimants' cited cases.  It explains that the defendant in Johnson Outdoors Inc. v. Navico Inc. alleged that specific individuals

> collectively had at least three decades of experience as brand managers, engineers, or in other professions related to or within the sonar field," the prior-art references were "widely known throughout the [sonar field] industry," the plaintiff had a long-term presence in the sonar industry, and one of the individuals had "alleged expertise in comparing patent claims for side scanning sonar systems to products that are available to determine if the elements of the claims are present in the products.

Reply at 7 (quoting Johnson Outdoors Inc. v. Navico, Inc., 774 F. Supp. 2d at 1200).  Front Row explains that the court in HTC Corp. v. IPCom GmbH & Co., KG reasonably inferred knowledge, because one of the inventors was a participant in a meeting where the relevant prior art was discussed.  See Reply at 8 (citing HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d at 151).  Both of the cases, it explains, involved far more specific allegations than the Counterclaim's allegations.  See Reply at 7.  It concludes that mere "general knowledge of a reference is not enough."  Reply at 8 (citing Exergen, 575 F.3d at 1330).

Front Row also questions the Counterclaim's success in alleging the intent requirement. See Reply at 7.  It focuses on the Counterclaim's allegation that "Ericsson would have required Lopez to assign, or at least disclose, his rights as a named inventor to Ericsson in any invention he claimed to conceive while employed as an in-house counsel for Ericsson," and its argument that the "timing of the conception date allowed Lopez to avoid any assignment obligations to Ericsson."  Reply at 9 (citing Counterclaim ¶ 96; MLB Response at 16).  First, it says, Mr. Lopez' rights as a named inventor employee for Ericsson present a legal issue, and the Court is not required to accept the Counterclaim's allegation as true.  See Reply at 8-9.  Second, it points out that the USPTO does not generally know a patent's conception date -- undermining the timing as proof of any intent to deceive the USPTO.  See Reply at 9.  Third, Front Row notes the absence of any allegation that Mr. Lopez or Mr. Ortiz knew that Ericsson would issue a public announcement.  See Reply at 9.  Their lack of knowledge meant that the timing of their new patent application is irrelevant to any alleged intent.  See Reply at 9.  They also attack the Counterclaim's use of their patent ownership interests as an inference of intent to deceive the USPTO as "absurd."  Reply at 10.

Finally, Front Row states that it "does not concede that [the Counterclaim's] other inequitable conduct allegations are legally sufficient to give rise to a colorable claim. As a practical matter, it was impossible to parse [the Counterclaim's] 90 pages of allegations to determine exactly what allegations might meet each *Exergen* requirement."  Reply at 10.  It suggests that the Court follow the example of the United States District Court for the Northern District of Indiana and require the Counterclaimants to create an "Exergen Pleading Chart" to show how the Counterclaim met each part of the Exergen standard.  Reply at 10 (citing Lincoln

Nat. Life v. Transamerica Fin. Life Ins. Co., No. 1:08-CV-135, 2009 WL 4547131, at *1 (N.D. Ind. Nov. 25, 2009)(Cosbey, J.)).

      **7.**      **The Motion to Transfer.**

      Front Row moved to transfer this case to the Eastern District of Texas on July 13, 2015. See Motion to Transfer at 1.  It explains that "[c]ourts engage in a two-step analysis to determine whether to transfer venue."  Motion to Transfer at 5.  First, courts determine "whether the case might have been brought in the forum to which transfer is sought."  Motion to Transfer at 5.  If the case could have been brought in that forum, the Court considers "whether the convenience to the parties and the interests of justice compel transfer."  Motion to Transfer at 6.

      Front Row raises three primary arguments in favor of transfer.  See Motion to Transfer at 6-18.  First, it contends that the case could have been brought in the Eastern District of Texas because: (i) Front Row is subject to personal jurisdiction there; and (ii) a substantial part of the events giving rise to all of the claims occurred there.  See Motion to Transfer at 6 (citing 28 U.S.C. § 1391(b)).  It notes that the Defendants' business is "directed to and conducted within the State of Texas."  Motion to Transfer at 7.  It also contends that "Counterclaim-Plaintiffs' allegations of inequitable conduct and fraud are directed toward the former work performed by Luis Ortiz and Kermit Lopez in or around Ericsson's Plano, Texas Office."  Motion to Transfer at 7.  Because Plano is within the Eastern District of Texas, Front Row says, the case should be heard there.  See Motion to Transfer at 7.

      Second, Front Row argues that the transfer factors[19] weigh in favor of transfer.  See Motion to Transfer at 9-18.  It notes that the Eastern District of Texas has compulsory power

---

     [19]These factors are:

over the possible third-party witnesses from Ericsson's Texas office, Bickel & Brewer, LLP, "and/or" Gardere Wynne Sewell LLP.  Motion to Transfer at 9.  These same witnesses, it notes, "reside much closer to the proposed transferee forum than this District."  Motion to Transfer at 10.  It identifies six of these witnesses by name, provides their approximate distance from the Eastern District of Texas courthouse, and briefly explains how they could support its version of events.  See Motion to Transfer at 11-12.  It argues that travel times and the Counterclaim's locus of events both favor a transfer.  See Motion to Transfer at 13-14.  It also contends that the District of New Mexico's docket is more congested than the docket in the Eastern District of Texas.  See Motion to Transfer at 16-17.

The Counterclaimants responded on July 30, 2015.  See Defendants' Response in Opposition to Plaintiff Front Row Technologies, LLC's Motion to Transfer, filed July 30, 2015 (Doc. 222)("Transfer Response").  The Counterclaimants first contend that the Motion to Transfer would split up the four consolidated patent infringement actions, "sending two cases to the Eastern District of Texas and keeping two cases involving the same patents and accused products here in New Mexico."  Transfer Response at 12.  They explain that the Motion to Transfer named only two out of four of the consolidated cases.  See Transfer Response at 12.

---

the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and[] all other considerations of a practical nature that make a trial easy, expeditious and economical.

Navajo Nation v. Urban Outfitters, Inc., 918 F. Supp. 2d 1245, 1253 (D.N.M. 2013)(Hansen, J.)(quoting Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010)).

They accuse Front Row of forum shopping and needlessly increasing litigation costs.   See Transfer Response at 14.   Second, the Counterclaimants attack the quality and materiality of Front Row's potential witnesses' testimony, noting that Front Row described how only one witness would refute its allegations.  See Transfer Response at 16.  They explain that the parties could use deposition testimony if any of the witnesses were unwilling to appear in New Mexico. See Transfer Response at 17.  Third, they contend that the "locus of operative facts" does not favor the Eastern District of Texas.   Transfer Response at 17.   They explain that many of their allegations have nothing to do with Ericsson, and that, even for the Ericsson allegations, the Arena and America's Cup Projects involved Sweden, New Zealand, and New Mexico as well as Texas.  See Transfer Response at 17-18.  They further explain that Dr. Krukar is located in New Mexico rather than Texas.  See Transfer Response at 18.  Fourth, they contend that, "given the ease of airplane travel today and numerous flights between Albuquerque and cities across the country, [the convenience and cost] factor does not warrant a transfer."  Transfer Response at 19. They conclude by disputing Front Row's docket congestion statistics and arguing that any differences are "inconsequential."  Transfer Response at 20-21.

Front Row replied on August 17, 2015.  See Plaintiff Reply in Support of Front Row Technologies, LLC's Motion to Transfer, filed August 17, 2015 (Doc. 223)("Transfer Reply"). Front Row first rebuts the Transfer Response's argument that a transfer would split the case in two.  See Transfer Reply at 1.  It states that, because the cases have been consolidated, a filing in one case "applies to all consolidated cases."  Transfer Reply at 3.  Second, Front Row contends that it has fully complied with its obligation to identify third-party witnesses who would benefit from a transfer.  See Transfer Reply at 5.  It asserts that depositions are undesirable, because "[t]he preference for a witnesses attendance at trial is axiomatic."  Transfer Reply at 6 (citing

Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1191 (10th Cir. 2004)).  Third, it attacks the Transfer Response's argument that the conduct occurred at least as much in other countries as in Texas, explaining that "no party is seeking to (or can) transfer this case to Sweden or New Zealand, and all parties with a connection to New Mexico seek transfer to the Eastern District of Texas."  Transfer Reply at 7.  Fourth, Front Row notes that all of the Counterclaim's non-Ericsson-related allegations "rely solely on evidence from Front Row principals Lopez and Ortiz, and their employee, Richard Krukar."  Transfer Reply at 10.  It states that no flights would be required for non-party witnesses in the Eastern District of Texas.  See Transfer Reply at 11.  Finally, Front Row again argues that New Mexico has a longer time to trial.  See Transfer Reply at 12.

     **8.**    **The Hearing.**

     The Court held a hearing on October 27, 2015.  See Transcript of Motion Proceedings at 1 (Court)(taken October 27, 2015)("Tr.").[20]  The parties largely stuck to the arguments in their briefing.  Front Row opened discussion of the Motions to Dismiss with a quote from the United States Court of Appeals for the Federal Circuit: "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague."  Notice of Plaintiff's Presentations for October 27, 2015 Hearing at 2, filed October 29, 2015 (Doc. 240-1)("PowerPoint A")(quoting Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988)(reversing summary judgment in favor of inequitable conduct claims).  Front Row broke all of the allegations in the Counterclaim into four general categories: "Ericsson," the "Krukar and Verna declarations," the "Board of Patent Appeals and Interference decisions," and

---

     [20]The Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

the "co-pending applications."  Tr. at 29:5-16 (Chan).  It repeated the arguments in its briefing,

noting that the Counterclaimants must: (i) identify the "who, what, when, where, and how" of the

material misrepresentation or omission; and (ii) allege both knowledge of the misrepresentation

and specific intent to deceive the USPTO.  See PowerPoint A at 4 (citing Exergen, 757 F.3d at

1327).   In particular, it focused on the "what and where," the "how," and the specific intent to

deceive the USPTO.  See Tr. at 51:10-52:10 (Chan)(stating that "there are three major defects"

in the Counterclaim).

        Front Row began with Exergen's "what" and "where" factors.  It argued that the

Counterclaim failed to adequately identify "specific claims or claim elements" bolstered by "the

failure to cite that information or the failure to disclose that information to the patent office."  Tr.

at 32:10-19 (Chan).  It contended that the Counterclaim used only vague descriptions, such as "at

least claims 1 through 15, and 21 of the 363 patent," and stated that there was "no identification

of any specific claim elements."  Tr. at 33:4-15 (Chan).  The Eastern District of Texas, Front

Row said, rejected similar references to "claims 1-74" and "every limitation" as allegations of

"what" and "where."   PowerPoint A at 19 (quoting MOSAID Techs. v. Freescale

Semiconductor, Inc., No. 11-CV-173, slip op. at 8 (E.D. Tex. Sept. 27, 2012)(Davis, J.)).

        Front Row then argued that the Counterclaimants fail to plead "how" with particularity.

See Tr. at 36:1-4 (Chan); PowerPoint A at 20.  For the Ericsson issue, Front Row contended, the

Counterclaimants fail "to identify the specific claim limitations" that were not already "disclosed

in the prior art considered by the examiner during prosecution."   PowerPoint A at 20.  It

described the Counterclaim's attempts to link alleged misrepresentations to specific patent

claims as "blanket statement[s]" that misconduct was relevant to every claim in every patent.  Tr.

at 36:1-4 (Chan).

Third, Front Row repeated its arguments that Messrs. Ortiz and Lopez lacked the necessary intent to deceive the USPTO.  See Tr. at 41:1-50:25 (Chan, Court).  It argued that Contact Magazine is analogous to American Way -- American Airlines' inflight magazine -- in that it includes only "very sketchy, general information about these two projects."  Tr. at 41:1-12 (Chan).  It also focused on the allegations against the Krukar and Verna Declarations.  It explained that, under Exergen, the Court had to "look at the entire record, and you have to look at and include any objective indications of candor and good faith."  Tr. at 43:19-25 (Chan).  It noted that both Krukar and Verna explained their relationships to Messrs. Ortiz and Lopez in subsequent filings with the USPTO.  See Tr. at 44:1-8 (Chan).  It disagreed with the Counterclaimants' interpretation of Therasense, 649 F.3d at 1292, arguing that the case stands for the opposite proposition: that intent to deceive cannot be inferred simply from materiality.  See PowerPoint A at 36.  Front Row also described a Federal Circuit case in which a defendant made a misleading statement, "repeated on five separate occasions in three different patent applications" before "multiple patent examiners."  PowerPoint A at 37 (quoting Centocor Ortho Biotech, Inc. v. Abbott Labs., 669 F. Supp. 2d 756, 763-64 (Fed. Cir. 2009)).  The Federal Circuit, Front Row said, refuses to infer inequitable conduct without "direct evidence from the inventor."  PowerPoint A at 37.  It argued that a cross-reference to another patent application "points away from an intent to deceive."  Tr. at 48:22-23 (Chan)(quoting Burlington Indus., Inc. v. Dayco Corp., 849 F.2d at 1422)).  It concluded that its failure to continuously update the USPTO with negative office actions in related patent applications does not evidence a specific intent to deceive.  See Tr. at 50:19-25 (Chan).

MLB Media spoke on the Counterclaimants' behalf.  See Tr. at 53:1-3 (Littmann).  It began by pointing that Front Row failed to address any issues other than Ericsson's projects in its

briefing.  See Tr. at 53:10-54:20 (Littman).  MLB Media explained that "issues raised for the first time in a reply are waived."  Tr. at 69:8-12 (Littman)(citing Minshall v. McGraw Hill Broad. Co., 323 F.3d 1273, 1288 (10th Cir. 2003)).

It distinguished Burlington Indus., Inc. v. Dayco Corp. and Centocor Ortho Biotech, Inc. v. Abbott Labs., noting that both cases had progressed past the motion-to-dismiss stage, to summary judgment or trial.  See Tr. at 54:11-21 (Littman).  It noted that "I think the 400 paragraphs describing exactly who, what, where, when, and how establish that we absolutely have pled with particularity."  Tr. at 64:9-12 (Littman).  MLB Media responded to Front Row's arguments on intent by noting that Front Row's intent to deceive is "shown over and over again by their failure to disclose" relevant information to the USPTO.  Tr. at 65:17-19 (Littman).  It repeated its argument that an affirmative misstatement is "in and of itself" material.  Tr. at 68:23-25 (Littman)(citing Therasense, 649 F.3d at 1292).

Front Row argued that it preserved the non-Ericsson issues, explaining that "we did say that the rest of the counterclaim isn't pled with specificity."  Tr. at 76:4-5 (Chan).  It also argued that the Counterclaimants could move to amend their pleadings if discovery uncovered more concrete evidence of inequitable conduct.  See Tr. at 77:21-78:4 (Chan).  In response to the Court's questions, Front Row clarified that it would have "to know the specifics" and "the materiality" of existing inventions to be liable under an equitable counterclaim.  Tr. at 79:17-19 (Chan).

The Court then confirmed that Front Row is "asking for all the inequitable conduct counterclaims to be dismissed entirely and in total."  Tr. at 83:3-5 (Court).  Front Row explained that all of the Counterclaim's allegations fail to allege any specific intent.  See Tr. at 83:6-8 (Chan).  The Court expressed concern about Krukar's and Verna's alleged failure to reveal their

- 45 -

relationship with Front Row to the USPTO.  See Tr. at 85:12-22 (Court).  Front Row responded that the information allegedly not disclosed was not material and that, in any case, it had solved the problem through disclosures to the USPTO.  See Tr. at 85:23-86:24 (Chan, Court).

