# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                        No. CIV 10-0433 JB/SCY

NBA MEDIA VENTURES, LLC,
MLB ADVANCED MEDIA, L.P.,
MERCURY RADIO ARTS, INC.,
GBTV, LLC, MAJOR LEAGUE
BASEBALL PROPERTIES, INC ., &
PREMIERE RADIO NETWORKS, INC.,

      Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                        No. CIV 12-1309 JB/SCY

MLB ADVANCED MEDIA, L.P.,
MERCURY RADIO ARTS, INC.,
d/b/a 'THE GLEN BECK PROGRAM,
INC.', & GBTV, LLC,

      Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                        No. CIV 13-1153 JB/SCY

NBA MEDIA VENTURES,
TURNER SPORTS INTERACTIVE, INC.
& TURNER DIGITAL BASKETBALL

SERVICES, INC.,

      Defendants.

*consolidated with*

FRONT ROW TECHNOLOGIES, LLC,

      Plaintiff,

vs.                                                                                      No. CIV 13-0636 JB/SCY

TURNER SPORTS INTERACTIVE, INC., AND
TURNER DIGITAL BASKETBALL SERVICES,
INC.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendants' Motion for Judgment on the

Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed October 21, 2015 (Doc. 229)("Motion").  The

Court held a hearing on January 5, 2016.  The primary issues are: (i) what evidentiary standard

applies to patent eligibility disputes under 35 U.S.C. § 101; (ii) whether the Court must wait until

a later stage to examine the subject-matter eligibility of Plaintiff Front Row Technologies, LLC's

patents; (iii) whether the Court may select representative claims, and what those claims should

be; (iv) whether Front Row's patents are directed to patent-ineligible abstract ideas; and (v) if

Front Row's patents are directed to patent-ineligible abstract ideas, whether the claims' elements,

as a whole, contain an inventive concept sufficient to transform the claimed abstract idea into a

patent-eligible invention.   First, the Court concludes that the clear-and-convincing evidence

standard does not apply to patent eligibility disputes under 35 U.S.C. § 101.  Second, the Court

concludes that it may proceed to examine the patents' subject-matter eligibility before claim

construction.  Third, the Court concludes that it may select representative claims and adopts a

modified set of the Defendants' proposed representative claims.  Fourth, the Court concludes that all of Front Row's patents are directed to abstract ideas, because their claims describe these ideas in vague and broad terms.  Finally, the Court determines that Front Row's claims do not contain an inventive concept or meaningful limitation in scope.  The Court thus grants the Defendants' Motion in its entirety and dismisses this case with prejudice.

## FACTUAL BACKGROUND

The Court takes its facts from the Plaintiff's Fourth Amended Complaint for Patent Infringement and Jury Demand, filed April 23, 2013 (Doc. 149)("Fourth Amended Complaint").[1]

Front Row[2] is a New Mexico limited liability company that holds patents related to streaming video on mobile devices.  See Fourth Amended Complaint ¶¶ 1-20, at 1-5.  Front Row owns "all rights, title, and interest in and under" ten such patents:

1. United States Patent No. 8,090,321 ("321 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on January 3, 2012;

2. United States Patent No. 8,086,184 ("184 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on December 27, 2011;

3. United States Patent No. 8,270,895 ("895 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on September 18, 2012;

---

[1]The Court recognizes that, while the Motion was pending, Front Row filed a new complaint.  See Plaintiff's Fifth Amended Complaint for Patent Infringement and Jury Demand, filed March 31, 2016 (Doc. 287)("Fifth Amended Complaint").  The Fifth Amended Complaint dropped some of Front Row's original claims against the Defendants.  See Fifth Amended Complaint ¶¶ 23-74, at 5-21.  The Court nonetheless draws on the Fourth Amended Complaint for its factual background, because the parties' briefing repeatedly refers to claims absent from the Fifth Amended Complaint.  The parties' arguments make more sense when considered under the Fourth Amended Complaint.

[2]Inventors Luis Ortiz and Kermit Lopez founded Front Row in 2000.  See Motion at 6.

4. United States Patent No. 7,812,856 ("856 patent"), titled "Providing Multiple Perspectives of a Venue Activity to Electronic Wireless Hand Held Devices," which duly and legally issued on October 12, 2010;

5. United States Patent No. 7,796,162 ("162 patent"), titled "Providing Multiple Synchronized Camera Views for Broadcast from a Live Venue Activity to Remote Viewers," which duly and legally issued on September 14, 2010;

6. United States Patent No. 7,884,855 ("855 patent"), titled "Displaying Broadcasts of Multiple Camera Perspective Recordings from Live Activities at Entertainment Venues on Remote Video Monitors," which duly and legally issued on February 8, 2011;

7. United States Patent No. 7,782,363 ("363 patent"), titled "Providing Multiple Video Perspectives of Activities through a Data Network to a Remote Multimedia Server for Selective Display by Remote Viewing Audiences," which duly and legally issued on August 24, 2010;

8. United States Patent No. 8,184,169 ("169 patent"), titled "Providing Multiple Video Perspectives of Activities through a Data Network to a Remote Multimedia Server for Selective Display by Remote Viewing Audiences," which duly and legally issued on May 22, 2012;

9. United States Patent No. 8,401,460 ("460 patent"), titled "Transmitting Sports and Entertainment Data to Wireless Hand Held Devices over a Telecommunications Network," which duly and legally issued on March 19, 2013; and

10. United States Patent No. 7,376,388 ("388 patent"), titled "Broadcasting Venue Data to a Wireless Hand Held Device," which duly and legally issued on May 20, 2008.

Fourth Amended Complaint ¶¶ 11-20, at 3-5. Front Row alleges that all of these patents are valid and enforceable. See Fourth Amended Complaint ¶¶ 21-31, at 5-6.

Defendant and Counterclaimant MLB Advanced Media, L.P. ("MLB Media") is in the business of broadcasting sporting events through electronic and wireless means, and selling software to support that broadcasting. Fourth Amended Complaint ¶ 2, at 1-2. Its primary product relevant to this litigation is "At Bat 13," Major League Baseball's official smartphone application. Fourth Amended Complaint ¶ 33, at 6.

Defendants and Counterclaimants Mercury Radio Arts, Inc. and GBTV, LLC create and distribute multimedia content over the internet. See Fourth Amended Complaint ¶¶ 3-4, at 2.

They are both associated with talk show host and radio personality Glenn Beck.  See Fourth Amended Complaint ¶¶ 4-5, at 2.

Defendant and Counterclaimant Premiere Radio Networks, Inc. is a "national radio network that produces radio programming and services for radio stations, and distributes its own and various third-party radio programs to radio station affiliates throughout the world."  Fourth Amended Complaint ¶ 5, at 2.

Defendant and Counterclaimant NBA Media Ventures, LLC ("NBA Media"), like MLB Advanced Media, L.P., is in the business of broadcasting sporting events through electronic and wireless means, and of selling software to support that broadcasting.  See Fourth Amended Complaint ¶¶ 6, 37, at 2, 8.  Its primary products relevant to this litigation are "NBA League Pass Mobile" and "NBA League Pass Broadband," which provide video of National Basketball Association games to consumers over the internet.  Fourth Amended Complaint ¶¶ 37, at 8.

Front Row filed its Fourth Amended Complaint on April 23, 2013.  See Fourth Amended Complaint for Patent Infringement and Jury Demand, filed April 23, 2013 (Doc. 149)("Complaint").  The Complaint alleges that the Defendants infringed its patents by: (i) selling applications that capture live video of entertainment events and transmit it over a cellular communications network to hand held mobile devices; and (ii) knowingly inducing their customers to infringe on the patent by providing applications that those customers would use to access live video of entertainment events.  See Complaint ¶¶ 33-37, at 6-8.  They target in particular Major League Baseball's MLB.TV, At Bat 13, Postseason.TV, MiLB.TV, and MiLB applications; the National Basketball Association's NBA League Pass Mobile and NBA League Pass Broadband applications; and Mercury Radio Arts, Inc., GBTV, LLC, and Premiere Radio

Networks, Inc.'s TheBlaze TV and TheBlaze TV Plus applications.  See Complaint ¶¶ 33, 35, 37, at 6-8.

## PROCEDURAL BACKGROUND

The current case consists of four consolidated cases.  Front Row filed its first lawsuit in the District of New Mexico on May 5, 2010.  See Plaintiff's Original Complaint for Patent Infringement and Jury Demand, filed May 5, 2010 (Doc. 1).  Front Row filed its second lawsuit on May 25, 2012, in the United States District Court for the Northern District of Texas.  See Complaint, filed May 25, 2012 (Doc. 1 in Front Row Techs., LLC v. MLB Advanced Media, L.P., No. 3:12-cv-01639-K (N.D. Tex.)(Kinkeade, J.)(the "Second Action")).

On December 17, 2012, the Honorable Ed Kinkeade, United States District Judge for the Northern District of Texas, transferred the Second Action to the District of New Mexico.  See Order, filed December 17, 2012 (Doc. 44 in the Second Action).  The Second Action then received a new case number, No. CIV 12-1309 JB/SCY (D.N.M.).  On February 12, 2013, the Honorable William P. Johnson, United States District Judge for the District of New Mexico, consolidated the Second Action with this case.  See Order Consolidating Civil Cases, filed February 12, 2013 (Doc. 65 in the Second Action).

Front Row filed its third lawsuit on July 10, 2013.  See Plaintiff Front Row Technologies, LLC's Original Complaint for Patent Infringement, filed July 10, 2013 (Doc. 1 in Front Row Techs. v. Time Warner Inc. et al, No. CIV 13-0636 JB/SCY)("the Third Action").  The Court granted the parties' joint consolidation motion on December 3, 2013.  See Proposed Order, filed December 3, 2013 (Doc. 43 in the Third Action).

Front Row filed its fourth lawsuit on December 5, 2013.  See Plaintiff Front Row Technologies, LLC's Original Complaint for Patent Infringement, filed December 5, 2013 (Doc.

1 in <u>Front Row Techs., LLC v. NBA Media Ventures</u>, No. CIV 13-1153 JB/SCY (D.N.M.)("the

Fourth Action")).  The Honorable Judith C. Herrera, United States District Judge for the District

of New Mexico, consolidated the Fourth Action with this case on April 22, 2014.  <u>See</u> Order of

Consolidation, filed April 22, 2014 (Doc. 65 in the Fourth Action).

### 1. **The Complaint.**

Front Row seeks extensive relief against all Defendants, including: (i) a declaration that

Front Row "exclusively owns" all of the patents; (ii) a declaration that all of the patents are valid

and enforceable; (iii) a declaration that all of the Defendants are liable for past and present

infringement, "both literally and under the doctrine of equivalents," on certain patents; (iv) all

damages to which Front Row is entitled; and (vi) permanent injunctions against the Defendants

for infringing certain patents.  Complaint ¶¶ (a)-(f), at 32-33.

### 2. **The Motion.**

The Defendants moved for judgment on the pleadings pursuant to rule 12(c) of the

Federal Rules of Civil Procedure and 35 U.S.C. § 101 on October 21, 2015.  <u>See</u> Motion at 1.

The Defendants begin by citing <u>Alice Corp. Pty. v. CLS Bank International</u>, 134 S. Ct. 2347

(2014)("<u>Alice</u>"), which they state applied the "fundamental principle" that "[a]n abstract idea is

not patentable" to "invalidate patent claims that purported to implement an abstract idea using

conventional computer technology."  Motion at 1.  The Defendants contend that Front Row has

patented "the abstract idea of providing video of an event to viewers using admittedly known

systems and handheld devices."  Motion at 2.  They ask the Court to follow the example of other

district courts, which have invalidated "dozens of patents under 35 U.S.C. § 101 that claimed

broad concepts and added nothing more than a generic directive to 'apply it with a computer.'"

Motion at 1.

The Defendants first contend that the Court should address subject-matter eligibility at the pleadings stage, before construing the patents' claims or beginning discovery. See Motion at 5. They explain that this approach "avoids the needless burden on the Court and the parties of unnecessary discovery, claim construction proceedings, and motion practice." Motion at 5. They cite a concurring opinion from the United States Court of Appeals for the Federal Circuit, which states that "subject matter eligibility is *the* primal inquiry, one that *must* be addressed at the outset of litigation." Motion at 6 (emphasis in Motion).

The Defendants then argue that the Court should select "representative claims" rather than analyze every patent in dispute. Motion at 7. They note that the claims are "substantially similar and linked to the same abstract idea," and "belong to the same patent family, involve the same technology, and share similar or identical patent specifications." Motion at 7 (quoting Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n, 776 F.3d 1343, 1348 (Fed. Cir. 2014)("Content Extraction"). They note that other courts have invalidated claims from multiple patents after examining only one representative claim in detail. See Motion at 7. They thus conclude that the "number of patents and claims at issue in this case is thus no barrier to deciding the issue of patentability at the present stage." Motion at 7. The Defendants then proceed to their primary subject-matter eligibility arguments. See Motion at 7-8.

### a.   **The Video Patents.**

First, the Defendants focus on Front Row's Video Patents.[3] See Motion at 7-8. They explain that, under Alice, courts "look to the 'basic character' or 'purpose' of the claims to

---

[3]The Defendants include nine of Front Row's ten relevant patents in their definition of "Video Patents." Motion at 3-4. These patents include the 388 patent, the 363 patent, the 162 patent, the 856 patent, the 855 patent, the 184 patent, the 169 patent, the 895 patent, and the 460 patent. See Motion at 3-4. The Court adopts the Defendants' terminology for the sake of simplicity in describing the Motion.

determine whether a patent claims an abstract idea."  Motion at 8 (quoting Internet Patents Corp.

v. Active Network, Inc., 790 F.3d 1343, 1348 (Fed. Cir. 2015)("Internet Patents"), and Affinity

Labs of Texas, LLC v. DirecTV, LLC, 109 F. Supp. 3d 916, 924 (W.D. Tex. 2015)(Smith,

J.)("Affinity Labs")(currently on appeal in Affinity Labs of Texas, LLC v. DirecTV, LLC, cv15-

1845 (Fed. Cir. 2016)).  They assert that the Video Patents "each claim the same basic and

abstract idea of providing video to handheld devices."  Motion at 8.  They select the 184 patent

as a case study, arguing that it "claims the abstract steps of acquiring video, authorizing a device

to receive the video, sending the video, and accessing the video for display on a handheld

device."  Motion at 9.  They cite to handheld televisions and similar products that were already

"well-known" at the time Front Row made its alleged invention.  Motion at 9.  They also contend

that the case is analogous to a series of patent decisions invalidating video-related patents.  See

Motion at 12-14 (citing Affinity Labs, 109 F. Supp. 3d at 938; Broadband iTV, Inc. v. Hawaiian

Telcom, Inc., 136 F. Supp. 3d 1228, 1238 (D. Haw. 2015)(Kay, J.); and Cyberfone Sys., LLC v.

CNN Interactive Grp., Inc., 558 F. App'x 988, 991 (Fed. Cir. 2014)("Cyberfone")).

   The Defendants then argue that Front Row's Video Patents fail the second step in Alice's

patent eligibility test -- the "inventive concept" stage -- for three reasons.  Motion at 14.  First,

they state that "the claims rely entirely on generic hardware components and conventional

software processes to perform 'well-understood, routine, and conventional activities commonly

used in industry.'"  Motion at 14 (quoting Content Extraction, 776 F.3d at 1348).  They explain

that the Video Patents' references to a "handheld device," "server," or "video camera" are

generic and well-known terms used to perform generic functions.  Motion at 15.  They complain

that "the claims merely take the 'basic concept' already present in handheld portable televisions,

and say 'do it on a PDA [Personal Digital Assistant] or a cell phone' using known technology." Motion at 18 (citation omitted).

Second, the Defendants argue that the Video Patents' limitations do not represent inventive concepts. See Motion at 14. That the Video Patents limit themselves to video captured in entertainment venues, require authentication or wireless transmission, or call for particular camera positions, the Defendants contend, does not change their reliance on an abstract idea and vague, generic computer elements. See Motion at 18-19. The Defendants describe the Video Patents' limitations as "token postsolution components." Motion at 20 (quoting Bilski v. Kappos, 561 U.S. 593, 612 (2010)).

Third, the Defendants state that the Federal Circuit uses a "machine-or-transformation test" as a "useful clue" in analyzing whether a patent contains an inventive concept. Motion at 20 (quoting Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709, 716 (Fed. Cir. 2014)("Ultramercial IV").[4] They contend that the Video Patents' claims "fail the 'machine-or-transformation' test because they are not tied to any particular machine and do not transform any article into a different thing." Motion at 14. They explain that the Video Patents' references to generic wireless handheld devices and other tools are not ties to "any particular machine." Motion at 14. They also note that the Video Patents "do not even purport to transform any physical object or article into another state. They merely involve the transmission of information." Motion at 20.

_____

[4]The Ultramercial case has repeatedly bounced back and forth between the Federal Circuit and the Supreme Court. See Ultramercial, LLC v. Hulu, LLC, 457 F. App'x 920 (Fed. Cir. 2011)("Ultramercial I"); Ultramercial, LLC v. Hulu, LLC, 657 F.3d 1323 (Fed. Cir. 2011)("Ultramercial II"); WildTangent, Inc. v. Ultramercial, LLC, 132 S. Ct. 2431 (2012); Ultramercial, Inc. v. Hulu, LLC, 722 F.3d 1335 (Fed. Cir. 2013)("Ultramercial III"); WildTangent, Inc. v. Ultramercial, LLC, 134 S. Ct. 2870 (2014); Ultramercial IV, 772 F.3d at 709. The Court assigns roman numerals to specific cases to distinguish between them.

The Defendants conclude that the other independent and dependent claims[5] that Front Row asserts "also fail to add meaningful limitations that either remove the claims from the realm of abstract ideas or impart an inventive concept."  Motion at 21.  They cite the other claims' "trivial" and "generic" limitations, as well as their "same abstract idea of providing video to handheld devices."  Motion at 21-22.

            **b.**        **The 027 Patent.**

The Defendants proceed to attack Front Row's 027 Patent, which they say "claims the abstract idea of allowing access to video based on location."  Motion at 22.  They break the 027 Patent's claims down into two basic elements: (i) determining user location; and (ii) allowing reception of data based on that location.  See Motion at 22.  They explain that the Federal Circuit rejected a similar patent that tailored comment based on a viewer's location or address, analogizing the claims to newspaper inserts and stating that "this sort of information tailoring is 'a fundamental . . . practice long prevalent in our system.'"  Motion at 23-24 (quoting Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363, 1369 (Fed. Cir. 2015)).  They compare the 027 Patent's claims to sports television broadcast blackouts, which are already in use to encourage fans to attend sporting events in person.  See Motion at 24.  The 027 Patent, they argue, merely extends the abstract idea of "allowing access to services based on location" to a wireless handheld device.  Motion at 24.

The Defendants then argue that the 027 Patent's claims do not present an innovative concept.  See Motion at 25.  They note that the patent contains only two limitations: "(1) that

---

[5]An independent claim does not reference any other claim.  A dependent claim references another claim, cannot stand on its own, and does not make sense without an independent claim.  For example,  a dependent claim could be "[t]he motor vehicle of claim 1, in which the fluid supply is a tank of compressed gas, and the motor is a variable-displacement fluid motor."  How Do I Read a Patent?, Brown & Michaels, P.C. (2015), http://www.bpmlegal.com/howtopat5.html.

location of the user is 'based on communications' between the 'wireless handheld device' and a 'data communications network,' and (2) that the data, or 'service,' is 'streaming video' captured by a 'video camera' in an 'entertainment venue' that is 'processed for delivery to subscribers.'" Motion at 25.  The Defendants complain that these limitations are well-established, conventional activities, and that they "are written in purely functional terms and fail to describe how they are performed."  Motion at 25.  They contend that the 027 Patent also fails the machine-or-transformation test, because it "it is not tied to a particular or novel machine, but instead relies on the same generic computers, networks, and handheld devices as the Video Patents," and "does not transform any physical object or article into another state."  Motion at 26.  The transmission of data, it suggests, is insufficient to meet the machine-or-transformation test.  See Motion at 26. As in their comments on the Video Patents, the Defendants extend these arguments to cover all of the 027 Patent's dependent and independent claims.  See Motion at 26-27.

     **3.**     **The Response**.

     Front Row responded to the Motion on December 14, 2015.  See Plaintiff's Response in Opposition to Defendants' Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed December 14, 2015 (Doc. 256)("Response").  Front Row begins with a general caution that "[d]ismissal for lack of the patentable subject matter should be 'the exception, not the rule.'"  Response at 2 (quoting Ultramercial IV, 722 F.3d at 1338–39).  It notes that the Court must view the facts as asserted in its pleadings in the light most favorable to it.  See Response at 2.  It also reminds the Court that issued patents are "statutorily presumed valid."  Response at 2. It thus argues that the Defendants must prove invalidity "by clear and convincing evidence." Response at 2 n.1.

Front Row then attacks the Defendants' reliance on representative claims.  See Response at 3.  It asserts that the Defendants' assumption that their handpicked claims represent all of the remaining claims "makes the presumption of validity of **each** claim an illusory, hollow standard."  Response at 3 (emphasis in original).  It argues that the Court should not use any representative claims absent its agreement on the precise claims at issue: "Each claim stands on its own merits because 'a party challenging the validity of a claim, *absent a pretrial agreement or stipulation,* must submit evidence supporting a conclusion of invalidity of *each* claim the challenger seeks to destroy.'"  Response at 4 (quoting StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc., No. 8:13-CV-2240-T-33MAP, 2015 WL 518852, at *5 (M.D. Fla. Feb. 9, 2015)(Covington, J.)("StoneEagle")(emphasis in original)).  It details the differences between the representative claims and its other claims, noting that they have different limitations, such as the required use of a graphical user interface ("GUI").  Response at 3-4.

Front Row focuses the bulk of its arguments on the Alice test.  See Response at 5-21.  First, it attempts to rebut the Defendants' argument that its claims are abstract.  See Response at 5.  It notes that "any claim, described at a certain level of generality, can be challenged as directed to an abstract idea."  Response at 5 (citing Fairfield Indus., Inc. v. Wireless Seismic, Inc., No. 4:14-CV-2972, 2014 WL 7342525, at *4 (S.D. Tex. Dec. 23, 2014)(Ellison, J.)).  It quotes another recent case: "The question before the Court, according to the Ineligible Concept Step of the *Alice* test, is not whether the Court is able reach into a patent and extract an abstract idea from which to determine patent-eligibility; such an exercise would render the Ineligible Concept Step a mere formality."  Response at 6 (quoting SimpleAir, Inc. v. Google Inc., 136 F. Supp. 3d 745, 751 (E.D. Tex. 2015)(Gilstrap, J.)("SimpleAir")).  Instead, it contends, the Court must examine its patents' claims on a more specific level.  See Response at 5-6.

- 13 -

Front Row then attacks the Defendants' proposed representative claims, arguing that they are not abstract ideas.  See Response at 6-7.  It explains that the 184 Patent's Claim 1 includes specific claim elements requiring "that communication occur over *a wireless network* to *a wireless device*, in *response to authentication*, and that *video-data comprising more than one video* captured by cameras at a venue *is acquired by authenticated handheld devices for display*."  Response at 6 (emphasis in Response).  It makes similar arguments with respect to the 895 Patent's Claim 1.  See Response at 6-7.  It compares these claims to the claims in Contentguard Holdings, Inc. v. Amazon.com, Inc., 142 F. Supp. 3d 510 (E.D. Tex. 2015)(Gilstrap, J.)("Contentguard"), which it says held that similar claims "'were not directed towards abstract ideas, but were instead directed towards systems of managing digital rights via trusted devices.'"  Response at 7 (quoting Contentguard, 142 F. Supp. 3d at 512).  It adds that, as with the patents that the district court upheld in Contentguard, its patents are "limited to authorized handheld devices that can receive content via a wireless network in specified types of secure manner."  Response at 7.  It also cites to Simpleair, which it says upheld patents directed towards similar "patent-eligible methods and systems of 'using a central broadcast server' to package and transmit 'data from an online information source to remote computing devices.'"  Response at 8 (quoting Simpleair, 136 F. Supp. 3d at 750).  It argues that the Court should reject the Defendants' approach to the elements:

> Whether the elements of Front Row's technology are "conventional, routine, or well-known at the time" of patenting is not the point.  Instead, the Court must examine "whether the function performed by the computer at each step of the process is [p]urely conventional."  This Court must address the claim limitations *as a whole*, not only on an element-by-element basis.

Response at 8 (citations omitted).

Front Row then turns its attention to the machine-or-transformation test.  <u>See</u> Response at 9.  It contends that this test does not require "transformation of the underlying physical object."  Response at 9.  For example, it explains, visual depictions representing physical objects may be patent-eligible.  <u>See</u> Response at 9 (citing <u>In re Abele</u>, 684 F.2d 902, 908 (C.C.P.A. 1982), <u>overruled on other grounds by</u> <u>In re Bilski</u>, 545 F.3d 943 (Fed. Cir. 2008)).  It then draws an analogy to its own patent:

> This process electronically transforms real-world objects (*i.e.*, baseball players participating in a game at a MLB ballpark) into video, which is then transformed to a format that can be streamed to wireless devices over a secure and user authenticated network.  It is of no import that the real-world objects are not changed in the process.  For example, the information is further limited by claim 1 of the '895 patent when it is processed "into a format for streaming over wireless networks as streamed data that is capable of being viewed."  These transformations readily meet the machine-or-transformation test.

Response at 9-10.  It argues that its claims do not involve the mere transmission of information, because they capture video of physical objects, transmit it, and then display it to an authenticated user.  <u>See</u> Response at 10-11.

Front Row also argues that its claims recite an inventive concept.  <u>See</u> Response at 13-18.  It emphasizes the danger of hindsight bias, stating that smart phones, mobile devices, and streaming video were not yet ubiquitous when it obtained its patents.  <u>See</u> Response at 13-14 (citing <u>Ameritox, Ltd. v. Millennium Health, LLC</u>, 88 F. Supp. 3d 885, 914 (W.D. Wis. 2015)(Conley, J.)).  It cautions the Court that using "what has become routine in 2013 to determine what was inherent in a concept in the early 1990s injects hindsight into the eligibility analysis and fails to recognize that patent eligibility, like all statutory patentability questions, ***is to be measured as of the filing date***."  Response at 14 (quoting <u>CLS Bank Int'l v. Alice Corp. Pty.</u>, 717 F.3d 1269, 1301 (Fed. Cir. 2013)(Rader, J., dissenting)(emphasis in Response)).  Front Row asserts that it can show at trial "that a person of ordinary skill in the art in October 2000

would have believed that it would be extremely expensive and technologically impractical to receive broadcasted television signals of live events in a wireless packet-based data network." Response at 14.  It observes that the portable televisions that the Defendants discuss received only analog signals,[6] and that, at the time, there was no way to broadcast these signals through a computer data network.  See Response at 14-15.  Moreover, it notes that there was no way for broadcasters to require authentication from receiving devices, given that they could not receive information back from the handheld devices.  See Response at 15.  It also points to the 184 Patent, which it says requires specialized hardware such as "a transmitter for wirelessly streaming" content.  Response at 15-16.

Even assuming that none of its claim elements are novel, Front Row argues, the Federal Circuit has recognized that "the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions."  Response at 17 (quoting DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1258 n.5 (Fed. Cir. 2014)("DDR Holdings")).  It adds that if any known element in a claim could defeat subject-matter eligibility, "obviousness under § 103 would always default to ineligibility" in violation of Supreme Court of the United States precedent.  Response at 17 (quoting Exergen Corp. v. Kaz USA, Inc., No. CV 13-10628-RGS, 2015 WL 8082402, at *6 (D. Mass. Dec. 7, 2015)(Stearns, J.)("Exergen")).  Front Row contends that the Defendants' Motion is effectively a motion for summary judgment, because the law requires the Defendants to disclose at least some evidence that a combination of elements is not new or useful.  See Response at 18.

---

[6]Merriam-Webster's Dictionary defines "analog" as "relating to, or being a mechanism in which data is represented by continuously variable physical quantities."  Analog, Merriam-Webster, http://www.merriam-webster.com/dictionary/analog.

Front Row concludes that its claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet."  Response at 18 (quoting <u>DDR Holdings</u>, 773 F.3d at 1257).  Front Row explains that its claims, like those in <u>DDR Holdings</u>, describe a solution that is "***necessarily rooted in computer technology*** in order to overcome a problem specifically arising in the realm of computer networks."  Response at 18 (quoting <u>DDR Holdings</u>, 773 F.3d at 1257).

Front Row suggests that although <u>Alice</u> does not specifically reference preemption,[7] its claims do not raise preemption concerns.  <u>See</u> Response at 19 ("Preemption is the idea that allowing a patent on an invention may impede rather than incentivize innovation.").  It contends that its "asserted patents and claims do not come close to preempting the field of providing streamed video of an event to a device," because they contain "additional requirements that guard against preemption."  Response at 20.

Front Row also addresses the Defendants' arguments that the 027 Patent is invalid under § 101.  <u>See</u> Response at 20.  It contends that the 027 Patent satisfies the "machine" prong of the "machine-or-transformation" test, because it can determine a user's location.  Response at 20.  It cites the Federal Circuit's decision in <u>SiRF Technologies, Inc. v. International Trade Commission</u>, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010)("<u>SiRF Technologies</u>"), which held that "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims."  Response at 20 (quoting <u>SiRF Technologies</u>, 601 F.3d at 1332).  It again attacks the Defendants' reliance on portable television sets, noting that "[t]he only geographic limitation of an analog signal is the signal strength and the receptive strength of the receiving device which is

---

[7]Front Row acknowledges that "preemption concerns are inherently addressed within the two-step *Alice* framework."  Response at 20.

unknown, varies between receiving devices and is completely uncontrolled by the transmission entity." Response at 21.

Finally, Front Row argues that the Court should consider patentability only after claim construction and discovery are complete. See Response at 1. It explains that a decision at this stage would require the Court to make a complex determination "in a ***complete vacuum***." Response at 21 (quoting Phoenix Licensing, L.L.C. v. CenturyLink, Inc., No. 2:14-CV-965-JRG-RSP, 2015 WL 5786582, at *3 (E.D. Tex. Sept. 30, 2015)(Gilstrap, J.))(emphasis in Response). Instead, it says, the Court must require the Defendants to prove that "no plausible construction of [the] Plaintiff's claims would satisfy the abstractness test." Response at 21. It quotes a case requiring that a Defendant "show, as a matter of law, ***that every possible plausible construction of each of the forty-nine claims asserted therein render the patent ineligible***." Response at 22 (quoting A Pty Ltd. v. HomeAway, Inc., No. 1-15-CV-158 RP, 2015 WL 5883364, at *6 (W.D. Tex. Oct. 8, 2015)(Pitman, J.)(unpublished)(emphasis in Response)). Front Row denies that any of the "narrow, exceptional circumstances" justifying a pre-claim construction patent eligibility ruling apply here. Response at 22. It also attacks the Defendants' reliance on Ultramercial IV, noting that their quoted language appears in a concurrence rather than the majority opinion. See Response at 23.