The Court opened discussion of the Motion to Transfer by noting that the "biggest problem" was "that at some point, if there is a trial in this matter, you're going to have some witnesses in the Dallas area that you probably can get to come testify for you in the Eastern District that you might not be able to get to testify here in New Mexico."  Tr. at 87:14-22 (Court).  It suggested that it deny the Motion to Transfer without prejudice to renewing down the road, because Front Row would have to proceed with depositions in any case.  See Tr. at 88:3-18 (Court).  Front Row could then renew the motion at that point when it knew "who is really going to testify at your trial in a very concrete way."  Tr. at 88:13-18 (Court).

Front Row agreed that the transfer problem "is really one of practicality."  Tr. at 89:1-4 (Chan).  It repeated its arguments on third-party witnesses' convenience.  See Tr. at 89:4-17 (Chan).  Front Row also provided a series of charts from its initial disclosures elaborating on various witnesses' locations:

| Name | Contact Information | Discoverable Information |
|---|---|---|
| Marika Staalnacke | May contact through counsel for Ericsson: Jennifer Wells Ericsson Inc. 6300 Legacy Drive Plano, Texas 75024 | Ms. Staalnacke was an engineer for the Arena Project and may have knowledge regarding prior art. |
| Jim Sundqvist | May contact through counsel for Ericsson: Jennifer Wells Ericsson Inc. 6300 Legacy Drive Plano, Texas 75024 | Mr. Sundqvist was a project manager at Ericsson and may have knowledge regarding prior art. |
| Aron Judson | University of Auckland | Mr. Judson was the project manager for Ericsson's contribution to the America's Cup Project and may have knowledge regarding prior art. |
| Johan Bengtsson | Center for Distance-Spanning Technology | Mr. Bengtsson is a current employee with the Centre for Distance-spanning Technology and a former employee of Telia.  Mr. Bengtsson worked as an engineer on the Arena Project and may have knowledge regarding prior art. |

| Robert Hardacker | | Mr. Hardacker is an inventor of a prior art system and has knowledge regarding the conception, diligence, and reduction to practice of his invention. |
|---|---|---|
| Tommy Arngren | May contact through counsel for Ericsson: Jennifer Wells Ericsson Inc. 6300 Legacy Drive Plano, Texas 75024 | Mr. Arngren was the project manager for the Arena Project and has knowledge regarding prior art. |
| Tor Bjorn Minde | May contact through counsel for Ericsson: Jennifer Wells Ericsson Inc. 6300 Legacy Drive Plano, Texas 75024 | Mr. Minde was the director of Advanced Wireless Algorithm Research at Ericsson and an engineer for the Arena Project. He may have knowledge regarding prior art. |

Notice of Plaintiff's Presentations for October 27, 2015 Hearing at 7-8, filed October 29, 2015 (Doc. 240-2)("PowerPoint B").  It stated that six of eleven witnesses were located in Plano, Texas.  See PowerPoint B at 13.

Front Row acknowledged that, "if the inequitable conduct claims are dismissed, at this juncture, the pleadings are dismissed, then the transfer issues really become moot."  Tr. at 91:2-6 (Chan).  The Court verified that it should "decide the motions to dismiss first.  And if I grant your motions, then deny your motion to transfer. And if I deny your motions to dismiss, then the motion to transfer is live and you want me to take it up[.]"  Tr. at 92:12-17 (Court).  Front Row agreed.  See Tr. at 92:18 (Chan).

The Counterclaimants first responded that Front Row had identified different witnesses in its Motion to Transfer.  See Tr. at 94:18-95:4 (Weaver)("In the pleadings Front Row identified six witnesses in and around the Dallas/Fort Worth Metroplex . . . .  The seven witnesses that were just referenced by Mr. Alfonso were not in that pleading.").  The Counterclaimants noted that the "May contact through counsel for Ericsson" in Front Row's charts does not indicate that the witnesses reside in Plano -- some, they asserted, were actually located in Sweden.  See Tr. at 95:16-96:11 (Weaver).  The Counterclaimants thus argued that only the original six potential witnesses listed in the Motion to Transfer are relevant to the transfer issue, and that Front Row

failed to explain "what the relevance of these individuals are to any of the issues."  Tr. at 98:19-99:1 (Weaver).  They repeated that Front Row had failed to identify, "at any level of specificity," what its witnesses would testify to, as the United States Court of Appeals for the Tenth Circuit requires.  Tr. at 97:13-98:2 (Weaver).  They also questioned why Front Row had not produced affidavits explaining why their six identified witnesses could not come to New Mexico.  See Tr. at 98:11-18 (Weaver).

The Counterclaimants next noted that the parties stipulated that "venue was properly laid in this court" in February of 2014.  Tr. at 99:6-10 (Weaver).  They add that Front Row subsequently filed another lawsuit in the District of New Mexico, which is now consolidated into this case.  See Tr. at 99:10-17 (Weaver).  The Court and the Counterclaimants confirmed that the Defendants in that new case, Turner Sports and Turner Basketball, would assert the same inequitable conduct counterclaims.  See Tr. at 100:5-24 (Court, Weaver).

The Court concluded this portion of the hearing by noting that it was "still a little bit enamored of what I suggested at the very beginning."  Tr. at 106:8-10 (Court).  It explained that the parties were still "somewhat guessing as to who the witnesses are going to be and where they're located."  Tr. at 106:10-14 (Court).  It stated that it would allow Front Row to renew the motion at a later date.  See Tr. at 107:7-8 (Court).

## LAW REGARDING AMENDING THE PLEADINGS BEFORE TRIAL[21]

Rule 15(a) provides that a party may amend his or her pleading as a matter of right within twenty-one days of serving it and within twenty-one days of the service of a response pleading; otherwise, the party must obtain the opposing parties' consent or the court's leave -- which should be "freely give[n] . . . when justice so requires -- to amend his or her pleading.

   **(a)   Amendments Before Trial.**

       **(1)   *Amending as a Matter of Course.*** A party may amend its pleading once as a matter of course within:

           **(A)   21 days serving it, or**

           **(B)   if the pleading is one to which a responsive pleading is required, 21 days after service of**

---

[21]In patent cases, Federal Circuit law applies if a question involves an issue of substantive patent law.  Regional Circuit law applies if the question does not involve patent law.  See In re Deutsche Bank Trust Co. Americas, 605 F.3d at 1377; Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1307 (Fed. Cir. 2001); In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803 (Fed. Cir. 2000)("In reviewing district court judgments, we apply the law of the circuit in which the district court sits with respect to nonpatent issues, but we apply our own law to issues of substantive patent law."); Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1362-63 (Fed. Cir. 2004)("We answer this question on an issue by issue basis and will apply the law of the regional circuit to those issues which district court appeals normally lie, unless the issue pertains to or is unique to patent law.")(quotations omitted); Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996).
    In keeping with this distinction, district courts evaluating inequitable conduct issues tend to apply Federal Circuit law only to the inequitable conduct claims themselves, and quote regional circuit decisions on motions to dismiss, strike, or amend pleadings in general.  See Wyeth Holdings Corp. v. Sandoz, Inc., No. CIV.A. 09-955-LPS, 2012 WL 600715, at *4 (D. Del. Feb. 3, 2012)(Burke, MJ), report and recommendation adopted, No. CIV.A. 09-955-LPS, 2012 WL 749378 (D. Del. Mar. 1, 2012)(Stark, J.); Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC, No. CIV. JKB-09-2657, 2011 WL 2415014, at *3 (D. Md. June 10, 2011)(Bredar, J.); Theranos, Inc. v. Fuisz Pharma LLC, 876 F. Supp. 2d 1123, 1136 (N.D. Cal. 2012)(Rogers, J.)(citing Ninth Circuit cases).  This distinction respects the Federal Circuit's general rule on applying its own law to patent-specific issues.
    In Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC, No. 1:09-CV-1685, 2012 WL 2115503 (M.D. Pa. June 11, 2012)(Caldwell, J.), for example, the district court applied cases from the United States Court of Appeals for the Third Circuit to a motion for leave to amend, but applied Federal Circuit law to the inequitable conduct issue.  See 2012 WL 2115503, at *1.

> a responsive pleading on 21 days after
> service of a motion under Rule 12(b), (e), or
> (f), whichever is earlier.
>
> **(2)     Other Amendments.**  In all other cases, a party may
> amend its pleading only with the opposing party's written
> consent or the court's leave.  The court should freely give
> leave when justice so requires.
>
> **(3)     Time to Respond.**  Unless the court orders otherwise, any
> required response to an amended pleading must be made
> within the time remaining to respond to the original
> pleading or within 14 days after service of the amended
> pleading, whichever is later.

Fed. R. Civ. P. 15(a).  Under rule 15(a), the court should freely grant leave to amend a pleading

where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80

(D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2

(D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Co-op., No. 05-0073,

2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the

United States has stated that, in the absence of an apparent reason such as "undue delay, bad

faith or dilatory motive . . . [,]repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.," leave to amend should be freely given.  Foman v. Davis, 371 U.S. 178, 182

(1962).  Furthermore, the Tenth Circuit has held that district courts should grant a plaintiff leave

to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d 1278,

1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed

"amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d

848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

An amendment is "futile" if the pleading, "as amended, would be subject to dismissal."  In re

Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462 (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore, "[w]here the party seeking amendment knows or should have known of the facts upon which the proposed amendment is based but fails to include them in the original complaint, the motion to amend is subject to denial."  Las Vegas Ice, 893 F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Sch., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

## LAW REGARDING RULE 12(B)(6)[22]

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

---

[22]As discussed above, district courts evaluating inequitable conduct issues tend to apply Federal Circuit law only to the inequitable conduct claims themselves, and quote regional circuit decisions on motions to dismiss, strike, or amend pleadings in general.  In Sloan Valve Co. v. Zurn Indus., Inc., No. 10-CV-204, 2012 WL 1108129 (N.D. Ill. Apr. 1, 2012)(St. Eve, J.), for example, the District Court for the Northern District of Illinois noted that "[a]lthough this is a patent case, the Court applies the Seventh Circuit's Rule 12(b)(6) standard" before it applied Federal Circuit law to the inequitable conduct allegations in particular.  2012 WL 1108129, at *3.

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

of a complaint is a question of law, and, when considering a rule 12(b)(6) motion, a court must

accept as true all well-pled factual allegations in the complaint, view those allegations in the light

most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's

favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a

reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would

the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098

(10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all

well-pled factual allegations in a complaint and view these allegations in the light most favorable

to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual

allegations must be enough to raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl.

Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that,

if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions: (i) where the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule."). The defense of limitations is the affirmative defense most likely to be established by the uncontroverted facts in the complaint.

See 5 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1277 (3d ed. 2014).

If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory

limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner

v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d

111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292

(D.N.M. 2011)(Browning, J.).   The plaintiff may counter this motion with an assertion that a

different statute of limitations or an equitable tolling doctrine applies to bring the suit within the

statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting

facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v.

Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint

indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent

upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an

exception to the affirmative defense).   It appears, from case law in several circuits, that the

plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply

refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d

458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v.

New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, 2008 WL 3833472 (W.D.

Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this

practice, the Court has permitted this avoidance practice, see Anderson Living Trust v. WPX

Energy Prod., LLC, 27 F. Supp. 3d 1188, 1208–09, 1234–38 (D.N.M. 2014)(Browning, J.).

## LAW REGARDING THE USE OF DOCUMENTS OUTSIDE THE PLEADINGS IN A RULE 12(B)(6) MOTION

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v.

Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th

Cir. 2005)(unpublished)[23]("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint.  The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint."  91 F. App'x at 85.  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the [motion to dismiss]."  627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance

---

[23]Gossett v. Barnhart is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Gossett v. Barnhart, Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004); Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); Driggers v. Clark, 422 F. App'x 747 (10th Cir. 2011); and Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." Gee v. Pacheco, 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint, however, it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission, and the Tenth Circuit analogized the deadline to a statute of limitations.  See 167 F. App'x at 705 n.9.  The Tenth Circuit concluded that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.)(on appeal). The Court in Mocek v. City of Albuquerque reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack their reliability and truthfulness.  See 2013 WL 312881, at *50-51.  Additionally, the Court has ruled that, when determining whether a statute of

limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may

not use interviews and letters attached to a motion to dismiss which evidence that a plaintiff was

aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Ins.

Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23,

2012)(Browning, J.).  The Court in Great American Insurance Co. v. Crabtree determined that the

documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a

complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate

the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.  On

the other hand, in a securities class action, the Court has found that a defendant's operating

certification, to which plaintiffs refer in their complaint, and which was central to whether the

plaintiffs adequately alleged a loss, falls within an exception to the general rule, and the Court

may consider the certification when ruling on the defendant's motion to dismiss without

converting the motion into one for summary judgment.  See Genesee Cnty. Emps.' Retirement

Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d 1082, 1150-51 (D.N.M.

2011)(Browning, J.).

## LAW REGARDING RULE 9(b)'S HEIGHTENED PLEADING REQUIREMENT

Normally, a plaintiff need plead only "a short and plain statement of the claim showing

that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet

more stringent standards.  "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action

with particularity when that cause of action contains allegations grounded in fraud.  See 2 James

Wm. Moore, Jeffrey A. Parness, & Jerry Smith, Moore's Federal Practice § 9.03(1)(d), at 9-20 (3d ed. 2008). On the other hand, claims based on negligent or innocent misrepresentation, to the extent those claims do not require proof of fraud, may be pled in accordance with the more relaxed standards of rule 8(a). See Moore, supra § 9.03(1)(d), at 9-21.

The primary motives that animate rule 9(b) help illuminate the reason for limiting the rule's reach to claims grounded in fraud. First, the requirement of pleading with particularity protects defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct. See Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to defendant's reputations."); United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation.")(citations omitted)(internal quotation marks omitted). Second, the requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense. See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d at 921. A related goal of 9(b) is to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes." Banker's Trust Co., v. Old Republic Insurance Co., 959 F.2d 677, 683 (7th Cir. 1992).

## LAW REGARDING INEQUITABLE CONDUCT CLAIMS IN PATENT LITIGATION

A defendant confronting a patent infringement suit has several equitable defenses that it can use to invalidate a patent. The inequitable conduct claim, formerly known as "fraud on the patent office," is a judge-made equitable doctrine with a long history. See Eric M. Dobrusin and Katherine E. White, INTELLECTUAL PROPERTY LITIGATION: PRETRIAL PRACTICE, § 2.05[G]

Inequitable Conduct (2015)("Although the defense of unenforceability due to inequitable conduct does not find express statutory basis, it is a judge-made doctrine that evolved from the 'doctrine of unclean hands to dismiss patent cases involving egregious misconduct.'")(quoting Therasense, 649 F.2d at 1285).  See United States v. Am. Bell Tel. Co., 128 U.S. 315, 356 (1888)(stating that fraud in securing patent could render patent unenforceable).  Inequitable conduct is now rooted in an individual's duties of candor and good faith with respect to the USPTO.  See 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office.").  Intentional breach of these duties can render an entire patent unenforceable.  See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 882 F.2d 1556, 1567 (Fed. Cir. 1989); INTELL. PROP. L. BUS. LAW. § 5:42 (2015-2016 ed.).  Specifically, if "(1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO," courts will not allow infringement actions on that individual's patents.  Exergen, 575 F.3d at 1327 n.3.  The Federal Circuit has held that district courts have no discretion in this respect.  See Monsanto Co. v. Bayer Bioscience N.V., 514 F.3d 1229, 1243 (Fed. Cir. 2008)("[T]he unenforceability of a patent follows automatically once a patent is found to have been obtained via inequitable conduct.").  "Inequitable conduct is an equitable issue committed to the discretion of the district court."  Mentor H/S, Inc. v. Med. Device All., Inc., 244 F.3d 1365, 1377 (Fed. Cir. 2001).  "The burden of proving inequitable conduct lies with the accused infringer."  Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008).  The Federal Circuit will "apply our own law, not the law of the

regional circuit, to the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b)." Exergen, 575 F.3d at 1326.