### 4. **The Reply**.

The Defendants replied on December 23, 2015. See Defendants' Reply in Support of their Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed December 23, 2015 (Doc. 257)("Reply"). The Defendants state that "[t]he Court should not be distracted from a straightforward application of the two-step analysis prescribed by the Supreme Court in *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)." Reply at 1. The Defendants again argue that

- 18 -

the Video Patents fail the "abstract idea" test, "because they claim nothing more than the abstract

idea of providing video to handheld devices."  Reply at 1.  They dispute Front Row's contention

that Alice's first step requires the Court to look at every specific claim limitation, arguing that it

may focus instead on "the purpose or basic character of the claims."  Reply at 1 (quoting Internet

Patents, 790 F.3d at 1348).  The Defendants distinguish Contentguard:

> *Contentguard* analyzed the use of "trusted" devices, which were "specific and
> non-generic" devices, 2015 WL 5853984, at *4, construed by the court to require
> three specific types of "integrities": "physical, communication, and behavioral,"
> *id.* at *2.  By contrast, the Video Patents are not limited to "specific and non-
> generic" devices.  Rather, as the Video Patents recite, the "handheld device" can
> be "a Personal Digital Assistant (PDA), paging device, WAP[8]-enabled mobile
> phone, and other associated handheld computing devices *well known in the art*."

Reply at 4.  They contend that SimpleAir is similarly irrelevant, noting that the claims there were

"non-abstract because they specified the manner in which data was transmitted from the 'central

broadcast server' to the 'remote computing devices' by describing specific features: parsing, data

blocks, addressing data blocks, and data channels."  Reply at 5 (quoting SimpleAir, 136 F. Supp.

3d at 747-48).

The Defendants also deny that Front Row has presented any inventive concept.  See

Reply at 5-6.  First, they argue that the novelty of Front Row's patents over the prior art is

meaningless for the Alice analysis.  See Reply at 6 (citing Diamond v. Diehr, 450 U.S. 175, 188-

89 (1981)).  They again contend that the relevant claims "'amount to nothing significantly more

than an instruction to apply the abstract idea' using a wireless handheld device and the Internet."

Reply at 6 (quoting Alice, 134 S. Ct. at 2360 (internal quotations omitted)).  They assert that

Front Row fails to "explain *how* the patents disclose any improvements or inventive concepts

---

[8]"WAP" stands for Wireless Application Protocol, a "secure specification that allows
users to access information instantly via handheld wireless devices such as mobile phones,
pagers, two-way radios, smartphones and communicators."   Vangie Beal, WAP - Wireless
Application Protocol, Webopedia, http://www.webopedia.com/TERM/W/WAP.html.

that advance upon the technology that Front Row admits was well known in the art." Reply at 1-2 (emphasis in original). Second, they attack Front Row's argument that its claims are patent-eligible in "combination." Reply at 7. They explain that the Federal Circuit in <u>DDR Holdings</u> "created a solution that overrides the routine and conventional use of the Internet." Reply at 7 (citing <u>DDR Holdings</u>, 773 F.3d at 1258-59). They contend that the Video Patents, on the other hand, merely "use routine and conventional hardware and software components and expect them to perform nothing more than their basic, routine, and well-known functions." Reply at 7. They remind the Court that Front Row did not invent "streaming video, a new wireless protocol, a new form of authentication, a new handheld device, or any improvements to any of these." Reply at 7. They add that Front Row has not cleared the machine-or-transformation test by transforming live objects into video, because its Video Patents "do not purport to modify or improve the video data at all." Reply at 8. The Defendants predict that Front Row's position "would mean that all inventions involving images or video automatically would be patentable." Reply at 2.

The Defendants assert that the 027 Patent fails the machine-or-transformation test. <u>See</u> Reply at 9-10. They distinguish <u>SiRF Technologies</u> on the grounds that the Federal Circuit allowed claims mentioning a GPS receiver, because the claims "*explicitly* require the use of a particular machine (a GPS receiver) and *could not be performed without the use of such a receiver*." Reply at 10 (quoting <u>SiRF Technologies</u>, 601 F.3d at 1331, 1332 (emphasis added)). The Defendants assert that the 027 Patent does not require a GPS receiver, or any other "particular machine or apparatus." Reply at 10 (quoting <u>SiRF Technologies</u>, 601 F.3d at 1332).

The Defendants also attempt to refute Front Row's procedural arguments. <u>See</u> Reply at 10-12. They note that Front Row relies on <u>Ultramercial, Inc. v. Hulu, LLC</u>, 722 F.3d 1335 (Fed. Cir. 2013)("<u>Ultramercial III</u>"), which the Supreme Court vacated following <u>Alice</u>. <u>See</u> Reply at

11.  They contend that Front Row has not demonstrated that claim construction is necessary, because it "fails to identify a single disputed claim term affecting the Section 101 analysis, as it is required to do."   Reply at 2.   Absent any specific dispute over claim construction, the Defendants urge, the Court may proceed directly to subject-matter eligibility.  See Reply at 11. The Defendants also contend that there is no need for discovery on the state of the art in 2000, because the Defendants' "patents themselves already state that the claim elements were well known."  Reply at 12.

**5.    The Hearing.**

The Court held a hearing on January 5, 2016.  See Transcript of Motion Proceedings at 1-2 (Court)(taken January 5, 2016), filed January 19, 2016 (Doc. 269)("Tr."); Notice of Defendants' Filing of Presentation from January 5, 2016, Hearing, filed January 7, 2016 (Doc. 263)("Defendants' PowerPoint"); Notice of Plaintiff's Filing of Presentation and Associated Documents Presented During January 5, 2016 Hearing, filed January 6, 2016 (Doc. 261)("Front Row's PowerPoint").  The parties largely stuck to the arguments in their briefing.  See Tr. at 5:21-192:17 (Court, Shore, Weaver).  The Court began the hearing by asking for a background session on Alice.  See Tr. at 3:21-4:10 (Court).

Although the Defendants began with an extensive background on § 101, Alice, and the patent system as a whole, see Tr. at 6:20-20:11 (Court, Shore, Weaver), and Front Row stated its intention to cover the same ground, see Tr. at 50:16-18 (Shore), both parties addressed topics intertwined with the case's merits, see Tr. at 6:20-60:25 (Court, Shore, Weaver).   The Defendants noted that "over 70 percent of Section 101 motions at the pleadings stage since Alice have been granted."  Tr. at 23:8-12 (Weaver).  They also relied heavily on Affinity Labs, which invalidated claims they describe as "basically identical to the basic subject matter that's claimed

here."  Tr. at 25:9-10 (Weaver).   Front Row described <u>Alice</u>'s scope as extremely narrow: "Abstract idea, put it on a computer?  It has to literally almost be that bad for the Alice decision to come into play."  Tr. at 30:18-21 (Shore).  <u>See id.</u> at 31:8 ("Alice is not about rewriting 101."). It emphasized that many of the Defendants' cited cases "were attempts to patent math" and similarly abstract concepts.  Tr. at 33:18-24 (Shore).  It focused on the United States Patent and Trademark Office ("USPTO") guidance for patent examiners, explaining that no examiner has challenged Front Row's patents under § 101, <u>see</u> Tr. at 35:4-7 (Shore), and that the guidance postdates <u>Affinity Labs</u>, <u>see</u> Tr. at 36:23-37:10 (Shore).  It also suggested that <u>Affinity Labs</u> could be reversed on appeal.  <u>See</u> Tr. at 41:9-25 (Shore).

Front Row described its conception of the <u>Alice</u> test, which included an extra "Step 1" to determine whether the claim is to "a process, machine, manufacture, or composition of matter." <u>See</u> Tr. at 39:4-21 (Shore).[9]

---

[9]The Court will use the <u>Alice</u> test, rather than Front Row's test, for the sake of clarity and because the parties agree that all relevant patents have cleared Step 1 of Front Row's test.  <u>See</u> Tr. at 42:3-4 (Shore).



Front Row's PowerPoint at 12.  It alleged that the Defendants "abstracted the abstract[s]" to create oversimplified and abstract descriptions of two of its Video Patents.  Tr. at 43:25 (Shore). It provided an example of a patent that is abstract --

> a Major League Baseball patent that was rejected under 101. Take a look at these claims.  It's "A method for performing pitch classification: Receiving, at a computing device" -- again, totally generic, a computing device could be anything -- "one or more pitch properties corresponding to a ball thrown by a pitcher."  A pitch property corresponding to a ball thrown by a pitcher.  That's what every baseball scout has been looking at since the 1800s.

Tr. at 43:14-25 (Shore).  It explained that this patent referred to "a computing device" -- a "purely functional reference" rather than "a hand-held device" or "a device with a graphical user interface with multiple specific inputs."  Tr. at 44:15-45:17 (Shore).  Front Row described the next step, in which claims must "impose meaningful limitations to impart patent-eligibility."  Tr.

- 23 -

at 49:13-14 (Shore).  It cited to a recent USPTO office action on one of its applications, which did not reject the claims under § 101.  See Tr. at 51:4-14 (Shore).

The Defendants attempted to rebut Front Row's § 101 arguments.  See Tr. at 53:25-54:13 (Weaver).  They attacked Front Row's attempt "to elevate [the USPTO guidelines] to some sort of court precedent," describing the argument as "just nonsensical."  Tr. at 54:14-16 (Weaver). They noted that the guidelines are not binding on courts and, in any case, change frequently to reflect new patent opinions.  See Tr. at 54:14-25 (Weaver).  They complained that patent examiners' decisions not to raise § 101 concerns for Front Row's other patents are irrelevant: "Well, if that was the way the law worked, we would never bring in court a 102 argument, a 103 argument, or a 101 argument.  Because by definition, the patent has gotten through the patent office, and so it would make the whole notion of invalidity a pointless gesture."  Tr. at 56:13-18 (Weaver).

The Defendants also doubted whether the clear-and-convincing evidence standard applies to the § 101 analysis, noting that courts have split on the question.  See Tr. at 57:1-10 (Weaver). They added that neither the Supreme Court nor the Federal Circuit has ruled on the issue.  See Tr. at 57:19-24 (Weaver).  In any case, they maintained that they had "surpassed the clear and convincing evidentiary standard."  Tr. at 57:12-14 (Weaver).

The Defendants compared the Video Patents to the patents invalidated in Ultramercial IV.  See Defendants' PowerPoint at 63-66.  The claims in Ultramercial IV, they explained, involved a method for "distribution of copyrighted material, video, over the Internet, via a facilitator," including a complicated series of eleven steps.  Tr. at 59:15-25 (Weaver).  The Defendants asserted that the Federal Circuit, considering claims far more complex and specific than Front Row's claims, concluded "that the abstract idea was nothing more than displaying an

advertisement in exchange for delivering free content."  Tr. at 60:7-9 (Weaver).  The Defendants

maintained that the Ultramercial IV patent's inclusion of "certain additional limitations, such as

consulting an activity log," was not enough to render its abstract idea patent-eligible.  Tr. at

60:19-25 (Weaver).

      The Defendants then stepped back to analyze the Video Patents under the Alice test.  See

Tr. at 62:6-8 (Weaver).  On Step 1, they noted that the "basic character or purpose of the claim"

does not include limits such as a "wireless communications network" or "authentication."  Tr. at

62:21-63:4 (Weaver).  They thus defended their reliance on the first sentences in the Video

Patents' abstracts.  See Tr. at 63:17-64:7 (Weaver).  On Step 2, they reminded the Court that, "if

you simply recite the basic functions that allow [an idea] to occur on a computer, like processing,

like storing, like transmitting, receiving, those aren't enough."  Tr. at 68:19-22 (Weaver).  They

reviewed many of Front Row's claimed limitations, including the hand held device, the "wireless

packet-based data network," the video cameras, the server, the processor, and the memory,

explaining how each component is generic and used only in a conventional sense.  Tr. at 70:15-

73:12 (Weaver).  They also attacked Front Row's theory that the combination of these elements

constitutes an inventive concept:

> The briefing is very clear, Your Honor, that in order for the combination of
> elements to provide that inventive concept, you're looking for the "how" element.
> How does it do these things?  And the claims of the video patents are noticeably
> absent of the how.  It just simply says you're going to collect the data, you're
> going to . . . process it so that it can be streamed.  [It d]oesn't describe how the
> processing is going to occur.  And then you're going to send that to an
> authenticated device; just says an authenticated device, you're going to
> authenticate it.  And then the device receives it and views it.  There is no
> particularity involved . . . there.  And when they try and bring in particularity,
> which they do in some of the dependent claims, they're well-known concepts that
> don't add anything beyond the basic claims.

Tr. at 75:9-25 (Weaver).

The Defendants then attempted to distinguish Front Row's cited cases.  See Tr. at 76:10-13 (Weaver).  DDR Holdings, they argued, patented "a unique solution that applies things in a nonconventional manner," whereas the Video Patents involve "a hand-held computing device acting in a very conventional manner to receive video from a particular venue."  Tr. at 78:1-7 (Weaver).  Contentguard, the Defendants asserted, involved far more specific claims related to device authentication.  See Tr. at 78:21-79:11 (Weaver).  They argued that the claims in SimpleAir, unlike Front Row's claims, "specified the manner in which the data was transmitted from the central broadcast server to the remote computing devices by describing specific features associated with that."  Tr. at 80:1-4 (Weaver).  They also pointed out that "simply transforming data from one format to another has never been held to be patent-eligible saving under the transformation prong."  Tr. at 82:12-15 (Weaver).

The Defendants rejected the notion of a preemption analysis separate from the Alice test.  See Tr. at 85:18-22 (Weaver).  They pointed to Ariosa Diagnostics, Inc. v. Sequenom, Inc., 788 F.3d 1371 (Fed. Cir. 2015)("Ariosa"), which they argued held that the Alice test effectively incorporates any required preemption analysis.  See Tr. at 86:9-15 (Weaver)(citing Ariosa, 788 F.3d at 1379).  They argued that Alice and Ultramercial IV held "that simply narrowing something to a particular field of use, a particular technological environment, et cetera, won't save a claim. That doesn't save it from preemption concerns."  Tr. at 86:19-24 (Weaver).

The Defendants argued that Front Row's system claims[10] should rise and fall with its method claims.[11]  See Tr. at 87:2-4 (Weaver).  They remarked that the system claims cover the

---

[10]"A system claim provides a different approach to protecting the invention. Instead of protecting the steps taken to execute an inventive process, we protect the novel components that carry out those steps."  Cynthia Gilbert, Anatomy of a System Claim, Hyperion Law, April 6, 2011, http://hyperionlawboston.com/blog/2011/04/anatomy-system-claim/.  See Arris Grp., Inc. v. British Telecommunications PLC, 639 F.3d 1368, 1376 (Fed. Cir. 2011)("Claims which recite

- 26 -

devices used to carry out the method claims' procedures, and that both share the same basic components.  See Tr. at 87:4-13 (Weaver).  They also noted that the Alice court applied roughly the same analysis.  See Tr. at 87:19-88:2 (Weaver).

Front Row began by focusing on its procedural arguments.  See Tr. at 97:2-98:3 (Shore). It first explained why the Court should hold a claims construction hearing before invalidating any of its patents:

> [I]f we went through a claims construction [hearing] and claims construction discovery and expert testimony, the defendants would take the position in those proceedings that these were incredibly limited patents. . . .  [T]hey're trying to take a free shot and say, [g]uess what, these things are so broad that they cover the abstract idea, this incredibly abstract idea, and therefore, they're not required to tie themselves to any claims construction that would make them infringe.  And so what they're trying to do here is basically, without consent, without agreement, without anything else, handpick claims, claim that they are so abstract at the 50,000 foot level that they never have to address whether or not they infringed them at that 50,000 foot level.

Tr. at 97:4-21 (Shore).  Front Row again denies that the Supreme Court or the Federal Circuit require § 101 determinations before claim construction hearings.  See Tr. at 90:3-5 (Shore).  It complained that the Defendants' quoted section of the concurrence in Ultramercial IV, which states that "the district court properly invoked Section 101 to dismiss Ultramercial's infringement on the pleadings," omits the same opinion's comment that "no formal claim construction was required because the asserted claims disclosed no more than an abstract idea 'garnished with accessories,' and there was no reasonable construction that would bring them

---

a 'system,' 'apparatus,' 'combination,' or the like are all analytically similar in the sense that their claim limitations include elements rather than method steps.").

[11]"A method claim is a series of steps of manipulation, whether the steps would be performed wholly by machine or partly by a person, so long as they are not purely mental steps (an algorithm, which is dealt with in connection with electronics and computer claims).  EBS Dealing Res., Inc. v. Intercontinental Exch., Inc., 379 F. Supp. 2d 521, 524 (S.D.N.Y. 2005)(Clark, J.).

within patentable subject matter." Tr. at 98:17-99:1 (Shore). It stated that the Defendants must "show the court that no reasonable construction would bring any of the claims of any of the patents-in-suit within patentable subject matter." Tr. at 99:1-5 (Shore). It suggested that, to make this showing, the Defendants would need to have expert testimony and to avoid any possible hindsight bias. See Tr. at 100:9-16 (Shore). The Court, it warned, should avoid analyzing the issue alone, "on a trust me basis from the defendants." Tr. at 102:1-4 (Shore).

Front Row repeatedly argued that the Court should require the Defendants "to take precise claims construction positions if they're going to make a 101 argument." Tr. at 101:1-3 (Shore). It explained that the Defendants, given their argument that Front Row's patents cover a broad swathe of material, ought to be willing to stipulate to infringement. See Tr. at 101:7-23 (Shore). It cited the Honorable Rodney Gilstrap, United States District Judge for the Eastern District of Texas:

> The difficulty of making a substantive ruling on the validity of an issued patent in what is -- in essence -- a complete vacuum cannot be understated. While the claim language of some patents may be so clear that the court need only undertake a facial analysis to render it invalid at the pleading stage, that will not be the norm and is certainly not the case here.

Tr. at 102:10-18 (Shore)(quoting Phoenix Licensing, L.L.C. v. CenturyLink, Inc., 2015 WL 5786582, at *3). Front Row argued that the same principle applies here, and pointed to what it called misleading comparisons between its claims and the claims in Ultramercial IV. See Tr. at 102:19-103:7 (Shore). It identified a series of claim construction disputes, which distinguished it from the patent holder in Affinity Labs. See Tr. at 103:12-106:3 (Shore). It also attacked the Defendants' reliance on patent abstracts, insisting that "[a]nybody who practices before the patent office, anybody who has been doing this more than six months would say, to take the

abstract, something that's required to be in the patent, and use it to prove that a patent is abstract is silly." Tr. at 107:7-11 (Shore).

Front Row acknowledged that <u>Alice</u>'s second step is confusing and explained that its requirement of "substantially more" actually refers to more limitations -- in other words, a narrower claim. Tr. at 107:15-108:8 (Shore). It cited a series of cases holding that defendants must show, by clear-and-convincing evidence, that no plausible claim construction would satisfy the abstractness test or that the constructions most favorable to plaintiffs would not satisfy the test. <u>See</u> Tr. at 108:12-17 (Shore). For example, it explained that the Defendants described the Video Patents as "claiming nothing more than the abstract idea of providing video to hand-held devices." Tr. at 109:20-23 (Shore)(citing Reply at 5). It responded that the relevant patent had to acquire video captured within a venue, authenticate the recipient, and wirelessly stream the compressed video from a server to a hand held device. <u>See</u> Tr. at 110:2-16 (Shore). All of these steps, it stated, would rely on specific devices, such as the server and "a hand-held device that's capable of de-packeting, decompressing the data" -- a device that may not have even existed in 2000. Tr. at 110:20-22 (Shore). It argued that no courts have selected and analyzed representative claims absent the parties' agreement. <u>See</u> Tr. at 115:14-117:15 (Shore). It attacked the Defendants' reliance on <u>Content Extraction</u>, noting that the case did not involve any objection to the defendants' selected representative claims. <u>See</u> Tr. at 124:6-8 (Shore).

Front Row then argued that the clear-and-convincing standard applies at the § 101 stage. <u>See</u> Tr. at 119:19-120:6. It argued that the Supreme Court has held that any invalidity defense must be proved by clear-and-convincing evidence. <u>See</u> Tr. at 119:21-25 (Shore)(citing <u>Microsoft Corp. v. I4I Ltd. P'ship</u>, 564 U.S. 91, 95 (2011)).

Front Row also reinforced its reliance on USPTO guidelines.  See Tr. at 120:7-8 (Court, Shore).  It explained that two courts recently relied on the guidelines and even compared their representative claims to the claims in dispute in their cases.  See Tr. at 120:8-25 (Shore)(citing Finjan, Inc. v. Blue Coat Sys., Inc., No. 13-CV-03999-BLF, 2015 WL 7351450, at *9 (N.D. Cal. Nov. 20, 2015)(Freeman, J.), and Intellectual Ventures I LLC v. Symantec Corp., 100 F. Supp. 3d 371, 403 (D. Del. 2015)(Stark, J.)).

Front Row then analyzed the Defendants' proposed representative claims.  See Tr. at 122:5-9 (Shore).  It pointed to the claims' limitations:

> These nonrepresentative claims include specific types of . . . graphical user interfaces; they have selection means to selectively retrieve and display said streaming video.  They actually have some means plus function claims, which actually pull in from the specification very specific limitations.  There is also the simultaneous capture of two camera views via primary and a slave camera, simultaneous synchronized display.  Again, clearly far beyond abstract.  They actually call out a specific wireless network, not any wireless network.  And that specific wireless network has specific features that we'd get into when we got into claims construction expert testimony.  And cellular telecommunications network. And again, it has to be a cellular telecommunications network capable of authorizing the receipt, actually receiving, transmitting, and taking in packeting and compressed data.  Touch screens that have very specific functionality, not a generic touch screen; very detailed touch screens with very detailed and specific functionality.  And GPS with a specified capability to do location within a very certain limited area.  And again, it's not your general, generic GPS. And even if it was a general, generic GPS, in combination with the other elements, the guidelines of the USPTO say that GPS is actually something that would make it qualify under 101.
>
> . . . .
>
> And smartphones with very specified features.  Again, it has to be smartphones with a touch screen, it has to be smartphones with the ability to receive, compress, and decompress the data.  This is not any smartphone.  This is not a generic smartphone. It's a smartphone that has a capability to do certain very specialized things, very specialized things that would have been very rare in the year 2000.  Certainly not generic.

Tr. at 122:10-124:3 (Shore).

Front Row condemned the Defendants' attempt to ignore or oversimplify its claims' limitations.  See Tr. at 125:1-2 (Shore).  It explained that, to determine whether the GUI feature is novel, the Court must examine what functions it must complete to meet the overall combination claims.  See Tr. at 125:11-14 (Shore).  These functions, it added, included "a GUI based menu . . . [that] has to select segments of the streaming video signal, and those segments have to be viewable on the GUI menu driven by a touch screen display, as real time or prerecorded video footage."  Tr. at 126:2-7 (Shore).

It also rejected the Defendants' summary of the 184 Patent's first claim as "the abstract steps of acquiring video, authorizing a device for receiving the video, sending the video, and accessing the video on a hand-held device."  Tr. at 126:21-24 (Shore).  It explained that the claim requires more complex processes:

> The communication occurs over a wireless packet-based data network.  So you need to understand what is a wireless packet-based data network.  That is a network where you have compression.  You have compression of the video.  The video has to be captured of a live human being, a live object, a real thing at a venue, a real thing.  It's not the retransmission of existing video.  It is capturing that video, compressing it, breaking it into packages.  And after breaking it into packages, sending it over a wireless packet-based data network to a wireless device that must be capable of receiving compressed packeted data, displaying it in response to authentication, and then later in other patents it has to be via graphical user interface that is capable of responding to commands to do that.  The video comprising more than one video captured by cameras is acquired by authenticated hand-held devices for display.

Tr. at 127:2-19 (Shore).  These limitations, it argued, are far more detailed than the "on a computer" limitation that Alice rejected.  Tr. at 128:5-7 (Shore).  See id. at 129:22-25 (Shore)("We're not saying receive it over the Internet.  We're saying you have to receive it in a certain way, in a certain sequence, within a certain system.").

Front Row also argued that its claims passed the machine-or-transformation test.  See Tr. at 130:23-131:8 (Shore).  It reminded the Court that the transformation prong does not require

transforming a physical object into something physically different.  See Tr. at 131:1-4 (Shore).  It

stated that its system captures "live human beings" with a camera, digitizes the resulting images,

breaks the digitized images into "pieces or packets," places them on a network, sends them to "a

GPS-controlled area," and displays them on authenticated mobile devices.  Tr. at 131:9-132:19

(Shore).  This process, Front Row said, would not have been known in 2000, given that the field

had no technique for live streaming unpacketed data.  See Tr. at 133:12-23 (Shore).  Front Row

added that no human could perform this process:

> I would love to meet the person who could do that.  This is not an algorithm case.
> This is not a math case.  This is not a software case.  And the idea that they would
> say in their reply brief that a human could do what these packets do with a pencil
> and paper . . . .  I mean, it's crazy what they're willing to say.

Tr. at 155:4-14 (Shore).

The state of the art, Front Row stated, is important to understanding the § 101 issues.  See

Tr. at 140:4-6 (Shore).  It criticized the Defendants' reliance on Diamond v. Diehr, explaining

that the case held only the state of the art irrelevant in considering the Alice test's first step.  See

Tr. at 140:4-23 (Shore).  It argued that

> you can't make the determination that what is being claimed is a generic
> computer or a generic graphic user interface, or a network, or a generic server,
> unless you know what a server, a graphical user interface, and all those things
> were at the time of the invention.  That comes with expert testimony.

Tr. at 141:10-16 (Shore).  It contended that PDAs and other such devices "were not generic at

the time the patents were filed," and suggested that the Court hear evidence on the state of the art

at the time.  Tr. at 130:19-22 (Shore).  For example, it noted that "a wireless data network"

mentioned in the patent refers to a specific type of wireless data network "capable of transmitting

compressed, packeted data in real time."  Tr. at 144:1-5 (Shore).

Front Row took every opportunity to remind the Court that § 101 "is one of a multipart test for patentability" and argued that "this first hurdle is not designed to be so high that it subsumes all of the other hurdles you have to cross." Tr. at 137:21-23 (Shore). It argued that other hurdles to a valid patent, such as obviousness, could prevent every video system from becoming patented. See Tr. at 137:10-17 (Shore).

Front Row also remarked that the Court must consider their claims' elements in combination rather than individually. See Tr. at 146:8-15 (Shore). It argued that the Court cannot accept the Defendants' argument that each individual element of its claims is generic, because "claim limitations must be considered in an ordered combination." Tr. at 146:23-25 (Shore). Moreover, it stated that improvements on current inventions are patent-eligible. See Tr. at 147:1-5 (Shore).

Front Row concluded its arguments by pointing the Court to a specific phrase in Alice disapproving patents that recite "purely functional and generic" elements. Tr. at 160:24-161:1 (quoting Alice, 134 S. Ct. at 2347). It argued that the Supreme Court used the word "purely" to limit its decision's scope. Tr. at 161:1-2. It also repeated a local version of its combination argument: "[I]f these lawyers were defending Walter White, they would come in and say, Judge, you can't convict him of anything because he didn't possess anything but Sudafed, battery acid, drain cleaner, lantern fuel, and antifreeze. Forget the fact that when you mix those up, it's methamphetamine." Tr. at 161:9-15 (Shore).[12]

The Defendants began by attacking Front Row's suggestion that they stipulate to infringement. See Tr. at 164:6-16 (Weaver). They stated that "no court -- and he didn't cite a

---

[12]This quote refers to Walter White, a character in Breaking Bad, a television show broadcast on ABC between January, 2008 and September, 2013. The show was set in Albuquerque, where the Court sits.

case -- says that, in order to challenge a patent under 101, you have to stipulate that you infringe -- not the claim, Your Honor, but the definition of what is the abstract idea." Tr. at 164:10-15 (Weaver)(emphasis added). They added that courts may use "a very short description of what that abstract idea is" in applying the Alice test. Tr. at 165:12-15 (Weaver)("Infringement is a different analysis than 101 eligibility, and whether something is abstract or not.").

The Defendants attempted to reinforce their arguments that Front Row's claim elements were conventional by pointing to Front Row's patent applications. See Tr. at 165:21-166:17 (Weaver). They cited to elements mentioned in Front Row's patent specifications such as packet-based data, Bluetooth, and compression to argue that these elements were conventional and well known in 2000. See Tr. at 167:5-168:8 (Weaver). They focused on the GUI in particular, explaining that the Court does not "have to spend your common sense at the door" and that a GUI is "an interface that the user uses to interact with the electronic device. If it's on a touch screen, you touch the different things that you want." Tr. at 169:11-14 (Weaver). The sheer number of limitations, they argued, is not decisive: "[I]f each one of those limitations, considered by itself, doesn't add an inventive concept, then adding all 11 of them together, you still end up with zero plus zero, 11 times equals zero, unless you can show you did it in an innovative way." Tr. at 172:12-17 (Weaver).

The Defendants also responded to two of Front Row's procedural arguments. See Tr. at 172:20-177:23 (Weaver). First, they argued that claim construction would make no difference here. See Tr. at 173:9-15 (Weaver). In Cyberfone, they asserted, the Federal Circuit held that a claim construction issue must be specific and actually impact the § 101 analysis to delay it. See Tr. at 173:2-15 (Weaver). They allowed that Front Row presented a series of claim construction disputes at the hearing, but argued that it failed to describe how any dispute would alter the § 101

analysis.  See Tr. at 173:18-174:12 (Weaver).  Second, they argued that the parties need not agree on representative claims for the Court to use them in its § 101 analysis.  See Tr. at 174:13-19 (Weaver).  They cited to Content Extraction, noting that, although the plaintiff initially did not object to the defendant's proposed representative claims, it "vociferously objected on appeal."  Tr. at 175:21-24 (Weaver).  They explained that the district court did its own analysis to determine whether the claims were representative, that the Federal Circuit affirmed its decision, and that both courts invalidated 242 separate claims without the plaintiff's agreement. See Tr. at 175:24-176:9 (Weaver).  They cited other cases which they argued selected representative claims over a party's objection.  See Tr. at 176:15-177:15 (Weaver)(citing Wireless Media Innovations, LLC v. Maher Terminals, LLC, 100 F. Supp. 3d 405, 409 (D.N.J. 2015)(Linares, J.), aff'd, 636 F. App'x 1014 (Fed. Cir. 2016), and Listingbook, LLC v. Mkt. Leader, Inc., 144 F. Supp. 3d 777, 789 (M.D.N.C. 2015)(Biggs, J.)).  They argued, as a fallback position, that the representative claims were in fact representative and that the Court would reach the same conclusions if it analyzed every claim in the case on an individual basis.  See Tr. at 174:20-175:15 (Weaver).