Inequitable conduct allegations can be sorted into two primary categories: misrepresentation claims and withholding claims. Misrepresentation claims involve affirmative false statements to the USPTO, such as false declarations that an applicant invented a patent and misrepresentations in interviews with the USPTO. See Correct Craft IP Holdings, LLC v. Malibu Boats, LLC, No. 9-cv-813, 2010 WL 598693 at *6 (M.D. Fla. Feb. 17, 2010)(involving false inventor declarations to the USPTO); Johnson Outdoors Inc. v. Navico, Inc., 774 F. Supp. 2d at 1199 (discussing false declarations on prior art); CIVIX-DDI, LLC v. Hotels.com, L.P., 711 F. Supp. 2d 839, 850 (N.D. Ill. 2010)(including allegations that patent holder's attorney made false statements at a USPTO interview). Withholding claims involve deliberate failures to disclose important information to the USPTO. See HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d at 151 (discussing failure to provide standards documents to the USPTO); Aerocrine AB v. Apieron Inc., 2010 WL 1225090, at *2 (involving failure to disclose material references).

### 1.   Exergen.

Exergen is the leading case on inequitable conduct claims in patent litigation. See 575 F.3d 1312. In that case, Exergen Corporation, a thermometer patent owner brought an infringement claim against Systems Application of Advanced Technology ("SAAT"), a competitor. 575 F.3d at 1317. SAAT sought leave to amend its answer to assert that two of Exergen Corporation's patents were unenforceable because of inequitable conduct. See 575 F.3d at 1316. Its proposed pleading consisted of only six paragraphs, alleging that: (i) Exergen Corporation had failed to disclose certain material patents to the USPTO as it pursued related patents; (ii) "its agents and/or attorneys intentionally withheld the [relevant patents] from the

PTO with the intent to deceive the PTO"; and (iii) assertions in one patent application were inconsistent with information on Exergen Corporation's website.  575 F.3d at 1326.  On this last point, SAAT contrasted Exergen Corporation's statement in its patent application -- "What had not been generally appreciated by those skilled in the art of temperature measurement was that the superficial temporal artery . . . provides an exceptionally reliable temperature reading," 575 F.3d at 1326, with a statement on its website -- "The temporal artery area has a long history of temperature measurement, dating back to the early centuries before Christ with the first recorded references to palpation of the head for fever assessment," 575 F.3d at 1326.  The defendant argued that these misrepresentations were material, because the information "was not cumulative to the information already of record in the prosecution history," and "refutes, or is inconsistent with, a position taken by Exergen in asserting an argument of patentability."  575 F.3d at 1326. It stated that it was "informed and believes, and therefore alleges, that the misrepresentation and omission were made with the intent to deceive the PTO."  575 F.3d at 1326.  The United States District Court for the District of Massachusetts denied SAAT's motion to amend its answer, explaining that its proposed pleading "failed to allege inequitable conduct with particularity under Rule 9(b)."  575 F.3d at 1317.  SAAT appealed to the Federal Circuit.  See 575 F.3d at 1316.

The Federal Circuit used the case to establish a new test for inequitable conduct claims. See 575 F.3d at 1328-29.  First, it noted that "inequitable conduct, while a broader concept than fraud, must be pled with particularity under Rule 9(b)."  575 F.3d at 1326.  This particularity, the Federal Circuit noted, requires "identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  575 F.3d at 1327. The Federal Circuit added two additional requirements: "(1) knowledge of the withheld material

information or of the falsity of the material misrepresentation, and (2) specific intent to deceive

the PTO." 575 F.3d at 1327. It acknowledged that rule 9(b) allows litigants to plead knowledge

and intent "generally," but nonetheless required the pleadings to "allege sufficient underlying

facts from which a court may reasonably infer[24] that a party acted with the requisite state of

mind." 575 F.3d at 1327.

> The Federal Circuit then restated its test:

> In sum, to plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO. Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.

575 F.3d at 1328-29.

The Federal Circuit then applied its new test to SAAT's proposed inequitable conduct

allegations. It explained that SAAT failed to identify the "who," because it did not "name the

specific individual associated with the filing or prosecution of the application." 575 F.3d at

1329. SAAT's reference to "Exergen, its agents and/or attorneys" was insufficient to plead a

material misrepresentation, because only individuals owe duties of candor and good faith to the

USPTO. 575 F.3d at 1329.

The Federal Circuit also rejected SAAT's attempt to identify the "what" and "where."

575 F.3d at 1329. It noted that the pleading "fails to identify which claims, and which

limitations in those claims, the withheld references are relevant to, and where in those references

---

[24]"A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." Exergen, 757 F.3d at 1329 n.5.

the material information is found -- i.e., the 'what' and 'where' of the material omissions."  575 F.3d at 1329.

The Federal Circuit rejected SAAT's explanation of "both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims."  575 F.3d at 1329-30.  Although the pleading alleged generally that the withheld references were material and not cumulative, it did "not identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record."  575 F.3d at 1329.

The Federal Circuit dismissed SAAT's attempt to plead knowledge of the withheld material information or knowledge of the falsity of the material misrepresentation for similar reasons.  See 575 F.3d at 1330.  The pleading alleged that "Exergen was aware" of certain patents, but lacked any factual basis to infer that any specific individual with a duty to disclose the existing patent claims had knowledge of the claims. 575 F.3d at 1330.  The Federal Circuit explained, in an oft-quoted passage: "A reference may be many pages long, and its various teachings may be relevant to different applications for different reasons. Thus, one cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material *information* contained in that reference."  575 F.3d at 1330 (emphasis in original).  Even the contrast between Exergen Corporation's website and its patent applications did not impress the Federal Circuit, which noted that "[n]o facts are alleged from which one can reasonably infer that, at the time of the allegedly false statement, the individual who made this statement to the PTO was aware of an allegedly contradictory statement on Exergen's website."  575 F.3d at 1330.

The Federal Circuit also found SAAT's attempt to allege intent insufficient.  See 757 F.3d at 1330-31.  It permitted pleading on "information and belief" when "essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based."  575 F.3d at 1330.  The Federal Circuit noted that "SAAT's pleading provides neither the 'information' on which it relies nor any plausible reasons for its 'belief.'"  575 F.3d at 1330-31.  Specifically, according to the Federal Circuit, the "mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct."  575 F.3d at 1331. Given SAAT's failure to properly plead any of the required elements for inequitable conduct, the Federal Circuit affirmed the district court's denial of leave to amend.  See 575 F.3d at 1331.

## 2.   Who, What, Where, and When.

Numerous courts have applied Exergen's "who, what, where, when" test to specific pleadings.  575 F.3d at 1328-29.  Most pleadings successfully allege "who" was responsible for misleading the USPTO and "when" the alleged acts occurred.   The "what" and "where" requirements pose the greater challenge.

### a.   Who.

"The 'who' requirement refers to the individuals responsible for material omissions from the PTO."  Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., No. 09-C-948, 2012 WL 1952977, at *7 (E.D. Wis. May 29, 2012)(Callahan, J.)(unpublished).  Exergen requires the pleading to contain the name of the specific "individual associated with the filing and prosecution of a patent application [who] failed to disclose material information."  Exergen, 575 F.3d at 1327 n.3.  In Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co., 2009 WL 4547131, the United States

District Court for the Northern District of Indiana found a proposed inequitable conduct pleading sufficient because it "specifically names two individuals who allegedly withheld material references from the PTO." 2009 WL 4547131, at *2. See SAP Am., Inc. v. Purple Leaf, LLC, No. C 11-4601 PJH, 2012 WL 2237995, at *3 (N.D. Cal. June 15, 2012)(Hamilton, J.)(unpublished)("The pleading must name the individual associated with the filing or prosecution of the application, who both knew of the material information and deliberately withheld or misrepresented it."). The individuals named in a claim of inequitable conduct must have a duty of disclosure to the PTO. See Pfizer Inc. v. Teva Pharm. USA, Inc., 803 F. Supp. 2d 409, 435 (E.D. Va. 2011)(Smith, J.), amended, 803 F. Supp. 2d 464 (E.D. Va. 2011). The pleader may not simply identify a corporate entity or its attorneys. See Sloan Valve Co. v. Zurn Indus., Inc., 2012 WL 1108129, at *10 (finding pleadings naming "at least one of SLOAN's attorneys" insufficient to state a claim for inequitable conduct).

### b.  **What and Where.**

Exergen requires pleaders to "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found -- i.e., the 'what' and the 'where' of the material omissions." Exergen, 575 F.3d at 1329. In claims that a party withheld material prior art, the allegations must identify the specific location within the withheld prior art where the material information is found. See Exergen, 575 F.3d at 1329. The allegations must cite to specific claims within specific patents. In Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., for example, the United States District Court for the Eastern District of Wisconsin evaluated a pleading which stated that "each of the prior art references listed in paragraph 26 of the counterclaim, anticipates or renders obvious the claims of the '173 and '510 patents," but failed to identify the precise claims at issue. 2012 WL

1952977, at *7.   The district court held that the defendants failed to plead the "what" and "where" elements sufficiently.  2012 WL 1952977, at *7.  The Eastern District of Texas has also rejected references to "claims 1-74" and "every limitation" as allegations of "what" and "where." MOSAID Techs. v. Freescale Semiconductor, Inc., No. 11-CV-173, slip op. at 8.  The United States District Court for the Northern District of Indiana, on the other hand, allowed a relatively relaxed identification of "what" claims were at issue -- the defendants stated "that all five references are relevant to Claim 1, and potentially all limitations, of the '608 Patent."  Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co., 2009 WL 4547131, at *3.

       **c.**     **When.**

      The "when" requirement asks when the relevant inequitable conduct occurred.  Exergen, 575 F.3d at 1328.  Where parties allege failures to disclose material information, the "when" applies from the date the party with the information submitted its patent applications to the USPTO through the date of issue.  Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *7.   Pleadings may, but are not required to, reference "specific dates when information became available to" the opposing side, such as the date of a filing from opposing counsel or a separate USPTO office action.   Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *7.  In Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co., for example, the defendants alleged that the plaintiff: (i) was "possibly aware of the references as early as January, 2006, when Defendants' expert, Mr. Scott Logan, produced an expert report on claim construction for related litigation that specifically discussed each reference"; and (ii) was certainly aware by the date of a subsequent deposition.  2009 WL 4547131, at *3.

3.    __Knowledge__.

"The relevant 'conditions of mind' for inequitable conduct include: (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO."  Exergen, 575 F.3d at 1327.  The party alleging inequitable conduct must thus allege that its opponent had actual knowledge of its misrepresentations or of material information that it failed to disclose.  See Exergen, 575 F.3d at 1330.  Parties may allege knowledge through a variety of methods.  In Johnson Outdoors Inc. v. Navico Inc., for example, the pleading party alleged that the three engineers responsible for inequitable conduct "collectively had at least three decades of experience" and would have been aware of "publications that were widely known in the art."  774 F. Supp. 2d at 1200.  See Wyeth Holdings Corp. v. Sandoz, Inc., 2012 WL 600715, at *14 ("Given Mr. Ofslager's experience, his direct oversight of this process, and his statements to the Examiner, it is reasonable to infer, at this stage, that he was familiar with the testing protocols he cited in his declaration[.]").  In HTC Corp. v. IPCom GmbH & Co., KG, the pleading noted that the relevant documents were "referenced at a meeting that at least one inventor attended."  671 F. Supp. 2d at 151.  Similarly, in Aerocrine AB v. Apieron Inc., a litigant successfully alleged its opponents' knowledge of a material fact because of their presence at a conference where the fact was presented or discussed.  See 2010 WL 1225090, at *2.  Mere knowledge of a reference, however, does not allow a court to assume a party's familiarity with all of its contents.  See Exergen, 575 F.3d at 1330 ("A reference may be many pages long, and its various teachings may be relevant to different applications for different reasons.").  In Exergen, for example, the Federal Circuit rejected an allegation that the counterdefendant "was aware of the '808 and '998 patents in general,"

because the allegation did not allege that the counterdefendant was aware of any more specific information.  Exergen, 575 F.3d at 1330.

### 4.      Why, How, and Materiality.

A party pleading inequitable conduct must explain "both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims."  Exergen, 575 F.3d at 1329.  See Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co., 2009 WL 4547131, at *3.  The materiality requirement is thus "also known as the 'how' and 'why' requirements."  Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *8; Zvelo, Inc. v. SonicWall, Inc., No. 06-CV-00445-PAB-KLM, 2013 WL 5443858, at *4 (D. Colo. Sept. 30, 2013)(Brimmer, J.).

Exergen is no longer the leading case governing materiality determinations in the inequitable conduct context.  The Federal Circuit, sitting en banc and assisted by more than thirty amici curiae, addressed inequitable conduct again in Therasense.  See 649 F.3d 1276.  It first provided a history of the doctrine and a description of its contemporary application, noting that the courts' "focus on encouraging disclosure has had numerous unforeseen and unintended consequences."  649 F.3d at 1288.  These consequences, the Federal Circuit explained, included the doctrine's use as a routine litigation strategy; one study, for example, estimated that eighty percent of infringement cases included allegations of inequitable conduct.  See 649 F.3d at 1289. Parties saw numerous advantages in these allegations, including the expansion of discovery into corporate practices before patent filing, attorney disqualification, and the "atomic bomb" threat -- a finding of inequitable conduct on a single claim within a single patent can render the entire patent, and even other related patents, unenforceable.  649 F.3d at 1288.  These concerns led the

Federal Circuit to "tighten[] the standards for finding both intent and materiality in order to redirect a doctrine that has been overused to the detriment of the public."  649 F.3d at 1290.

Therasense held that, "as a general matter, the materiality required to establish inequitable conduct is but-for materiality."  649 F.3d at 1291.  To determine whether a withheld reference, for example, is material, district courts must "determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference" using a preponderance of the evidence standard and giving claims "their broadest reasonable construction."  649 F.3d at 1292. The Federal Circuit refused to invalidate patents where misconduct had no impact on the final claim, noting that the patentee "obtains no advantage from misconduct if the patent would have issued anyway."  649 F.3d at 1292.  See Human Genome Scis., Inc. v. Genentech, Inc., No. 2:11-CV-6519-MRP, 2011 WL 7461786, at *4 (C.D. Cal. Dec. 9, 2011)(Pfaelzer, J.)("[The] accused infringer must show facts indicating that the PTO was particularly concerned with a representation, or that the truth, if presented to the PTO, would have rendered the invention unpatentable.").