The Court permitted the parties to proceed to the 027 Patent.  See Tr. at 177:24-178:2 (Court, Weaver).  The Defendants defended their reliance on the patent's abstract:

> I didn't suggest for a second, Your Honor, that because a characterization of a patent appears in the abstract, that that's where you conduct your entire analysis. We didn't do that.  We didn't suggest it.  I am simply pointing to the language in the abstract on these patents that describes, at a high level, what these patents are directed to.

Tr. at 178:18-25 (Weaver).  They also explained that they did not "have to prove that every single element in the claim has been practiced forever in that combination in order to reach 101." Tr. at 179:24-180:1 (Weaver).  Meeting such a requirement, they asserted, would invalidate a

claim under § 102.  See Tr. at 180:1-3 (Weaver).  They cited Intellectual Ventures I LLC v. Capital One Bank (USA) for the proposition that "tailoring content based on the viewer's location or address is the sort of information tailoring that's been a fundamental practice long prevalent in our system."  Tr. at 180:15-18 (Weaver)(citing Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d at 1369).

The Defendants then moved to bolster their Step 2 arguments.  See Tr. at 180:22-181:5. They argued that Front Row's limitations

> fail to impart an inventive concept, because they rely on generic computer implementation.  And the 027 patent importantly fails to describe how to perform these.  Merely saying you're using wireless packet data network isn't how.  That's the what.  How are you using the wireless packet data network to solve the latency issues, to solve the bandwith issues . . . .[13]

Tr. at 181:6-13 (Weaver).  They also attacked Front Row's conception of the machine-or-transformation test, explaining that not "all claims that claim GPS receiver[s] pass the test."  Tr. at 182:22-25 (Weaver).  They distinguished SiRF Technologies on the grounds that the 027 Patent "does not recite or require a receiver or any other specific machine.  And it, basically, just recites this generic hardware; the hand-held device is going to talk to the wireless communications server, and somehow, it's going to determine location."  Tr. at 183:17-22 (Weaver).  They added that Front Row does not explain how its claims filter content based on location data, or whether the filtering is software or hardware.  See Tr. at 184:2-11 (Weaver).

Front Row then made its final arguments.  See Tr. at 186:1-192:7 (Court, Shore).  It began by explaining that it did not have the burden to identify any representative claims or specific claims constructions.  See Tr. at 186:8-11 (Shore).  It noted that the 169 Patent's Claim 23 specifically requires a GPS chip set.  See Tr. at 187:5-7 (Shore).

---

[13]Bandwith, in this context, refers to "the transmission capacity of an electronic communications device or system" or "the speed of data transfer."  Bandwith, Dictionary.com

Front Row focused on the 027 Patent.  See Tr. at 188:10-12 (Shore).  It described the 027

Patent's preamble as "extraordinarily limiting, and frankly, unknown in the art at the time."  Tr.

at 189:5-6 (Shore).  It summarized its objections:

> [T]he '027 patent is probably, in my opinion, the worst example of the bad faith
> filing of this 101 motion.  And how they present it and how they argue it, it's
> wrong.  And a proper claims construction, with expert testimony, would point out
> that this is a relatively narrow patent, with very severe requirements on the
> systems.  The systems have to be able to do certain things.

Tr. at 191:1-9 (Shore).  It allowed that "some of these elements existed" before the patent, but

argued that "they've never been combined the way they've been combined" here.  Tr. at 191:13-

18 (Shore).

The Defendants concluded that the Court should extend its rulings on the representative

claims to the other claims.  See Tr. at 194:1-9 (Weaver).  They argued that the claims, rather than

the specifications, must provide the inventive concept.  See Tr. at 194:10-15 (Weaver).  They

urged the Court to review the patent specification, however, noting that "most of it is them

simply requiring all the prior art systems that existed at the time."  Tr. at 194:19-20 (Weaver).

The Court closed the hearing with its inclinations:

> The Supreme Court really hasn't defined "abstract."  And so you have to look at
> the Federal Circuit, and you have to look at the district court cases.  So I'm going
> to have to spend time there.  I'm going to have to give some thought as to whether
> this is the time to make a ruling on 101.  And the plaintiffs may be right that this
> is not the time to do it.  And I'm going to have to give that some thought.  And I
> don't have, really, any sort of inclination on that.  But my sense is that, if and
> when we reach the 101 issue, whether it's now or down the road, I do have
> concerns about the patentability of these patents under 101.

Tr. at 196:10-24 (Court).

###    6.    **The Supplementary Briefing.**

The parties filed a series of notices of supplemental authority to inform the Court of

recent decisions related to § 101.  The Defendants filed the first such notice on January 8, 2016.

See Defendants' Notice of Supplemental Authority Regarding Their Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed January 8, 2016 (Doc. 265)("First Supplement"). The First Supplement informed the Court of the Honorable John Love, United States Magistrate Judge for the Eastern District of Texas' Report and Recommendation in Rothschild Location Techs. LLC v. Geotab USA, Inc., No. 6:15-CV-682-RWS-JDL, 2016 WL 2847975 (E.D. Tex. May 16, 2016)(Schroeder, J.)("Rothschild")(adopting Judge Love's Report and Recommendation). The Defendants explain that Judge Love recommended invalidating a patent involving GPS devices under § 101. See First Supplement at 1 (citing 2016 WL 2847975, at *1). They argue that the Report and Recommendation: (i) placed the burden on the patentee to identify claim terms and proposed constructions relevant to a § 101 inquiry; and (ii) concluded that the patent's reference to a GPS device did not render its claims non-abstract. See First Supplement at 1.

Front Row responded on January 12, 2016. See Plaintiff's Response to Notice of Authority (Dkt. 265) and Supplemental Response to Defendants' Oral Argument on Motion to Dismiss (Dkt. 229), filed January 12, 2016 (Doc. 266)("Second Supplement"). Front Row first notes that the Report and Recommendation is "irrelevant and not dispositive" because "it is not a decision by a court created under Article III of the Constitution." Second Supplement at 1. It adds that the parties to the case still had time to object to the Report and Recommendation. Second Supplement at 1. It explains that, in Rothschild, there was "only one claim term that the plaintiffs believed needed construction, the defendants did not dispute the plaintiffs' preferred construction of the term, and the parties had no significant claim disputes or factual issues." Second Supplement at 1.

- 38 -

Front Row, without receiving leave or other authorization from the Court, proceeds to re-argue various issues presented at the hearing.  See Second Supplement at 2-9; D.N.M. Local Rule 7.4(b) ("The filing of a surreply requires leave of the Court.")  Front Row repeats its arguments that the representative claims are not representative.  See Second Supplement at 2.  It contends that the Court should consider the claims and the specification together, because they are both part of a fully integrated written instrument.  See Second Supplement at 2-3.  It objects to the Defendants' argument that its claims' language does not teach how to achieve their purposes: "The language of patent's claims is not recited to teach the invention; its purpose is to set the parameters of the monopoly that the patent holder obtains when the patent issues." Second Supplement at 3.  It quotes the Federal Circuit: "Specifications teach.  Claims claim." Second Supplement at 4 (quoting SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985)).  They add that this principle refutes the Defendants' objection that their claims "fail to teach the new and inventive combinations of the known elements claimed." Second Supplement at 4.  They assert that their patents teach persons with ordinary skill in the art "how to make the claimed inventions using claimed combinations of interconnected and integrated elements and components."  Second Supplement at 6.

The Defendants strongly objected to the Second Supplemental Notice's new arguments on January 21, 2016.  See Defendants' Objection to Plaintiff's Supplemental Response to Defendants' Oral Argument on Motion to Dismiss, filed January 21, 2016 (Doc. 270)("Third Supplement").  They explain:

> The Court's Rules provided Plaintiff the opportunity to file a response to Defendants' Motion limited to twenty-four pages, D.N.M. L.R. 7.5, and Plaintiff had every opportunity during an all-day hearing before the Court on January 5, 2016, to provide its responses to Defendants' oral arguments. Nothing in the Court's Rules authorize a party to reopen unilaterally the briefing to present additional arguments at this late stage.

Third Supplement at 1.  The Defendants decline to address any of Front Row's new arguments "unless the Court requests it."  Third Supplement at 2.

Front Row replied on January 25, 2016.  <u>See</u> Plaintiff's Response to Defendants' Objection and Notice of Supplemental Authority, filed January 25, 2016 (Doc. 271)("Fourth Supplement").  It attempts to explain its filing:

> Plaintiff's response and citation of additional supplemental authority are explicitly allowed under Local Rule 7.8, which states that, if controlling, or pertinent and significant authority comes to the attention of a party, that party may advise the court "after oral argument but before a decision."  Local Rule 7.8 does not require that the supplemental authority issue after oral argument; instead it requires only that such authority comes to a party's attention before the Court renders its decision.

Fourth Supplement at 1.  It also adds another argument related to the hearing, explaining that recent cases have cited USPTO guidelines.  <u>See</u> Fourth Supplement at 2.  Front Row directs the Court to <u>Xlear, Inc. v. STS Health, LLC</u>, No. 2:14-CV-00806-DN, 2015 WL 8967574 (D. Utah Dec. 15, 2015)(Nuffer, J.), which it says "held the claims at issue patentable after finding those claims similar to a claim identified as patentable by the USPTO."  Fourth Supplement at 2-3 (citing <u>Xlear, Inc. v. STS Health, LLC</u>, 2015 WL 8967574, at *5).

Front Row filed a notice of supplemental authority with two cases on January 26, 2016. <u>See</u> Plaintiff's Notice of Supplemental Authority Pursuant to Local Rule 7-8, filed January 26, 2016 (Doc. 272)("Fifth Supplement").  First, Front Row points to <u>Advanced Marketing Systems, LLC v. CVS Pharmacy, Inc.</u>, No. 6:15-CV-134-JRG-KNM, 2016 WL 1741396 (E.D. Tex. May 3, 2016)(Mitchell, M.J.), which it says determined that a § 101 analysis would be "best left until after claim construction."  Fifth Supplement at 1 (citing <u>Advanced Mktg. Sys., LLC v. CVS Pharmacy, Inc.</u>, 2016 WL 1741396, at *6).  It notes that Judge Gilstrap adopted this Report and Recommendation.  <u>See</u> Fifth Supplement at 1.  Second, Front Row refers to a Patent Trial and

Appeal Board decision, which it contends held that the petitioner "oversimplified" claims and failed to consider the elements as "ordered combinations."  Fifth Supplement at 1 (citing <u>NRT Tech. Corp v. Everi Payments, Inc.</u>, No. CBM2015-00167 (PTAB Jan. 22, 2016)).

On March 31, 2016, Front Row filed its Fifth Amended Complaint.  <u>See</u> Fifth Amended Complaint at 1.  The Fifth Amended Complaint alleges infringement of the 184, 895, 856, 460, and 027 Patents.  <u>See</u> Fifth Amended Complaint ¶¶ 23-75, at 5-21.  The Court approved the parties' stipulations on the same day.  <u>See</u> Stipulation and Order to Dismiss All Claims, Counterclaims, and Defenses Related to Patents Dropped in Plaintiff's Fifth Amended Complaint for Patent Infringement, filed March 31, 2016 (Doc. 288)("Stipulation").  The Stipulation dismissed the 388, 363, 162, 855, and 169 Patents.  <u>See</u> Stipulation at 4.

On April 13, 2016, the Defendants filed a notice to describe the Fifth Amended Complaint's effect on the Motion.  <u>See</u> Defendants' Notice Regarding Effect of Fifth Amended Complaint on Defendants' Pending Motion for Judgment on the Pleadings, filed April 13, 2016 (Doc. 289)("Sixth Supplement").  The Defendants contend that, "[b]y eliminating half of the patents Plaintiff previously asserted, the Fifth Amended Complaint (1) undermines any argument that Defendants' proposed representative claims for a Section 101 analysis are not truly representative and (2) underscores -- by removing many purportedly novel claim elements -- the unpatentability of Front Row's claims."  Sixth Supplement at 1.  The Defendants explain that the Fifth Amended Complaint dropped five of Front Row's patents and state that "[t]he only issue before the Court now is whether the asserted claims of the five remaining patents are directed to patent-eligible subject matter."  Sixth Supplement at 1-2.  First, they argue that Front Row has dropped many of the claims that it complained the 184 and 027 Patents' claims did not represent, including "all claims containing the graphical user interface and GPS chipset limitations."  Sixth

Supplement at 2.  Second, they argue that the remaining claims were "concededly well-known" and do not transform abstract ideas into patent-eligible applications.  Sixth Supplement at 3. They urge the Court to grant the Motion based on their representative claims.  See Sixth Supplement at 3.

Front Row responded to this filing on April 20, 2016.  See Plaintiff's Response to Defendants' Notice Regarding Effect of Fifth Amended Complaint on Defendants' Pending Motion for Judgment on the Pleadings, filed April 20, 2016 (Doc. 292)("Seventh Supplement"). First, Front Row disputes that the Defendants' chosen claims are "representative of the 64 claims asserted from five different patents in Plaintiff's Fifth Amended Complaint."  Seventh Supplement at 2.  It points to limitations absent from the representative claims, including an "802.11 wireless standard network,"[14] a "cellular telecommunications network," a "touchscreen display," a "smartphone," a "cellular telephone," a "tablet computer device," and "storing subscriber information . . . in a database."  Seventh Supplement at 2-3.

Second, Front Row repeats its arguments that the Court must not engage in factfinding, noting that it must "'accept all facts pleaded by the ***non-moving party*** as true and grant all reasonable inferences from the pleadings in that party's favor.'"   Seventh Supplement at 4 (quoting Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012)(emphasis in Seventh Supplement)).

---

[14]An 802.11 wireless standard network is a standardized wireless network that allows various devices to communicate with each other.  See In re Innovatio IP Ventures, LLC Patent Litig., No. 11 C 9308, 2013 WL 5593609, at *12 (N.D. Ill. Oct. 3, 2013)(Holderman, J.).  Wi-Fi networks are based on this standard.  See Realtek Semiconductor Corp. v. LSI Corp., No. C-12-03451 RMW, 2012 WL 4845628, at *1 (N.D. Cal. Oct. 10, 2012)(Whyte, J.).  It "was developed under the patronage of the Institute of Electrical and Electronics Engineers ('IEEE')."  Microsoft Corp. v. Motorola, Inc., No. C10-1823JLR, 2012 WL 395734, at *1 (W.D. Wash. Feb. 6, 2012)(Robart, J.).

Third, Front Row cites to <u>Treehouse Avatar LLC v. Valve Corp.</u>, No. CV 15-427-SLR, 2016 WL 1129726 (D. Del. Mar. 22, 2016)(Robinson, J.), which it says covered claims requiring "the creation, storage, and display, over a network, of an avatar 'that is indicative of the individuality of the network user.'" Seventh Supplement at 4 (quoting <u>Treehouse Avatar LLC v. Valve Corp.</u>, 2016 WL 1129726, at *10). Front Row explains that the decision denied a defendant's motion to dismiss under § 101 on the grounds that its claims were "necessarily routed in computer technology in order to overcome a problem specifically arising in the realm of computer networks." Seventh Supplement at 5. Front Row argues that this case is similar, because the claims "require sending, over a network, an image representative of one or more persons." Seventh Supplement at 5. Front Row concludes by repeating its arguments that its claims are neither generic nor indefinite. <u>See</u> Seventh Supplement at 5-6.

Front Row filed another supplement on May 12, 2016. <u>See</u> Plaintiff's Notice of Binding Supplemental Authority Concerning Invalidity Under Section 101 Pursuant to Local Rule 7-8, filed May 12, 2016 (Doc. 306)("Eighth Supplement"). Front Row explained that a new Federal Circuit case, <u>Enfish, LLC v. Microsoft Corp.</u>, No. 2015-1244, 2016 WL 2756255 (Fed. Cir. May 12, 2016)("<u>Enfish</u>"), "clarifies that the first step is not to be taken lightly but is the highest hurdle to overcome for a defendant asserting a Section 101 defense." Eighth Supplement at 1. Front Row argues that the Federal Circuit's consideration of claims' character "as a whole" during Step 1 "makes clear that a court considering a Section 101 defense should never reach the second step unless the claimed invention completely, or wholly involves ***only*** an abstract idea. If any part of the claimed invention is not abstract, the inquiry stops at the first step." Eighth Supplement at 2 (quoting <u>Enfish</u>, 2016 WL 2756255, at *4).

Front Row filed the next supplement to provide the Court with guidance from the USPTO. See Plaintiff's Notice of Supplemental Authority Concerning Invalidity Under Section 101 Pursuant to Local Rule 7-8, filed May 16, 2016 (Doc. 308)("Ninth Supplement"). Front Row contends that the new guidance emphasizes the importance of evaluating a claim's elements in combination. Ninth Supplement at 1. Further, Front Row argues that it tends to make patents including "generic components" more likely to pass § 101. Ninth Supplement at 1.

The Defendants replied to Front Row's Eighth and Ninth Supplements on May 19, 2016. See Defendants' Response to Plaintiff's Notices of Supplemental Authority Concerning Invalidity Under Section 101 Pursuant to Local Rule 7.8, filed May 19, 2016 (Doc. 320)("Tenth Supplement"). The Defendants contend that neither of Front Row's new authorities "involves a change in the law or presents any basis for altering the analysis set forth in Defendants' Motion for Judgment on the Pleadings." Tenth Supplement at 1. First, they contend that Enfish does not make a major change, "because the asserted patents do not claim any improvement to technology" or "computer functionality." Tenth Supplement at 1. They note that the Enfish invention has technological advantages including "'increased flexibility, faster search times, and smaller memory requirements.'" Tenth Supplement at 1 (quoting Enfish, 2016 WL 2756255, at *6).

Second, the Defendants argue that the new USPTO guidelines are consistent with their understanding of the § 101 analysis and their past arguments. See Tenth Supplement at 2. They point to a recent decision by the USPTO's Patent Trial and Appeal Board invalidating "an online content delivery patent similar to Plaintiff's Video Patents." Tenth Supplement at 2 (citing Motorola Mobility, LLC, CBM2015-00004, 2016 WL 1133073, at *22 (Mar. 21, 2016)). They

also notify the Court that Judge Schroeder adopted the Report and Recommendation in Rothschild.  See Tenth Supplement at 3.

The Defendants filed yet another supplement four days later.  See Defendants' Notice of Binding Supplemental Authority Regarding their Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed May 23, 2016 (Doc. 321)("Eleventh Supplement").   The Defendants point to a new Federal Circuit case which they say "affirmed dismissal based on Section 101 invalidity of a patent claiming methods and apparatus for taking, storing, transmitting, and organizing digital images."   Eleventh Supplement at 1 (citing In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607, 609 (Fed. Cir. 2016)).   They quote the Federal Circuit, which stated that the claims were "directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two."   Eleventh Supplement at 1 (quoting In re TLI Commc'ns LLC Patent Litig., 823 F.3d at 612).

Front Row responded to this supplement on June 3, 2016.  See Plaintiff's Resposne to Defendant's Notice of Binding Supplemental Authority Regarding their Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed June 3, 2016 (Doc. 330)("Twelfth Supplement").   Front Row disagrees with the Defendants' interpretation of In re TLI Communications LLC Patent Litigation, noting that the claim in that case does not "describe a new telephone, a new server, or a new physical combination of the two."  Twelfth Supplement at 1 (quoting In re TLI Commc'ns LLC Patent Litig., 823 F.3d at 612).  Front Row asserts that its patents, on the other hand, claim new physical combinations of hardware, software, and data networks.  See Twelfth Supplement at 1.

Front Row filed its next notice of supplemental authority on July 5, 2016.  See Plaintiff's Notice of Binding Supplemental Authority Concerning Invalidity under Section 101 Pursuant to Local Rule 7-8, filed July 5, 2016 (Doc. 350)("Thirteenth Supplement").  Front Row cites another new Federal Circuit case, arguing that it shows that the unconventional arrangement of conventional pieces can result in patent-eligible subject-matter.  See Thirteenth Supplement at 1 (citing Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC, No. 2015-1763, 2016 WL 3514158, at *8 (Fed. Cir. June 27, 2016)("Bascom")).

The Defendants responded on July 12, 2016.  See Defendants' Response to Plaintiff's Notice of Supplemental Authority Concerning Invalidity Under Section 101 Pursuant to Local Rule 7.8, filed July 12, 2016 (Doc. 372)("Fourteenth Supplement").  The Defendants deny that Bascom supports Front Row's arguments.  See Fourteenth Supplement at 1.  First, the Defendants argue that Bascom confirms that the Court may reach § 101 issues at any appropriate stage.  See Fourteenth Supplement at 1.  Second, they contend that Bascom approved an "ordered combination of elements" as patent-eligible because, unlike Front Row's patents, it claimed a "***specific, discrete implementation*** of the abstract idea of filtering content." Fourteenth Supplement at 1 (quoting Bascom, 2016 WL 3514158, at *7)(emphasis in Fourteenth Supplement).

On July 15, 2016, Front Row filed another supplement, explaining that three patents and applications "concerning sports and entertainment video streaming similar to the Front Row patents at issue in this case have been examined at the USPTO and not been the subject of any *Alice* 101 rejections."  Plaintiff's Notice of Supplemental Authority Concerning Invalidity Under Section 101 Pursuant to Local Rule 7-8 at 1, filed July 15, 2016 (Doc. 353).

## LAW REGARDING MOTIONS TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The complaint's sufficiency is a question of law; and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss.");  Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010)(Seymour, J.). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis omitted). The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)(citations omitted).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th

Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion

to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the

complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING RULE 12(C)[15]

"After the pleadings are closed -- but early enough not to delay trial -- a party may move

for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  A rule 12(c) motion is designed to

provide a means of disposing of cases when the material facts are not in dispute between the

parties.  See Kruzitis v. Okuma Mach. Tool, Inc., 40 F.3d 52, 54 (3d Cir. 1994)("Under Rule

12(c), we will not grant judgment on the pleadings unless the movant clearly establishes that no

material issue of fact remains to be resolved and that he is entitled to judgment as a matter of

law.")(internal quotation marks omitted).  A "[j]udgment on the pleadings should not be granted

'unless the moving party has clearly established that no material issue of fact remains to be

resolved and the party is entitled to judgment as a matter of law.'"  Park Univ. Enters., Inc. v.

Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006)(citing United States v. Any

& All Radio Station Transmission Equip., 207 F.3d 458, 462 (8th Cir. 2000)).

"Any party may move for judgment on the pleadings if no material facts are in dispute

and the dispute can be resolved on both the pleadings and any facts of which the Court can take

---

[15]In patent cases, Federal Circuit law applies if a question involves an issue of substantive patent law.  Regional Circuit law applies if the question does not involve patent law.  See In re Deutsche Bank Trust Co. Americas, 605 F.3d at 1377; Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1307 (Fed. Cir. 2001); In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803 (Fed. Cir. 2000)("In reviewing district court judgments, we apply the law of the circuit in which the district court sits with respect to nonpatent issues, but we apply our own law to issues of substantive patent law."); Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1362-63 (Fed. Cir. 2004)("We answer this question on an issue by issue basis and will apply the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law.")(quotations omitted); Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996).

judicial notice." Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. 303, 304 (D.N.M. 2000)(citing Fed. R. Civ. P. 12(c)).  A motion pursuant to rule 12(c) is generally treated in the same manner as a motion to dismiss under rule 12(b)(6).  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304 (citing Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638 (2d Cir. 1998)).  The court will grant a motion for judgment on the pleadings if the pleadings demonstrate that the moving party is entitled to judgment as a matter of law.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.

A court considering a motion for judgment on the pleadings should "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same."  Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1244.  The court must view the facts presented in the pleadings and draw the inferences therefrom in the light most favorable to the nonmoving party.  See Ramirez v. Wal-Mart Stores, Inc., 192 F.R.D. at 304.  All of the nonmoving party's allegations are deemed to be true, and all of the movant's contrary assertions are taken to be false.  See Nat'l Metro. Bank v. United States, 323 U.S. 454, 456-57 (1945); Ramirez v. Dep't of Corr., 222 F.3d 1238, 1240 (10th Cir. 2000); Freeman v. Dep't of Corr., 949 F.2d 360, 361 (10th Cir. 1991).

The same standards that govern a motion to dismiss under rule 12(b)(6) also govern a motion for judgment on the pleadings under rule 12(c).  See Atl. Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1160 (10th Cir. 2000).  Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when

considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca City, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit has

stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."   The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v.

Twombly, 550 U.S. at 570 (citations omitted)).

In reviewing a pro se complaint, the court applies the same legal standards applicable to

pleadings that counsel drafts, but is mindful that the complaint must be liberally construed.  See

Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).   But "[t]he broad reading of the

plaintiff's complaint does not relieve the plaintiff of alleging sufficient facts on which a

recognized legal claim could be based."   Hall v. Bellmon, 935 F.2d at 1110.

> [T]he [pro se] plaintiff whose factual allegations are close to stating a claim but
> are missing some important element that may not have occurred to him, should be
> allowed to amend his complaint.   Nevertheless, conclusory allegations without
> supporting factual averments are insufficient to state claim on which relief can be
> based.   This is so because a pro se plaintiff requires no special legal training to
> recount the facts surrounding his alleged injury, and he must provide such facts if
> the court is to determine whether he makes out a claim on which relief can be
> granted.   Moreover, in analyzing the sufficiency of the plaintiff's complaint, the
> court need accept as true only the plaintiff's well-pleaded factual contentions, not
> his conclusory allegations.

Hall v. Bellmon, 935 F.2d at 1110 (citations omitted).

## LAW REGARDING PATENT-ELIGIBLE SUBJECT-MATTER

An inventor or discoverer may patent "any new and useful process, machine,

manufacture, or composition of matter, or any new and useful improvement thereof . . . subject

to the conditions and requirements of this title."   35 U.S.C. § 101.   The Supreme Court has

carved out three specific exceptions to § 101's broad eligibility grant: "laws of nature, physical phenomena, and abstract ideas."[16]  Bilski v. Kappos, 561 U.S. at 601.  See Gottschalk v. Benson, 409 U.S. 63, 67 (1972)("Phenomena of nature, though just discovered, mental processes, and abstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work.").  "Patent eligibility under 35 U.S.C. § 101 is an issue of law[.]"  OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d 1359, 1362 (Fed. Cir. 2015).

The Supreme Court and the Federal Circuit have repeatedly disagreed over the scope of the exception for abstract ideas.  The conflict became particularly apparent in In re Bilski, 545 F.3d 943 (Fed. Cir. 2008)(en banc), where a patent applicant challenged the USPTO's denial of his application "for a method of hedging risk in the field of commodities trading."  545 F.3d at 949.  The USPTO concluded that the "transformation of non-physical financial risks and legal liabilities of the commodity provider, the consumer, and the market participants is not patent-eligible subject matter."  In re Bilski, 545 F.3d at 950 (quotation omitted).  The Federal Circuit held that the Supreme Court had created only one § 101 test:

> The Supreme Court, however, has enunciated a definitive test to determine whether a process claim is tailored narrowly enough to encompass only a particular application of a fundamental principle rather than to pre-empt the principle itself.  A claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.

In re Bilski, 545 F.3d at 954.  The Supreme Court rejected the Federal Circuit's conclusion:

> This Court's precedents establish that the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101. The machine-or-transformation test is not the sole test for deciding whether an invention is a patent-eligible "process."

---

[16]"While these exceptions are not required by the statutory text, they are consistent with the notion that a patentable process must be 'new and useful.'"  Bilski v. Kappos, 561 U.S. at 601-02 (2010)(quoting 35 U.S.C. §101).

Bilski v. Kappos, 561 U.S. at 604.  It even added that "nothing in today's opinion should be read as endorsing interpretations of § 101 that the Court of Appeals for the Federal Circuit has used in the past."  Bilski v. Kappos, 561 U.S. at 612.  Instead of providing a replacement test, however, the Supreme Court instead compared the specific claims at issue to its prior decisions on abstract ideas.  See 561 U.S. at 609 ("Rather than adopting categorical rules that might have wide-ranging and unforeseen impacts, the Court resolves this case narrowly on the basis of this Court's decisions . . . .").  The Supreme Court thus eviscerated the Federal Circuit's approach to § 101 without providing a specific replacement.

The Supreme Court's next major statement concerned a "natural phenomena" patent. Mayo Collaborative Servs. v. Prometheus Labs., Inc., 132 S. Ct. 1289, 1293 (2012)("Mayo").  In that case, a laboratory producing tests secured patents embodying "relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm."  132 S. Ct. at 1296.  The Federal Circuit concluded that the patents were valid, because they passed the machine-or-transformation test -- it specifically noted that "the claimed processes specify the steps of (1) 'administering a [thiopurine] drug' to a patient and (2) 'determining the [resulting metabolite] level.'"  132 S. Ct. at 1296.  The Supreme Court again reversed and invalidated the patents.  See 132 S. Ct. at 1297. It first recognized that "too broad an interpretation of this exclusionary principle could eviscerate patent law.  For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."  132 S. Ct. at 1293.  It explained, however, that the laboratory's patents "set forth laws of nature -- namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm."  132 S. Ct. at 1296.  Second, the Supreme Court considered whether

- 54 -

the claims "also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself."  132 S. Ct. at 1294 (quoting Parker v. Flook, 437 U.S. 584, 594 (1978)("Flook")).  Patents that "simply state the law of nature while adding the words 'apply it,'" the Supreme Court explained, do not amount to the required inventive concept. 132 S. Ct. at 1290.  Applying this principle to the laboratory's patent, the Supreme Court rejected the patents:

> To put the matter more succinctly, the claims inform a relevant audience about certain laws of nature; any additional steps consist of well-understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately.