The Federal Circuit allowed for one exception, however: "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material."  649 F.3d at 1292.  It reasoned that "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent."  649 F.3d at 1292.

Several district courts have applied Therasense to specific facts.  In Spectrum Pharm., Inc. v. Sandoz Inc., the defendant alleged that the prosecuting attorney "routinely certified to the USPTO that the claim that ultimately issued as claim 13 was a dependent claim, even though Plaintiffs intended the claim as an independent claim."  2013 WL 5492667, at *3.  The defendant

further alleged that the attorney "knew that these declarations were inaccurate and false, but, nevertheless, filed the declarations in an attempt to pay a lower filing fee for the patent application."   2013 WL 5492667, at *3.   The prosecuting attorney objected, arguing that the defendant could not prove these facts and that they did not constitute affirmative egregious misconduct.  See 2013 WL 5492667, at *3.  The United States District Court for the District of Nevada held that the defendant established a "plausible material misrepresentation," noting that it would not "weigh the alleged facts and consider whether Defendant will ultimately prevail on this cause of action" at the motion-to-dismiss-stage.  2013 WL 5492667, at *3.

False statements in affidavits are material.  In Refac Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d 1576 (Fed. Cir. 1996), for example, the applicant submitted affidavits from supposedly disinterested third parties with the following statement: "I have not been in the past employed by nor do I intend in the future to become employed by Paragon Podiatry Laboratories, a corporation which I understand is the assignee of the interest in the above captioned patent application."  81 F.3d at 1583.  The individuals failed to disclose that each of them held stock in the applicant and that one had been a paid consultant for it.  See 81 F.3d at 1583.  The Federal Circuit concluded, and affirmed in Therasense, that "[a]ffidavits are inherently material, even if only cumulative."  Therasense, 649 F.3d at 1292 (quoting Refac Int'l, Ltd. v. Lotus Dev. Corp., 81 F.3d at 1583).  In Theranos, Inc. v. Fuisz Pharma LLC, the inequitable conduct allegations stated that the supposed inventors "falsely declared that they were the original, first, and sole inventors in the patent's application," and that "the PTO would not have issued the patent if it had known that Holmes and/or Kemp should have been listed as inventors."  876 F. Supp. 2d at 1137.  The district court found these allegations sufficient and allowed the inequitable conduct claims to proceed.  See 876 F. Supp. 2d at 1137.

Failures to disclose material prior art, on the other hand, do not generally[25] rise to this level.  The Federal Circuit noted in <u>Therasense</u> that "neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct."  649 F.3d at 1292-93.  Pleading inequitable conduct based on nondisclosure of prior art and other misconduct requires specific allegations focused on the USPTO's decisions.   In <u>Pall Corp. v. Cuno Inc.</u>, 681 F. Supp. 2d 258 (E.D.N.Y. 2010)(Boyle, J.), for example, the United States District Court for the Eastern District of New York considered whether an alleged patent infringer pleaded inequitable conduct with sufficient particularity.  <u>See</u> 681 F. Supp. 2d at 264.  The infringer alleged in part that

> Pall's attorneys at Leydig, Voit & Mayer, Ltd., including at least Mr. Belz, failed to tell the Examiner that the claim limitation upon which the PTO intended to, and ultimately did, confirm the patentability of the reexamined '047 Patent claims was the same claim limitation that the PTO had previously determined to be no more than an obvious variation over the prior art and thus unpatentable.

681 F. Supp. 2d at 263.  The court found that this allegation sufficiently identified "the person responsible for the alleged inequitable conduct . . . [,]when and where the alleged conduct occurred and how such conduct is material to the issuance of the reexamination certificate."  681 F. Supp. 2d at 264.  Other cases involve more direct evidence of the misrepresentation's impact on the USPTO.  In <u>Wyeth Holdings Corp. v. Sandoz, Inc.</u>, for example, "the Examiner repeatedly cited the data provided in the declaration as the primary reason for his allowance of the patent."  2012 WL 600715, at *10.  In <u>Sloan Valve Co. v. Zurn Indus., Inc.</u>, the district court

---

[25]Although the Federal Circuit provided only false affidavits as an example of affirmative egregious misconduct, it did not rule out other misrepresentations.  It explained that "the general rule requiring but-for materiality provides clear guidance to patent practitioners and courts, while the egregious misconduct exception gives the test sufficient flexibility to capture extraordinary circumstances."  <u>Therasense</u>, 649 F.3d at 1293.

cited "factual allegations that the examiner's reasons for allowance" of a certain patent were premised on one party's affirmative misrepresentations.  2012 WL 1108129, at *9.

Many other parties have failed to adequately allege but-for materiality.  Some failures to disclose are immaterial.  In Pfizer Inc. v. Teva Pharm. USA, Inc., a patent infringement defendant alleged that Pfizer, Inc. engaged in inequitable conduct by failing to disclose a competitor's Canadian patent suit, which alleged that Pfizer's patents for animal erectile-dysfunction drugs were overbroad.  803 F. Supp. 2d at 429.  The district courted rejected the failure to disclose allegation, explaining: "Even at the pleading stage, the court cannot imagine how a *generalized complaint* against Pfizer that its *Canadian* patent was *'covetous' under Canadian law* could have had any bearing whatsoever on the issuance of the ' 012 patent under the law of the United States."  803 F. Supp. 2d at 435 (emphasis in original).  If the parties alleging inequitable conduct fail to cite specific claims in specific patents "that would be deemed unpatentable in light of undisclosed information," they have failed to allege materiality.  Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *8.  Allegations must include facts "showing that 'the patentee's misconduct resulted in the unfair benefit of receiving an unwarranted claim.'"  SAP Am., Inc. v. Purple Leaf, LLC, 2012 WL 2237995, at *6 (citing Therasense, 649 F.3d at 1292).

### 5.   Specific Intent to Deceive the USPTO.

Therasense clarified that "intent and materiality are separate requirements," and that district courts "should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa."  649 F.3d at 1290.  In Human Genome Scis., Inc. v. Genentech, Inc., the plaintiff argued that the defendants knew about the existence and significance of its patents, because they had already "paid some seventy

million dollars in royalties."  2011 WL 7461786, at *4.  The court held that the allegation was sufficient to plead materiality, but insufficient to plead the separate specific intent to deceive. See 2011 WL 7461786, at *4.

Parties attempting to deceive the USPTO are unlikely to leave any direct evidence of their plans, such as an email indicating that they deliberately failed to disclose an existing application to increase their chances of a successful prosecution.  See Human Genome Scis., Inc. v. Genentech, Inc., 2011 WL 7461786, at *2 ("Because intent is a condition of mind, direct evidence of intent is rarely available.").  The Federal Circuit has recognized that "[b]ecause direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence."  Therasense, 649 F.3d at 1290.  Therasense involved a merits determination on a claim of inequitable conduct.  See 649 F.3d at 1290.  The Federal Circuit noted there that, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'"  649 F.3d at 1290.

District courts interpreting Therasense have disagreed whether this "single most reasonable inference" also applies to pleading standards.  Pfizer Inc. v. Teva Pharm. USA, Inc., 803 F. Supp. 2d at 431; Shashank Upadhye, GENERIC PHARMACEUTICAL PATENT AND FDA LAW § 4:10.  One line of cases has applied Therasense's "single most reasonable inference" standard at the pleading stage.  Hansen Mfg. Corp. v. Enduro Sys., Inc., No. CIV. 11-4030, 2011 WL 5526627, at *5 (D.S.D. Nov. 14, 2011)(Simko, J.); Quest Software, Inc. v. Centrify Corp., No. 2:10-CV-859 TS, 2011 WL 5508820, at *3 (D. Utah Nov. 9, 2011)(Stewart, J.)(noting that an attorney's inexperience tended to show that deceit was not the single most reasonable inference from his actions); Pamlab, L.L.C. v. Viva Pharm., Inc., No. C12-98MJP, 2012 WL 3262825, at

*2 (W.D. Wash. Aug. 8, 2012)(Pechman, J.); <u>VDF FutureCeuticals, Inc. v. Sandwich Isles</u> <u>Trading Co.</u>, No. CIV. 11-00288 ACK, 2011 WL 6820122, at *5 (D. Haw. Dec. 27, 2011)(Kay, J.).

A second line of cases has disagreed, holding that the pleader "need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." <u>Wyeth Holdings Corp. v. Sandoz, Inc.</u>, 2012 WL 600715, at *7 (emphasis in original). One of these courts justified its use of a lower standard on three grounds. <u>See</u> <u>Wyeth Holdings Corp. v. Sandoz, Inc.</u>, 2012 WL 600715, at *7. First, it argued that <u>Therasense</u> used the phrase "single most reasonable inference" to refer to "an *evidentiary* standard that must be satisfied at the proof stage, not a pleading standard." 2012 WL 600715, at *7 (emphasis in original). Second, it stated that <u>Exergen</u> used the phrase in a specific context:

> In contrast to the pleading stage, to prevail on the merits, the accused infringer must prove both materiality and intent by clear and convincing evidence. *See Star Scientific,* 537 F.3d at 1365. *Whereas an inference of deceptive intent must be reasonable and drawn from a pleading's allegations of underlying fact to satisfy Rule 9(b), this inference must be "the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." Id.* at 1366.

2012 WL 600715, at *8 (quoting <u>Exergen</u>, 575 F.3d at 1329 n.5)(emphasis added). It noted that <u>Exergen</u> effectively confined the use of this phrase to its discussion of the merits. <u>See</u> 2012 WL 600715, at *8. Third, the district court cited the Federal Circuit's subsequent cases on similar topics. <u>See</u> 2012 WL 600715, at *8. <u>Delano Farms Co. v. California Table Grape Comm'n</u>, 655 F.3d 1337 (Fed. Cir. 2011), which discussed a similar issue -- the failure to disclose relevant information that did not rise to the level of inequitable conduct -- required a complaint to recite "facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." 655 F.3d at 1350.

The second line of cases is now the majority position.  See Pfizer Inc. v. Teva Pharm. USA, Inc., 803 F. Supp. 2d at 430 (applying reasonable inference standard); Human Genome Scis., Inc. v. Genentech, Inc., 2011 WL 7461786, at *2; Sloan Valve Co. v. Zurn Indus., Inc., 2012 WL 1108129, at *5; Tessenderlo Kerley, Inc. v. Or-Cal, Inc., No. C 11-04100 WHA, 2012 WL 1094324, at *3 (N.D. Cal. Mar. 29, 2012)(Alsup, J.); Theranos, Inc. v. Fuisz Pharma LLC, 876 F. Supp. 2d at 1137; Butamax Advanced Biofuels LLC v. Gevo, Inc., No. CIV. 11-54-SLR, 2012 WL 2365905, at *3 (D. Del. June 21, 2012)(Robinson, J.)("[T]he standard for proving inequitable conduct is a more rigorous one than the standard for pleading inequitable conduct; apparently, even the Federal Circuit has been tempted to confuse the same."); Taro Pharm. N. Am. Inc. v. Suven Life Scis., Ltd., No. CIV.A. 11-2452 JAP, 2012 WL 2513523, at *5 (D.N.J. June 28, 2012)(Pisano, J.)(unpublished)(stating that Therasense "did not address whether [its] more stringent standards . . . should apply at the pleading stage"); SAP Am., Inc. v. Purple Leaf, LLC, 2012 WL 2237995, at *3; Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *6; Sanders v. The Mosaic Co., 418 F. App'x 914, 919 (Fed. Cir. 2011).

Under either test, a party may plead "on information and belief" "when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." Exergen, 575 F.3d at 1330.  In other words, the party must present "sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." Exergen, 575 F.3d at 1327.

A reasonable inference must consider "any objective indications of candor and good faith." Exergen Corp, 575 F.3d at 1329 n.5.  Inequitable conduct claims often focus on a patent applicant's failure to disclose co-pending patent applications to one of the examiners reviewing the applications.  In Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380

- 75 -

(Fed. Cir. 1998), the district court based its inequitable conduct finding on a litigant's failure to disclose his Venus patent application to the examiner reviewing its related Katz application.  See 148 F.3d at 1384.  The litigant appealed, noting that it had disclosed the existence of the Katz application to the Venus application's reviewer.  See 148 F.3d at 1384.  The Federal Circuit reversed, noting that the litigant "hardly could be seeking to deceive the PTO as to the existence of copending applications when it actually disclosed the fact of copendency to the Venus examiner."  148 F.3d at 1384.  This sort of cross-reference to another related patent application generally "points away from an intent to deceive."  Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1366 (Fed. Cir. 2003)(internal quotation omitted).

Even "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." Therasense, 649 F.3d at 1290.  See Pfizer Inc. v. Teva Pharm. USA, Inc., 803 F. Supp. 2d at 432 ("[A]fter Therasense, a mere recitation that 'X' individual, at 'X' time, failed to turn over 'X' information to the PTO that would have been material to the prosecution, with the specific intent to deceive the PTO, is insufficient under Rule 9(b).").  In Pixion, Inc. v. Citrix Sys., Inc., No. C 09-03496 SI, 2012 WL 762005 (N.D. Cal. Mar. 8, 2012)(Illston, J.), for example, one party disclosed co-pending material applications, but "allegedly did not disclose certain negative office actions" in those co-pending applications.  2012 WL 762005, at *6.  The United States District Court for the Northern District of California rejected the argument, because "[e]xaminers are not bound to follow other examiners' interpretations. While the Federal Circuit has found rejections of co-pending applications to be material, it has never found that failure to continuously update an IDS with negative office actions in otherwise disclosed applications evidences a specific intent to deceive."  2012 WL 762005, at *6.  On the other hand, in Human Genome Scis., Inc. v.

Genentech, Inc., the plaintiff successfully pled "specific facts regarding Genentech's intent to deceive," including its attorneys' selective compliance with a requirement that they file a patent settlement agreement with the USPTO.  2011 WL 7461786, at *7.  If a litigant can "satisfactorily explain[] why he did not view the contents of the '94 Catalogue as relevant to the elements of the invention," courts may be inclined to forgive nondisclosure.   Duhn Oil Tool, Inc. v. Cooper Cameron Corp., 818 F. Supp. 2d 1193, 1229 (E.D. Cal. 2011)(Wanger, J.).

Failure to disclose an expert declarant's affiliation raises red flags.  In Sanders v. The Mosaic Co., 418 F. App'x 914 (Fed. Cir. 2011), the Federal Circuit noted:

> Our cases indicate that the failure to disclose an expert's affiliation with the applicant to the Patent Office can constitute inequitable conduct. *See, e.g., Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1584–85 (Fed. Cir. 1996). It is a plausible inference, flowing logically from the facts alleged, that the applicant intended to conceal Dr. Murphy's connection to Sanders and Specialty Fertilizers from the Patent Office, thereby buttressing his credibility as an impartial witness.

418 F. App'x at 919.

More minor misrepresentations often fail to support a reasonable inference of intent to mislead the USPTO.  In Taro Pharm. N. Am. Inc. v. Suven Life Scis., Ltd., the defendant argued that: (i) one of plaintiff's patent application's tables was misleading, "because it used fresh samples on the one hand and at least one-year-old samples on the other"; and (ii) that the plaintiff "tried to mislead the Patent Office by 'dump[ing]' a 'mass of technical data' . . . on the Patent Office at the 'eleventh hour.'"  2012 WL 2513523, at *3-6.  The district court rejected both arguments, explaining that the table "clearly and unequivocally states that the Cheminova samples were at least one year old," and that the documents allegedly dumped "comprised a mere 12 pages of not-particularly-dense data."  2012 WL 2513523, at *3-6.