132 S. Ct. at 1298.

The Supreme Court extended this framework to abstract ideas in Alice.  That case involved "a computer-implemented scheme for mitigating 'settlement risk' (i.e., the risk that only one party to a financial transaction will pay what it owes) by using a third-party intermediary."  Alice, 134 S. Ct. at 2351-52.  The Supreme Court formalized the test that it applied in Mayo "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts."  Alice, 134 S. Ct. at 2355.  "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts."  134 S. Ct. at 2355.  Second, if so,

> we then ask, "[w]hat else is there in the claims before us?"  Id., at ——, 132 S.Ct., at 1297.  To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. Id., at ——, 132 S.Ct., at 1298, 1297.  We have described step two of this analysis as a search for an "'inventive concept'" -- i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to

> significantly more than a patent upon the [ineligible concept] itself." *Id.,* at ——,
> 132 S.Ct., at 1294.

134 S. Ct. at 2355.

The Supreme Court then applied this test and invalidated the claims at issue. See 134 S.

Ct. at 2356-57. First, it concluded that the claims, on their face, were directed to an abstract idea

-- "the concept of intermediated settlement, *i.e.,* the use of a third party to mitigate settlement

risk." 134 S. Ct. at 2356. It explained that the patents were similar to those in Bilski v. Kappos,

but declined to set out a specific definition for "abstract ideas":

> In any event, we need not labor to delimit the precise contours of the "abstract
> ideas" category in this case. It is enough to recognize that there is no meaningful
> distinction between the concept of risk hedging in *Bilski* and the concept of
> intermediated settlement at issue here. Both are squarely within the realm of
> "abstract ideas" as we have used that term.

134 S. Ct. at 2357. Second, the Supreme Court held that the patents' method claims, "which

merely require generic computer implementation, fail to transform that abstract idea into a

patent-eligible invention." 134 S. Ct. at 2357. It explained:

> [T]he mere recitation of a generic computer cannot transform a patent-ineligible
> abstract idea into a patent-eligible invention. Stating an abstract idea "while
> adding the words "apply it" is not enough for patent eligibility. Nor is limiting
> the use of an abstract idea "to a particular technological environment." Stating an
> abstract idea while adding the words "apply it with a computer" simply combines
> those two steps, with the same deficient result. Thus, if a patent's recitation of a
> computer amounts to a mere instruction to "implemen[t]" an abstract idea "on . . .
> a computer," that addition cannot impart patent eligibility.

134 S. Ct. at 2358 (citations omitted). The Supreme Court noted that the claims did not: (i)

"purport to improve the functioning of the computer itself"; (ii) "effect an improvement in any

other technology or technical field"; or (iii) considered as an ordered combination, add anything

"that is not already present when the steps are considered separately." 134 S. Ct. at 2359. It

applied the same analysis to the patent-holder's system claims, which recited "purely functional

and generic" hardware, such as a data processing system with a communications controller.  134 S. Ct. at 2360.  The Supreme Court rejected these claims as well, noting that "the system claims are no different from the method claims in substance.  The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea."  134 S. Ct. at 2360.[17]

---

[17]The Supreme Court's guidance in <u>Alice</u> has proven confusing for the Federal Circuit and district courts, which have raised two primary criticisms.  First, some courts have argued that the two-step test is really a one-step test.  In <u>McRO, Inc. v. Sony Computer Entertainment America, LLC</u>, 55 F. Supp. 3d 1214 (C.D. Cal. 2014)(Wu, J.), for example, the district court commented:

> Describing this as a two-step test may overstate the number of steps involved.  If the claim is not "directed" to a patent-ineligible concept, then the test stops at step one.  If the claim is so directed, but we find in step two that the claim contains an "inventive concept" that "transforms" the nature of the claim into something patent eligible, then it seems that there was a categorization error in finding the claim -- which is considered "as an ordered combination" -- "directed to an abstract idea" in step one.

55 F. Supp. 3d at 1220.  It compared the <u>Alice</u> test to Justice Potter Stewart's comments on pornography -- that "I know it when I see it."  <u>McRO, Inc. v. Sony Computer Entm't Am., LLC</u>, 55 F. Supp. 3d at 1220 (quoting <u>Jacobellis v. State of Ohio</u>, 378 U.S. 184, 197 (1964)(Stewart, J., concurring)).  <u>See Amerock Corp. v. Unican Sec. Sys. Corp.</u>, No. 76-0002-CIV.8, 1981 WL 48185, at *3 (E.D.N.C. Sept. 24, 1981)(Merhige, J.)(quoting the same sentence).  It concluded that "comparisons to previously adjudicated patents -- or more precisely, to past cases' characterizations of those patents -- have done the heavy lifting."  55 F. Supp. 3d at 1220.

Second, courts have argued that the <u>Alice</u> test's results depend entirely on courts' preferred characterization of the patented idea.  <u>See Fairfield Indus., Inc. v. Wireless Seismic, Inc.</u>, No. 4:14-CV-2972, 2014 WL 7342525, at *4 (S.D. Tex. Dec. 23, 2014)(Ellison, J.)("[A]ny claim, described at a certain level of generality, can be challenged as directed to an abstract idea.").  Courts may independently characterize the patented idea and need not accept either party's suggestions.  In <u>Cogent Medicine, Inc. v. Elsevier Inc.</u>, 70 F. Supp. 3d 1058 (N.D. Cal. 2014)(Whyte, J.)("<u>Cogent Medicine</u>"), the defendants argued that a patent embodied "the abstract idea of providing users with a personal library interface containing medical literature."  70 F. Supp. 3d at 1063.  The plaintiff proposed a far narrower definition.  <u>See</u> 70 F. Supp. 3d at 1063.  The Honorable Ronald White, United States District Judge for the Northern District of California, rejected these proposals and adopted the far broader abstract idea of "maintaining and searching a library of information."  70 F. Supp. 3d at 1063.  It invalidated the patents, explaining that they were "the equivalent of human mental work."  70 F. Supp. 3d at 1065.  A

Alice has had an extraordinary impact on patent litigation. See Kenneth Adamo, Comment in Where Do We Stand One Year After Alice?, Law360, June 17, 2015, http://www.law360.com/articles/668773/where-do-we-stand-one-year-after-alice ("No U.S. Supreme Court patent case has ever had so large an effect in so short a time as Alice Corp. Pty. Ltd. v. CLS Bank Int'l."); Michael Renaud, Courtney Quish, Sean Casey, & Matthew Karambelas, Patentability of Software Post-Alice: How Do Courts Determine Whether an Idea is Abstract?, Mintz Levin Intellectual Property Advisory, January 12, 2015 ("While software has not fared well in courts following Alice, there have been cases upholding software patents."); Robert R. Sachs, Two Years After Alice: A Survey of the Impact of a "Minor Case", Bilskiblog, Fenwick & West, June 16, 2016, http://www.bilskiblog.com/blog/2016/06/two-years-after-alice-a-survey-of-the-impact-of-a-minor-case.html#_ftnref16 (tracking patent eligibility decisions per month after Alice); Dugan, Ben, Estimating the Impact of Alice v. CLS Bank Based on a Statistical Analysis of Patent Office Subject Matter Rejections, February 23, 2016, http://ssrn.com/abstract=2730803 ("[I]t is highly likely that well over a hundred thousand issued patents have been invalidated by the Supreme Court's recent focus on, and resulting reduction in, the scope of subject matter that is eligible for patenting.").  The great majority of the Federal Circuit's post-Alice opinions on § 101 have affirmed district courts' decisions invalidating patents on subject-matter eligibility grounds.[18]  Only a small number of these opinions have reversed determinations that patents were not subject-matter eligible.[19]

---

court's choice to describe a patent's idea as simple or complex, in short, may determine its validity.

[18]See buySAFE, 765 F.3d at 1355 ("The claims are squarely about creating a contractual relationship -- a 'transaction performance guaranty' -- that is beyond question of ancient lineage."); Content Extraction, 776 F.3d at 1349 ("[N]one of CET's claims amount to 'significantly more' than the abstract idea of extracting and storing data from hard copy

The Federal Circuit has attempted to provide guidance on the <u>Alice</u> test in this developing and unstable environment.  It recently addressed Step 1 in <u>Enfish</u>.  <u>See</u> 822 F.3d at 1335.  In that case, a software developer corporation patented an "innovative logical model for a computer database" that, "[c]ontrary to conventional logical models . . . includes all data entities in a single

documents using generic scanning and processing technology."); <u>Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.</u>, 758 F.3d 1344, 1351 (Fed. Cir. 2014)(invalidating "device profile" claims and method claims); <u>Planet Bingo, LLC v. VKGS LLC</u>, 576 F. App'x 1005, 1008 (Fed. Cir. 2014)(unpublished)("<u>Planet Bingo</u>")(rejecting claims that "recite methods and systems for managing a game of Bingo")(internal quotation omitted); <u>Ultramercial IV</u>, 772 F.3d at 717; <u>Lendingtree, LLC v. Zillow, Inc.</u>, No. 2014-1435, 2016 WL 3974203, at *6 (Fed. Cir. July 25, 2016); <u>Shortridge v. Found. Constr. Payroll Serv., LLC</u>, No. 2015-1898, 2016 WL 3742816, at *1 (Fed. Cir. July 13, 2016); <u>In re TLI Commc'ns LLC Patent Litig.</u>, 823 F.3d at 613 ("[T]he claims' recitation of a 'telephone unit,' a 'server', an 'image analysis unit,' and a 'control unit' fail to add an inventive concept sufficient to bring the abstract idea into the realm of patentability."); <u>In re Brown</u>, No. 2015-1852, 2016 WL 1612776, at *2 (Fed. Cir. April 22, 2016)(per curiam)("While it is true that a hair cut would not result without practicing the final step of cutting hair, step (e) merely instructs one to apply the abstract idea discussed above with scissors.  Such a limitation is not the type of additional feature <i>Alice</i> envisioned as imparting patent eligibility."); <u>In re Smith</u>, 815 F.3d 816, 818 (Fed. Cir. 2016)("Applicants' claims, directed to rules for conducting a wagering game, compare to other 'fundamental economic practice[s]' found abstract by the Supreme Court."); <u>Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.</u>, 811 F.3d 1314, 1325 (Fed. Cir. 2016); <u>Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC</u>, 635 F. App'x 914, 919 (Fed. Cir. 2015)(rejecting claims covering testing a vehicle's operator for impairments); <u>Versata Dev. Grp., Inc. v. SAP Am., Inc.</u>, 793 F.3d 1306, 1331 (Fed. Cir. 2015)("Versata's concept of organizational hierarchies for products and customers is abstract because it represents a disembodied concept, a basic building block of human ingenuity -- it is little more than determining a price, essentially a method of calculating."); <u>Intellectual Ventures I LLC v. Capital One Bank (USA)</u>, 792 F.3d at 1367; <u>Internet Patents Corp. v. Active Network, Inc.</u>, 790 F.3d 1343, 1349 (Fed. Cir. 2015); <u>OIP Techs., Inc. v. Amazon.com, Inc.</u>, 788 F.3d at 1362 (rejecting claims covering a system of pricing a product for sale); <u>Allvoice Developments US, LLC v. Microsoft Corp.</u>, 612 F. App'x 1009, 1018 (Fed. Cir. 2015)(unpublished); <u>Content Extraction</u>, 776 F.3d at 1347 (holding that the recitation of a scanner did not save claims directed to the "concept of data collection, recognition, and storage"); <u>In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.</u>, 774 F.3d 755, 764 (Fed. Cir. 2014).

[19]<u>Bascom</u>, 2016 WL 3514158, at *1 ("BASCOM has alleged that the claims of the '606 patent contain an "inventive concept" in their ordered combination of limitations sufficient to satisfy the second step of the Supreme Court's <i>Alice</i> test."); <u>Enfish</u>, 822 F.3d at 1336; <u>DDR Holdings</u>, 773 F.3d 1245 (Fed. Cir. 2014)(concluding that a patent's claims passed Step 2 of the <u>Alice</u> test).

table, with column definitions provided by rows in that same table."  822 F.3d at 1330.  This

"self-referential" model could search and store data more effectively, and allowed for more

flexibility in designing a database.  822 F.3d at 1333.  The software developer brought a patent

infringement action against the Microsoft Corporation, arguing that one of Microsoft's products

created and manipulated self-referential tables.  See 822 F.3d at 1333.  The district court granted

summary judgment in Microsoft Corporation's favor, concluding that "that the claims were

directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' or,

more simply, 'the concept of organizing information using tabular formats.'"  822 F.3d at 1337

(quoting Enfish, LLC v. Microsoft Corp., 56 F. Supp. 3d 1167, 1176 (C.D. Cal. 2014)(Pfaelzer,

J.)).

      The Federal Circuit seized the opportunity to discuss Alice's Step 1.  See Enfish, 822

F.3d at 1334.  It first explained:

> The Supreme Court has not established a definitive rule to determine what
> constitutes an "abstract idea" sufficient to satisfy the first step of the *Mayo/Alice*
> inquiry.  Rather, both this court and the Supreme Court have found it sufficient to
> compare claims at issue to those claims already found to be directed to an abstract
> idea in previous cases.

Enfish, 822 F.3d at 1334 (citation omitted).  It emphasized, however, that "the first step of the

inquiry is a meaningful one, i.e., that a substantial class of claims are *not* directed to a patent-

ineligible concept."  822 F.3d at 1335 (emphasis in original).  It concluded that the first step

"cannot simply ask whether the claims *involve* a patent-ineligible concept, because essentially

every routinely patent-eligible claim involving physical products and actions *involves* a law of

nature and/or natural phenomenon -- after all, they take place in the physical world."  822 F.3d at

1335 (emphasis in original).  Instead, it instructed district courts to apply "a stage-one filter to

claims, considered in light of the specification, based on whether 'their character as a whole is

directed to excluded subject matter.'"   822 F.3d at 1335 (quoting Internet Patents, 790 F.3d at

1346).   It added that not all improvements in computer-related technology, including software

innovations, are abstract and that courts could address them in Step 1.   See Enfish, 822 F.3d at

1335 (citing "a chip architecture" and "an LED display"[20] as examples of non-abstract

improvements in computer-related technology).   The Federal Circuit then analyzed the patents

before it:

> [T]he first step in the *Alice* inquiry in this case asks whether the focus of the
> claims is on the specific asserted improvement in computer capabilities (i.e., the
> self-referential table for a computer database) or, instead, on a process that
> qualifies as an "abstract idea" for which computers are invoked merely as a tool.
> As noted *infra,* in *Bilski* and *Alice* and virtually all of the computer-related § 101
> cases we have issued in light of those Supreme Court decisions, it was clear that
> the claims were of the latter type -- requiring that the analysis proceed to the
> second step of the *Alice* inquiry, which asks if nevertheless there is some
> inventive concept in the application of the abstract idea.  *See Alice,* 134 S.Ct. at
> 2355, 2357-59.   In this case, however, the plain focus of the claims is on an
> improvement to computer functionality itself, not on economic or other tasks for
> which a computer is used in its ordinary capacity.

Enfish, 822 F.3d at 1335-36.   It noted that: (i) the claims were not directed "to *any* form of

storing tabular data, but instead are specifically directed to a *self-referential* table for a computer

database"; (ii) the self-referential table functioned differently from other database structures; (iii)

the self-referential table offered significant and unique benefits, such as faster search times.  822

F.3d at 1337.   That the claims could be run on a general purpose computer, it said, did not doom

them.   See 822 F.3d at 1338 (explaining that the claims, unlike the claims in other cases, were

directed to an improvement in a computer's functioning and did not add conventional computer

components to existing business practices).   The claims' failure to reference physical

components was similarly non-dispositive.   See 822 F.3d at 1339 ("To hold otherwise risks

---

[20]An LED, or "light emitting diode" display, "is a flat panel that uses light emitting
diodes as the video display."   What is an LED Display?, Future Electronics, available at
http://www.futureelectronics.com/en/optoelectronics/led-displays.aspx.

resurrecting a bright-line machine-or-transformation test . . . or creating a categorical ban on software patents."). The Federal Circuit concluded that it was "not faced with a situation where general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation. Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts." 822 F.3d at 1339. It thus held that the relevant claims were patent-eligible without proceeding to Step 2. See 822 F.3d at 1339.

The Federal Circuit has provided additional guidance on the ideas that may be subject-matter eligible. First, mathematical algorithms are ineligible, even if they are executed on a generic computer. See DDR Holdings, 773 F.3d at 1256 (citing Gottschalk v. Benson, 409 U.S. 63, 72 (1972)). Second, certain fundamental or conventional economic and business practices are ineligible. These include, among other things: (i) hedging, see Alice, 134 S.Ct. at 2356; (ii) treating advertising as a currency, see Ultramercial IV, 772 F.3d at 717; (iii) creating a "transaction performance guaranty" using a computer, buySAFE, Inc. v. Google, Inc., 765 F.3d 1350, 1355 (Fed. Cir. 2014)("buySAFE"); (iv) "handling insurance-related information," Accenture Global Services, GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1344 (Fed. Cir. 2013)("Accenture"); and (v) "managing a stable value protected life insurance policy," Bancorp Services., L.L.C. v. Sun Life Assurance Company of Canada (U.S.), 687 F.3d 1266, 1278 (Fed. Cir. 2012)("Bancorp").

The Federal Circuit addressed the second step in DDR Holdings. In that case, the plaintiff/patentee secured a patent for a system to prevent online shoppers from following a link from one merchant's website to another merchant's website, thereby costing the first merchant significant business. See 773 F.3d at 1257. The system, which creates a web page to imitate the second merchant's website: "1) incorporates 'look and feel' elements from the host website, and

- 62 -

2) provides visitors with the opportunity to purchase products from the third-party merchant without actually entering that merchant's website." 773 F.3d at 1258.

The Federal Circuit noted, at Step 1, that "identifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases." 773 F.3d at 1257. It bypassed the issue by determining that, "under any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two." 773 F.3d at 1257. It then addressed Step 2. See 773 F.3d at 1257. It first explained that the relevant claims were different from claims that merely involve both a computer and the Internet:

> [T]hese claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

773 F.3d at 1257 (emphasis added). It dismissed the defendants' argument that the claims were analogous to "a warehouse store that contains a kiosk for selling a third-party partner's cruise vacation packages," explaining that a customer in a warehouse is not "suddenly and completely transported outside the warehouse store and relocated to a separate physical venue associated with the third-party." 773 F.3d at 1258. The claims, it explained, would allow online merchants to retain control over their customers, thus solving a problem that the Internet's unique nature causes. See 773 F.3d at 1258.

The Federal Circuit distinguished the claims from the claims in Ultramercial IV, noting "that not all claims purporting to address Internet-centric challenges are eligible for patent." 773 F.3d at 1258. It continued:

> The '399 patent's claims are different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the claims in *Ultramercial*, the claims at issue here specify how

interactions with the Internet are manipulated to yield a desired result -- a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink.  Instead of the computer network operating in its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual "look and feel" elements from the host website.  When the limitations of the '399 patent's asserted claims are taken together as an ordered combination, the claims recite an invention that is not merely the routine or conventional use of the Internet.

DDR Holdings, 773 F.3d at 1258-59.  It added that the claims did not preempt every technique or

application of increasing sales by making two websites appear similar.  See 773 F.3d at 1259.

The Federal Circuit concluded:

To be sure, the '399 patent's claims do not recite an invention as technologically complex as an improved, particularized method of digital data compression.  But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations, such as the claims in *Alice, Ultramercial, buySAFE, Accenture*, and *Bancorp*.

DDR Holdings, 773 F.3d at 1259.

Many of the other cases discussing Step 2 have distinguished their claims from the claims

in DDR Holdings.  In Bascom, the patentee/plaintiff secured a patent on a system located on an

Internet Service Provider's servers that allowed users, such as parents or employers, to filter

Internet content on an individual basis.  See 2016 WL 3514158, at *2.  The system, it said,

prevented computer-literate users from circumventing blocks, did not require installation on

individual computers, did not require different software for different computers, and could be

easily updated to filter new websites with objectionable content.  See 2016 WL 3514158, at *2.

AT&T, the alleged infringer, argued that these claims "were directed to the abstract idea of

'filtering content,' 'filtering Internet content,' or 'determining who gets to see what,' each of

which is a well-known 'method of organizing human activity' like the intermediated settlement

concept that was held to be an abstract idea in *Alice*."  2016 WL 3514158, at *3.  It "analogized the idea of filtering content to a parent or librarian forbidding children from reading certain books[.]"  2016 WL 3514158, at *3.

The Federal Circuit first concluded that the claims were "directed to filtering content on the Internet."  2016 WL 3514158, at *5.  It described this concept as "an abstract idea because it is a longstanding, well-known method of organizing human behavior, similar to concepts previously found to be abstract."  2016 WL 3514158, at *5.  It allowed that the patentee had not invented local computers, ISP servers,[21] network accounts, or filtering.  See 2016 WL 3514158, at *6.  It nonetheless held that the ordered combination of limitations created an inventive concept -- "the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user."  2016 WL 3514158, at *6.  It explained that the claims did not "merely recite the abstract idea of filtering content along with the requirement to perform it on the Internet" or "a set of generic computer components."  2016 WL 3514158, at *7.  Instead of preempting all ways of filtering content on the internet, the claims recited "a specific, discrete implementation of the abstract idea of filtering content."  2016 WL 3514158, at *7.  Because the claimed invention was a "software-based invention[] that improve[s] the performance of the computer system itself," it was similar to the claims in DDR Holdings.  2016 WL 3514158, at *7 (citing Alice, 134 S. Ct. at 2351).

The Federal Circuit reached the opposite conclusion in In re TLI Communications LLC Patent Litigation.  See 823 F.3d at 613.  The patentee/plaintiff there secured a patent for a method and system of taking, transmitting, and organizing digital images "simply, fast and in

---

[21]An ISP is an Internet Service Provider, such as Comcast.  See Brian Fung, The Copyright Case that Should Worry All Internet Providers, The Washington Post (August 12, 2016), available at https://www.washingtonpost.com/news/the-switch/wp/2016/08/12/the-copyright-case-that-should-worry-all-internet-providers/.

such way that the information therefore may be easily tracked." 823 F.3d at 610. Specifically, the patent's claims taught the use of classification data, such as dates or timestamps, and referenced a "telephone unit" and a "server." 823 F.3d at 610.

The Federal Circuit concluded that "the claims are directed to the abstract idea of classifying and storing digital images in an organized manner and fail to add an inventive concept sufficient to confer patent eligibility." 823 F.3d at 611. First, it noted that although claims "directed to an improvement to computer functionality" might not be abstract, the claims before it were "directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two." 823 F.3d at 612. The specification did not "describe a new telephone, a new server, or a new physical combination of the two." 823 F.3d at 612. Instead, it discussed its physical components in purely functional terms -- the telephone unit, for example, had "the standard features of a telephone unit" and some features of "a digital photo camera of the type which is known." 823 F.3d at 612. Second, the Federal Circuit rejected the patentee's argument that the physical components, taken together, added an inventive concept to the abstract idea. See 823 F.3d at 615. It explained that the specification recited "abstract functional descriptions devoid of technical explanation as to how to implement the invention." 823 F.3d at 615. It concluded with a comparison to its earlier opinions:

> Just as "[s]teps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility," *Intellectual Ventures I,* 792 F.3d at 1371–72 (citing *Alice,* 134 S.Ct. at 2359), here, steps that generically spell out what it means to "apply it on a telephone network" also cannot confer patent eligibility.

In re TLI Communications LLC Patent Litigation, 823 F.3d at 615.

- 66 -

<u>ANALYSIS</u>

The Court will grant the Motion and dismiss this case, because Front Row's patents are not subject-matter eligible under 35 U.S.C. § 101.  First, the clear-and-convincing evidence standard applies.  Second, the Motion is ripe for decision because the parties' claim construction disputes would not change the outcome and the patents themselves contain the necessary background information.  Third, the 856 Patent's Claim 15, the 895 Patent's Claim 1, and the 027 Patent's Claim 1 accurately represent Front Row's other claims.  Fourth, these claims are directed to patent-ineligible abstract ideas.  Fifth, these claims do not disclose inventive concepts sufficient to transform their abstract ideas into patent-eligible inventions.  The Court thus grants the Defendants' Motion and dismisses this case with prejudice.

## I.    THE COURT WILL REQUIRE THE DEFENDANTS TO MEET THE CLEAR-AND-CONVINCING EVIDENCE STANDARD.

The Court concludes that the clear-and-convincing evidence standard of proof applies to the Motion.  Front Row argues that a patent infringement defendant must prove any invalidity defense by clear-and-convincing evidence.  <u>See</u> Tr. at 119:21-25 (Shore)(citing <u>Microsoft Corp. v. I4I Ltd. P'ship</u>, 564 U.S. at 95).  The Defendants contend that neither the Supreme Court nor the Federal Circuit has addressed the issue, and that district courts have reached different conclusions.  <u>See</u> Tr. at 57:19-24 (Weaver).

In <u>Microsoft Corp. v. I4I Ltd. Partnership</u>, Justice Sotomayor gave an authoritative statement on point, in which Justices Scalia, Kennedy, Ginsburg, Breyer, Alito, and Kagan joined:

> Under § 282 of the Patent Act of 1952, "[a] patent shall be presumed valid" and "[t]he burden of establishing in-validity of a patent or any claim thereof shall rest on the party asserting such invalidity."  35 U.S.C. § 282.  We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.

Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 95.  The Supreme Court noted that the Federal

Circuit had consistently adhered to this interpretation of 35 U.S.C. § 282 for almost thirty years.

See Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 95 (citing Am. Hoist & Derrick Co. v. Sowa

& Sons, Inc., 725 F.2d 1350, 1360 (Fed. Cir. 1984)).   Justice Breyer authored a separate

concurrence, in which Justices Scalia and Alito joined, emphasizing the distinction between

questions of fact and questions of law:

> I believe it worth emphasizing that in this area of law as in others the evidentiary
> standard of proof applies to questions of fact and not to questions of law.  *See,*
> *e.g.*, *Addington v. Texas*, 441 U.S. 418, 423 [] (1979).  Thus a factfinder must use
> the "clear and convincing" standard where there are disputes about, say, when a
> product was first sold or whether a prior art reference had been published.

Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 114 (Breyer, J., concurring).  Justice Breyer added

that, "[b]y preventing the 'clear and convincing' standard from roaming outside its fact-related

reservation, courts can increase the likelihood that discoveries or inventions will not receive legal

protection where none is due."  564 U.S. at 115.

The Federal Circuit attempted to apply the Supreme Court's guidance to § 101 in CLS

Bank International v. Alice Corporation Pty., 717 F.3d 1269 (Fed. Cir. 2013)(en banc).   The

Federal Circuit explained that, "[b]ecause we believe the presumption of validity applies to all

challenges to patentability, including those under Section 101 and the exceptions thereto, we find

that any attack on an issued patent based on a challenge to the eligibility of the subject matter

must be proven by clear and convincing evidence."  CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d

at 1304-05.  It noted that the evidentiary standard was "consistent with the Supreme Court's

admonition to cabin the judicially created exceptions to Section 101[.]"  717 F.3d at 1305.

This statement does not, however, settle the issue.  The Supreme Court affirmed the

Federal Circuit's opinion in CLS Bank International v. Alice Corporation Pty. on other grounds,

and did not mention any evidentiary standard.  See Alice, 134 S. Ct. at 2352.  The Federal Circuit subsequently applied the clear and convincing standard in Ultramercial III: "[T]he high level of proof applies to eligibility as it does to the separate patentability determinations. Accordingly, any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence."  Ultramercial III, 722 F.3d at 1342 (citing Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 97).  The Supreme Court vacated Ultramercial III, however, for reconsideration in light of Alice.  See WildTangent, Inc. v. Ultramercial, LLC, 134 S. Ct. at 2870.

District courts have interpreted the recent Supreme Court and Federal Circuit decisions in four primary ways.[22]  See 6A-19 Chisum on Patents § 19.02 ("Whether the presumption is primarily a procedural device, merely shifting the burden of proof on issues of fact that are pertinent to a legal conclusion on validity, or a rule of deference to the determination of patentability by the Patent and Trademark Office, is a long-disputed question.").  One group of courts has concluded that the clear-and-convincing evidence standard does not apply.  These

---

[22]One district court blamed the split on the Supreme Court and Federal Circuit's lack of guidance:

> This dispute stems in large measure from Justice Breyer's concurrence in *Microsoft v. i4i Ltd. P'Ship*, —— U.S. ——, 131 S.Ct. 2238 [] (2011).  There, Justice Breyer noted that the clear and convincing evidence standard "applies to questions of fact and not to questions of law" and "[w]here the ultimate question of patent validity turns on the correct answer to legal questions -- what these subsidiary legal standards mean or how they apply to the facts as given -- *today's strict standard of proof has no application.*"  *Id.* at 2253 (emphasis added). Interestingly, no other opinion in *Microsoft* addresses this issue, and neither the Supreme Court nor the Federal Circuit has revisited the standard of proof applicable to § 101 challenges since *Microsoft*.  As a result of this deafening silence, district courts, not surprisingly, are split over the standard of proof applicable to § 101 challenges.

In re TLI Commc'ns LLC Patent Litig., 87 F. Supp. 3d 773, 797 (E.D. Va. 2015)(Ellis, J.).

courts note that Ultramercial III no longer has precedential effect because the Supreme Court

vacated it.  They reason that neither Alice nor Ultramercial IV discussed standards of evidence:

> Notably, the Federal Circuit's opinion on remand made no mention of any
> presumption of validity attaching in a case under Section 101; nor did it mention a
> clear and convincing evidence standard.  But, in a concurring opinion, Judge
> Mayer opined that "no presumption of eligibility should attach when assessing
> whether claims meet the demands of section 101." *Ultramercial [IV]*, 772 F.3d at
> 720 (Fed. Cir. 2014)(Mayer, J., concurring).

Esoterix Genetic Labs. LLC v. Qiagen Inc., 133 F. Supp. 3d 349, 355 n.4 (D. Mass.

2015)(Burroughs, J.)([I]t is unclear, if there is a presumption of validity or if the clear and

convincing evidence standard applies in Section 101 challenges.").  See Modern Telecom Sys.

LLC v. Earthlink, Inc., No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7 (C.D. Cal. Mar. 17,

2015)(Carter, J.)("Because, ordinarily, no evidence outside the pleadings is considered in

resolving a motion to dismiss or a motion for judgment on the pleadings, it makes little sense to

apply a 'clear and convincing evidence' standard -- a burden of proof -- to such motions."); TNS

Media Research, LLC v. Tivo Research & Analytics, Inc., No. 11 CIV. 4039 (SAS), 2016 WL

817447, at *10 (S.D.N.Y. Feb. 22, 2016)(Scheindlin, J.)("The presumption of validity -- and its

concomitant clear and convincing evidence standard -- does not apply to section 101 claims.");

Wireless Media Innovations, LLC v. Maher Terminals, LLC, 100 F. Supp. 3d 405, 411 (D.N.J.