## LAW REGARDING TRANSFER OF VENUE[26]

"Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district." Whiting v. Hogan, 855 F. Supp. 2d 1266, 1284 (D.N.M. 2012)(Browning, J.). Section 1404(a) vests "discretion in the district court to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)(quoting Van Dusen v. Barrack, 376 U.S. 612, 622, (1964)).

"The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d 973, 977 (7th Cir. 2010). The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

---

[26]District courts evaluating inequitable conduct issues tend to apply Federal Circuit law only to the inequitable conduct claims themselves, and quote regional circuit decisions on motions to transfer. In SIPCO, LLC v. Control4 Corp., No. 1:11-CV-0612-JEC, 2012 WL 526074 (N.D. Ga. Feb. 16, 2012)(Carnes, J.), a patent infringement plaintiff sought to transfer a case to the Eastern District of Texas. See 2012 WL 526074, at *2. The district court applied Eleventh Circuit law to the motion to transfer, and Federal Circuit law to the inequitable conduct claim. See 2012 WL 526074, at *2.

Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1516 (internal quotation marks omitted).  See Silver v. Brown, 678 F. Supp. 2d 1187, 1204 (D.N.M. 2009)(stating the factors that the courts consider in making a venue determination under § 1404(a)), aff'd in part and rev'd in part and remanded, 382 F. App'x 723 (10th Cir. 2010).

Section 1406 "permits transfer to cure a venue defect."   Whiting v. Hogan, 855 F. Supp. 2d at 1266.  It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406. Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid."  Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration.  Van Dusen v. Barrack, 376 U.S. at 626-27.  "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citations omitted).  In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th Cir. 1986)).  The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action.  Driggers v. Clark,

422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

## ANALYSIS

The Court will not convert the Motions to Dismiss into motions to strike or motions for summary judgment.  The Court has considered each of the Counterclaimants' four primary theories of inequitable conduct separately, evaluating whether they sufficiently allege: (i) the who, what, when, and where of Ortiz and Lopez' alleged conduct; (ii) Ortiz and Lopez' knowledge of their alleged conduct; (iii) the materiality of the alleged conduct; and (iv) whether Ortiz and Lopez specifically intended to deceive the USPTO.  First, the Court concludes that the Counterclaimants have not sufficiently alleged that Ortiz and Lopez improperly filed patent applications on inventions properly attributed to Ericsson.  Second, the Court concludes that the Counterclaimants have sufficiently alleged that Ortiz and Lopez affirmatively misled the USPTO by submitting an avowedly "independent" declaration from one of their law firm's associates, Dr. Krukar, but not by submitting a separate declaration from Verna.  Third, the Court concludes that the Counterclaimants have sufficiently alleged that Ortiz and Lopez concealed adverse decisions from the Appeals Board.  Finally, the Court concludes that the Counterclaimants have not sufficiently alleged that Ortiz and Lopez withheld material information from examiners handling related, co-pending patent applications.  The Court thus grants the Motions to Dismiss in part and denies them in part without prejudice to Front Row renewing them at a later date.  Further, the Court concludes that, although the case could have been brought in the Eastern District of Texas, neither the convenience of parties and witnesses nor the interests of justice favor a transfer.  The Court thus denies Front Row's Motion to Transfer.  Finally, the Court will grant the Motion for Leave in part, because it does not involve any bad faith, delay, or prejudice

to Front Row.  It will allow only the remaining parts of the Counterclaim to proceed against
Front Row.

## I.     THE COURT WILL NOT CONVERT THE MOTIONS TO DISMISS INTO MOTIONS TO STRIKE OR MOTIONS FOR SUMMARY JUDGMENT.

The Court declines the Beck Counterclaimants' invitation to consider the Motions to
Dismiss as motions to strike.  See Beck Response at 1 (arguing that the Motions to Dismiss are
"really [] motion[s] to strike in disguise").   That the Motions to Dismiss argue that the
Counterclaim's Ericsson allegations "are 'false,' 'factually untrue,' 'highly-inflammatory,'
slanderous and 'career-threatening'" does not convert a motion expressly brought under rule
12(b)(6) into a motion to strike.  Beck Response at 1.  See Motions to Dismiss at 6.  The
Counterclaimants' motion's first paragraphs and a footer on every page identify it as a motion to
dismiss, and it does not use the word "strike."  Motions to Dismiss at 1-13.  To a certain degree,
the movant should be master of its motion; if it wants to file a motion to dismiss, and not a
motion to strike, the Court should treat it as a motion to dismiss, with its standard of review, and
not as a motion to strike, with its more rigorous standard.

The Court also declines to convert the Motions to Dismiss into motions for summary
judgment.  As a general matter, a complaint's sufficiency must rest on its pleadings alone.  See
Casanova v. Ulibarri, 595 F.3d at 1125.  The Counterclaim references three appendices.  See
Counterclaim ¶¶ 417-418, 476-477, 482-483, at 92, 105-106, 107-108.   These appendices,
however, fall within the limited exception for documents that the complaint incorporates by
reference. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.

The Motions to Dismiss attach fifty pages of affidavits and exhibits.  See Motions to
Dismiss at 14-64. Were the Court to rely on these additional materials in deciding the Motions to
Dismiss, it would "effectively convert the motion to one for summary judgment."  Gee v.

Pacheco, 627 F.3d at 1186-87.  "Under Rule 12(d), a court has broad discretion to refuse to accept the extra-pleading materials and resolve the motion solely on the basis of the pleading itself."  Navajo Nation v. Urban Outfitters, Inc., 935 F. Supp. 2d at 1157.  The Court is unwilling to consider Front Row's extra-pleading materials at this stage.  A conversion "would require the Court to give notice to the parties and allow Plaintiff an opportunity to present its own extra-pleading evidence, an inefficient process better left for a motion for summary judgment filed in the normal course of the discovery process."  Navajo Nation v. Urban Outfitters, Inc., 935 F. Supp. 2d at 1157.  Again, Front Row does not want its motion converted.  The Court is reluctant to convert at this stage, where there is a thin record -- no discovery -- on which to base any summary judgment motion.  Front Row has to recognize, however, that the Court will also have to ignore its affidavits and attachments, too.

## II.   THE COURT WILL FOLLOW THE MAJORITY RULE, AND REQUIRE THAT THE COUNTERCLAIMANTS NEED ONLY ALLEGE FACTS FROM WHICH IT COULD REASONABLY INFER THAT ORTIZ AND LOPEZ MADE A DELIBERATE DECISION TO DECEIVE THE PTO.

The Court concludes for two reasons that the majority of district courts interpreting the Federal Circuit's holding in Therasense have reached the correct conclusion.  First, Therasense itself suggests a lower standard for intent.  The opinion was a decision on the merits after trial rather than a ruling on a rule 12(b)(6) motion.  See 649 F.3d at 1282.  Its statements of the law assumed that the parties were past the pleading stage.  See Therasense, 649 F.3d at 1287 ("To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO.")(emphasis added).  The holding -- that, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence'" --  discusses "evidence" that would not be available at the pleading

stage.   649 F.3d at 1290.   It is unclear how a party could plead, for example, that the patent

holder inequitably obtained its patent by failing to disclose material information; there would

always be "multiple reasonable inferences" available, such as simple negligence, and the pleader

would have no way to obtain further information.   Therasense, 649 F.3d at 1290-91.

> [T]he court in *Therasense* did not foreclose all inequitable conduct claims. It
> would be inappropriate at the motion to dismiss stage to hold that DrugLogic
> cannot plead inequitable conduct based on a case that addressed the heightened
> standards not for pleading but for proving the elements of such a claim.

Oracle Corp. v. DrugLogic, Inc., 807 F. Supp. 2d 885, 900 (N.D. Cal. 2011)(Spero, M.J.).

Second, a Federal Circuit case post-dating Therasense employed the less restrictive

standard at the pleading stage.   In Delano Farms Co. v. California Table Grape Comm'n, the

Federal Circuit confronted a "charge of inequitable conduct based on a failure to disclose" at the

motion-to-dismiss stage.   655 F.3d at 1350.   The Federal Circuit cited both Exergen and

Therasense, but applied Exergen's "facts from which the court may reasonably infer" standard

instead of Therasense's "most reasonable inference" standard.   655 F.3d at 1350.   Delano Farms

Co. v. California Table Grape Comm'n thus strongly suggests that Therasense did not replace the

Exergen standard at the pleading stage.   See 655 F.3d at 1350.   Subsequent district courts have

followed this instruction.   In W.L. Gore & Associates, Inc. v. Medtronic, Inc., 850 F. Supp. 2d

630 (E.D. Va. 2012)(Davis, J.), for example, the district court declined to follow other decisions

within the Eastern District of Virginia based on   Delano Farms Co. v. California Table Grape

Comm'n.   See 850 F. Supp. 2d at 634.   It explained that "this Court will follow the *Delano*

court's recitation of the *Exergen* standard, without any modification for the heightened

*Therasense* requirements, as it is binding precedent on this Court."   850 F. Supp. 2d at 634 n.1.

See iLife Techs. Inc. v. Body Media, Inc., No. CIV.A. 14-990, 2015 WL 1000193, at *3 (W.D.

Pa. Mar. 6, 2015)(Conti, J.)("Before the court is a motion to dismiss Body Media's inequitable

conduct counterclaim.    The appropriate legal standard, therefore, is set forth in
*Exergen*.")(citations omitted); <u>Evonik Degussa GmbH v. Materia Inc.</u>, No. 09-CV-636 NLH-JS,
2012 WL 4503771, at *4 (D. Del. Oct. 1, 2012)(Hillman, J.)("[T]he proper standard to apply at
this stage in the proceedings is the standard set forth in *Exergen*.").

The Court recognizes the Federal Circuit's apparent concern with restricting inequitable
conduct claims at the pleading stage.  The Federal Circuit specifically noted, for example, that
"[a] charge of inequitable conduct conveniently expands discovery into corporate practices
before patent filing and disqualifies the prosecuting attorney from the patentee's litigation team."
<u>Therasense</u>, 649 F.3d at 1288.  It added that the doctrine "discourages settlement and deflects
attention from the merits of validity and infringement issues."  649 F.3d at 1288.  Both of these
harms occur before the merits determination.  The Court will not, however, ignore <u>Delano Farms</u>
<u>Co. v. California Table Grape Comm'n</u> to further the policy statements expressed in <u>Therasense</u>.

III.    **THE COUNTERCLAIM DOES NOT SUFFICIENTLY ALLEGE THAT ORTIZ**
**AND LOPEZ IMPROPERLY FILED PATENT APPLICATIONS ON**
**<u>INVENTIONS PROPERLY ATTRIBUTED TO ERICSSON.</u>**

As to the allegations that Messrs. Ortiz and Lopez improperly filed patent applications on
innovations properly attributed to Ericsson, the Counterclaim sufficiently alleges the who, what,
where, and when.  The Counterclaim does not, however, sufficiently allege Messrs. Ortiz and
Lopez' knowledge.  In the end, the Court concludes that the Counterclaim does not sufficiently
allege that Messrs. Ortiz and Lopez improperly filed patent applications on Ericsson's
innovations.

A.    **THE COUNTERCLAIM SUFFICIENTLY ALLEGES THE WHO, WHAT,**
**WHERE, AND WHEN.**

The Counterclaim complies with <u>Exergen</u>'s command to specifically allege the "who,
what, where, [and] when."  575 F.3d at 1317.  First, the Counterclaim identifies Mr. Ortiz and

Mr. Lopez as the "owners and founders of Front Row," and as the persons directly responsible for the alleged inequitable conduct.  Counterclaim ¶¶ 18-22, at 37.  The Counterclaim does not merely allege that one of Front Row's attorneys was involved.  See Sloan Valve Co. v. Zurn Indus., Inc., 2012 WL 1108129, at *10.  It instead names the specific "individual associated with the filing and prosecution of a patent application" responsible for the alleged inequitable conduct.  Exergen, 575 F.3d at 1327 n.3.

Second, the Counterclaim adequately alleges the "what" and "where" elements.  The cases analyzing these elements tend to involve failures to disclose material information, in which claimants must identify a specific omission and how that omission affected specific claims.  Exergen, for example, requires the pleader to "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found -- i.e., the 'what' and the 'where' of the material omissions."  Exergen, 575 F.3d at 1329.  Front Row argues that the Counterclaim does not "identify a single specific Front Row patent claim or limitation that would be affected by its inequitable conduct allegations."  Reply at 7.  The Court finds this reasoning unconvincing for two reasons.  First, this is not a material representation issue, and Messrs. Ortiz and Lopez' alleged false representation that they invented the subject matter of their patent claims would invalidate their entire patents.  See Theranos, Inc. v. Fuisz Pharma LLC, 876 F. Supp. 2d at 1137 (denying motion to dismiss inequitable conduct claim focused on entire patent).  Second, the Counterclaim identifies specific areas of Ericsson's ongoing projects, see Counterclaim ¶ 77, at 52-53, that appeared in Messrs. Ortiz and Lopez' patent applications, see Counterclaim ¶ 88, at 55.

Third, the Counterclaim sufficiently alleges the alleged misconduct's "when."  It lists the dates on which Messrs. Ortiz and Lopez submitted eighteen inventor declarations to the USPTO.

See Counterclaim ¶ 102, at 58-59.  Although most cases discussing the "when" requirement deal with the failure to disclose material information, the submission date of an allegedly false affidavit is analogous to the submission date for a patent application that fails to disclose material information.  See Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *7.  The district court in Theranos, Inc. v. Fuisz Pharma LLC allowed an inequitable conduct claim to proceed when the plaintiff alleged that the defendants "falsely declared that they were the original, first, and sole inventors in the patent's application" "in or about September 2009." 876 F. Supp. 2d at 1137.  The Counterclaim provides even more specific dates for the submission of the relevant inventor declarations.  See Counterclaim ¶ 102, at 58-59.  The Counterclaim thus complies with Exergen's requirement by naming precisely when the relevant inequitable conduct occurred.  See Exergen, 575 F.3d at 1328.

### B.   THE COUNTERCLAIM DOES NOT SUFFICIENTLY ALLEGE MESSRS. ORTIZ AND LOPEZ' KNOWLEDGE.

The Counterclaim does not sufficiently allege Messrs. Ortiz and Lopez' knowledge of the alleged misrepresentation.  The Counterclaim directly alleges that "attorneys Ortiz and Lopez knew they were not the true and original investors of the claimed invention," and that they "knew they were not entitled" to the resulting patents.  Counterclaim ¶ 104, at 60.  These allegations, even if adequate under a normal pleading standard, are insufficient under Exergen.  See 575 F.3d at 1330.