2015)(Linares, J.)("With no authoritative law binding the Court as to an applicable standard, the

Court adopts Judge Mayer's approach and will not afford Plaintiff's Patents the presumption of

subject matter eligibility.").

A second group of courts concludes that Ultramercial III is no longer good law, but agree

with its reasoning at the pleading stage.  See Genetic Techs. Ltd. v. Bristol-Myers Squibb Co., 72

F. Supp. 3d 521, 527 (D. Del. 2014)(Stark, J.), aff'd sub nom. Genetic Techs. Ltd. v. Merial

L.L.C., 818 F.3d 1369 (Fed. Cir. 2016).  The Honorable Leonard Stark, Chief United States

District Judge for the District of Delaware, commented in 2014 that "the Court finds the reasoning in *Ultramercial* at least persuasive here insofar as it concerns the procedural mechanics of a § 101 challenge at the 12(b)(6) stage -- particularly the significant burden on a movant given the limited factual record, if any, before the Court." Genetic Techs. Ltd. v. Bristol-Myers Squibb Co., 72 F. Supp. 3d at 527.

A third group of courts follows Justice Breyer's reasoning, applying the clear-and-convincing standard only to factual questions. In Affinity Labs, the district court cited Judge Mayer's concurrence in Ultramercial IV and explained that § 101 "involves a legal analysis as to whether the basic character of the claimed subject matter is patent ineligible and thus largely implicates questions of law." Affinity Labs, 2015 WL 3757497, at *5. It concluded that the clear-and-convincing standard applies only "[t]o the extent that questions of fact exist." 2015 WL 3757497, at *5. See TriPlay, Inc. v. WhatsApp Inc., No. CV 13-1703-LPS, 2015 WL 1927696, at *5 (D. Del. April 28, 2015)(Burke, M.J.)("[E]ven assuming that the 'clear and convincing' evidence standard is applicable to Section 101 challenges, it would apply only to the resolution of factual disputes, not to the resolution of pure issues of law."), report and recommendation adopted in part, rejected in part, No. CV 13-1703-LPS, 2015 WL 4730907 (D. Del. Aug. 10, 2015)(Stark, J.); 01 Communique Lab., Inc. v. Citrix Sys., Inc., 151 F. Supp. 3d 778, 787 (N.D. Ohio 2015)(Lioi, J.)("In this Court's view, the most reasoned approach is to apply the clear and convincing evidentiary standard of proof to invalidity defenses under § 101 to the extent that analysis involves underlying factual issues, but not to the purely legal portion of the § 101 analysis."); The Presumption of Administrative Correctness: The Proper Basis for the Clear and Convincing Evidence Standard, 10 Fed. Circuit Bar Journal 143, 146 (2000)("The

evidentiary standard for establishing patent invalidity can, therefore, relate only to the proof of facts that underlie the ultimate legal presumption of validity.").

A fourth group of courts holds that the clear-and-convincing evidence standard continues to apply to all aspects of § 101 challenges. The Honorable Sharon Coleman, United States District Judge for the Northern District of Illinois, adopted this position in Trading Technologies International, Inc. v. CQG, Inc., No. 05-CV-4811, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015)(Coleman, J.)("Trading Technologies"). Judge Coleman first acknowledged the force of Justice Breyer's reasoning in Microsoft Corp. v. I4I Ltd. Partnership, noting that, "because the section 101 eligibility inquiry is purely a question of law and there is no statutory presumption of eligibility, it should not be subject to the clear and convincing burden of proof." Trading Technologies, 2015 WL 774655, at *3. She nonetheless concluded that the clear-and-convincing evidence standard applies to the subject-matter eligibility question as a whole, because: (i) 35 U.S.C. § 282 requires that patents are presumed valid; (ii) it is "well established that a party seeking to overcome that presumption must do so by clear and convincing evidence"; and (iii) she was "duty-bound to apply the law as enacted by Congress and signed by the President, and in light of the Federal Circuit's interpretation thereof," and the parties did not present any authority eliminating the presumption of validity. 2015 WL 774655, at *3 (citing Nystrom v. TREX Co., 424 F.3d 1136, 1149 (Fed. Cir. 2005)). She held that, "until the Federal Circuit or the United Supreme Court mandates otherwise, [the infringer] must show by clear and convincing evidence that the patents-in-suit claim patent-ineligible subject matter." Trading Technologies, 2015 WL 774655, at *3.

The Honorable Mark Davis, United States District Judge for the Eastern District of Virginia, reached a similar conclusion in CertusView Technologies, LLC v. S & N Locating

Services, LLC, 111 F. Supp. 3d 688 (E.D. Va. 2015)(Davis, J.).  Judge Davis explained that he also found Justice Breyer's reasoning more convincing, but explained that he was "duty-bound to apply the law as enacted by Congress and signed by the President, and in light of the Federal Circuit's interpretation thereof."  111 F. Supp. 3d at 707.  See Wolf v. Capstone Photography, Inc., No. 2:13-CV-09573, 2014 WL 7639820, at *5 (C.D. Cal. Oct. 28, 2014)(Snyder, J.)("Wolf")("[A] challenger must overcome the presumption that every issued patent is presumed to have been issued validly absent clear and convincing evidence to the contrary.")(internal quotations omitted)); Carfax, Inc. v. Red Mountain Techs., 119 F. Supp. 3d 404, 410 (E.D. Va. 2015)(Lee, J.); Ameritox, Ltd. v. Millennium Health, LLC, 88 F. Supp. 3d 885, 914 (W.D. Wis. 2015)(Conley, J.); Bascom Research, LLC v. LinkedIn, Inc., 77 F. Supp. 3d 940, 945 (N.D. Cal. 2015)(Illston, J.); Enfish, LLC v. Microsoft Corp., 56 F. Supp. 3d 1167, 1170 (C.D. Cal. 2014)(Pfaelzer, J.)("Despite misgivings about the standard's relevance to § 101, the Court must follow binding precedent."); reversed and vacated on other grounds by Enfish, 822 F.3d 1327.

The Court concludes that the fourth approach -- applying the clear-and-convincing standard to both legal and factual determinations -- is correct for two reasons. First, and most importantly, this position is consistent with the limited Supreme Court and Federal Circuit authority on point.  The Supreme Court's last decision to address this question held that defenses to patent infringement claims, including § 101, must be proved by clear-and-convincing evidence.  See Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 95; 69 C.J.S. Patents § 670 ("It is generally the rule in an action for patent infringement that every reasonable doubt should be resolved in favor of the validity of the patent and that the invalidity of the patent should be proved by clear and convincing evidence.").  The Federal Circuit's last direct discussion, in Ultramercial III, conformed to this holding.  See Ultramercial III, 722 F.3d at 1342.  Although

the Supreme Court vacated Ultramercial III in Alice, it did not comment on the standard of evidence or burdens involved in the process.  The Federal Circuit has since cited Microsoft in its opinions.  See Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1377 (Fed. Cir. 2015)("A patent is presumed valid under 35 U.S.C. § 282 and, consistent with that principle, a [fact finder is] instructed to evaluate . . . whether an invalidity defense has been proved by clear and convincing evidence.")(internal quotations omitted)(alteration in original); SSL Servs., LLC v. Citrix Sys., Inc., 769 F.3d 1073, 1089 (Fed. Cir. 2014)("A party must prove an invalidity defense by clear and convincing evidence."); Virnetx, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1323 (Fed. Cir. 2014); Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd., 807 F.3d 1283, 1293 (Fed. Cir. 2015)("The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity, 35 U.S.C. § 282, which the party must prove by clear and convincing evidence.")(quotations omitted).

Courts concluding that the clear-and-convincing standard does not apply at all have not cited sufficient authority to support their statements.  Judge Mayer's concurrence in Ultramercial IV -- which reasons that, because the Supreme Court has taken up several § 101 cases without mentioning any presumption of eligibility, there is no such presumption for § 101 and thus no clear-and-convincing standard -- is not sufficient to overcome Supreme Court and Federal Circuit authority directly on point.  See Ultramercial IV, 772 F.3d at 720-21.

The Court cannot assume that the Supreme Court will overrule Microsoft Corp. v. I4I Ltd. Partnership.  See Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477, 484 (1989)("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.");

Agostini v. Felton, 521 U.S. 203, 237 (1997)("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent.").   The Defendants have not cited any controlling authority to support their arguments.  See CertusView Techs., LLC v. S & N Locating Servs., LLC, 111 F. Supp. 3d at 707 ("[T]he Defendants have not presented any authority indicating that the presumption of validity no longer applies to challenges to a patent's validity under section 101.").

Second, it is difficult to tease out legal and factual issues under § 101.  As the Federal Circuit has observed, "the analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues."  Ultramercial III, 722 F.3d at 1339.  The Supreme Court has recognized that "PTO examiners must make various factual determinations -- for instance, the state of the prior art in the field and the nature of the advancement embodied in the invention." Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. at 96.  See id. at 91 ("While the ultimate question of patent validity is one of law, the same factual questions underlying the PTO's original examination of a patent application will also bear on an invalidity defense in an infringement action.")(citations and quotations omitted); Affinity Labs, 109 F. Supp. 3d at 933 ("Although the issue of invalidity under § 101 presents a question of law, the court recognizes that a legal conclusion may contain underlying factual issues.")(quotation omitted).  But see TNS Media Research, LLC v. Tivo Research & Analytics, Inc., 2016 WL 817447, at *10 ("[T]his Court's determination of patent-eligibility requires no extraneous information, no factual record -- only the patents themselves.").  Requiring infringers to present clear-and-convincing evidence of invalidity under § 101 tends to reinforce § 282's command that "[a] patent shall be presumed valid."  35 U.S.C. § 282.

When a jury takes the Court's jury instructions, and finds that a defendant possessed a firearm, the courts call that issue a question of fact.  The Court tells the jury to find that issue beyond a reasonable doubt.  While the courts feel comforted saying that the jury decided a factual issue, the jury is deciding whether the defendant violated a federal statute.  The Constitution and federal law demand that the jury reach its decision beyond a reasonable doubt.  Asking the Court to apply the clear and convincing standard is not a very different task.  The Court is basically tasked with being relatively certain that the patent is invalid.  Fifty-one percent will not do; it has to be more.  It does not have to be beyond a reasonable doubt -- but the evidence has to be clear.  The nation's trial judges, of all people, are used to dealing with such evidentiary standards.  Applying a clear and convincing standard is also consistent with the Supreme Court's instruction that the lower courts consider the standard of evidence in deciding motions for summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)(holding that a judge considering a summary judgment motion "must bear in mind the actual quantum and quality of proof necessary to support liability").  Justices Breyer, Scalia, and Alito's separation of legal issues and factual issues in their concurring opinion in Microsoft Corp. v. I4I Ltd. P'ship is not only unnecessary and unreasonable, but also unhelpful.  The district courts can handle the task that the Supreme Court gave them in Microsoft Corp. v. I4I Ltd. P'ship, and the district courts should not decline that duty, or ignore the Supreme Court's distinction direction because they pretend to know better than the Supreme Court what the standard should be.

## II.     THE MOTION IS RIPE FOR DECISION BECAUSE IT DOES NOT REQUIRE CLAIM CONSTRUCTION OR FURTHER FACTUAL DEVELOPMENT.

The Court will decide the Motion without a claim construction hearing because of the parties' limited disputes.  The Defendants urge the Court to decide the Motion before any claim

construction or discovery.  See Motion at 5.  Front Row responds that this action "is only warranted in narrow, exceptional circumstances, none of which Defendants have shown applies here."  Response at 22.

The Court may decide the Motion without waiting for a claim construction hearing. "Courts may . . . dispose of patent-infringement claims under § 101 whenever procedurally appropriate."  Bascom, 2016 WL 3514158, at *4.  See Cyberfone, 558 F. App'x at 992 ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility."); Genetic Techs. Ltd. v. Merial L.L.C., 818 F.3d 1369, 1374 (Fed. Cir. 2016)("In many cases, too, evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction."); OIP Techs., Inc. v. Amazon.com, Inc., 788 F.3d at 1364 (resolving § 101 dispute on the pleadings).

Claim construction is unnecessary when "[t]he basic character of the claimed subject matter is readily ascertainable from the face of the patent.  Cardpool, Inc. v. Plastic Jungle, Inc., No. C 12-04182 WHA, 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013)(Alsup, J.)("Cardpool").  See Lumen View Tech. LLC v. Findthebest.com, Inc., 984 F. Supp. 2d 189, 205 (S.D.N.Y. 2013)(Cote, J.)("The claimed process elements of Claim 1 are straightforward. No components are opaque such that claim construction would be necessary to flush out its contours.").  Courts may also see no need for claim construction where "the claim language is relatively simple and neither party has identified any disputes presently ripe for claim construction."  Clear with Computers, LLC v. Altec Indus., Inc., No. 6:14-CV-79, 2015 WL 993392, at *3 (E.D. Tex. Mar. 3, 2015)(Gilstrap, J.).

Claim construction may also be unnecessary where a claim construction hearing would not have any effect on claims' subject-matter eligibility.  See DietGoal Innovations LLC v.

Bravo Media LLC, 33 F. Supp. 3d 271, 289 (S.D.N.Y. 2014)(Englemayer, J.)("Nor would claim construction shed light on any dispositive legal issue; the computerized process disclosed in the '516 Patent is invalid under § 101, under any reasonable construction.  Claim construction would not assist the Court in resolving the § 101 claim of invalidity."), aff'd, 599 F. App'x 956 (Fed. Cir. 2015).  In Content Extraction, for example, the patentee complained that the district court erred "by declaring its claims patent-ineligible under § 101 at the pleading stage without first construing the claims or allowing the parties to conduct fact discovery and submit opinions from experts supporting their claim construction positions."  776 F.3d at 1349.  The Federal Circuit rejected this argument, explaining that, "[a]lthough the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101."  Content Extraction, 776 F.3d at 1349.  It noted that, "even when construed in a manner most favorable to CET, none of CET's claims amount to 'significantly more' than the abstract idea of extracting and storing data from hard copy documents using generic scanning and processing technology."  776 F.3d at 1349.  Courts bypass claim construction to avoid delay on § 101 rulings "while the parties continue to expend significant resources which will not impact or aid the Court in reaching this decision."  Clear with Computers, LLC v. Altec Indus., Inc., 2015 WL 993392, at *3.

Section 101 determinations, however, often depend on "the scope and meaning of the claims," which may be resolved through claim construction.  Internet Patents, 790 F.3d at 1348. The Federal Circuit has thus noted that "it will ordinarily be desirable -- and often necessary -- to resolve claim construction disputes before a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter."

Bancorp, 687 F.3d at 1273-74.  See Phoenix Licensing, L.L.C. v. CenturyLink, Inc., No. 2:14-CV-965-JRG-RSP, 2015 WL 5786582, at *3 (E.D. Tex. Sept. 30, 2015)(Gilstrap, J.)("[A] proper analysis under *Mayo* would be premature and improper given the extent of the parties' present claim construction disputes."); StoneEagle, 2015 WL 518852, at *4 ("In this case, the parties dispute the basic character of the claimed subject matter.").  In short, "the Federal Circuit seems to have concluded that claim construction is desirable, unless in reviewing the patents at issue, a district court concludes that it isn't."  Intellectual Ventures I LLC v. Erie Indem. Co., 134 F. Supp. 3d at 908.  See A Pty Ltd. v. HomeAway, Inc., 2015 WL 5883364, at *5 ("District courts are divided on the necessity of claim construction prior to determining the eligibility of patents that rely on computer implementation.").

The Court concludes that the Motion is ripe for decision for three reasons.  First, the claims' basic characters are relatively straightforward.  Second, the parties have not identified any disputed claim constructions that prevent the Court from addressing the § 101 merits at this stage.  Finally, Front Row's alleged factual disputes do not require the Court to make complex factual determinations.

### A.   THE COURT DOES NOT REQUIRE CLAIM CONSTRUCTION TO UNDERSTAND THE CLAIMS' BASIC CHARACTER.

The claims' basic character is evident from the patents, and there is no need for expert testimony or other extrinsic evidence.  Claim construction is unnecessary when "[t]he basic character of the claimed subject matter is readily ascertainable from the face of the patent." Cardpool, 2013 WL 245026, at *4.  The Court does not need evidence from outside the pleadings to understand the basic issues here.  See StoneEagle, 2015 WL 518852, at *4 (citing expert report, separate patent's prosecution history, and a declaration, all of which were outside the pleadings, in denying motion for judgment as a matter of law).  Even if the parties had cited

extensive extrinsic evidence, the Court would not necessarily take it into account.  See Cardpool,

2013 WL 245026, at *4 (declining to consider the plaintiff's evidentiary materials, "given the

Rule 12 procedural posture").

As discussed in greater detail below, the Court concludes that the 856 Patent's Claim 15

is directed to the idea of sending video of an event to handheld devices over wireless networks.

The 460, 184, and 895 Patents are directed toward the same basic concept as the 856 Patent.  The

027 Patent is directed to the idea of authorizing handheld devices to receive streaming video

based on a user's location.

## B. THE PARTIES' CLAIM CONSTRUCTION DISPUTES DO NOT RULE OUT JUDGMENT BEFORE CLAIMS CONSTRUCTION.

Second, the parties' specific claim construction disputes do not prevent the Court from

making a determination at this stage.[23]   As Front Row acknowledged at the hearing, the

---

[23]Front Row's argument that it need not present its own set of claim constructions, which
relies on a single district court case, does not accurately reflect the law.  See Front Row's
PowerPoint at 13; Data Distribution Techs., LLC v. BRER Affiliates, Inc., No. CIV. 12-4878
JBS/KMW, 2014 WL 4162765, at *7 (D.N.J. Aug. 19, 2014)(Simandle, J.)("Data
Distribution")("Plaintiff has not provided proposed constructions and has no obligation to do so
at this time.").   The Federal Circuit, and many other district courts, have commented on
patentees' failures to provide proposed claim constructions.  See  Cyberfone, 558 F. App'x at
992 n.1 ("Cyberfone argues that claim construction must precede the § 101 analysis, but does not
explain which terms require construction or how the analysis would change. It merely points to
claim language that we consider here."); Clear with Computers, LLC v. Altec Indus., Inc., 2015
WL 993392, at *3 ("[N]either party has identified any disputes presently ripe for claim
construction."); Uniloc USA, Inc. v. E-MDS, Inc., No. 6:14-CV-00625-RWS, 2015 WL
10791906, at *3 (E.D. Tex. Aug. 19, 2015)(Schroeder, J.)("Were the court to accept Uniloc's
conclusory arguments, the Court would endorse a rule that a § 101 motion can only precede
claim construction with a patentee's blessing.  But there is no such rule."); Boar's Head Corp. v.
DirectApps, Inc., No. 2:14-CV-01927-KJM, 2015 WL 4530596, at *7 (E.D. Cal. July 28,
2015)(Mueller, J.)("Although it is defendants' burden to show ineligibility, a court should look
to the plaintiff to show some factual dispute requiring claim construction."); DietGoal
Innovations LLC v. Bravo Media LLC, 33 F. Supp. 3d 271, 289 (S.D.N.Y. 2014)(Engelmayer,
J.)("[T]he claims of the '516 Patent are sufficiently 'straightforward' that formal claim
construction is not necessary to understand their content.").

Defendants must show that "no plausible construction of Plaintiff's claims would satisfy the abstractness test <u>or</u> that the constructions most favorable to Plaintiff would not satisfy the test." Front Row's PowerPoint at 27 (quoting <u>Data Distribution</u>, 2014 WL 4162765, at *8)(emphasis added).   <u>See</u> <u>Cogent Medicine</u>, 70 F. Supp. 3d at 1065 (invalidating patent "using the constructions most favorable to" the patentee); <u>Intellectual Ventures I LLC v. Erie Indem. Co.</u>, 134 F. Supp. 3d at 904 ("The court also dismissed the idea that courts are precluded from considering § 101 challenges at the pleading stage because there has not yet been discovery or claim construction.  Rather, courts must simply construe the claims in favor of the plaintiff at the pleading stage to appropriately resolve the issue.")(internal quotations omitted).

Unlike the court in <u>Data Distribution</u>, which acknowledged that "the best way for a court to apply constructions most favorable to the plaintiff is to apply the plaintiff's proposed constructions, the Court need not "presume, *sua sponte,* the constructions that would be most favorable."  2014 WL 4162765, at *8.[24]  It can instead adopt Front Row's proposed constructions to evaluate whether its patents are patent-eligible.

| # | Claim Term | Patent/Claim | Front Row's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|---|---|
| 1 | Venue-based data | 895: 1, 8, 15 460: 1, 10, 13 184:1, 12, 20 | Multimedia data that includes video and may also include other sports, advertising, or entertainment information | data and information, such as video, audio, advertisements, promotional information, propaganda, historical information, statistics, event scheduling, and so |

_____

[24]The Court has the benefit of the parties' proposed claim constructions, because they were preparing for a claims construction hearing at the time that the Court announced its inclination to grant the Motion.  <u>See</u> Front Row's Preliminary Claim Constructions and Intrisic & Extrinsic Evidence at 1-8, filed May 13, 2016 (Doc. 307-1)("Front Row's Constructions"); Defendants' Proposed Constructions and Identification of Intrinsic and Extrinsic Evidence at 1-10, filed May 13, 2016 (Doc. 307-2)("Defendants' Constructions").

|   |   |   |   | forth, associated with a particular venue and generally not retrievable through public networks |
|---|---|---|---|---|
| 2 | Processor capable of authenticating/ Processor capable . . . of authenticating | 895: 1, 8, 15 460: 13 | Plain and ordinary meaning, not §112(6): Processor capable of "performing a process by which subjects, normally users, establish their identity to a system"  Alternate §112(6) Construction: Structure: a Processor Function: A process by which subjects, normally users, establish their identity to a system | Defendants contend that this limitation is governed by 112 ¶ 6: Function: authenticating a handheld device Structure: none disclosed, therefore indefinite |
| 3 | format suitable for streaming over wireless data networks as streamed data | 895: 1, 8, 15 460: 1, 10, 13 | Plain and ordinary meaning | Indefinite |
| 4 | Streaming | 895: 1, 8, 15 460: 1, 10, 13 184: 1, 12, 20 027: 1, 7 | Providing a steady flow of data that a user can access as it is transmitted | transmitting data continuously, not as segments for download and storage |
| 5 | Streaming video | 027: 1, 7 | Providing a steady flow of video data that a user can access as it is transmitted | transmitting video data continuously, not as segments for download and storage |
| 6 | Wirelessly transmitting said encrypted video packet over an 802.11 wireless local area network to said at least one authorized hand held device said plurality of video perspectives of a venue-based activity from said server | 856: 15 | Plain and ordinary meaning no construction necessary | Indefinite |

| 7 | Hand held device/Handheld device | 895: 1, 8, 15<br>460: 1, 10, 13<br>184: 1, 12, 20 | A wireless device intended to be held in one's hand during use, such as a smart phone, personal digital assistant (PDA), or tablet computing device | a device designed to be carried and used in a person's hand |
|---|---|---|---|---|
| 8 | Remote hand held device | 895: 1, 4-6, 8, 11-13, 15, 18<br>460: 1-4, 8, 10-13, 17-19 | A wireless device intended to be held in one's hand during use, such as a smart phone, personal digital assistant (PDA), or tablet computing device remote from said server | Indefinite |
| 9 | Entertainment venue/venue | 895: 1, 8, 15<br>460: 1, 10, 13<br>184: 12<br>856: 15<br>027: 1, 7 | Sports stadiums, arenas, or other entertainment facilities that feature live entertainment in front of an audience | a sports stadium, concert hall, or arena, "entertainment" does not require construction |
| 10 | Authenticating/ Authentication | 184:1, 2, 12, 14, 20<br>895: 1, 8, 15<br>460: 1, 10, 13 | A process by which subjects, normally users, establish their identity to a system | verifying the identity of |
| 11 | Authentication module | 184: 12 | Plain and ordinary meaning, not §112(6): Software, hardware, or combination of both that verifies the identity of a client<br><br>Alternate §112(6) Construction: Structure: software, hardware, or combination of both Function: verifies the identity of a client | Defendants contend this element is governed by 112 ¶ 6.<br><br>Function: authenticating a handheld device<br><br>Structure: none provided, therefore indefinite |
| 12 | Locations within and remote from said at least | 184:1, 12, 20<br>895: 1, 8, 15 | Plain and ordinary meaning: Locations | Indefinite |

| | one venue/Locations within or remote from said at least one venue/Locations within or remote from said at least one entertainment venue | 460: 1, 10, 13 | inside or outside of a venue | |
|---|---|---|---|---|
| 13 | Instructions | 184: 20 460: 1, 10 | Front Row does not believe the preamble is limiting and, thus, does not need to be construed.

Alternatively, should be construed as its plain and ordinary meaning: computer code that tells a computer to perform an operation | Defendants contend this limitation is governed by 112 ¶ 6:

Function: storing, processing, and streaming or transmitting venue-based data; also for authenticating a handheld device

Structure: none disclosed, therefore indefinite |
| 14 | [At least one] server | 460:1, 10, 13 895: 1, 8 | Front Row does not believe the preamble is limiting and, thus, does not need to be construed.

Alternatively, should be construed as its plain and ordinary meaning: A combination of hardware, software, and stored data on a packet-based network that provides a service to a client | "at least one" – No construction required. Plain and ordinary meaning.

"server" -- "a computer that provides a service to a client device" |
| 15 | "video captured by more than one video camera"/ "video . . . captured from more than one camera" | 895: 1, 8, 15 460: 1, 4, 10, 11, 13, 17, 19 184: 1, 12, 20 856: 15 027: 1, 13 | Plain and ordinary meaning: video recorded by multiple cameras | "two or more videos acquired from a particular venue for simultaneous display" |

- 84 -

Front Row's Constructions (providing the first four columns); Defendants' Constructions (providing the last column).

Front Row raises three issues relevant to patentability that claim construction could resolve: (i) whether the claims require capturing video of real-life objects; (ii) whether the claims require "transforming images representative of real-world objects into data packets capable of being securely transmitted wirelessly to only authorized recipients on limited types of devices"; and (iii) the proper boundaries of the 027 Patent's location-based limitations.  Front Row's PowerPoint at 31.  Front Row then lists a large number of claims, explaining only that "[c]onstructions of some or all of the following terms are relevant to this question[.]"  Front Row's PowerPoint at 32-36.  This sort of conclusory statement does not explain "how the analysis would change" after claim construction.  Cyberfone, 558 F. App'x at 992.  See Tr. at 174:8-12 (Weaver)("[T]hey showed a laundry list of claim language . . . but they didn't say: If you construe the claim this way, it will change the 101 analysis, and here's how."); Protegrity USA, Inc. v. Netskope, Inc., No. 15-CV-02515-YGR, 2015 WL 6126599, at *3 (N.D. Cal. Oct. 19, 2015)(Rogers, J.)("Protegrity")("[W]here a patentee fails to explain which terms require construction or how the analysis would change were those constructions adopted, the Court may rule on the validity challenge prior to construing claims.")(internal quotations omitted)(emphasis added); Wolf, 2014 WL 7639820, at *6 ("But beyond the conclusory statement that these terms would 'have to be construed in order to determine whether they cover an abstract idea,' plaintiff offers no argument as to how claim construction would aid the court in applying § 101 to these non-technical terms.").

Even accepting Front Row's preferred claim constructions, the Court concludes that the claims would not satisfy § 101's requirements.  This problem is particularly obvious with respect

to Front Row's three specific questions.  Adopting Front Row's proposed constructions does not clarify "whether the claims require capturing video of real-life objects."   Front Row's PowerPoint at 31.  The proposed constructions do not even mention this issue.  Nor do they strengthen any of Front Row's arguments on the machine or transformation test.   Further, interpreting "[l]ocations within and remote from said at least one venue," to mean "[l]ocations inside or outside of a venue," does not expand or shrink any location-based limitations on the 027 Patent.  Front Row's Constructions at 6.

On a more general, level, the Court does not see how a decision on any of Front Row's constructions would affect its patents' subject-matter eligibility, because the distinctions between the parties' constructions are insignificant for § 101 purposes.  Claim construction is necessary "only where claim construction disputes are relevant to the § 101 question." Eclipse IP LLC v. McKinley Equip. Corp., No. SACV 14-154-GW AJWX, 2014 WL 4407592, at *5 (C.D. Cal. Sept. 4, 2014)(Wu, J.)("Eclipse IP").  See Boar's Head Corp. v. DirectApps, Inc., No. 2:14-CV-01927-KJM, 2015 WL 4530596, at *7 (E.D. Cal. July 28, 2015)(Mueller, J.)("Boar's Head")("Courts that have declined to decide Rule 12 motions prior to engaging in claim construction have found there are possible constructions of key claim terms that, if adopted, could render the claims subject matter eligible.").   For example, the distinction between a "process by which subjects, normally users, establish their identity to a system," Front Row's Constructions at 1, and "verifying the identity of" a user, Defendants' Constructions at 7, is unlikely to make a difference to a court "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts," Alice, 134 S. Ct. at 2355.  Cases concluding that claim construction disputes required a hearing involved more stark disputes.  In StoneEagle, for example, the Defendants argued that

the patent specification defined "store-valued card" to include physical credit and debit cards. 2015 WL 518852, at *4.  The plaintiff countered that the claim applied "only to virtual stored-value cards, not credit or debit cards."  2015 WL 518852, at *4.  The Honorable Virginia Covington, United States District Judge for the Middle District of Florida, tied the disputed claims to specific aspects of the patentability inquiry: "At the very least, proper construction of the term 'stored-value card' is necessary prior to an assessment of whether the claims implicate a fundamental economic practice, and whether the claims comprise a sufficiently inventive process." 2015 WL 518852, at *4.  The Court cannot soundly conclude that resolution of the disputes listed above will affect whether Front Row's claims implicate any fundamental economic practice, or comprise an inventive concept.