The Counterclaimants make most of their knowledge allegations "on information and belief."  Counterclaim ¶¶ 23-105, at 38-60.  Under Exergen, "[p]leading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based."  Exergen, 575 F.3d at 1330.  The essential information here is not uniquely

within Front Row's control.  Ericsson, for example, could provide information substantiating allegations the Counterclaimants make on information and belief.  Ericsson could confirm or determine whether Mr. Lopez' "access to internal documentation and information regarding Ericsson's research and development" extended to projects hosted in Sweden.  Complaint ¶ 27, at 38.  If the Counterclaimants had contacted Ericsson, it could confirm or expand on whether Mr. Lopez "regularly received news and status updates from Ericsson" regarding its technology projects, and whether Contact Magazine was only "[o]ne means of publicizing these projects." Counterclaim ¶ 28, at 38-39.  See Mikityanskiy v. Podee, Inc., No. 10 CIV. 6410 PKC, 2011 WL 2038773, at *3 (S.D.N.Y. May 24, 2011)(Castel, J.)(noting that "[m]any key factual allegations are not uniquely within another party's control").

Second, the Counterclaim does not set forth "the specific facts upon which the belief is reasonably based."  Exergen, 575 F.3d at 1330.  It presents two possible theories on how Messrs. Ortiz and Lopez learned about Ericsson's research.  The primary theory alleges that the pair read about the project in Ericsson's Contact Magazine.  See Counterclaim ¶¶ 59-60, 78-79, at 47-48, 53.  Ericsson had thousands of employees when the relevant articles appeared in Contact Magazine.  See PowerPoint A at 24.  Mr. Ortiz was not an Ericsson employee.  See PowerPoint A at 24.  Moreover, Contact Magazine was even more obscure than a publication like American Way, the magazine in the back of the seats for American Airlines.  See Tr. at 41:1-12 (Chan)(comparing the two magazines).  It may be that few employees read their employers' in-house magazines; the Counterclaim does not give enough information for the Court to know, one way or the other, so it is left to guess.  The Court thus cannot reasonably infer Messrs. Ortiz and Lopez' knowledge based on articles in Contact Magazine; the allegation does not give the Court much comfort, because it is imaginative speculation.

The Counterclaim also alleges, as a fallback, that Messrs. Ortiz and Lopez were aware of Ericsson's projects "through other sources of information available to Ericsson [] counsel or the public in general."  Counterclaim ¶¶ 59-60, 78-79, at 47-48, 53.  It fails, however, to identify these other sources or cite specific facts to support its assertion.[27]  The Counterclaim's allegations are less specific than the allegations in other cases finding sufficient allegations of knowledge.  See Johnson Outdoors Inc. v. Navico Inc., 774 F. Supp. 2d at 1200 (supporting allegations included responsible engineers' extensive experience and that the publications were "widely known in the art"); Wyeth Holdings Corp. v. Sandoz, Inc., 2012 WL 600715, at *14 (relying on allegations of attorney's "experience, his direct oversight of this process, and his statements to the Examiner"); HTC Corp. v. IPCom GmbH & Co., KG, 671 F. Supp. 2d at 151 (relying on allegation that relevant documents were "referenced at a meeting that at least one inventor attended").  The specific facts that could support this assertion, such as a description of Ericsson's computer networks, may be obtained from Ericsson.  The Court will require the Counterclaimants to investigate further to support this theory before allowing it to proceed.[28]

---

[27]The Counterclaimants contend that the similarity between Ericsson's projects and Front Row's patent applications and their timing, "shortly after Mr. Lopez left Ericsson as inhouse [sic] counsel," allow the Court to infer Messrs. Ortiz and Lopez' knowledge of Ericsson's projects and its misrepresentations.  MLB Response at 16.  The Court concludes that these allegations are insufficient to support a reasonable inference of knowledge.  Moreover, the Counterclaimants describe the subject matter of the relevant patents and Ericsson's projects only in general terms, making any overlap -- at least pled overlap -- considerably less significant.  See Counterclaim ¶ 58, at 47 (describing brief and general Arena Project features); id. ¶ 77, at 52-53 (describing brief and general America's Cup Project features); id. ¶ 100, at 58 (stating that Front Row's patents "all generally relate to wireless transmission of venue-based data during live events").

[28]Given the Court's conclusion that the Counterclaim does not sufficiently allege Messrs. Ortiz and Lopez' knowledge, the Ericsson allegations are insufficient, without any determination of materiality.  The Court notes, however, that the alleged misrepresentations would be material if the Counterclaim successfully alleged knowledge.  "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit,

IV.    **THE COUNTERCLAIM SUFFICIENTLY ALLEGES THAT ORTIZ AND LOPEZ AFFIRMATIVELY MISLED THE USPTO BY SUBMITTING DR. KRUKAR'S "INDEPENDENT" DECLARATION, BUT NOT VERNA'S DECLARATION.**

As to the allegations that Messrs. Ortiz and Lopez affirmatively misled the USPTO with respect to the Krukar and Verna Declarations, the Counterclaim sufficiently alleges the who, what, when, and where.  The Counterclaim also sufficiently alleges Messrs. Ortiz and Lopez' knowledge.  The Counterclaim alleged materiality and intent for the Dr. Krukar Declaration, but not for the Verna Declaration.

A.    **THE COUNTERCLAIM SUFFICIENTLY ALLEGES THE WHO, WHAT, WHERE, AND WHEN.**

First, the Counterclaim adequately alleges "who" was responsible for the inequitable conduct.  It identifies Messrs. Ortiz and Lopez as the "named inventors and prosecuting attorneys for all of the patents-in-suit," and alleges that they "repeatedly violated their duties of candor and good faith by submitting declarations that they knew were false or materially misleading." Counterclaim ¶ 110, at 61.  It thus identifies the specific "individual[s] associated with the filing and prosecution of a patent application" responsible for the alleged inequitable conduct. Exergen, 575 F.3d at 1327 n.3.

---

the misconduct is material."  Therasense, 649 F.3d at 1292.  The Counterclaim alleges that "attorneys Ortiz and Lopez filed numerous false declarations attesting that they were the true inventors of the applications that issued as each and every one of the patents-in-suit." Counterclaim ¶ 98, at 57.  These declarations are legally indistinguishable from the affidavits discussed in Therasense.  The allegations here are also closely analogous to the allegations in Theranos, Inc. v. Fuisz Pharma LLC, which stated that the supposed inventors "falsely declared that they were the original, first, and sole inventors in the patent's application," and that "the PTO would not have issued the patent if it had known that Holmes and/or Kemp should have been listed as inventors."  876 F. Supp. 2d at 1137.  The Court would thus conclude that materiality is present because of the affirmative misconduct.  See Spectrum Pharm., Inc. v. Sandoz, Inc., 2013 WL 5492667, at *2-3.  The Counterclaim's failure to allege knowledge also means that it cannot successfully allege intent to deceive the USPTO.  See Exergen, 575 F.3d at 1330.

Second, the Counterclaim sufficiently alleges the alleged misconduct's "what" and "where."  Again, existing case law does not directly address how to apply the "what" and "where" requirements to cases that do not center on failures to disclose material information. Exergen, 575 F.3d at 1329 (defining the "what" and "where" requirements as requiring the pleader to "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found").  The Counterclaim, however, identifies "(i) the particular patent claims at issue in the inequitable conduct allegation and (ii) the particular limitations of those claims that are implicated by the inequitable conduct."  Reply at 5 (citing Exergen, 575 F.3d at 1329).

Front Row argues that the Counterclaim includes "no identification of any specific claim elements whatsoever" for both the Krukar and Verna Declarations.  Tr. at 33:16-18 (Chan).  See PowerPoint A at 21.  The Court disagrees with this analysis.  The Counterclaim walks through the Krukar and Verna Declarations' relationships to various arguments that Front Row submitted in support of patentability, quoting the argument, the examiner's response, and Front Row's reply relying on the Declarations.  See Counterclaim ¶¶ 106-199, at 60-81.  As it goes through the analysis, it identifies a series of specific claims.  See Counterclaim ¶ 114, at 62 ("the claims of the '458 Application"); id. ¶ 151-152, at 70 ("at least claims 1 and 21 of the '162 Patent"); id. ¶ 157, at 71 ("at least claim 19 of the '855 Patent"); id. ¶ 161, at 72 ("at least claims 1-15 and 21 of the '363 patent"); id. ¶ 166, at 74 ("the claims of the '169 Patent").  Front Row nonetheless faults the Counterclaim for failing to identify particular claim elements within these claims.  See Tr. at 35:19-25 (Chan)("They didn't go and say, Well, the representation that Dr. Krukar made with respect to his independence bore specifically on the prosecution of claims X through Y, and

in particular, the elements A through B of those asserted claims. There is no statement to that effect whatsoever.").

Exergen, at first glance, appears to support this argument.  See 575 F.3d at 1329 (requiring pleadings to identify both claims "and . . . limitations in those claims").  In the same paragraph, however, Exergen cited numerous cases discussing only claims:

> Second, the pleading fails to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found—i.e., the "what" and "where" of the material omissions. *See Regents of Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1570 (Fed. Cir. 1997) ("Information is material if a reasonable examiner would have considered it important to the patentability of a *claim.*" (emphasis added)); 37 C.F.R. § 1.56(a) ("The duty to disclose information exists with respect to each pending claim until the *claim* is cancelled or withdrawn from consideration, or the application becomes abandoned." (emphasis added)).

575 F.3d at 1329.  Moreover, subsequent Federal Circuit cases have discussed only "claims." See Therasense, 649 F.3d at 1291 (defining but-for material by reference to "claims" rather than claim elements); Intellect Wireless, Inc. v. HTC Corp., 732 F.3d 1339, 1345 (Fed. Cir. 2013). Other district courts have also allowed less specific language.  See Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co., 2009 WL 4547131, at *3 (allowing assertion that "all five references are relevant to Claim 1, and potentially all limitations, of the '608 Patent").  In Drew Techs., Inc. v. Robert Bosch, L.L.C., No. 12-15622, 2014 WL 562458 (E.D. Mich. Feb. 13, 2014)(Berg, J.), for example, the United States District Court for the Eastern District of Michigan approved a pleading that referenced "at least claim 1 of the Asserted '851 Patent." 2014 WL 562458, at *4.  The district court explained that, "[w]hile the allegations could be clearer . . . Bosch is alleging that *every limitation* in claim 1 is "anticipated or rendered obvious based on the '964 Patent."  2014 WL 562458, at *4 (emphasis in original).  Even the district court in MOSAID Techs. v. Freescale Semiconductor, Inc. approved a separate pleading alleging

that "the PowerMizer feature practices every limitation of [36 numbered] claims of the '885 Patent."   MOSAID Techs. v. Freescale Semiconductor, Inc., No. 11-CV-173, slip op. at 8 (alterations in original).

Third, the Counterclaim sufficiently alleges "when" the alleged misconduct occurred.   As to Dr. Krukar, it explains that, "[o]n March 19, 2007, Ortiz and Lopez submitted the declaration of Dr. Richard Krukar," and that they reaffirmed his independence "[i]n a November 5, 2007 submission to the PTO" and in further arguments "on January 25, 2008."   Counterclaim ¶¶ 119, 133, 137, at 63, 66.   As to Verna, the Counterclaim states that Ortiz and Lopez submitted the Verna Declaration on May 26, 2011, and that they resubmitted it on June 21, 2011, July 14, 2011, November 21, 2011, and February 7, 2013.   See Counterclaim  ¶¶ 171, 185, 186, 190, at 75, 78, 79.   As in Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., the Counterclaim identifies the date on which the relevant party submitted incomplete or misleading statements to the USPTO.   See 2012 WL 1952977, at *7.

## B.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES MESSRS. ORTIZ AND LOPEZ' KNOWLEDGE.

The Counterclaim sufficiently alleges that Messrs. Ortiz and Lopez "submit[ed] declarations that they knew were false or materially misleading."   Counterclaim ¶ 110, at 61. See Exergen, 575 F.3d at 1330.   The Counterclaim notes that "Ortiz and Lopez repeatedly told the PTO examiner that Dr. Krukar's declaration was 'independent analysis' that supported their arguments."   Counterclaim ¶ 111, at 61.   Dr. Krukar, however, "had been employed as an associate at Ortiz and Lopez, PLLC since the fall of 2005, when he was one of the first associates hired by Ortiz and Lopez."   Counterclaim ¶ 127, at 64.   Dr. Krukar was allegedly "one of only three to five attorneys practicing at the firm as of January 2007."   Counterclaim ¶ 127, at 64.   It

is implausible at best to suggest that Messrs. Ortiz and Lopez were unaware that Dr. Krukar was their associate.

There are also strong allegations of Messrs. Ortiz and Lopez' knowledge of their relationship with Verna. The Counterclaim alleges that Verna was their "business partner and a co-inventor with them on other patent applications." Counterclaim ¶ 167, at 74. It adds that the pair filed a provisional patent application with Verna as a co-inventor the day after Verna signed the Verna Declaration. See Counterclaim ¶ 181, at 77. Finally, it notes, "Ortiz and Lopez were unquestionably aware of the content of the Verna Declaration by at least December 2, 2011, because they submitted the Verna Declaration and relied on it in [sic] during prosecution of a different Front Row patent application." Counterclaim ¶ 191, at 79. The Counterclaimants sufficiently allege that Messrs. Ortiz and Lopez had actual knowledge of the misleading content of the Krukar and Verna Declarations.

### C.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THAT THE MISREPRESENTATIONS IN THE DR. KRUKAR DECLARATION, BUT NOT THOSE IN THE VERNA DECLARATION, WERE MATERIAL.

The Counterclaim adequately alleges that the Dr. Krukar Declaration was but-for material to various patents. See Therasense, 649 F.3d at 1291. First, the declaration constitutes egregious misconduct and is thus inherently material. See Therasense, 649 F.3d at 1292 ("Affidavits are inherently material, even if only cumulative."). The Dr. Krukar Declaration is less obviously material than the affidavit in Refac Int'l, Ltd. v. Lotus Dev. Corp., which directly stated that "I have not been in the past employed by nor do I intend in the future to become employed by Paragon Podiatry Laboratories." 81 F.3d at 1583. Nonetheless, the Dr. Krukar Declaration allegedly asserted that Dr. Krukar was presenting an "independent analysis." Counterclaim ¶ 143, at 68. Messrs. Ortiz and Lopez cannot contend that an associate at their law firm submitted

such an "independent analysis."   Counterclaim ¶ 143, at 68.  Messrs. Ortiz and Lopez even allegedly reaffirmed the "independent" nature of the Dr. Krukar Declaration after questioning from the examiner on Dr. Krukar's interest.  Counterclaim ¶¶ 130,137 at 65-67.

The Dr. Krukar Declaration would be material even if it did not constitute egregious misconduct.  The Counterclaim explains that a patent examiner rejected "all pending claims" of one patent application, "based at least in part on a determination that" a person skilled in the art would have combined two existing patents, Anderson and Duhalt.  Counterclaim ¶¶ 114-116, at 62.   Front Row responded with the Dr. Krukar Declaration, stating that "Dr. Krukar's independent analysis . . . . defeats the proposition that one skilled in the art would be motivated to combine Duhalt with Anderson et. al because of Anderson et al's limitations."  Counterclaim ¶ 122, at 64.   The examiner then "permanently withdrew the combination of Anderson and Duhault as grounds for rejection of claims during prosecution of the '458 Application."  Counterclaim ¶ 140, at 67.  The Court can reasonably infer from these allegations that the examiner would have reached a different result but for the Dr. Krukar Declaration.