### C.   FRONT ROW'S ALLEGED FACTUAL DISPUTES DO NOT RULE OUT JUDGMENT BEFORE CLAIMS CONSTRUCTION.

The Court will decide the Motion, despite Front Row's argument that there are unresolved factual disputes, because the relevant findings either are defined in the patents themselves or are the type of findings that courts routinely make when deciding legal questions. Front Row contends that the Motion is "procedurally improper," because it asks the Court to "make findings of fact about the state of the art in 2000 that go far beyond anything contained in the pleadings."  Seventh Supplement at 3.   It raises six specific examples of disputed factual findings from the Defendants' arguments:

1. Since the dawn of television, moreover, broadcasters have captured video in one location and transmitted it wirelessly for display in another location . . . . The television industry has thus employed these basic concepts of video transmission "for some time" and these concepts were "undisputedly well-known' at the time of Plaintiff's claimed invention."  [Motion] at 9.

2. The television industry has done the same for decades with video by recording video and sending it in a format that can be received by different devices, including portable televisions.  [Motion] at 10-11.

3. [T]he claims rely entirely on generic hardware components and conventional software processes to perform "well-understood, routine, and conventional activities commonly used in the industry." [Motion] at 14.

4. [E]ach of Plaintiff's claimed components are generic terms for widely understood elements. Each Element, furthermore, is used to perform its generic function -- e.g. the video camera captures video and the wireless network sends data wirelessly. [Motion] at 15.

5. The generic functions of Plaintiff's software -- "transmitting," "capturing," "acquiring," "authenticating," "receiving," "processing," "accessing," "displaying," -- are basic computing functions "specified at a high level of generality." [Motion] at 16-17.

6. Plaintiff's patent claims also fail to provide the requisite "inventive concept" because they do not describe the "mechanism" by which these generic functions are performed. [Motion] at 17.

Seventh Supplement at 3-4. Front Row continues:

None of these "facts" are found in the pleadings and, because this is a motion for judgment on the pleadings, no evidence, such as testimony from an expert about whether the claims only recite generic functions with a description of the "mechanism" those "generic functions are performed," is in the record that would allow the Court to determine the veracity of these factual allegations.

Seventh Supplement at 4. The Defendants assert that: (i) the Court need not make factual findings that the claim elements were well known, because the patents themselves establish the fact; and (ii) there is no need to conduct discovery on the state of the art, because it is irrelevant to the § 101 determination.[25] See Reply at 12. The Court agrees with the Defendants for two primary reasons.

_____

[25]The Defendants' argument that the claims' novelty -- and thus the state of the art in 2000 -- is irrelevant to the § 101 inquiry raises a confusing area within the law on § 101. Section 101 provides that a person who invents or discovers "any new and useful process" may obtain a patent. 35 U.S.C. § 101 (emphasis added). Section 102 deals with "novelty," attempting to ensure that patents do not issue for inventions that have already been claimed. See 35 U.S.C. § 102. One line of authority holds that courts should not consider novelty at all in their § 101 decisions. The foundational case, Diamond v. Diehr, held that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the

subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."
Diamond v. Diehr, 450 U.S. at 190.  More recent cases have cited this principle with approval.
See Netflix, Inc. v. Rovi Corp., 114 F. Supp. 3d 927, 937 (N.D. Cal. 2015)(Hamilton, J.)("[T]he
search for an 'inventive concept' places no importance on the novelty of the abstract idea.  A
novel abstract idea is still an abstract idea, and is therefore unpatentable.").

Cases attempting to reconcile Diamond v. Diehr and Alice have held that Step 2 is a sort
of boundary-drawing exercise, intended to minimize a claim's possible preemptive effect.  In
HealthTrio, LLC v. Aetna, Inc., No. 12-CV-03229-REB-MJW, 2015 WL 4005985 (D. Colo.
June 17, 2015)(Watanabe, M.J.), for example, the Honorable Michael Watanabe, United States
Magistrate Judge for the District of Colorado, attempted to define the "inventive concept" that
Alice requires.  2015 WL 4005985, at *6.  Judge Watanabe concluded that the inventive concept
"has more to do with limiting the patent's preemptive scope as it does with the actual
innovation."  2015 WL 4005985, at *6.  He reasoned that, "[i]n searching for 'an inventive
concept,' . . . courts are to focus on whether the claimed application is something more than just
a generic application [of] the abstract idea itself -- and not on related concepts that arise later in
the patent-validity analysis, like novelty or non-obviousness."  2015 WL 4005985, at *6.
Another district court recently rejected an argument based on novelty:

> Defendant's argument, however, treads too closely to allegations of novelty and
> obviousness.  While it may be true that ancient civilizations used . . . movable
> barriers, that analysis is more appropriately addressed as a question of what
> constitutes the prior art and whether the '977 Patent claims hold any novelty over
> the teachings of the prior art.

Chamberlain Grp., Inc. v. Linear LLC, 114 F. Supp. 3d 614, 627 (N.D. Ill. 2015)(St. Eve, J.).  In
these courts' approach, the inventive concept is a limit that prevents a patent's claims from
preempting an entire abstract idea.  See Alice, 134 S. Ct. at 2357 ("A claim that recites an
abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting
effort designed to monopolize the [abstract idea].'")(quoting Mayo, 132 S. Ct. at 1294)).

This line of cases, however, is in tension with the language that other courts use in
evaluating "inventive concept" arguments.  Alice held that "[s]imply appending conventional
steps, specified at a high level of generality," is not enough to supply an inventive concept.
Alice, 134 S. Ct. at 2357.  Yet it is unclear how courts can evaluate whether steps are
conventional without implicitly or explicitly discussing their novelty.  Several controlling cases
have thus incorporated novelty concepts into their analyses.  In Ultramercial IV, for example, the
Federal Circuit noted that "any novelty in implementation of the idea is a factor to be considered
only in the second step of the Alice analysis."  Ultramercial IV, 772 F.3d at 715.  See Neochloris,
Inc. v. Emerson Process Mgmt. LLLP, 140 F. Supp. 3d 763, 771 (N.D. Ill. 2015)(Chang,
J.)(holding that "novelty" is relevant to the Alice test).  The Federal Circuit has also contrasted
"traditional" and "inferior" inventions with a "new type of database program," thereby applying
some concept of novelty.  Enfish, 822 F.3d at 1330, 1337.  The Court need not resolve this issue
definitively, because: (i) it can draw any necessary factual findings from the patents themselves;
and (ii) it can consider general, historical observations in making its decision.

First, the Court will not require extrinsic evidence to make its determination.   In Mortgage Grader, Inc. v. First Choice Loan Services. Inc., 811 F.3d 1314 (Fed. Cir. 2016)("Mortgage Grader"), the Federal Circuit affirmed a district court's decision to grant summary judgment against a patentee under § 101.  See 811 F.3d at 1325.  The patentee argued that the parties' expert declarations and other materials created factual disputes that the jury would have to resolve.  See 811 F.3d at 1325.  The Federal Circuit rejected this argument, explaining that the district court "did not rely on these materials in its § 101 analysis.  Instead, in making its patent-eligibility determination, the district court looked only to the claims and specifications of the patents-in-suit."  Mortgage Grader, 811 F.3d at 1325.

The Patents' specifications and claims provide extensive descriptions of the claimed inventions, and define their systems' components.  See, e.g., 856 Patent 17:1-15, 17-25 (defining the SS7 signaling standard and the XML standard); 460 Patent 16:16-19 (defining GPRS technology).  In short, "the terms that might need to be construed in this case are largely defined in the Patents, and those definitions amount to 'little more than synonyms for generic conventional computer processing steps,' or conventional computer components."  Intellectual Ventures I LLC v. Erie Indem. Co., 134 F. Supp. 3d 877, 909 (W.D. Pa. 2015)(Hornak, J.)(quoting Tranxition, Inc. v. Lenovo (U.S.) Inc., No. 3:12-CV-01065-HZ, 2015 WL 4203469, at *12 (D. Or. July 9, 2015)(Hernandez, J.)).   Several district courts have relied on the specifications' information.  See Whitepages, Inc. v. Isaacs, No. 16-CV-00175-RS, 2016 WL 3971270, at *5 (N.D. Cal. July 25, 2016)(Seeborg, J.)("The factual averments in Greenflight's counterclaim, in combination with the history set out in the specification, adequately afford the requisite level of understanding."); CertusView Techs., LLC v. S & N Locating Servs., LLC, 111 F. Supp. 3d at 704 ("[T]he Court finds that it need not rely on any factual matter other than that

presented in the specifications of the patents-in-suit themselves."). In short, the parties' arguments here "rely largely on facts already in the record," a sign that claim construction is not required. Boar's Head, 2015 WL 4530596, at *7. See id. at *7 ("Courts also have considered the extent to which extrinsic facts may be helpful or relevant in construing the claims, and the substance of the parties' arguments.").

Second, courts routinely make similar findings while evaluating § 101 challenges. See Alice, 134 S. Ct. at 2356 (citing various outside sources, including a law review article and a treatise, to support its conclusion that intermediated settlement is an "abstract idea"); buySAFE, 765 F.3d at 1355 (citing a textbook and concluding that creating a transaction performance guarantee is "beyond question of ancient lineage"). One district court has described these findings as "well-known, general historical observations." Network Apparel Grp., LP v. Airwave Networks Inc., 154 F. Supp. 3d 467 (W.D. Tex. 2015)(Manske, M.J.). See California Institute, 59 F. Supp. 3d at 979 n.6 ("Eligibility questions mostly involve general historical observations, the sort of findings routinely made by courts deciding legal questions."); Affinity Labs, 109 F. Supp. 3d at 926 ("several Federal Circuit cases have made general historical observations in ruling on a 12(b)(6) motion.")(citing buySAFE, 765 F.3d at 1354-55, Ultramercial IV, 772 F.3d at 723 (Mayer, J., concurring), and Content Extraction, 776 F.3d at 1347). But see VS Techs., LLC v. Twitter, Inc., No. 2:11CV43, 2012 WL 1481508, at *4 (E.D. Va. Apr. 27, 2012)(Morgan, J.)("However, Plaintiff ignores the fact that there may be underlying factual questions that the jury must answer in order to reach a conclusion on validity."). The facts that Front Row highlights -- such as whether "broadcasters have captured video in one location and transmitted it wirelessly for display in another location" -- are the general historical observations that courts routinely make in deciding legal questions. Seventh Supplement at 3.

In any case, the Court is willing to conclude, by clear and convincing evidence, that broadcasters have captured and transmitted video "for some time," and that the concepts were "well-known" at the time of Front Row's claimed invention.  Seventh Supplement at 3.  That the television industry has recorded video and transmitted it in "a format that can be received by different devices, including portable televisions," is similarly not open to reasonable dispute.  Seventh Supplement at 4.

Finally, courts regularly decide Front Row's final four questions without holding evidentiary hearings.  Front Row's proposed questions include whether the claims rely on "generic" or "conventional" components, whether the claims' functions are specified at a "high level of generality," and whether the claims provide the requisite "inventive concept."  Seventh Supplement at 14.[26]  Numerous courts have decided these and similar questions before claim construction and without additional evidentiary briefing.  See Gametek LLC v. Zynga, Inc., No. CV-13-2546 RS, 2014 WL 1665090, at **5-6 (N.D. Cal. Apr. 25, 2014)(Seeborg, J.)(considering preemption, claim limitations, and well-understood, routine, and conventional activity before granting a motion to dismiss); Wolf v. Capstone Photography, Inc., No. 2:13-CV-09573, 2014 WL 7639820, at *12 (C.D. Cal. Oct. 28, 2014)(Snyder, J.)(describing claims as using "conventional" methods).

---

[26]Some courts have described these questions as legal conclusions.  See California Institute, 59 F. Supp. 3d at 979 ("The parties primarily dispute legal conclusions drawn from undisputed facts, such as the conventionality of claim elements or the relevance of certain claim elements to the § 101 issue."); Boar's Head, 2015 WL 4530596, at *7 ("Although plaintiff presents these issues as 'necessary factual predicates,' they more closely resemble the questions a court must consider in determining a patent's eligibility, that is, questions of law that many courts have decided without claim construction.").  As discussed above, the Court concludes that these questions have some factual elements.  In any case, the precise characterization here is irrelevant, because courts routinely decide similar issues without evidentiary hearings.

**III.**   **THE 856 PATENT'S CLAIM 15, THE 895 PATENT'S CLAIM 1, AND THE 027 PATENT'S CLAIM 1 FAIRLY AND ACCURATELY REPRESENT THE OTHER CLAIMS.**

The Court selects the 856 Patent's Claim 15, the 895 Patent's Claim 1, and the 027 Patent's Claim 1 as representative claims.  First, district courts may select representative claims despite the parties' disagreement or the number of claims.  Second, these claims accurately represent the other claims because they are substantially similar and linked to the same abstract idea.  Finally, the dependent claims do not alter the Court's calculus because they make only minor variations to the independent claims.

**A.**   **THE COURT MAY SELECT REPRESENTATIVE CLAIMS, DESPITE FRONT ROW'S DISAGREEMENT AND THE NUMBER OF CLAIMS INVOLVED.**

The Court concludes that it may identify representative claims here.  First, the Court does not require a pretrial agreement or stipulation from Front Row to designate representative claims.  In Content Extraction, an infringement defendant selected two of the patentee's claims as representative, arguing that "none of the other claims included anything more than minor changes in format or phrasing."  Content Extraction, 776 F.3d at 1346.  The patentee did not contest the defendant's argument, and the district court held that the patents claimed ineligible subject matter.  See 776 F.3d at 1346.  On appeal, the patentee argued that the representative claims were not actually representative.  See Third Brief for Appellant at 8-13, filed April 28, 2014 (Doc. 56 in Content Extraction v. Wells Fargo Bank, No. 13-cv-1588 (Fed. Cir. 2014)).  The Federal Circuit affirmed the district court's decision:

> The district court, however, correctly determined that addressing each claim of the asserted patents was unnecessary.  After conducting its own analysis, the district court determined that PNC is correct that claim 1 of the 'nah 855 patent and claim 1 of the '416 patent are representative, because all the claims are "substantially similar and linked to the same abstract idea."  CET, 2013 WL 3964909, at *5 (citing Bilski, 561 U.S. at 612, 130 S.Ct. 3218).  Moreover, CET

never asserted in its opposition to PNC's motion that the district court should
have differentiated any claim from those identified as representative by PNC.
Nor did CET identify any other claims as purportedly containing an inventive
concept.  If CET disagreed with PNC's or the district court's assessment, CET
could have identified claims in its opposition brief that it believed would not be
fairly represented by claims 1 of the '855 and '416 patents for purposes of PNC's
§ 101 challenge.

Content Extraction, 776 F.3d at 1348 (emphasis added).  Despite the patentee's failure to dispute

the representative nature of its claims, the Federal Circuit conducted an independent review, and

agreed that "1) the claims of the asserted patents are substantially similar in that they recite little

more than the same abstract idea, and 2) claim 1 of the '855 patent and claim 1 of the '416 patent

are representative."  Content Extraction, 776 F.3d at 1348.

District courts have interpreted Content Extraction in numerous ways.  One line of

authority, which Front Row urges the Court to follow, allows courts to use representative claims

only if the parties have agreed on them in advance.  See Tr. at 124:16-125:4 (Shore).[27]  Front

Row cites to StoneEagle, which relies on a 1984 Federal Circuit case holding that "'a party

challenging the validity of a claim, *absent a pretrial agreement or stipulation,* must submit

evidence supporting a conclusion of invalidity of *each* claim the challenger seeks to destroy.'"

StoneEagle, 2015 WL 518852, at *5 (quoting Shelcore, Inc. v. Durham Indus., Inc., 745 F.2d

621, 625 (Fed. Cir. 1984)("Shelcore")(emphasis in StoneEagle)).

At least two courts have placed the burden on the patentee to point out flaws in proposed

representative claims.  See Pragmatus Telecom, LLC v. Genesys Telecommunications Labs.,

---

[27]Front Row's citation to Exergen does not establish a rule requiring the parties'
agreement on representative claims.  In Exergen, an alleged infringer attempted to apply a rule of
patent prosecution -- that "permits a patent application to claim only one 'independent and
distinct invention'" -- to a judicial validity determination.  2015 WL 8082402, at *5 (quoting 37
C.F.R. § 1.141).  The district court rejected this attempt, explaining that a separate judicial
opinion invalidating a single claim in a patent does not automatically invalidate every other
claim.  See Exergen, 2015 WL 8082402, at *5.  The court did not discuss representative claims.

Inc., 114 F. Supp. 3d 192 (D. Del. 2015)(Andrews, J.)("Genesys"), gave a separate interpretation of Content Extraction: "The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a representative claim and all the claims are substantially similar and linked to the same abstract idea." 114 F. Supp. 3d at 198 (emphasis added)(quotation omitted). Under this interpretation, the Court cannot select representative claims if Front Row points to specific claims it believes are not represented. See Genesys, 114 F. Supp. 3d at 198. Similarly, in Intellectual Ventures I LLC v. Erie Indemnity Co., the patentee "oppose[d] the designation of representative claims and insist[ed] on a claim by claim, fully *Markman*-ized analysis." 134 F. Supp. 3d at 908. The district court declined, explaining that: (i) the chosen claims were representative, because they were "'substantially similar and linked to the same abstract idea'" as the other independent claims; and (ii) the patentee "failed to identify any other claims that 'purportedly contain an inventive concept.'" 134 F. Supp. 3d at 908 (quoting Content Extraction, 776 F.3d at 1348).

Other courts have placed the burden on the movant, declining to designate representative claims where the movant has not discussed any non-designated claims in detail. The district court adopted this approach in Versata, where the patentee objected to the challenger's proposed representative claims:

> There is no indication that the parties have agreed that the particular claims focused upon are representative for purposes of the Court's Section 101 analysis. And with Defendants having given negligible attention to the remainder of the claims, the Court does not find it wise or appropriate to make a final determination as to the subject matter eligibility of such claims at this time.

Versata, 2015 WL 5768938, at *4.

The Court concludes, however, that Content Extraction permits it to designate representative claims, even absent the parties' agreement and in the face of the patentee's specific objections.  First, although Content Extraction mentioned the absence of a dispute at the district court level, it independently "reviewed all the claims of CET's asserted patents" and held that they were "substantially similar in that they recite little more than the same abstract idea." 776 F.3d at 1349.   It could have reached the same conclusion regardless of the parties' agreement.  Second, Content Extraction is distinguishable from Shelcore.  Shelcore, which set out a requirement applicable "at trial," requires either a "pretrial agreement or stipulation."  745 F.2d at 625.   Content Extraction took place at a much earlier stage, and involved neither an affirmative agreement nor a stipulation.  See Content Extraction, 776 F.3d at 1349.  Third, other district courts have cited Content Extraction without mentioning the need for an agreement, stipulation, or acquiescence by either side.  See Aatrix Software, Inc. v. Green Shades Software, Inc., No. 3:15-CV-164-HES-MCR, 2016 WL 1375141, at *9 (M.D. Fla. March 30, 2016)(Schlesinger, J.)(applying the Court's interpretation of Content Extraction and independently designating certain claims representative); Zimmers v. Eaton Corp., No. 2:15-CV-2398, 2016 WL 4094870, at *5 (S.D. Ohio Aug. 2, 2016)(Marbley, J.)("[A] district court is not required to individually address claims not asserted or identified by the non-moving party if the court determines that certain claims are representative because they are substantially similar and linked to the same abstract idea."); Multimedia Plus, Inc. v. Playerlync, LLC, No. 14CV8216, 2016 WL 4074439, at *6 (S.D.N.Y. July 29, 2016)(Pauley, J.)(not mentioning pretrial stipulations or agreements on representative claims); Idexx Labs., Inc. v. Charles River Labs., Inc., No. CV 15-668-RGA, 2016 WL 3647971, at *2 (D. Del. July 7, 2016)(Andrews, J.)(same); Becton, Dickinson & Co. v. Baxter Int'l, Inc., 127 F. Supp. 3d 687, 689 n.3 (W.D. Tex.

2015)(Yeakel, J.)("Becton")("Where claims are substantially similar and linked to the same abstract idea, the court may dispose of the other claims in the patent with less detail.")(quotation omitted); Summit 6 LLC v. HTC Corp., No. 7:14-CV-00014-O, 2015 WL 11117867, at *4 (N.D. Tex. May 28, 2015)(O'Connor, J.)("Plaintiff . . . argue[s] that the claims are all presumed to be valid and must each be challenged in the absence of agreed representative claims.  However, the Federal Circuit specifically dismissed this argument in *Content Extraction*, 776 F.3d at 1348.").

Finally, a ban on selecting representative claims absent the patentee's agreement would effectively grant the patentee a veto over § 101 determinations.  A plaintiff litigating in bad faith, with a very large number of claims at stake, could refuse to agree that any of them were representative, effectively guaranteeing a claim construction hearing and its associated costs to put it in a better settlement position.  Like the district court in Uniloc USA, Inc. v. E-MDS, Inc., albeit in a different context, the Court will not "endorse a rule that a § 101 motion can only precede claim construction with a patentee's blessing."  2015 WL 10791906, at *3.

The number of claims does not preclude the use of representative claims here.  Front Row contends that "invalidating a large swath of claims without addressing each individual claim is impermissible."  Response at 3.  Numerous other cases, however, have invalidated large numbers of claims by examining representative claims.  See Open Text S.A. v. Box, Inc., 78 F. Supp. 3d 1043, 1044-45 (N.D. Cal. 2015)(Donato, J.)(invalidating five patents based on an analysis of one representative claim); Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc., No. CV 13-1747-GMS, 2015 WL 436160, at *1 (D. Del. Jan. 27, 2015)(Sleet, J.)(invalidating 887 claims based on a single representative claim).

### B.   THE COURT'S REPRESENTATIVE CLAIMS FAIRLY AND ACCURATELY REPRESENT THE OTHER CLAIMS.

The Court's representative claims fairly and accurately represent the other claims in this case, because they are "substantially similar" to the other claims and all of the claims are "linked to the same abstract idea."  Content Extraction, 776 F.3d at 1348.   The Defendants have identified Claim 1 of the 184 Patent and Claim 1 of the 895 Patent as representative claims.  See Motion at 8-9; Sixth Supplement at 2.  Front Row contends that the Defendants handpicked these two claims and that they are not representative at all.  See Seventh Supplement at 2.  It cites "additional limitations" which it says are not present in the Defendants' selected claims:

| Additional Limitations | Patent/Claim |
|---|---|
| 802.11 wireless standard network | Claims 3, 10, 17 of the '895 patent<br>Claim 6 of the '460 Patent |
| Cellular telecommunications network | Claims 2, 9, 16 of the '895 patent<br>Claim 5 of the '460 Patent |
| Touchscreen display | Claim 10 of the '184 Patent<br>Claims 6, 13, 18 of the '895 patent<br>Claim 11, 17, 19 of the '460 Patent |
| Touch-sensitive display screen | Claim 15 of the '856 Patent |
| Smartphone/Smart phone | Claim 10 of the '184 Patent<br>Claims 4, 7, 11, 14 of the '895 patent<br>Claim 15 of the '856 Patent<br>Claim 3, 12, 18 of the '460 Patent |
| Cellular telephone | Claims 9, 18 of the '184 Patent |
| Tablet computing device | Claims 5, 7, 12, 14 of the '895 patent |
| Storing subscriber information . . . in a database | Claims 4, 10 of the '027 Patent |

Seventh Supplement at 2-3.  The Court agrees with the Defendants on the 895 Patent's Claim 1, and will adopt it as representative.  The Defendants have proposed that the Court select the 184 Patent's Claim 1 as the representative method claim.  See Seventh Supplement at 2.  The Court will instead analyze the 856 Patent's fifteenth claim, which appears to include an additional step for "processing" video "into [an] encrypted video data packet."  856 Patent at 26:52-61.  Selecting a superficially complex claim will help to ensure that the Court does not overlook any

important elements.  The Court will consider the 027 Patent separately, because it is not substantially similar to the representative claims in the 856 and 895 Patents.

The Federal Circuit has not expanded on <u>Content Extraction</u>'s test for representative claims.  Several opinions have identified representative claims without extensive analysis.  <u>See Versata</u>, 793 F.3d at 1312 ("Claim 17 is representative."); <u>In re TLI Commc'ns LLC Patent Litig.</u>, 823 F.3d at 610 ("Claim 17 is representative.").  It has noted that there may be "no meaningful distinction between the method and system claims or between the independent and dependent claims," where "the system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations of the independent claims."  <u>Planet Bingo</u>, 576 F. App'x at 1007.  Several district courts have provided similarly limited analysis.  <u>See Hewlett Packard Co. v. ServiceNow, Inc.</u>, No. 14-CV-00570-BLF, 2015 WL 1133244, at *2 n.3-6 (N.D. Cal. Mar. 10, 2015)(Freeman, J.); <u>Tuxis Techs., LLC v. Amazon.com, Inc.</u>, No. CV 13-1771-RGA, 2015 WL 1387815, at *5 (D. Del. Mar. 25, 2015)(Andrews, J.).

Other courts have created guidelines for the Court to follow.  In <u>Intellectual Ventures I LLC v. Erie Indemnity Co.</u>, for example, the district court explained that "the § 101 analysis 'is the same regardless of claim type, i.e., method claim, system claim, computer readable medium claim, etc.'"  134 F. Supp. 3d at 908 (quoting <u>Trading Technologies</u>, 2015 WL 774655, at *1).  Another court has reasoned that, in <u>Alice</u>, <u>Mayo</u>, and <u>Bilski</u>, the Supreme Court held "that various claim types (method, system, etc.) directed to the same invention should rise and fall together."  <u>Amdocs (Israel) Ltd. v. Openet Telecom, Inc.</u>, 56 F. Supp. 3d 813, 820 (E.D. Va. 2014)(Brinkema, J.).  <u>See Bancorp</u>, 687 F.3d at 1277 ("On the facts of this case, we hold that the district court correctly treated the asserted system and medium claims as no different from the asserted method claims for patent eligibility purposes.").

As an initial matter, the Court notes that Front Row's Patents are in the same patent family, involve very similar technology, and share similar patent specifications. Their background descriptions and brief summaries also share many elements. These similarities alone, however, do not permit the Court to designate a representative claim. See Genesys, 114 F. Supp. 3d at 199 ("Defendants have not demonstrated that the eight claims of the '314 patent are representative of the other three patents -- even if they all share a common specification."). The Court will thus analyze the specific claims in greater detail.

**1.   Claim 15 of the 856 Patent Adequately Represents Most of the Independent System Claims.**

The 856 Patent's Claim 15 presents a method claim:

A method for displaying a particular perspective of a venue-based activity at least one authorized hand held device having a display screen, said method comprising the steps of:

> simultaneously capturing a plurality of video perspectives of a venue-based activity utilizing more than one camera located at a sports and entertainment venue;
>
> processing said plurality of video perspectives at a server into encrypted video data packet for display on a touch-sensitive display screen associated with said at least one authorized hand held device provided in the form of at least a smart phone or personal digital assistan[t], said at least one hand held device further comprising at least one 802.11 wireless module for access to a wireless local area network and a cellular communications module for communication with a wireless cellular communications network;
>
> wirelessly transmitting said encrypted video packet over an 802.11 wireless local area network to said at least one authorized hand held device said plurality of video perspectives of a venue-based activity from said server;
>
> processing said plurality of video perspectives at said at least one authorized hand held device into decrypted video data packet for display on said touch-sensitive display screen associated with said at least one authorized hand held device; and

> displaying a particular video perspective on said touch-sensitive
> display screen, in response to a user selection of said particular
> video perspective from among said plurality of video perspectives.

856 Patent at 26:46-27:7.  This claim essentially sets out the following method: (i) acquiring

data, such as video, at a venue; (ii) authorizing a device to receive the data; (iii) processing the

data; (iv) transmitting the data; and (v) displaying the data on a handheld device.  See 856 Patent

at 26:46-27:7.  Comparing the 856 Patent's Claim 15 to the other independent method claims

shows their numerous similarities:

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| 856:15 | A method for displaying a particular perspective of a venue-based activity at least one authorized hand held device having a display screen, said method comprising the steps of: simultaneously **capturing** a plurality of video perspectives of a venue-based activity utilizing more than one camera located at a sports and entertainment venue; | associated with said at least one **authorized** hand held device provided in the form of at least a smart phone or personal digital assistance, said at least one hand held device further comprising at least one 802.11 wireless module for access to a wireless local area network and a cellular communications module for communication with a wireless cellular communications network; | **processing** said plurality of video perspectives at a server into encrypted video data packet for display on a touch-sensitive display screen | **wirelessly transmitting** said encrypted video packet over an 802.11 wireless local area network to said at least one authorized hand held device said plurality of video perspectives of a venue-based activity from said server; | processing said plurality of video perspectives at said at least one authorized hand held device into decrypted video data packet for **display** on said touch-sensitive display screen associated with said at least one authorized hand held device; and **displaying** a particular video perspective on said touch-sensitive display screen, in response to a user selection of said particular video perspective from among said plurality of video perspectives. |
| 184:1 | **acquiring** venue-based data via at least one server, said venue-based data comprising more than one video captured by more than one video camera capturing | **authenticating** at least one hand held device for receipt of said venue-based data to said at least one hand held device from said at least one |  | wirelessly **streaming** said venue-based data from said at least one server to said at least one hand held device through a wireless packet | **accessing** said venue-based data via said at least one hand held device for **display** of said more than one video captured by said more than one video camera capturing said more than one video |

- 101 -

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|--------|------------------------|---------------------|-----------------|-------------------|---------------------------|
| | video within said at least one venue; | server; | | based data network, in response to said authenticating said at least one hand held device, in order to permit said venue-based data to be accessible via said at least one hand held device at locations within and remote from said at least one venue; and | within said at least one venue. |
| 856:1 | A method for providing venue-based data to hand held devices, said method comprising the steps of: **capturing** video images from more than one perspective of a venue-based activity using more than one video camera located at a sports and entertainment venue; | | providing said video images to a server to **process** said more than one video perspective captured by more than one video camera into venue-based data formatted for wireless transmission via wireless data networks to more than one hand held device, each of said more than one hand held device further comprising at least one of a personal digital assistant and a smart phone, said more than one hand held device including at least one 802.11 wireless module for access to a wireless local area network and | retrieving said venue-based data from said server and wirelessly **transmitting** said venue-based data to at least one hand held device located at said sports and entertainment venue over said wireless local area network and also wirelessly transmitting said venue-based data to at least one hand held device located outside of said sports and entertainment venue over said wireless cellular communications network. | |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | | | a cellular communications module for communication with a wireless cellular communications network, said more than one hand held device further comprising a touch-sensitive display screen to simultaneously and singularly display said venue-based data and to accept user input via said touch-sensitive display screen; and | | |
| 856:14 | **capturing** video images from more than one perspective of a venue-based activity using more than one video camera located at a sports and entertainment venue; | | providing said video images to a server to **process** said more than one video perspective captured by more than one video camera into venue-based data formatted for wireless transmission via wireless data networks to more than one hand held device, each of said more than one hand held device further comprising at least one of a personal digital assistant and a smart phone, said more than one hand held device including | wirelessly **transmitting** venue-based data including video captured from multiple perspective by cameras located at said a sports and entertainment venue to at least one hand held device among said more than one hand held device located at said sports and entertainment venue over said wireless local area network from said server; wirelessly transmitting said venue-based data to at least one hand held device among said more | **displaying** at least one video perspective processed as data on said touch-sensitive display screen of said more than one hand held device. |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | | | at least one 802.11 wireless module for access to a wireless local area network and a cellular communications module for communication with a wireless cellular communications network, said more than one hand held device further comprising a touch-sensitive display screen to simultaneously and singularly display said venue-based data and to accept user input via said touch-sensitive display screen; | than one hand held device located at or outside of said sports and entertainment venue over said wireless a cellular communications network; and | |

856 Patent at 24:39-28:38; 184 Patent at 25:24-26:2 (emphasis added).

After comparing the various independent method claims, the Court concludes that they are substantially similar and directed to the abstract idea of sending video of an event to handheld devices over wireless networks. The first step in all of the claims uses cameras at an entertainment venue to capture video. The second step, which is present in some of the claims, authorizes specific devices to receive the video. The third and fourth steps process the data and wirelessly transmit it to a handheld device. The fifth step accesses the data and displays it on the handheld device.