The Court cannot soundly reach the same conclusion with respect to the Verna Declaration.  The Counterclaim alleges that "Verna disclosed that he '[had] been retained by Front Row Technologies in connection with the above-referenced reexamination of the above referenced U.S. Patent.'"  Counterclaim ¶ 176, at 76.  The Counterclaim alleges that the Verna Declaration was misleading, because it failed to: (i) disclose Verna's attorney-client relationship with Messrs. Ortiz and Lopez, see Counterclaim ¶ 180, at 76-77; (ii) disclose the three's co-inventor relationship, see Counterclaim ¶ 181, at 77; and (iii) describe Verna's compensation as a consultant for Front Row, see Counterclaim ¶ 176, at 76.  The Counterclaim alleges that these deceptions "created the misleading impression that the 'legendary' Tony Verna was an

independent expert" when he was only "a business partner and co-inventor with Ortiz and Lopez." Counterclaim ¶ 179, at 76.

These allegations do not amount to egregious misconduct. Therasense defines "affirmative acts of egregious misconduct" to include the filing of an "unmistakably false affidavit." 649 F.3d at 1292. The Verna Declaration disclosed that Front Row was compensating Verna in return for his Declaration and was thus not "unmistakably false" in the same sense as the Dr. Krukar Declaration. See Counterclaim ¶ 176, at 76. The Court cannot reasonably infer that an examiner's knowledge that Verna was "a business partner and co-inventor with Ortiz and Lopez" instead of "an outside, independent consultant retained only for the reexamination(s)" would have a but-for effect on any patent reexaminations. Counterclaim ¶¶ 179, 192, at 76, 79. Moreover, the Counterclaim's brief discussion of the Verna Declaration does not explain how Verna's statements affected specific patent claims. See Counterclaim ¶¶ 171-200, at 75-82.

### D. THE COUNTERCLAIM SUFFICIENTLY ALLEGES MESSRS. ORTIZ AND LOPEZ' INTENT TO DECEIVE THE USPTO.

The Counterclaim sufficiently alleges Messrs. Ortiz and Lopez' intent to deceive the USPTO. As discussed above, the Counterclaimants "need only allege facts from which the Court could *reasonably infer* that the patent applicant made a deliberate decision to deceive the PTO." Wyeth Holdings Corp. v. Sandoz, Inc., 2012 WL 600715, at *7 (emphasis in original). See Human Genome Scis., Inc. v. Genentech, Inc., 2011 WL 7461786, at *2 ("Because intent is a condition of mind, direct evidence of intent is rarely available."). The Federal Circuit addressed a similar issue in Sanders v. The Mosaic Co., where a patent applicant failed to disclose an expert's connection to its own business. See 418 F. App'x at 919. The Federal Circuit explained that the applicant's intent to deceive the USPTO was "a plausible inference,

flowing logically from the facts alleged."  418 F. App'x at 919.  Front Row's alleged failure to modify the Dr. Krukar Declaration after the examiner specifically inquired into Dr. Krukar's interests reinforces the Court's understanding that its choice of words was no accident.  See Counterclaim ¶¶ 130,137 at 65-67.

## V.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THAT ORTIZ AND LOPEZ CONCEALED ADVERSE APPEALS BOARD DECISIONS.

The Counterclaim alleges that Examiner Selby issued a second office action, rejecting two of Front Row's arguments, on July 12, 2007.  See Counterclaim ¶¶ 211-212, at 84.  The Appeals Board allegedly affirmed Selby's decision and conclusively rejected the same arguments on January 29, 2010.  See Counterclaim ¶¶ 216-220, at 85-86.  It then alleges that Messrs. Ortiz and Lopez "would subsequently assert nearly identical arguments in support of the patentability of four related Front Row patents, which were examined by examiners other than Selby: the '856 Patent, the '184 Patent, the '895 Patent, and the '460 Patent."  Counterclaim ¶ 221, at 86.  The Counterclaim adds that Messrs. Ortiz and Lopez failed to disclose one or both of these decisions to examiners in these four other patent applications.  See Counterclaim ¶¶ 222-253, at 86-93.

The Counterclaim sufficiently alleges the who, what, where, and when for these claims. It sufficiently alleges Messrs. Ortiz and Lopez' knowledge, as they raised related issues in a brief to the USPTO.  The Counterclaim also sufficiently alleges that the failure to disclose the Appeals Board decisions was material, and that Messrs. Ortiz and Lopez acted with intent to deceive the USPTO examiners.

### A.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THE WHO, WHAT, WHERE, AND WHEN.

The Counterclaim sufficiently alleges "who" was responsible for the inequitable conduct. It notes that "attorneys Ortiz and Lopez" failed to disclose an adverse decision from the Appeals Board during their prosecution of several related patents.  Counterclaim ¶ 204, at 83.  As with the Counterclaim's other sections, the Counterclaim names the "specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it."  Exergen, 575 F.3d at 1329.  Messrs. Ortiz and Lopez both had duties of candor and good faith to the USPTO.  See Counterclaim ¶ 206, at 83; Pfizer Inc. v. Teva Pharm. USA, Inc., 803 F. Supp. 2d at 435.

The Counterclaim identifies the specific claims at issue within each of these four patents. See Counterclaim ¶¶ 255-276, at 93-98.  For the '856 Patent, it targets "at least issued claims 1, 14, 15, and 16."  Counterclaim ¶ 255-256, at 93-94.  For the '184 Patent, the Counterclaim mentions "at least claims 1, 12, and 20."  Counterclaim ¶ 260, at 94.  For the '895 Patent, the Counterclaim mentions "at least claims 1, 8, and 15."  Counterclaim ¶ 265, at 95.  Finally, for the '460 Patent, it identifies "at least claims 1, 8, and 13."  Counterclaim ¶ 271, at 97.  These identifications are more specific than the generic "claims of the '173 and '510 patents" that the district court rejected in Milwaukee Elec. Tool Corp. v. Hitachi Koki Co.  2012 WL 1952977, at *7.

The Counterclaim also sufficiently alleges the "when" for this alleged misconduct. Given that this claim is a failure to disclose claim, the "when" extends from the date Front Row learned of the Appeals Board's decision -- the "specific date[] when information became available" --  through "the pendency of the . . . patents' consideration by the PTO."  Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *7.  The allegations here are also

more precise than the allegations that the district court approved in Lincoln Nat. Life v. Transamerica Fin. Life Ins. Co. See 2009 WL 4547131, at *3.

### B.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES MESSRS. ORTIZ AND LOPEZ' KNOWLEDGE.

Exergen requires inequitable conduct claims to allege "knowledge of the withheld material information."  575 F.3d at 1327.  The alleged withheld material information here is the disposition of two arguments Messrs. Ortiz and Lopez submitted in support of their '098 Application, including: (i) a July 12, 2007 final rejection and office action by Selby rejecting both of their arguments; and (ii) a January 29, 2010 Appeals Board decision rejecting the same two arguments.  See Counterclaim ¶¶ 212, 216, at 84, 85.  The Counterclaim specifically alleges knowledge, see Counterclaim ¶¶ 277-278, at 98, and notes that Messrs. Ortiz and Lopez raised these arguments in a brief and at a hearing before the Appeals Board, see Counterclaim ¶¶ 214-215, at 84-85.  Messrs. Ortiz and Lopez had more reason to know of the relevant information than the inventors in HTC Corp. v. IPCom GmbH & Co., KG, who happened to be present at a meeting.  See 671 F. Supp. 2d at 151.  Their brief to the Appeals Board may have been "many pages long, and its various teachings may [have] be[en] relevant to different applications for different reasons," but the Counterclaim states that Messrs. Ortiz and Lopez offered these two arguments in particular on appeal.  Exergen, 575 F.3d at 1330.  See Counterclaim ¶ 214, at 84-85.  The Counterclaim thus sufficiently alleges knowledge.

### C.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THAT THE MISREPRESENTATIONS WERE MATERIAL.

The Counterclaim sufficiently alleges that Messrs. Ortiz and Lopez' failure to disclose the USPTO's adverse decisions were but-for material to specific claims within four Front Row patents.  Therasense requires the Court to "determine whether the PTO would have allowed the

claim if it had been aware of the undisclosed reference. In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." Therasense, 649 F.3d at 1291-92. Human Genome Scis., Inc. v. Genentech, Inc. required that the pleader present "facts indicating that the PTO was particularly concerned with a representation, or that the truth, if presented to the PTO, would have rendered the invention unpatentable." Human Genome Scis., Inc. v. Genentech, Inc., 2011 WL 7461786, at *4. The Counterclaim alleges that various examiners "would not have allowed" certain claims within each contested patent. See Counterclaim ¶¶ 259, 263, 269, 274 at 94, 95, 97, 98 (using identical language). In some cases, it provides more specific examples of how examiners reacted to Front Row's arguments. See Counterclaim ¶ 275, at 98 ("In the Notice of Allowance for the '460 Patent, Examiner Gesesse explicitly referred to Ortiz and Lopez's 'server' arguments as the basis for allowing the claims to issue."). These allegations are similar to the successful allegation in Pall Corp. v. Cuno Inc., which stated that the applicant

> failed to tell the Examiner that the claim limitation upon which the PTO intended to, and ultimately did, confirm the patentability of the reexamined '047 Patent claims was the same claim limitation that the PTO had previously determined to be no more than an obvious variation over the prior art and thus unpatentable.

681 F. Supp. 2d at 263. The Court thus concludes that the Counterclaim successfully alleges materiality.[29]

---

[29]The Court notes that the Counterclaim also alleges that Messrs. Ortiz and Lopez further "asserted arguments in favor of patentability that they knew were inconsistent with the Board's Decision," and thus made "affirmative misrepresentations . . . constitut[ing] affirmative egregious misconduct that is inherently material." Counterclaim ¶ 270, at 97. The Court concludes that these allegations do not rise to the level of affirmative egregious misconduct. They are not "unmistakably false," as Therasense requires. 649 F.3d at 1292.

### D.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES MESSRS ORTIZ AND LOPEZ' INTENT TO DECEIVE THE USPTO.

The Counterclaim sufficiently alleges the required intent to deceive the USPTO.  As an initial matter, the Counterclaim's argument about Ortiz and Lopez' "direct financial and proprietary interest in the patents" is not sufficient to support their intent.   Counterclaim ¶ 279, at 98-99.  Many patent attorneys have a financial interest in their patent applications, and the others have a financial interest in securing approvals from the USPTO.  The allegation that "Ortiz and Lopez had a much stronger motive to breach their duties of good faith and candor," without more, is not enough.  Counterclaim ¶ 281, at 99.  The Counterclaimants, however, have provided more concrete allegations.  Pfizer Inc. v. Teva Pharm. USA, Inc., notes that, "after *Therasense,* a mere recitation that 'X' individual, at 'X' time, failed to turn over 'X' information to the PTO that would have been material to the prosecution, with the specific intent to deceive the PTO, is insufficient under Rule 9(b)."  803 F. Supp. 2d at 432.  The facts here, however, are distinguishable.  The Counterclaim alleges that Messrs. Ortiz and Lopez not only failed to disclose adverse USPTO actions, but also "affirmatively assert arguments rejected by" an Appeals Board decision.  Counterclaim ¶ 280, at 99.  This case is also distinguishable from Pixion, Inc. v. Citrix Sys., Inc., in which the district court stated that "[e]xaminers are not bound to follow other examiners' interpretations."  2012 WL 762005, at *6.  This case involved an Appeals Board decision, which is binding on other patent examiners.  The Counterclaim alleges facts from which the Court can reasonably infer that Messrs. Ortiz and Lopez "made a deliberate decision to deceive the PTO."  Wyeth Holdings Corp. v. Sandoz, Inc., 2012 WL 600715, at *7.

## VI.   THE COUNTERCLAIM DOES NOT SUFFICIENTLY ALLEGE THAT ORTIZ AND LOPEZ WITHHELD MATERIAL INFORMATION FROM EXAMINERS HANDLING RELATED, CO-PENDING PATENT APPLICATIONS.

The Court concludes that the Counterclaim sufficiently alleges the who, what, where, and when for its claims related to Messrs. Ortiz and Lopez' failure to disclose relevant information to examiners handling related, co-pending patent applications.  It also successfully alleges the attorneys' knowledge and the information's materiality.  It does not, however, provide enough detail for the Court to reasonably infer that they acted with intent to deceive the USPTO.

### A.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THE WHO, WHAT, WHERE, AND WHEN.

First, the Counterclaim adequately alleges that Messrs. Ortiz and Lopez were responsible for the alleged inequitable conduct.  It explains that "Ortiz and Lopez deliberately violated their duties of disclosure by concealing material information from the PTO. On further information and belief, Ortiz and Lopez also selectively disclosed information and misrepresented the completeness of their disclosure with intent to deceive the PTO."  Counterclaim ¶ 285, at 101.  This pleading "name[s] the individual associated with the filing or prosecution of the application, who both knew of the material information and deliberately withheld or misrepresented it."  SAP Am., Inc. v. Purple Leaf, LLC, 2012 WL 2237995, at *3.

Second, the Counterclaim sufficiently identifies the "what" and "where."  Its Appendices 2 and 3 identify the precise claims in the '388 and '549 Patents, and their parallel claims in the '348 and '458 Patent Applications.  Counterclaim at 149-154.  The Counterclaim has linked the specific claims at issue to USPTO actions on other claims.  See Exergen, 575 F.3d at 1329.

Third, the Counterclaim alleges when the alleged inequitable conduct occurred.  It explains that, "[b]etween November 8, 2000, and December 13, 2001, attorneys Ortiz and Lopez filed three different patent applications."  Counterclaim ¶ 291, at 102.  They then filed separate

submissions with nearly identical terms "within one week of one another (between August 10

and August 15, 2005)."  Counterclaim ¶ 299, at 104.  It provides the dates of office actions in

each patent application, as well as the dates that various patents ultimately issued.  See

Counterclaim ¶¶ 296-365, at 103-119.  It thus references "specific dates when information

became available to" Front Row, including office actions in separate patent applications.

Milwaukee Elec. Tool Corp. v. Hitachi Koki Co., 2012 WL 1952977, at *7.

### B.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES MESSRS. ORTIZ AND LOPEZ' KNOWLEDGE.

The Counterclaim sufficiently alleges Messrs. Ortiz and Lopez' "knowledge of the

withheld material information."  Exergen, 575 F.3d at 1327.  The Counterclaim repeatedly

alleges that Messrs. Ortiz and Lopez were aware of certain office actions, references, and

lawsuits.  See, e.g., Counterclaim ¶¶ 339, 354, 367, 371, 381, at 112, 115, 120, 123.  These

claims are more detailed and specific than the allegation rejected in Exergen -- that the

counterdefendant "was aware of the '808 and '998 patents in general."  575 F.3d at 1330.

Moreover, the information in question generally came from Front Row's other patent

applications.  Messrs. Ortiz and Lopez allegedly concealed information such as "co-pending

applications with substantially similar claims; office actions in the co-pending applications; and

prior art references cited in the office actions in the co-pending applications."  Counterclaim ¶

286, at 101.  Messrs. Ortiz and Lopez, as Front Row's principals and the prosecuting attorneys

on all of these patent applications, would necessarily have been aware of their own applications'

prior art references.  See Counterclaim ¶¶ 291, 320, 366 at 102, 108, 119 (stating that Messrs.