2.      **Claim 1 of the 895 Patent Adequately Represents Most of the Independent
System Claims.**

The 895 Patent's Claim 1 presents a system claim:

At least one server, comprising:

> memory capable of storing entertainment venue-based data
> comprising video captured of live entertainment occurring in front
> of a live audience from more than one camera located in at least
> one entertainment venue;
>
> at least one processor capable of authenticating via a security code
> at least one remote hand held device to provide at least one user of
> said at least one remote hand held device wireless access to said
> entertainment venue-based data;
>
> at least one processor processing the venue-based data including
> video captured from the more than one camera into a format
> suitable for streaming over wireless data networks as streamed data
> that is capable of further processing for viewing by said at least
> one remote hand held device; and
>
> at least one port capable of streaming said venue-based data as
> streamed data from said at least one server so that said
> entertainment venue-based data may be wirelessly received as said
> streamed data by at least one remote hand held device authorized
> to receive said entertainment venue-based data through at least one
> wireless data communications network, in order to permit said
> entertainment venue-based data to be accessible wirelessly as said
> streamed data via said at least one remote hand held device by said
> at least one user of said at least one remote hand held device at
> locations within or remote from said at least one venue for viewing
> via said at least one remote hand held device, said video captured
> from said more than one camera located at said at least one
> entertainment venue.

895 Patent at 25:41-25:5.  This claim essentially describes a server, with: (i) memory for storing

video; (ii) a processor to authenticate a hand-held device; (iii) a processor to process the video;

and (iv) a port to stream the data to the hand-held device.  See 895 Patent at 25:41-25:5.

Comparing the 895 Patent's Claim 1 to the other independent system claims shows their

numerous similarities:

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| 895:1 | At least one server, comprising: memory capable of **storing** entertainment venue-based data comprising video captured of live entertainment occurring in front of a live audience from more than one camera located in at least one entertainment venue; | at least one processor capable of **authenticating** via a security code at least one remote hand held device to provide at least one user of said at least one remote hand held device wireless access to said entertainment venue-based data; | at least one processor **processing** the venue-based data including video captured from the more than one camera into a format suitable for streaming over wireless data networks as streamed data that is capable of further processing for viewing by said at least one remote hand held device; and | at least one port capable of **streaming** said venue-based data as streamed data from said at least one server so that said entertainment venue-based data may be wirelessly received as said streamed data by at least one remote hand held device authorized to receive said entertainment venue-based data through at least one wireless data communications network, in order to permit said entertainment venue-based data to be accessible wirelessly as said streamed data via said at least one remote hand held device by said at least one user of said at least one remote hand held device at locations within or remote from said at least one venue | for **viewing** via said at least one remote hand held device, said video captured from said at least one camera located at said at least one entertainment venue. |
| 895:8 | At least one server, comprising: memory capable of **storing** entertainment venue-based data that comprises video captured of live entertainment occurring in front of a live audience from more than one camera located in at least one entertainment venue; | at least one processor capable of **authenticating** via a security code at least one remote hand held device to provide at least one user of said at least one remote hand held device | at least one processor **processing** the venue-based data including video captured from the more than one camera into a format suitable for streaming over wireless data networks as streamed | at least one port capable of **streaming** said entertainment venue-based data as streamed data from said at least one server so that said entertainment venue-based data may be wirelessly streamed to at least one remote hand held device | for **viewing** via said at least one remote hand held device, said video captured from said more than one camera located at said at least one entertainment venue. |

- 106 -

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | | wireless access to said entertainment venue-based data; | data that is capable of further processing for viewing by said at least one remote hand held device; and | authorized to receive said entertainment venue-based data through at least one wireless data communications network, in order to permit said entertainment venue-based data to be accessible wirelessly as said streamed data via said at least one remote hand held device by said at least one user of said at least one remote hand held device at locations within or remote from said at least one entertainment venue | |
| 895:15 | A system, comprising: memory capable of **storing** entertainment venue-based data comprising video captured of live entertainment occurring in front of a live audience from more than one camera located in at least one entertainment venue; | at least one processor capable of **authenticating** via a security code at least one remote hand held device to provide at least one user of said at least one remote hand held device wireless access to said entertainment venue-based data; | at least one processor capable of **processing** the venue-based data including video captured from the more than one camera into a format suitable for streaming over wireless data networks as streamed data that is capable of further processing for viewing by said at least one remote hand held device; and | at least one port capable of **streaming** said entertainment venue-based data as streamed data from said at least one server so that said entertainment venue-based data may be wirelessly received as said streamed data by and/or streamed to at least one remote hand held device authorized to receive said entertainment venue-based data through at least one wireless data communications network, in order to permit said entertainment venue-based data | for **viewing** via said at least one remote hand held device, said video captured from said more than one camera located at said at least one entertainment venue. |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | | | | to be accessible wirelessly as said streamed data via said at least one remote hand held device by said at least one user of said at least one remote hand held device at locations within or remote from said at least one entertainment venue | |
| 460:1 | At least one server that includes a computer-readable medium tangibly embodying computer-executable instructions, said computer-executable instructions comprising instructions for: **acquiring** entertainment venue-based data that comprises video of live entertainment occurring in front of a live audience captured from more than one camera located in at least one entertainment venue; | **authenticating** at least one remote hand held device to provide at least one user of said at least one remote hand held device wireless access to said entertainment venue-based data; and | **processing** said entertainment venue-based data including video of live entertainment occurring in front of a live audience captured from the more than one camera located in at least one entertainment venue into a format suitable for streaming over wireless data networks as streamed data that is capable of further processing for viewing by at least one remote hand held device; | **transmitting** said entertainment venue-based data after processing from said at least one server so that said entertainment venue-based data may be received and further process for viewing by at least one remote hand held device authorized to receive said venue-based data through at least one wireless data communications network, in response to said authenticating of said at least one remote hand held device to wirelessly access said entertainment venue-based data, in order to permit said entertainment venue-based data to be accessible via said at least one remote hand held device by said at least one user of said at | for **viewing** via said at least one remote hand held device. |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | | | | least one remote hand held device at locations within or remote from said at least one entertainment venue | |
| 460:10 | At least one server that includes a computer-readable medium tangibly embodying computer-executable instructions, said computer-executable instructions comprising instructions for: **acquiring** entertainment venue-based data that comprises video of live entertainment occurring in front of a live audience captured from more than one camera located in at least one entertainment venue; | **authenticating** at least one remote hand held device to provide at least one user of said at least one remote hand held device wireless access to said entertainment venue-based data; and | **processing** said entertainment venue-based data including video of live entertainment occurring in front of a live audience captured from the more than one camera located in at least one entertainment venue into a format suitable for streaming over wireless data networks as streamed data that is capable of further processing for viewing by at least one remote hand held device; | **transmitting** said entertainment venue-based data after processing from said at least one server so that said entertainment venue-based data may be streamed to at least one remote hand held device authorized to receive said venue-based data through at least one wireless data communications network, in response to said authenticating of said at least one remote hand held device to wirelessly access said entertainment venue-based data, in order to permit said entertainment venue-based data to be accessible via said at least one remote hand held device by said at least one user of said at least one remote hand held device at locations within or remote from said at least one entertainment venue | for further processing and **viewing** via said at least one remote hand held device. |
| 460:13 | At least one server, comprising: memory capable of **storing** entertainment venue- | **authenticating** at least one remote hand held device to | at least one processor capable of **processing** | at least one port capable of **transmitting** said entertainment | **viewing** via said at least one remote hand held device. |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | based data that comprises video of live entertainment occurring in front of a live audience from more than one camera located in at least one entertainment venue; | provide at least one user of said at least one remote hand held device wireless access to said entertainment venue-based data; and | said entertainment venue-based data including video of live entertainment occurring in front of a live audience captured from the more than one camera located in at least one entertainment venue into a format suitable for streaming over wireless data networks as streamed data that is capable of further processing for viewing by at least one remote hand held device, | venue-based data, after its processing into a format suitable for streaming over wireless data networks as streamed data, from said at least one server so that said venue-based data may be received by or streamed to at least one remote hand held device authorized to receive said venue-based data through at least one wireless data communications network, in response to said authenticating of said at least one remote hand held device to wirelessly access said entertainment venue-based data, in order to permit said entertainment venue-based data to be accessible via said at least one remote hand held device by said at least one user of said at least one remote hand held device at locations within or remote from said at least one entertainment venue for further processing and | |
| 184:12 | A system for wirelessly providing venue-based data to at least one hand held device, said system | at least one **authentication** module for authenticating at least one | at least one server for storing and **processing** venue-based | at least one transmitter for wirelessly **streaming** said venue-based data | for **display** of said more than one video captured by said more than one video camera capturing said more |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
| | comprising: at least one entertainment venue including more than one video camera **capturing** more than one video of performers engaged in an entertainment activity within said at least one entertainment venue;<br><br>at least one server for **storing** and processing venue-based data; | hand held device for authorized acceptance of said venue-based data to said at least one hand held device; and | data; | from said at least one server to said at least one hand held device through a wireless packet based data network, in response to authenticating said at least one hand held device via said at least one authentication module, in order to permit said venue-based data to be accessible via said at least one hand held device at locations within and remote to said at least one venue | than one video within said at least one entertainment venue |
| 856:16 | An entertainment venue multimedia system configured with a data processing system and wireless infrastructure for providing venue-based data to authorized hand held devices located within and outside of an entertainment venue via data communication networks including cellular communications and local wireless networking capabilities, said multimedia system comprising: more than one venue-based camera **capturing** a different video perspective within an entertainment venue; | | a server receiving and **processing** more than one video perspective received from said more than one venue-based camera; | wireless data communication networks including a wireless local area network and a wireless cellular communications network in communication with said server, said wireless data communication networks accessing and **transmitting** said more than one video perspective from said server to more than one hand held device; and | |
| 184:20 | A system for | **authenticating** | | wirelessly | **accessing** said venue- |

| Claims | Capturing/Storing Video | Authorizing a Device | Processing Data | Transmitting Data | Accessing/Displaying Video |
|---|---|---|---|---|---|
|  | wirelessly providing venue-based data to at least one hand held device, said system comprising: at least one server; a processor and a data bus coupled to said processor; computer-usable medium embodying computer code, said computer-usable medium being coupled to said data bus, said computer program code comprising instructions executable by said processor and configured for: **acquiring** venue-based data via said at least one server, said venue-based data comprising video captured by more than one video camera capturing more than one video within said at least one venue; | at least one hand held device for receipt of said venue-based data to said at least one hand held device from said at least one server; |  | **streaming** said venue-based data from said at least one server to said at least one hand held device through a wireless packet based data network, in response to said authenticating said at least one hand held device, in order to permit said venue-based data to be accessible via said at least one hand held device at locations within and remote from said at least one venue; and | based data via said at least one hand held device for **display** of said more than one video captured by said more than one video camera capturing said more than one video within said at least one venue. |

895 Patent at 25:42-28:28; 460 Patent at 25:39-28:28; 184 Patent at 26:5-28:10 (emphasis added).

After comparing the various independent system claims, the Court concludes that they are substantially similar and directed to the abstract idea of sending video of an event to handheld devices over wireless networks. They list the hardware required to carry out the steps listed in the 856 Patent's Claim 15.

3. **Claim 1 of the 027 Patent Adequately Represents the 027 Patent's Independent Claims.**

The 027 Patent's Claim 1 presents a method claim:

A method for authorizing access by a user of at least one service associated with an event at a venue based on a location of said user as determined by information derived from communication between a computing device in the form of a wireless handheld device carried and utilized by said user and assets of a data communications network, said method comprising:

>    determining a location of at least one user based on communications of at least one computing device comprised of a wireless handheld device utilized by said at least one user with said data communications network supporting data communications of said at least one computing device;

>    authorizing said at least one computing device to receive said at least one service based on said location as determined by said data communications network, wherein said at least one service includes streaming video accessed from a server wherein streaming video captured by at least one video camera operating within at least one entertainment venue is processed for delivery to subscribers of the at least one service and wherein said authorizing said at least one computing device further comprising preventing said at least one computing device from receiving said at least one service beyond or within a particular geographic area based on said location determination by said data communication network.

027 Patent at 26:8-35. This claim describes a method that: (i) determines a handheld device user's location; and (ii) authorizes devices within a certain area to receive streaming video. See 027 Patent at 26:8-35. Comparing the 027 Patent's Claim 1 to its other independent claims shows their numerous similarities:

| Claim | Determining Location | Authorizing Streaming Video Based on Location |
|---|---|---|
| 027:1 | A method for authorizing access by a user of at least one service associated with an event at a venue based on a location of said user as determined from communication between a computing device in the form of a wireless handheld device carried and utilized by said user and assets of a data communications network, said method comprising: **determining a location** of at least one user based on communications of at least one computing | **authorizing** said at least one computing device to receive said at least one service based on said location as determined by said data communications network, wherein said at least one service includes streaming video accessed from a server wherein streaming video captured by at least one video camera operating within at least one entertainment venue is processed for delivery to subscribers of the at least one service and wherein said authorizing said at least one computing device further |

| | | |
|---|---|---|
| | device comprised of a wireless handheld device utilized by said at least one user with said data communications network supporting data communications of said at least one computing device; | comprising preventing said at least one computing device from receiving said at least one service beyond or within a particular geographic area based on said location determination by said data communication network. |
| 027:7 | A system for authorizing access by a user of at least one service associated with an event at a venue based on a location of said user as determined by information derived from communication between a computing device in the form of a wireless handheld device carried and utilized by said user and assets of a data communications network, said system comprising:<br>a processor;<br>a data bus coupled to said processor; and<br>a computer-usable medium embodying computer code, said computer-usable medium being coupled to said data bus, said computer program code comprising instructions executable by said processor and configured for:<br>**determining a location** of at least one user based on communications of at least one computing device comprising a wireless handheld device utilized by said at least one user with said data communications network supporting data communications of said at least one computing device; and | **authorizing** said at least one computing device to receive said at least one service based on said location as determined by said data communications network, wherein said at least one service includes streaming video accessed from a server wherein streaming video captured by at least one video camera operating within at least one entertainment venue is processed for delivery to subscribers of the at least one service and wherein said instructions for authorizing said at least one computing device further comprising instructions for preventing said at least one computing device from receiving said at least one service beyond or within a particular geographic area based on said location determination by said data communication network. |
| 027:13 | At least one server for authorizing access by a user of at least one service associated with an event at a venue based on a location of said user as determined by information derived from communication between a computing device in the form of a wireless handheld device carried and utilized by said user and assets of a data communications network, said at least one server comprising:<br>at least one processor capable of **determining a location** of at least one user based on communications of at least one computing device comprising a wireless handheld device utilized by said at least one user with said data communications network supporting data communications of said at least one computing device; and | at least one processor capable of **authorizing** said at least one computing device to receive said at least one service based on said location as determined by said data communications network, wherein said at least one service includes streaming video accessed from a server wherein streaming video captured by at least one video camera operating within at least one entertainment venue is processed for delivery to subscribers of the at least one service and wherein said authorizing said at least one computing device further comprising preventing said at least one computing device from receiving said at least one service beyond or within a particular geographic area based on said location determination by said data communication network. |

027 Patent at 26:8-28:46 (emphasis added).

After comparing the various independent system claims, the Court concludes that they are substantially similar and directed to the abstract idea of authorizing handheld devices to receive streaming video based on a user's location.

- 114 -

**4.      The Representative Claims Also Represent the Dependent Claims.**

Many of Front Row's arguments against selecting representative claims rely on limitations recited in the dependent claims.  See, e.g., 895 Patent at 26:9-12 ("802.11 wireless standard network"); 895 Patent at 26:6-8 ("cellular telecommunications network"); 895 Patent at 28:18-22 ("touchscreen display"); 895 Patent at 27:6-8 ("tablet computing device"); 460 Patent at 28:20-21 ("Smartphone"); 184 Patent at 25:63-64 ("cellular telephone").  The Honorable Lee Yeakel, United States District Judge for the Western District of Texas, recently dismissed similar claims as an obstacle to selecting a representative claim.  See Becton, 127 F. Supp. 3d at 689 n.3.  Judge Yeakel explained that, despite the patentee's "arguments to the contrary, the dependent claims of the '887 Patent introduce only slight variations of the independent claims, variations which do not change the validity calculus; thus the court need not consider each claim distinctly."  Becton, 127 F. Supp. 3d at 689 n.3.  Like the claims in Becton, the additional claims here introduce only slight variations to the representative independent claims.  District courts have dismissed similar differences as immaterial.  See Intellectual Ventures I LLC v. Erie Indem. Co., 134 F. Supp. 3d at 910 (dismissing "user request," the automatic activation of a discovery agent, and a "processor" as immaterial differences); Listingbook, LLC v. Mkt. Leader, Inc., 144 F. Supp. 3d 777, 789 (M.D.N.C. 2015)(Biggs, J.)("Each of these dependent claims narrows the method of Claim 1 by adding details and functions to improve the information exchange and collaborative process, but none of these claims changes the concept at the core of the claimed method.").  Although the dependent claims slightly narrow the representative claims' scope, "while these claims may have a narrower scope than the representative claims, no claim contains an inventive concept that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea."  Content Extraction, 776 F.3d at 1349 (quotations

omitted).   In short, the Court has reviewed the dependent claims, with a focus on Front Row's listed claims, and concludes that none of them are materially distinct from the representative independent claims.   See 3 Annotated Patent Digest § 15:49 ("[W]here the patentee fails to argue the validity of a dependent claim separate from an independent claim, the law will presume that the validity of the dependent claim stands or falls with the independent claim.").

## IV.   **FRONT ROW'S CLAIMS ARE DIRECTED TO ABSTRACT IDEAS.**

The Defendants contend that Front Row's claims are directed to the abstract ideas of "providing video of an event to viewers" and "allowing access to video based on location." Motion at 2, 22.   Front Row responds that the Defendants "oversimplify" and "ignore" significant concrete limitations.   Response at 6.   The Court has examined Front Row's representative claims to determine whether they are "directed to a patent-ineligible concept." Alice, 134 S. Ct. at 2355.   It concludes that Front Row's claims are directed to two abstract ideas: (i) sending video of an event to handheld devices over wireless networks; and (ii) authorizing handheld devices to receive streaming video based on a user's location.   See 856 Patent at 26:46-27:7; 895 Patent at 25:41-25:5; 027 Patent at 26:12-35.

There is no clear guide to Alice's Step 1.   See Mobile Telecommunications Techs., LLC v. United Parcel Serv., Inc., No. 1:12-CV-3222-AT, 2016 WL 1171191, at *3 (N.D. Ga. Mar. 24, 2016)(Totenberg, J.)("Mobile Telecommunications")("Striking the proper balance in identifying those 'abstract ideas' that are too ephemeral to be patentable is not an easy task, as courts have repeatedly observed.").   As the Federal Circuit has explained,

> The Supreme Court has not established a definitive rule to determine what constitutes an "abstract idea" sufficient to satisfy the first step of the *Mayo/Alice* inquiry.   Rather, both this court and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases.

Enfish, 822 F.3d at 1334 (citation omitted).  Front Row's claims do not fall squarely within any existing cases' facts.  Unlike the claims in Gottschalk v. Benson, Front Row's claims do not attempt to patent mathematical algorithms.  See Gottschalk v. Benson, 409 U.S. at 65.  Nor do they attempt to cover a fundamental business practice, such as hedging, see Alice, 134 S.Ct. at 2356, using advertisements as currency, see Ultramercial IV, 772 F.3d at 717, managing a life insurance policy, see Bancorp, 687 F.3d at 1278, or using a transaction performance guaranty, see buySAFE, 765 F.3d at 1355.[28]  The Court will thus compare the claims here to the Federal Circuit's broader statements on Step 1.

First, the Court concludes that its identification of the relevant abstract ideas -- (i) sending video of an event to handheld devices over wireless networks; and (ii) authorizing handheld devices to receive streaming video based on a user's location -- does not oversimplify Front Row's claims.  The Supreme Court has instructed district courts to examine the claims "[o]n their face" and determine what they are "drawn to."  Alice, 134 S. Ct. at 2356.  The Federal Circuit has added that courts should examine claims' "character as a whole."  Enfish, 822 F.3d at 1335.  See Internet Patents, 790 F.3d at 1348 ("[W]e start by ascertaining the basic character of the subject matter[.]"); Ultramercial IV, 772 F.3d at 715 (describing "the concept embodied by the majority of the limitations").  The Federal Circuit recently drew a line between Step 1 and Step 2:

---

[28]The Court disagrees, however, with the Defendants' comparison between Front Row's claims and hand held televisions.  Although "broadcasters have captured video in one location and transmitted it wirelessly for display in another location" for "decades, at least since the dawn of television," Front Row's claims include features, such as authorizing a specific device to receive video, that are not possible with conventional television.  Defendants' PowerPoint at 30.  The Defendants' comparison between Front Row's 027 Patent and a newspaper determining "whether a person will receive a newspaper advertisement based on the person's location" is more convincing.  Defendants' PowerPoint at 77.  See Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d at 1369 ("This sort of information tailoring is "a fundamental . . . practice long prevalent in our system[.]")(quoting Alice, 134 S. Ct. at 2350.).

> [W]e have described the first-stage inquiry as looking at the "focus" of the claims, their "character as a whole," and the second-stage inquiry (where reached) as looking more precisely at what the claim elements add -- specifically, whether, in the Supreme Court's terms, they identify an "inventive concept" in the application of the ineligible matter to which (by assumption at stage two) the claim is directed.

Elec. Power Grp., LLC v. Alstom S.A., No. 2015-1778, 2016 WL 4073318, at *3 (Fed. Cir. Aug.

1, 2016)("Electric Power")(quotations omitted)(quoting Enfish, 822 F.3d at 1335-36).

The Federal Circuit has also, however, cautioned district courts that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." Enfish, 822 F.3d at 1337. The Court concludes that its summaries strike the proper balance, describing the claims' underlying purpose without overgeneralizing their requirements. Front Row's claims do not merely "*involve* a patent-ineligible concept." Enfish, 822 F.3d at 1335 (emphasis in original). They describe two patent-ineligible concepts and not much else. The Federal Circuit has also used less specific definitions. In Intellectual Ventures I LLC v. Capital One Bank (USA), for example, the Federal Circuit concluded that a patent for

> storing, in a database, a profile keyed to a user identity and containing one or more user-selected categories to track transactions associated with said user identity, wherein individual user-selected categories include a user pre-set limit; and causing communication, over a communication medium and to a receiving device, of transaction summary data in the database for at least one of the one or more user-selected categories, said transaction summary data containing said at least one user-selected category's user pre-set limit

was directed to the abstract idea of "budgeting." 792 F.3d at 1367. Similarly, in Ultramercial IV, the Federal Circuit concluded that a patent for "receiving copyrighted media, selecting an ad, offering media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad," was directed to the abstract idea of "showing an advertisement before delivering free content." Ultramercial

IV, 772 F.3d at 715.  Finally, Front Row's own briefing on other motions describes streaming "live video of the band onto my PDA" as "the basic concept behind all the ideas now embodied in Front Row's patent portfolio."  Defendants' PowerPoint at 27 (quoting Plaintiff Front Row Technologies, LLC's Motion to Dismiss MLB Advanced Media, L.P.'s Inequitable Conduct Counterclaim at 3, filed November 26, 2013 (Doc. 187)).

Second, Front Row's claims do not amount to "improvements to computer-related technology."  Enfish, 822 F.3d at 1335.  The Supreme Court first questioned whether claims "purport to improve the functioning of the computer itself or effect an improvement in any other technology or technical field" in Alice.  134 S. Ct. at 2351.  Alice applied this test at Step 2, see 134 S. Ct. at 2351, but the Federal Circuit moved it to Step 2 in Enfish, see 822 F.3d at 1335.  It provided several examples of possible improvements, including "chip architecture, an LED display," and software creating "non-abstract improvements" in computer technology.  Enfish, 822 F.3d at 1335.  The self-referential table in Enfish provided numerous benefits, including increased flexibility and faster searches, and required less programmer time and memory than other tables.  See 822 F.3d at 1337.  Front Row's claimed inventions do not provide any similar benefits.  Front Row did not invent streaming video, digital video, a new wireless protocol, or even an improvement to any component.  Compare Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc., No. 2015-1570, 2016 WL 3606624, at *4 (Fed. Cir. July 5, 2016)("Rapid Litigation")("Through the recited steps, the patented invention achieves a better way of preserving hepatocytes.") with Electric Power, 2016 WL 4073318, at *4 ("In *Enfish*, we applied the distinction to reject the § 101 challenge at stage one because the claims at issue focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement -- a particular database technique -- in how computers could carry out one of their basic functions of

- 119 -

storage and retrieval of data.").  Its claims do not improve the functioning of any of their generic physical components, such as PDAs or cellular telephones.  They do not create any "non-abstract" software improvements, such as faster processing times or flexibility.  Enfish, 822 F.3d at 1335.  Unlike the claims in Enfish, the "plain focus" of Front Row's claims is on "economic or other tasks for which a computer is used in its ordinary capacity," rather than on an "improvement to computer functionality itself."  Enfish, 822 F.3d at 1336.  See Electric Power, 2016 WL 4073318, at *4 ("The present case is different [from Enfish]: the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools.").

Third, although a human being without a computer cannot perform Front Row's claims, this fact is not dispositive.  Courts applying Alice's Step 1 have considered whether the patents claim a method that human beings can perform without a machine.  See SiRF Technologies, 601 F.3d at 1333 ("We are not dealing with a situation in which there is a method that can be performed without a machine."); CyberSource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1372 (Fed. Cir. 2011)("All of claim 3's method steps can be performed in the human mind, or by a human using a pen and paper."); Content Extraction, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.  Indeed, humans have always performed these functions."); Mortgage Grader, 811 F.3d 1314, 1324 (Fed. Cir. 2016)("The series of steps covered by the asserted claims . . . could all be performed by humans without a computer.").  Not all claims that require computer assistance, however, are patent-eligible.  See Internet Patents, 790 F.3d at 1348 (invalidating claims directed to "the idea of retaining information in the navigation of online forms"); Cyberfone, 558 F. App'x at 992 ("Although methods that can be performed in the human mind alone are not eligible for patent protection,

*CyberSource,* 654 F.3d at 1373, the category of patent-ineligible abstract ideas is not limited to methods that can be performed in the human mind.").

Front Row's patents cover methods and systems that cannot be performed with pen and paper, such as capturing and transmitting video.  This fact alone does not make its claims concrete and patent-eligible.  Front Row's claims are similar to the claims in Affinity Labs,[29] which covered "a means for delivering regionally broadcasted radio or television content to an electronic device located outside a region of the regionally broadcasted content."  Affinity Labs, 109 F. Supp. 3d at 919.  Like the patentee in Affinity Labs, Front Row defends its claims on the ground that its claims use handheld devices and other specific pieces of hardware.  See Response at 6; Affinity Labs, 109 F. Supp. 3d at 924.  The Court agrees with the Affinity Labs court that "under this view, it is difficult to foresee any patent that utilizes a computer component classified as abstract."  Affinity Labs, 109 F. Supp. 3d at 924.

Fourth, Front Row's citations to Contentguard and SimpleAir do not compel the opposite conclusion.  Contentguard, which is currently on appeal to the Federal Circuit, involved a broad patent covering digital rights management[30] techniques.  See Contentguard, 142 F. Supp. 3d at 512.  The representative claim covered:

---

[29]The Court recognizes that some aspects of the Affinity Labs opinion may not survive appellate review.  Specifically, the opinion held that Alice's Step 1 could be analyzed using a "quick look" test, waiting until the second step to look at "specific claim elements."  Affinity Labs, 109 F. Supp. 3d at 924.  It relied on Enfish, LLC v. Microsoft Corp., 56 F. Supp. 3d 1167 (C.D. Cal. 2014)(Pfaelzer, J.), which the Federal Circuit vacated in part in Enfish.  See Enfish, 822 F.3d at 1330; Enfish, LLC v. Microsoft Corp., 56 F. Supp. 3d at 1173.  Any potential flaws in this part of Affinity Labs, however, do not affect the portions of the opinion on which the Court relies.

[30]Digital rights management ("DRM") is a general term used to describe technology that controls access to copyrighted material using technological means.  See Julia Layton, How Digital Rights Management Works, http://computer.howstuffworks.com/drm1.htm.

A computer-implemented method of distributing digital content to at least one recipient computing device to be rendered by the at least one recipient computing device in accordance with usage rights information, the method comprising:

> determining, by at least one sending computing device, if the at least one recipient computing device is trusted to receive the digital content from the at least one sending computing device;

> sending the digital content, by the at least one sending computing device, to the at least one recipient computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; and

> sending usage rights information indicating how the digital content may be rendered by the at least one recipient computing device, the usage rights information being enforceable by the at least on[e] recipient computing device.