Ortiz and Lopez were the "sole prosecuting attorneys" for various patent applications); id. ¶ 331,

at 110 ("Attorneys Ortiz and Lopez had known of the Hendricks, Jain, McClintock, and

Blanchard references for at least four years prior to October 2008 because Examiner Cathey II first cited those references as grounds for rejection in the '348 Application in September 2004.").

### C.   THE COUNTERCLAIM SUFFICIENTLY ALLEGES THAT THE MISREPRESENTATIONS WERE MATERIAL.

The Counterclaim also sufficiently alleges but-for materiality.  To determine whether a reference is material, the Court must "determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference" using a preponderance of the evidence standard and giving claims "their broadest reasonable construction." Therasense, 649 F.3d at 1292.  At the motion-to-dismiss stage, the Counterclaim must "show facts indicating that the PTO was particularly concerned with a representation, or that the truth, if presented to the PTO, would have rendered the invention unpatentable." Human Genome Scis., Inc. v. Genentech, Inc., 2011 WL 7461786, at *4.  The Counterclaim identifies the reasons that an examiner rejected claims in various patent applications and links them to similar claims in other patent applications that the USPTO ultimately granted. See Counterclaim at 149-154.  It explains that, if Messrs. Ortiz and Lopez had disclosed these office actions, they would have prevented other patent examiners from granting similar claims. See, e.g., Counterclaim ¶ 367, at 120.  These allegations are sufficient to plead but-for materiality. See Pall Corp. v. Cuno Inc., 681 F. Supp. 2d at 264.

### D.   THE COUNTERCLAIM DOES NOT SUFFICIENTLY ALLEGE MESSRS ORTIZ AND LOPEZ' INTENT TO DECEIVE THE USPTO.

The Counterclaim alleges Messrs. Ortiz and Lopez' intent to deceive the USPTO "on information and belief," but does not plead sufficient facts to reasonably support its assertions. Counterclaim ¶ 285, at 101.  Under Exergen, the Counterclaim must "allege sufficient underlying facts from which a court may reasonably infer that a specific individual . . . withheld or

misrepresented [] information with a specific intent to deceive the PTO." 575 F.3d at 1328-29. "The mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct." Exergen, 575 F.3d at 1329. The Counterclaim does not provide enough facts focused specifically on Messrs. Ortiz and Lopez' intent for the Court to draw any reasonable inferences. The Counterclaimants cite Delano Farms Co. v. California Table Grape Comm'n, but that case involved more specific allegations that the alleged wrongdoer knew that the withheld information was material. 655 F.3d at 1350. There, the inequitable conduct allegations included a statement that "[t]he Commission and Dr. Ramming discussed the fact that public uses and sales of new varieties prior to seeking patent protection could jeopardize the Commission's patenting program." 655 F.3d at 1350. The Counterclaim contains no similar allegations that would allow for a reasonable inference of intent to deceive the USPTO.

The Counterclaim's allegation that Messrs. Ortiz and Lopez engaged in a "pattern of misconduct" does not compensate for this lack of detail. Counterclaim ¶¶ 378-384, at 123-24. The Counterclaim relies on Intellect Wireless, Inc. v. HTC Corp. for the proposition that a "pattern of deceit" can strengthen an inference of intent. 732 F.3d at 1345. That case, however, involved far less ambiguous conduct. See 732 F.3d at 1345. The counterclaim defendant there: (i) "told the PTO that he built a device that could receive images via wireless transmission," but presented a device that "contained only preloaded images and was not capable of wireless communication"; (ii) released an extremely misleading press release; and (iii) falsely stated that he had reduced an invention to practice and demonstrated it at a meeting. 732 F.3d at 1342-45. Failures to disclose Appeals Board decisions do not, without more, rise to this level.

## VII.   THE COURT WILL DENY FRONT ROW'S MOTION TO TRANSFER.

The Court declines to transfer this case to the Eastern District of Texas.  Section 1404(a) of Title 28 of the United States Code states that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  The Court must determine (i) whether the case could properly been brought in the proposed transferee district; and (ii) whether the convenience of parties and witnesses, and the interests of justice, favor a transfer.  See Navajo Nation v. Urban Outfitters, Inc., 918 F. Supp. 2d at 1253.

The parties agree that Front Row could have brought the case in the Eastern District of Texas.  See Motion to Transfer at 6-8; Response to Transfer Motion at 12 ("The relevant question here is whether convenience of the parties and witnesses and the interest of justice compel a transfer to the Eastern District of Texas.")(quotations omitted).  The Court does not know of any reason, from its own review of the facts and circumstances, why Front Row could not have brought its cases there.  See 28 U.S.C. § 1400(b) ("Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business.").  Indeed, Front Row brought one of the four consolidated cases in the Northern District of Texas.  See Plaintiff's Original Complaint for Patent Infringement and Jury Demand, filed May 25, 2012 (Doc. 1 in CIV 12-1309 JB/SCY).  The Court thus focuses its attention on the proposed transfer's convenience and effect on the interests of justice.

The discretionary factors caution against a transfer.  The caption on Front Row's Motion to Transfer named only two of four cases in this matter, CIV 10-0043 JB/SCY and CIV 12-1309

JB/SCY, but its procedural background section named all four cases.  <u>See</u> Motion to Transfer at 1, 3-5.  Front Row argues that it seeks to transfer all four cases, citing earlier consolidation orders in three cases.  <u>See</u> Transfer Reply at 3.  The Court does not decide this issue, because it would deny the Motion to Transfer regardless of whether it relates to two or four of the consolidated cases.  Transferring two out of four cases to the Eastern District of Texas would create a risk of inconsistent schedules and results and waste judicial resources.  Transferring all four cases would be only marginally more sensible.

The factors related to the location of Front Row's proposed witnesses, including "the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance," provide thin support for Front Row's arguments.  <u>Navajo Nation v. Urban Outfitters, Inc.</u>, 918 F. Supp. 2d at 1253.  As discussed above, the Counterclaim insufficiently alleges that Messrs. Ortiz and Lopez improperly filed patent applications based on Ericsson's inventions.  The remaining portions of the Counterclaim, in Front Row's own words, "rely solely on evidence from Front Row principals Lopez and Ortiz, and their employee, Richard Krukar."  Transfer Reply at 10.  Front Row noted at the hearing that, "if the inequitable conduct claims are dismissed, at this juncture, the pleadings are dismissed, then the transfer issues really become moot," and allowed that the Court should deny the Motion to Transfer if it dismissed the Counterclaim.  Tr. at 91:2-92:17 (Chan, Court).  Although the Court is not dismissing the Counterclaim in its entirety, the transfer issues are nonetheless largely moot.  The witnesses who can address the remaining issues, Messrs. Lopez and Ortiz and Dr. Krukar, are in New Mexico.  <u>See</u> Transfer Response at 18.

This issue would weigh against transfer even if the Court reached a different result on the Ericsson allegations, for two reasons.  First, the litigation is at an early stage.  The parties cannot

be sure who will appear on the final witness list or even where some of the witnesses are located, because they have not conducted discovery into many of the relevant issues. See Tr. at 106:10-14 (Court). The Court concludes that Front Row's charts do not accurately represent its proposed witnesses' locations, and Front Row has only identified six witnesses which it can confirm are in or near the Eastern District of Texas. See Motion to Transfer at 11-12. Front Row may change its mind on the ideal location before trial -- video testimony has certain advantages, and Front Row itself is located in New Mexico. Front Row's arguments, in short, provide very thin support for transferring the entire case.

Second, the Court agrees with the Honorable Ed Kinkeade, United States District Judge for the Northern District of Texas, as to the appropriate venue. Judge Kinkeade transferred the Texas Action to the District of New Mexico, noting that the "plaintiff's choice of forum carries less weight when the plaintiff originally filed suit in another district." Front Row Techs., LLC v. MLB Advanced Media, L.P., No. 3:12-CV-1639-K, 2012 WL 12044383, at *3 (N.D. Tex. Dec. 17, 2012)(Kinkeade, J.). Judge Kinkeade also rejected Front Row's arguments on cost:

> It is clear that no matter where this case is venued, some witnesses will have to travel. The court sees no need to debate the minutia of exactly how far each witness may have to travel compared to other possible witnesses, or the relative merits of the flight schedules, travel time and layovers involved, or the airports serving this district and the District of New Mexico. No evidence has been presented persuading the court that travel to either district imposes an excessive burden on the parties or witnesses. Because traveling to either of the proposed venues is not particularly onerous, the court finds that this factor is neutral.

Front Row Techs., LLC v. MLB Advanced Media, L.P., No. 3:12-CV-1639-K, 2012 WL 12044383, at *4 (N.D. Tex. Dec. 17, 2012)(Kinkeade, J.).

The remaining discretionary factors do not favor a transfer. Front Row concedes that the "relative advantages and obstacles to a fair trial," "possibility of the existence of questions arising in the area of conflict of laws," and "advantage of having a local court determine

questions of local law" factors are either irrelevant or neutral.  Motion to Transfer at 19-20.  The

Court concludes that Front Row's argument on congested dockets is unconvincing.  See Motion

to Transfer at 16-17.  "When evaluating the administrative difficulties of court congestion, the

most relevant statistics are the median time from filing to disposition, median time from filing to

trial, pending cases per judge, and average weighted filings per judge."  Employers Mut. Cas.

Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1169 (10th Cir. 2010).  The median time from filing to

disposition is 11.2 months in New Mexico versus 8.1 months in the Eastern District of Texas.

See ADMINISTRATIVE OFFICE OF THE U.S. COURTS, TABLE N/A -- U.S. DISTRICT COURTS --

COMBINED CIVIL AND CRIMINAL FEDERAL COURT MANAGEMENT STATISTICS at 35, 81 (June 30,

2015)("Combined Management Statistics").  The median time from filing to trial is 27.4 months

in New Mexico versus 22.9 in the Eastern District of Texas.  See Combined Management

Statistics at 35, 81.  These differences do not justify relocating a case of this complexity.

Although the Court acknowledges the delay in these cases, it is now disposing of the parties'

motions and the case is proceeding toward trial.  See Tr. at 4:1-19:21 (Court).  Finally, a transfer

would contravene any reasonable conception of judicial economy.  This litigation originated in

three separate actions before three judges in this District and one in the Northern District of

Texas.  See Transfer Response at 1, 5.  The parties and the Court have both expended significant

resources to integrate and consolidate these actions.

## VIII.   THE COURT WILL GRANT THE MOTION FOR LEAVE IN PART.

The Court will grant the Motion for Leave and allow Turner Sports and Turner

Basketball to assert counterclaims against Front Row.  The Court freely grants leave to amend

pleadings absent "undue delay, bad faith or dilatory motive . . . repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

of allowance of the amendment, futility of amendment, etc." <u>Foman v. Davis</u>, 371 U.S. at 182. None of these exceptions -- aside from futility -- apply here.  The Motion for Leave was Turner Sports and Turner Basketball's first motion for leave to amend, and there was no significant delay.  <u>See</u> Motion for Leave at 3.  The Motion for Leave does not prejudice Front Row in any way, given that it must respond to other Counterclaimants' almost identical counterclaims. Finally, as discussed in greater detail above, only parts of the proposed counterclaims will be futile.  <u>See</u> Motion for Leave at 4-6.  The Court will allow Turner Sports and Turner Basketball to file a counterclaim, but it must be redrafted to conform to the rulings herein.  In other words, Turner Sports and Turner Basketball may file a counterclaim that alleges only the claims that the Court has allowed the other Counterclaimants to prosecute.

**IT IS ORDERED** that: (i) Plaintiff Front Row Technologies, LLC's Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 187), is granted in part and denied in part; (ii) Plaintiff Front Row Technologies, LLC's Motion to Dismiss NBA Media Ventures, LLC's Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 188), is granted in part and denied in part; (iii) Plaintiff Front Row Technologies, LLC's Motion to Dismiss GBTV, LLC's & Mercury Radio Arts, Inc.'s Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 189), is granted in part and denied in part; (iv) Plaintiff Front Row Technologies, LLC's Motion to Dismiss Premiere Radio Networks, Inc.'s Inequitable Conduct Counterclaim, filed November 26, 2013 (Doc. 190), is granted in part and denied in part; and (v) Plaintiff's 12(b)(6) Motion to Dismiss Defendants' Inequitable Conduct Counterclaims, filed February 14, 2014 (Doc. 21 in Front Row v. NBA Media), is granted in part and denied in part.  The inequitable conduct claims based Ericsson's Projects, the Verna Declaration, and Front Row's failure to disclose material information to

examiners handling related, co-pending patent applications are dismissed, but the inequitable conduct claims based on the Dr. Krukar Declaration and Front Row's concealment of adverse Appeals Board decisions may proceed.   Plaintiff Front Row Technologies, LLC's Motion to Transfer, filed July 13, 2015 (Doc. 221), is denied without prejudice to Front Row renewing it if, as the matter proceeds, it becomes more evident that the case should be tried elsewhere. Defendants' Motion for Leave to File Defendants' First Amended Answer, Defenses, and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement, filed October 30, 2013 (Doc. 39 in Front Row v. Time Warner), is granted in part and denied in part.   Turner Sports and Turner Basketball may file an amended counterclaim that may plead inequitable conduct claims based on the Dr. Krukar Declaration and Front Row's concealment of adverse Appeals Board decisions, but not claims based on Ericsson's Projects, the Verna Declaration, and Front Row's failure to disclose material information to examiners handling related, co-pending patent applications.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Bryan J. Davis
William G. Gilchrist
Davis, Gilchrist & Lee, P.C.
Albuquerque, New Mexico

-- and --

Michael W. Shore
Alfonso G. Chan
Christopher L. Evans

Patrick J. Conroy
Ari Rafilson
Dustin Lo
Jennifer Rynell
Rajkumar Vinnakota
Shore Chan DePumpo LLP
Dallas, Texas

 *Attorneys for Plaintiff Front Row Technologies, LLC*

John R. Cooney
Emil Kiehne
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

-- and --

Alan E. Littmann
Douglas J. Winnard
Brian P. O'Donoghue
Goldman Ismail Tomaselli Brennan & Baum, LLP
Chicago, Illinois

-- and --

Cynthia J. Rigsby
Kevin J. Malaney
Foley & Lardner, LLP
Milwaukee, Wisconsin

Jason J. Keener
Foley & Lardner, LLP
Chicago, Illinois

Matthew B. Lowrie
Foley & Lardner, LLP
Boston, Massachusetts

 *Attorneys for Defendants Major League Baseball Properties, Inc. and MLB Advanced Media, L.P.*

David B. Weaver
Baker Botts LLP
Austin, Texas

-- and --

Andrew J. Allen
Hilary L. Preston
Temilola Sobowale
Vinson & Elkins LLP
New York, New York

Jeffrey Han
Stephen M. Hash
Vinson & Elkins LLP
Austin, Texas

> *Attorneys for Defendant NBA Media Ventures, Turner Sports Interactive, Inc., and Turner Digital Basketball Services, Inc.*

Emil Kiehne
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

-- and --

Eleanor M. Lackman
Joshua S. Wolkoff
Cowan DeBaets Abrams & Sheppard LLP
New York, New York

-- and --

Donna K. Schneider
San Antonio, Texas

> *Attorneys for Mercury Radio Arts, Inc., GBTV, LLC, and Premiere Radio Networks Inc.*