Contentguard, 142 F. Supp. 3d at 512-13.  Judge Gilstrap concluded that this claim was "directed toward patent-eligible methods and systems of managing digital rights using specific and non-generic 'trusted' devices and systems."  Contentguard, 142 F. Supp. 3d at 515.  The trusted devices and systems, he explained, are limited to devices that "maintain physical, communications, and behavioral integrity, rather than all devices that are capable to receive content via the internet."  142 F. Supp. 3d at 515.  Front Row argues that its patents also limit the handheld devices to devices "capable of receiving streaming video over the internet, rather than all devices capable of receiving content over the Internet."  Front Row's PowerPoint at 51.  The Court respectfully disagrees with Judge Gilstrap's approach to this claim.  It is difficult to imagine any form of DRM not preempted under this vague description of a limiting method for digital content.  A developer attempting to create limits on copyrighted content, for example, would likely find the limitation for "physical, communications, and behavioral integrity" prevented the vast majority of possible DRM techniques.  Contentguard, 142 F. Supp. 3d at 515.

The Court disagrees with Judge Gilstrap's conclusions in <u>SimpleAir</u> for similar reasons. <u>SimpleAir</u> involved claims "generally concerned with systems and methods for transmitting data to remote computing devices." <u>SimpleAir</u>, 136 F. Supp. 3d at 747. For example, one representative claim covered:

> A system to transmit data from an information source to remote computing devices, the system comprising:
>
>> a central broadcast server configured to receive data from at least one information source and process the received data with at least one parser; an information gateway communicatively coupled to the central broadcast server, the information gateway configured to build data blocks from the parsed data and assign addresses to the data blocks;
>>
>> a transmission gateway communicatively coupled to one or both of the central broadcast server and the information gateway, the transmission gateway configured to prepare the addressed data blocks for transmission to receivers communicatively coupled with the remote computing devices and cause the addressed data blocks to be transmitted to the receivers;
>>
>> a plurality of remote computing devices configured to receive the addressed data blocks transmitted from the transmission gateway utilizing the receivers, wherein the remote computing devices are capable of being notified of the receipt of the transmitted data blocks by the receivers whether the remote computing devices are online or offline from a data channel associated with each remote computing device.

<u>SimpleAir</u>, 136 F. Supp. 3d at 748. Judge Gilstrap concluded that the patents "are not directed toward an abstract idea, because they are directed toward patent-eligible methods and systems of 'using a central broadcast server' to package and transmit 'data from an online information source to remote computing devices.'" <u>SimpleAir</u>, 136 F. Supp. 3d at 750. As with the claim in <u>Contentguard</u>, this claim encompasses a broad swathe of human activity. It effectively claims the idea of packing and transmitting information, because supposedly "key features" -- such as a

"central broadcast server" -- recite components that any similar system would require. SimpleAir, 136 F. Supp. 3d at 750.

Fifth, many of the other district courts which have examined comparable claims have reached the same conclusions.  The representative claim in Affinity Labs was similar to the representative claims here:

> A broadcast system, comprising:
>
>> A network based resource maintaining information associated with a network available representation of a regional broadcasting channel that can be selected by a user of a wireless cellular telephone device; and
>>
>> a non-transitory storage medium including an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device:
>>
>> to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel;
>>
>> to transmit a request for the regional broadcasting channel from the wireless cellular telephone device; and to receive a streaming media signal in the wireless cellular telephone device corresponding to the regional broadcasting channel, wherein the wireless cellular telephone device is outside of a broadcast region of the regional broadcasting channel, wherein the wireless cellular telephone device is configured to receive the application via an over the air download.

Affinity Labs, 109 F. Supp. 3d at 919-20.  The claim effectively covered the abstract idea of disseminating regionally broadcasted content to users outside of a region.  See 109 F. Supp. 3d at 924.  It is very similar to Front Row's representative claims, as it includes a wireless handheld device, a storage medium, and streaming data.  See 856 Patent; 895 Patent.  The representative claim in Ultramercial IV recited eleven steps, including "receiving" media products from a

content provider, "restricting general public access" to a media product, and "facilitating the display of a sponsor message to the consumer."  772 F.3d at 712.  The Federal Circuit held that these steps, which resemble many claim elements in Front Row's representative claims, recited "an abstraction -- an idea, having no particular concrete or tangible form."   772 F.3d at 715.  The patentee's recitation of "merely novel or non-routine components to the claimed idea" did not "necessarily turn[] an abstraction into something concrete."  772 F.3d at 715.  As in Ultramercial IV, Front Row's recitation of "key limitations" does not change its abstract ideas into patent-eligible processes.  Front Row's PowerPoint at 49.

The 027 Patent's Claim 1 is also similar to the claim in Intellectual Ventures I LLC v. Capital One Bank (USA), which recited a method of "tailoring content based on the viewer's location or address."  792 F.3d at 1369.  The Federal Circuit held that the claim was directed towards an abstract idea:

> This sort of information tailoring is "a fundamental . . . practice long prevalent in our system . . . ." [Alice, 134 S. Ct. at 2356].  There is no dispute that newspaper inserts had often been tailored based on information known about the customer -- for example, a newspaper might advertise based on the customer's location.  Providing this minimal tailoring -- e.g., providing different newspaper inserts based upon the location of the individual -- is an abstract idea.

Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d at 1369.  The 027 Patent is directed to the same abstract idea -- restricting content based on a user's location.

## V.   FRONT ROW'S CLAIMS, CONSIDERED INDIVIDUALLY AND AS AN ORDERED COMBINATION, DO NOT CONTAIN ANY INVENTIVE CONCEPT.

The Court's conclusion that Front Row's claims are directed towards patent-ineligible abstract ideas does not end the inquiry.  Alice's Step 2 requires the Court to "determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  Alice, 134 S. Ct. at 2355 (quoting Mayo, 132 S. Ct. at 1297-98).  In other words, the Court must

search for an "inventive concept" -- an "element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"   Alice, 134 S. Ct. at 2355 (quoting Mayo, 132 S. Ct. at 1294)(brackets in Alice).   The Court concludes that Front Row's claims do not contain an inventive concept sufficient to make them patent-eligible.

There is no checklist of claim elements for Step 2, and Front Row's claims again do not fall squarely within the facts of any existing cases.   They do not present a solution "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."   DDR Holdings, 773 F.3d at 1257.   Nor do they represent a "software-based invention that improves the performance of the computer system itself."   Bascom, 2016 WL 3514158, at *7 (brackets omitted).   On the other hand, they do not use the exact phrase "apply it with a computer" that the Supreme Court condemned in Alice.   Alice, 134 S. Ct. at 2350.   See Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d at 1370 ("Steps that do nothing more than spell out what it means to apply it on a computer cannot confer patent-eligibility.")(internal quotations omitted).   As in Step 1, the Court will thus examine other courts' Step 2 analyses to help it determine whether Front Row's claims contain any inventive concepts.

## A.      THE 856 PATENT'S CLAIM 15 DOES NOT CONTAIN AN INVENTIVE CONCEPT.

The 856 Patent's Claim 15 does not contain any inventive concept for four reasons.   First, it adds only generic and conventional elements to the abstract idea of sending video of an event to handheld devices over wireless networks.   "[A]ppending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable."   Mayo, 132 S. Ct. at 1300.   Claim 15 mentions limitations such as a "cellular telecommunications network," a "server," a "touch-sensitive

display screen," and a "802.11 wireless module."  856 Patent at 26:46-27:7.   It requires: (i) acquiring data, such as video, at a venue; (ii) authorizing a device to receive the data; (iii) processing the data; (iv) transmitting the data; and (v) displaying the data on a handheld device. See 856 Patent at 26:46-27:7.

None of these limitations are sufficient to make the claim patent-eligible.  Its references to authorizing or authenticating data, for example, are not specific and are similar to limitations that other courts have dismissed.  See Secure Mail Sols. LLC v. Universal Wilde, Inc., No. CV157562DOCGJSX, 2016 WL 3392414, at *13 (C.D. Cal. Feb. 16, 2016)(Carter, J.)("Additionally, the Court notes that the claims' general language regarding authentication or encoding of data are not sufficiently inventive."); Kinglite Holdings Inc. v. Micro-Star Int'l Co., No. CV1403009JVSPJWX, 2015 WL 6437836, at *10 (C.D. Cal. Oct. 16, 2015)(Selna, J.)("[T]he '304 Patent claims, viewed individually and as an ordered combination, simply instruct the practitioner to implement the abstract idea of authentication with routine, conventional activity on a generic computer."); Network Apparel Grp., LP v. Airwave Networks Inc., 154 F. Supp. 3d 467, 490 (W.D. Tex. 2015)(Manske, M.J.)(describing an authentication step as "a well-understood, routine, conventional activity in the computer networking field that does not make the claim patent-eligible").  Processing data for display is similarly conventional. See CertusView Techs., LLC v. S & N Locating Servs., LLC, 111 F. Supp. 3d 688, 710 (E.D. Va. 2015)(Davis, J.)(invalidating claim as conventional and noting that it "simply involves using generic computer components to perform the conventional computer function of processing data to display an input image on a display device").  Transmitting data, even over a cellular data network, is not unconventional.   See Joao Bock Transaction Sys., LLC v. Jack Henry & Associates, Inc., 76 F. Supp. 3d 513, 523 (D. Del. 2014)(Robinson, J.)("Joao Bock").

Second, the 856 Patent's Claim 15 merely "limit[s] an abstract idea to one field of use" and "add[s] token postsolution components [that do] not make the concept patentable."  Bilski v. Kappos, 561 U.S. at 612.  See Alice, 134 S. Ct. at 2358 ("Flook stands for the proposition that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment."); Flook, 437 U.S. at 590 ("The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance.").  This claim effectively takes a subject-matter ineligible idea -- the concept of sending video of an event to handheld devices over wireless networks -- and limits it to entertainment venues.[31]

Third, considered "as an ordered combination," Claim 15's elements "add nothing . . . that is not already present when the steps are considered separately."  Alice, 134 S. Ct. at 2359. In defining this test, Alice considered whether the relevant claims "purport to improve the functioning of the computer itself or effect an improvement in any other technology or technical field."  Alice, 134 S. Ct. at 2359.  See Enfish, 822 F.3d at 1339 (recognizing that "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two").  In DDR Holdings, the Federal Circuit recognized that the claims, "taken together as an ordered combination," improved internet shopping by "overcom[ing] a problem specifically arising in the realm of computer networks."  DDR Holdings, 773 F.3d at 1265.  In Bascom, the Federal Circuit noted that the claims "may be read to improve[] an existing technological process."  Bascom, 2016 WL 3514158, at *7 (internal quotations omitted).  Front

---

[31]On a broader level, the Court questions the usefulness of a Step 2 that merely ensures that the patent does not preempt a broad swathe of the abstract idea's possible applications.  If Front Row had kept its patents the same, but focused on covering non-venue-based sports events such as the Tour de France, the claim would not be any less of an abstract idea.  Moreover, there would be no purpose in forcing defendants to pay claim construction costs to have such patents invalidated.

Row did not invent or even improve the hardware components, general processes, and other concepts on which its claims rely.  Taken as a whole, the claims do not create any new innovation, such as an improvement in online shopping, or an improved filter for web browsers.

Fourth, Claim 15 does not pass the machine-or-transformation test.  Front Row does not argue that its claims represent a novel machine.  See Ultramercial IV, 772 F.3d at 716-17 ("The claims of the '545 Patent, however, are not tied to any particular novel machine or apparatus, only a general purpose computer.")(internal citations omitted).  Although a cellular telephone or computer "is a tangible system (in § 101 terms, a 'machine')," if "that were the end of the § 101 inquiry, an applicant could claim any principle of physical or social sciences by reciting a computer system configured to implement the relevant concept."  Alice, 134 S. Ct. at 2358.  Moreover, "the Internet is not sufficient to save the patent under the machine prong of the machine-or-transformation test."  Ultramercial IV, 772 F.3d at 716.

The Court concludes that Claim 15 does not make the required transformation.  Front Row accurately notes that the transformation prong does not require any physical transformation.  It relies on In re Abele, which it says held that "the electronic transformation of the data itself into a visual depiction in Abele was sufficient; the claim was not required to involve any transformation of the underlying physical object that the data represented."  Response at 9 (quoting In re Bilski, 545 F.3d at 963)(emphasis added).  Other courts have adhered to this general principle.  See Prompt Med. Sys., L.P. v. Allscriptsmysis Healthcare Sols., Inc., No. 6:10-CV-71, 2012 WL 678216, at *5 (E.D. Tex. Feb. 13, 2012)(Davis, J.)("The Federal Circuit has explained that the transformation of raw data into a form that represents physical and tangible objects is a patent-eligible transformation of articles.").  Front Row proposes two possible transformations:

Capture and transformation of real world objects (i.e. baseball players at a MLB game) into packeted data capable of being transmitted over a wireless network via the internet to be received only by authenticated devices;

After receipt of the packeted data by authenticated devices, a second transformation into a video of the real world objects on an authenticated device's display that includes a GUI.

Front Row's PowerPoint at 56. Neither of these definitions, however, sufficiently transform the data. Claim 15 does not literally transform "real world objects," such as baseball players, into "packeted data." Front Row's PowerPoint at 56. It instead merely transmits and reproduces captured data, without altering the underlying video. See Ultramercial IV, 772 F.3d at 717 ("Any transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis."). In In re Abele, on the other hand, the claims took raw data, manipulated it to remove artifacts, and generated an improved scan image. See 684 F.2d at 909. Front Row does not cite any cases holding that merely recording or photographing a physical object transforms it into data. Under such a rule, any patent involving video or imaging would pass the machine-or-transformation test. At least one case, on the other hand, has invalidated claims based on image capture and transmission. See Affinity Labs, 2015 WL 3764356, at *25.

The Court's ruling on the overall Motion would not change even if Claim 15 satisfied the machine-or-transformation test. The machine-or-transformation test is "just an important and useful clue" for "what constitutes a 'process.'" Bilski v. Kappos, 561 U.S. at 603. See DDR Holdings, 773 F.3d at 1256 ("[T]he machine-or-transformation test, by itself, is not sufficient to render a claim patent-eligible, as not all transformations or machine implementations infuse an otherwise ineligible claim with an 'inventive concept.'")(quoting Mayo, 132 S. Ct. at 1301).

Other Federal Circuit opinions do not even discuss the test.  See Content Extraction, 776 F.3d at 1348; Planet Bingo, 576 F. App'x at 1008.

Finally, the Court concludes that a separate preemption analysis is unnecessary. Although the preemption concern "undergirds our § 101 jurisprudence," it is not a freestanding test for patent-eligibility.  Alice, 134 S. Ct. at 2358.  See Rapid Litigation, 2016 WL 3606624, at *7 ([P]re-emption is not the test for determining patent-eligibility[.]").  In Ariosa, for example, the parties disagreed on whether "the principle of preemption" is an independent argument in a § 101 challenge.  Ariosa, 788 F.3d at 1378-79.  The Federal Circuit explained that it is not:

> The Supreme Court has made clear that the principle of preemption is the basis for the judicial exceptions to patentability.  Alice, 134 S.Ct. at 2354 ("We have described the concern that drives this exclusionary principal as one of pre-emption").  For this reason, questions on preemption are inherent in and resolved by the § 101 analysis. . . .  Where a patent's claims are deemed only to disclose patent ineligible subject matter under the Mayo framework, as they are in this case, preemption concerns are fully addressed and made moot.

Ariosa, 788 F.3d at 1379.  In any case, Front Row's "token" components preempt a significant set of possible inventions.  Bilski v. Kappos, 561 U.S. at 612.  That they leave some avenues open is not dispositive.  See Ariosa, 788 F.3d at 1379 ("[T]he absence of complete preemption does not demonstrate patent eligibility."); Tenon & Groove, LLC v. Plusgrade S.E.C., No. CV 12-1118-GMS-SRF, 2015 WL 1133213, at *4 (D. Del. Mar. 11, 2015)(Sleet, J.)("Leaving open some avenues with which to practice the underlying idea, however, does not guarantee patent eligibility.").  "Instead, the focus is on whether the claim risks 'disproportionately tying up the use of the underlying' abstract idea."  Kaavo Inc. v. Cognizant Tech. Sols. Corp., No. CV 14-1192-LPS-CJB, 2016 WL 476730, at *13 (D. Del. Feb. 5, 2016)(Burke, M.J.)("Kaavo")(quoting Alice, 134 S. Ct. at 2354-55)(emphasis in Kaavo).  Front Row's claims include terms with considerable breadth, such as "venue-based activity," which would make it extremely difficult

- 131 -

for any future developer to create an application to stream data from stadiums to mobile telephones.  856 Patent at 24:39.   The Court does not "apprehend how slight -- and extremely general -- modifications . . . prevent the claims from monopolizing their underlying abstract ideas." Morsa v. Facebook, Inc., 77 F. Supp. 3d 1007, 1016 (C.D. Cal. 2014)(Staton, J.).

**B.     THE 895 PATENT'S CLAIM 1 DOES NOT CONTAIN AN INVENTIVE CONCEPT.**

The 895 Patent's Claim 1 does not contain any inventive concept.  First, Front Row's system claims are substantially similar to its method claims.  The 895 Patent's Claim 1 describes a server with: (i) memory for storing video; (ii) a processor to authenticate a hand-held device; (iii) a processor to process the video; and (iv) a port to stream the data to the hand-held device. See 895 Patent at 25:41-25:5.  These physical components merely provide a way to carry out the steps that the 856 Patent's Claim 15 lists.  See Walker Digital, LLC v. Google, Inc., 66 F. Supp. 3d 501, 511 (D. Del. 2014)(Stark, J.)("Similarly, the system claims recited in claims 23, 24, 27, 32, and 33 merely take the abstract idea of claims 1, 2, 5, 10, and 11 and list generic computer components (processor, memory) to implement the abstract idea.").   Both claims are substantially similar and directed to the abstract idea of sending video of an event to handheld devices over wireless networks.  In Alice, the Supreme Court noted that "the system claims are no different from the method claims in substance" and held that the system claims were also patent-ineligible under § 101.  134 S. Ct. at 2360.  Although the Alice patentee conceded that "its media claims rise or fall with its method claims," 134 S. Ct. at 2360, the Federal Circuit has applied the same rule absent any concessions, see Accenture, 728 F.3d at 1344 ("Because the system claim and method claim contain only minor differences in terminology [but] require performance of the same basic process, they should rise or fall together.")(citations and quotations omitted).  As one district court noted,

- 132 -

> [t]he fact that the asserted claims are apparatus claims, not method claims, does not change the court's analysis. Indeed, if that were the case, then "applying a presumptively different approach to system [or apparatus] claims generally would reward precisely the type of clever claim drafting that the Supreme Court has repeatedly instructed [the Court] to ignore."

Joao Bock, 76 F. Supp. 3d at 523 (D. Del. 2014)(quoting CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d at 1289).

Second, the system claims are ineligible even considered separately from the method claims.  The 895 Patent mentions a "server," "memory," a "processor," and a "remote hand-held device."  895 Patent at 25:41-25:5.  These basic functions are insufficient to establish an inventive concept.  In In re TLI Communications LLC Patent Litigation, the Federal Circuit considered a server that "receives data, extract[s] classification information . . . from the received data, and stor[es] the digital images . . . taking into consideration the classification information."

In re TLI Commc'ns LLC Patent Litig., 823 F.3d at 614 (quotations omitted).  It concluded:

> These steps fall squarely within our precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea. *Alice,* 134 S.Ct. at 2360 ("Nearly every computer will include a 'communications controller' and a 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."); *Content Extraction,* 776 F.3d at 1345, 1348 ("storing information" into memory, and using a computer to "translate the shapes on a physical page into typeface characters," insufficient confer patent eligibility); *Mortg. Grader,* 811 F.3d at 1324-25 (generic computer components such as an "interface," "network," and "database," fail to satisfy the inventive concept requirement); *Intellectual Ventures I,* 792 F.3d at 1368 (a "database" and "a communication medium" "are all generic computer elements"); *BuySAFE v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed. Cir. 2014)( "That a computer receives and sends the information over a network -- with no further specification -- is not even arguably inventive.").

In re TLI Commc'ns LLC Patent Litig., 823 F.3d at 614.  Front Row argues that the 895 Patent's Claim 1 is different, because it requires more specific and concrete components:

> a wireless communications data network, authentication via a specific security code, at least one remote hand held device, and a processor processing venue-based data including video captured by more than one camera into a format

suitable for streaming over a wireless data network . . . for viewing by said at least one remote hand held device.

Response at 6-7.  These additional components, however, are generic, and the claims use them in conventional ways.  As the Supreme Court explained in Alice, certain concrete components -- such as a "data storage unit" or "communications controller" -- may still be "purely functional and generic."  Alice, 134 S. Ct. at 2360.  See id. at 2351 ("The method claims recite the abstract idea implemented on a generic computer; the system claims recite a handful of generic computer components configured to implement the same idea.").  In Content Extraction, for example, the claims mentioned an "automated digitizing unit" and a computer.  776 F.3d at 1348.  The Federal Circuit described the components as "generic" and concluded that they held no inventive concept.  776 F.3d at 1348.  See Wolf v. Capstone Photography, Inc., No. 2:13-CV-09573, 2014 WL 7639820, at *12 (C.D. Cal. Oct. 28, 2014)(Snyder, J.)("The most specific piece of technology recited by the claims is still generic: a 'component worn by the sporting event participant . . . [that] trigger[s] a camera to take a photograph' by interfacing with 'a sensor' and can include 'a passive component,' a 'bar code,' an 'inductive circuit,' or an 'active component.'"); Intellectual Ventures I LLC v. Manufacturers & Traders Trust Co., 76 F. Supp. 3d at 546 n.5 (holding that references to "a telephone, pager, PDA, or the like" were generic).  That the claims discuss a generic cellular telephone rather than a generic computer does not mean that they supply an inventive concept.  See Affinity Labs, 109 F. Supp. 3d at 925 ("Claim 1 takes the abstract idea and says 'apply it' to a wireless, cellular telephone device acting as a generic computer."); Joao Bock, 76 F. Supp. 3d at 523 ("The computer components are being employed for basic functions, including storage, transmitting and receiving information[.]").

Front Row's patent specifications also show that these techniques were "well-known at the time of filing."  Content Extraction, 776 F.3d at 1348.  See, e.g., 388 Patent at 8:50-55

("[T]hose skilled in the art will appreciate that hand held device 11 can be implemented as a specific type of a hand held device, such as a Personal Digital Assistant (PDA), paging device, WAP-enabled mobile phone, and other associated hand held computing devices well known in the art."); 895 Patent at 7:32-37 (using identical phrasing); 388 Patent at 11:28 ("Transmitters are well known in the art[.]"); 895 Patent at 10:3-4 (using identical phrasing); 388 Patent at 11:51-53 ("Those skilled in the art can appreciate that touch screen interfaces are well known in the art and further explanation thereof may be not necessary."); 895 Patent at 10:27-29 (using identical phrasing); 388 Patent at 16:43-45 (discussing Cellular Digital Packet Data networks); 895 Patent at 15:12-14 (using identical phrasing); 895 Patent at 14:59-61 (mentioning Bluetooth technology).  The 895 Patent also recognizes conventional security features:

> For example, hand held television[s] are available for receiving public television broadcasts, but the basic technology can be modified on such devices so that they may be adapted to (e.g., proper authentication, filters, security codes, or the like) receive venue-based RF transmissions from at least one venue-based RF source (e.g., a wireless camera, or data from a camera transmitted wirelessly through a transmitter)(emphasis added).

895 Patent at 7:22-39.  In short, even Front Row has admitted that its claims' steps "consist of well-understood, routine, conventional activity."  Mayo, 132 S. Ct. at 1298.  As with the 856 Patent's Claim 15, the 895 Patent's Claim 1 uses generic components to "limit[] an abstract idea to one field of use." Bilski v. Kappos, 561 U.S. at 612.

Further, considering the elements in the 895 Patent's Claim 1 "as an ordered combination" does not reveal any inventive concept.  Alice, 134 S. Ct. at 2359.  The system has not overcome a problem "specifically arising in the realm of computer networks," DDR Holdings, 773 F.3d at 1265, or improved any "existing technological process," Bascom, 2016 WL 3514158, at *7.  Front Row's citation to Messaging Gateway Solutions, LLC v. Amdocs, Inc., No. CV 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 15, 2015)(Andrews, J.), is

distinguishable.  The patent in that case "solved a problem specific to the realm of computer networks in a way that was rooted in computer technology" by translating text messages from cellular telephones into messages that computers can understand.  2015 WL 1744343, at *5. Front Row's claim provides no such benefit.

Finally, the 895 Patent's Claim 1 fails the machine-or-transformation test for the reasons set out above.  The system claim recites more hardware components, but they are even less specific than the components in the 856 Patent's Claim 15.  As in <u>Ultramercial IV</u>, the components are "not tied to any particular novel machine or apparatus," 772 F.3d at 716-17, but are instead linked to a "server" that contains "processors" and "ports."  895 Patent at 25:41-25:5.

### C.   THE 027 PATENT'S CLAIM 1 DOES NOT CONTAIN AN INVENTIVE CONCEPT.

The 027 Patent's Claim 1, despite its differences from the other representative claim, does not add any inventive concept.  The claim is directed to the abstract idea of authorizing handheld devices to receive streaming video based on a user's location.  The method determines a user's location based on a handheld device's communications with a "computing device."  027 Patent at 26:12.  It then authorizes the user to receive streaming video from an entertainment video based on his or her location.  <u>See</u> 027 Patent at 26:12-35.  These steps barely recite any limitations beyond the abstract concept -- they add that the user's location is determined based on communications between a wireless handheld device and a communications network, and that the data consists of streaming video from a video camera in an entertainment video.  <u>See</u> Defendants' PowerPoint at 79.  They fail to impart an inventive concept for three reasons.

First, the 027 Patent's Claim 1 recites generic features, such as "a computing device in the form of a wireless handheld device," a "data communications network," and "a processor." 027 Patent at 26:56-67.  Just as "[n]early every computer will include a 'communications

controller' and a 'data storage unit' capable of performing [] basic calculation, storage, and transmission functions," Alice, 134 S.Ct. at 2360, practically every "computing device" will include a processor, and a "wireless handheld device" will be able to access a "data communications network," 027 Patent at 26:8-35.  See Mortgage Grader, Inc. v. First Choice Loan Servs. Inc., 811 F.3d at 1324-25 (" [T]he claims 'add' only generic computer components such as an 'interface,' 'network,' and 'database.'  These generic computer components do not satisfy the inventive concept requirement.").  Front Row's claims use these generic components in conventional ways.  They do not solve a problem unique to the Internet.  See Intellectual Ventures I LLC v. Capital One Bank (USA), 792 F.3d at 1371.

Second, the 027 Patent's Claim 1 fails to explain how the elements will accomplish their intended result.  "[T]he Federal Circuit has invalidated patents under § 101 for not qualifying as an inventive concept because it did not specify how the patent performs the steps claimed in the patent."  Affinity Labs, 109 F. Supp. 3d at 926.  Claim 1 recites that it will determine a user's location "based on communications" and "authorize" a user's device to receive streaming video, but does not explain how it will accomplish either aim.  027 Patent at 26:8-35.  See TDE Petroleum Data Solutions, Inc. v. AKM Enterprise, Inc., No. 2016-1004, 2016 WL 4271975, at *2 (Fed. Cir. Aug. 15, 2016)("As we discussed at greater length in [Electric Power], the claims of the '812 patent recite the *what* of the invention, but none of the *how* that is necessary to turn the abstract idea into a patent-eligible application.)(emphasis in original); Kaavo, 2016 WL 476730, at *12 ("Here again, reciting the step of 'determining,' without describing a sufficiently specific way of doing the 'determining,' would be simply to claim a well-known, generic function of computers.").  The complete absence of explanation here would effectively foreclose a great range of possible handheld device applications based on location.  See Internet Patents,

790 F.3d at 1348 ("As the district court observed, claim 1 contains no restriction on how the result is accomplished.").

Finally, the 027 Patent's Claim 1 does not satisfy the machine-or-transformation test. Front Row argues that the claim satisfies the machine prong, because "the claimed machine or invention is *capable of determining the location of a user*, and the receiving device is *blocked from receiving service beyond a particular geographic area*."  Front Row's PowerPoint at 79 (emphasis in original).  It cites SiRF Technologies for the proposition that "the presence of the GPS receiver in the claims places a meaningful limit on the scope of the claims."  601 F.3d at 1332-33.  These arguments are unconvincing, however, because the 027 Patent's Claim 1 does not mention a GPS receiver and the category of "handheld devices capable of working within *data communications networks* to determine a location" is not specific enough to satisfy the machine-or-transformation test.  Front Row's PowerPoint at 81 (emphasis in original).

**IT IS ORDERED** that: the requests in the Defendants' Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c), filed October 21, 2015 (Doc. 229), are granted.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*
Bryan J. Davis
William G. Gilchrist
Davis, Gilchrist & Lee, P.C.
Albuquerque, New Mexico

-- and --

Michael W. Shore
Alfonso G. Chan
Christopher L. Evans
Patrick J. Conroy
Ari Rafilson
Dustin Lo
Jennifer Rynell
Rajkumar Vinnakota
Shore Chan DePumpo LLP
Dallas, Texas

　　　*Attorneys for Plaintiff Front Row Technologies, LLC*

John R. Cooney
Emil Kiehne
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

-- and --

Alan E. Littmann
Douglas J. Winnard
Brian P. O'Donoghue
Goldman Ismail Tomaselli Brennan & Baum, LLP
Chicago, Illinois

-- and --

Cynthia J. Rigsby
Kevin J. Malaney
Foley & Lardner, LLP
Milwaukee, Wisconsin

Jason J. Keener
Foley & Lardner, LLP
Chicago, Illinois

Matthew B. Lowrie
Foley & Lardner, LLP
Boston, Massachusetts

　　　*Attorneys for Defendants Major League Baseball Properties, Inc. and MLB Advanced Media, L.P.*

David B. Weaver
Baker Botts LLP
Austin, Texas

-- and --

Andrew J. Allen
Hilary L. Preston
Temilola Sobowale
Vinson & Elkins LLP
New York, New York

Jeffrey Han
Stephen M. Hash
Vinson & Elkins LLP
Austin, Texas

 *Attorneys for Defendant NBA Media Ventures, Turner Sports Interactive, Inc., and Turner Digital Basketball Services, Inc.*

Emil Kiehne
Modrall Sperling Roehl Harris & Sisk PA
Albuquerque, New Mexico

-- and --

Eleanor M. Lackman
Joshua S. Wolkoff
Cowan DeBaets Abrams & Sheppard LLP
New York, New York

-- and --

Donna K. Schneider
San Antonio, Texas

 *Attorneys for Mercury Radio Arts, Inc., GBTV, LLC, and Premiere Radio Networks Inc.*